AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA v. ISMAEL GUTIERREZ VILAVAZO | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO. 14-0660M |

Complaint for violation of Title 21, United States Code, Section 846

| NAME OF MAGISTRATE JUDGE HONORABLE FREDERICK F. MUMM | UNITED STATES MAGISTRATE JUDGE | LOCATION Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE September 26, 2013 | PLACE OF OFFENSE Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

CLERK U.S. DISTRICT COURT
APR — 1 2014
CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. § 846]

Beginning on a date unknown and continuing until on or after September 26, 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendant ISMAEL GUTIERREZ VILAVAZO, and others known and unknown, conspired and agreed with each other to knowingly and intentionally distribute at least five grams of methamphetamine, that is, 48.6 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT MICHAEL E. ALKER /S/ |
|---|---|
| | OFFICIAL TITLE Special Agent – FEDERAL BUREAU OF INVESTIGATION |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[(1)] Frederick F. Mumm | DATE April 1, 2014 |
|---|---|

[(1)] See Federal Rules of Criminal Procedure 3 and 54

AUSA Angela Scott x6683          REC: Detention

# A F F I D A V I T

I, Michael E. Alker, being duly sworn, hereby depose and say:

1.      I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and have been so employed since August of 2008.   I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code Section 2510(7).   I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

## PURPOSE OF THE AFFIDAVIT

2.      This affidavit is being made in support of a criminal complaint and arrest warrant for Ismael Gutierrez VILAVAZO, also known as ("aka") "Ismael Gutierrez," aka "Mike Gutierrez," aka "Mikey," hereinafter referred to as "VILAVAZO," for violations of 21 U.S.C. § 846: Conspiracy to distribute methamphetamine.

3.      This affidavit is intended to show that there is sufficient probable cause for the requested criminal complaint and arrest warrant, and does not purport to set forth all knowledge of my investigation into this matter.

## TRAINING AND EXPERIENCE

4.      I am currently assigned to a squad that investigates criminal enterprises.   This squad conducts major narcotics, money laundering, kidnapping, extortion and public corruption investigations associated with transnational criminal enterprises.   This squad is comprised of Special Agents from the FBI.   As part of my work, including this investigation, I also work with Special Agents from the Drug Enforcement Administration ("DEA"), and local law enforcement personnel designated as federal Task Force Officers ("TFOs").

1

5.      From 2009 until 2013 I investigated national security matters and international terrorism in relation to violations of federal laws such as conspiracy to use weapons of mass destruction, conspiracy to murder officers and employees of the United States, money laundering, structuring, material support to terrorism, use of an explosive device to commit a felony, marriage fraud, immigration fraud, false information and hoaxes, and making false statements.   I was previously assigned to the Southern California Drug Task Force/High Intensity Drug Trafficking Area ("SCDTF/HIDTA") in Los Angeles, California.   The SCDTF/HIDTA conducts major narcotics investigations and is comprised of Special Agents from the FBI, DEA, the Bureau of Immigration and Customs Enforcement ("ICE"), the Internal Revenue Service ("IRS"), and TFOs.

6.      I have participated in investigations concerning the identification of co-conspirators through the use of telephone records and bills, financial records, photographs, and other documents.   I have directed and assisted in the handling of confidential sources to gather intelligence through various methods to include consensual recordings.   I have executed search warrants for controlled substances and I have conducted physical surveillance in connection with narcotics investigations.   I have also conducted investigations in which I have used Global Positioning System ("GPS") information to locate and track persons who are the subjects of criminal investigations.

7.      Based upon my experience and training with the FBI as well as conversations that I have had with other, more experienced agents and law enforcement officers who specialize in narcotics investigations, I am familiar with the methods utilized in narcotics-trafficking operations and the trafficking patterns employed by narcotics organizations.   I have also spoken with agents, as well as other law enforcement officers, about their experiences and the results of their investigations and interviews.   Through my conversations with these agents and other law

enforcement officers, I am knowledgeable in the methods and modes of narcotics operations and the language patterns typical of narcotics trafficking.   Based on my training and experience, I know that narcotics traffickers often use coded language when discussing narcotics trafficking activities, and I have participated in narcotics investigations in which I have deciphered monitored calls containing coded language.   I have become familiar with the methods of operation typically used by narcotics traffickers.   I know that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances.   I know that professional narcotics operations depend upon maintaining timely long-distance and local contacts with the original suppliers and those down the organizational chain to the local traffickers.   The telephone enables narcotics traffickers to maintain contact with narcotics associates, narcotics suppliers, and narcotics customers.   I also know that narcotics traffickers often use fraudulent information to subscribe to communication facilities, especially cellular telephones, and frequently change communication facilities to thwart law enforcement efforts to intercept their communications.   I also know that narcotics traffickers frequently use pre-paid telephones with misleading subscriber information as a way of insulating themselves from criminal liability.

8.     The basis of the opinions and conclusions set forth below are drawn from my training, my experience with the FBI, my participation in the investigations of narcotics organizations, my conversations with FBI SA Richard J. Brooks, FBI SA Cody Burke, FBI SA Christopher N. Miner, FBI SA Suzanne Gertler, FBI SA Jeremy Stebbins, Los Angeles Police Department ("LAPD") Detectives Efren Gutierrez, Juan Santa and Jim Edwards and my conversations with other agents of the FBI, DEA, IRS, and other state and local law enforcement

3

officers familiar with narcotics trafficking and money laundering matters.

## STATEMENT OF PROBABLE CAUSE

*I.*      ***Basis for Facts Set Forth in this Affidavit***

9.      I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation. Conclusions I have reached are based on my training, experience, and upon information I believe to be reliable from the following sources:

   a.   Oral and written reports about this investigation, which I have received from other federal agents and other law enforcement agencies;

   b.   Physical surveillance conducted by federal agents or local law enforcement agencies, which has been reported to me either directly or indirectly;

   c.   Information from a Confidential Source (hereinafter, "CS-1") [1]; and

   d.   Law enforcement and public databases and records.

10.     Unless otherwise noted, when I assert that a statement was made, I have personal knowledge of the information or I received the information from a law enforcement officer who provided the information to me, either verbally or in a written report.   The officer had personal knowledge of the information or received it from another law enforcement officer with personal knowledge of the information.

---

[1] CS-1 is a newly-developed CS who recently began giving information to the LAPD and the FBI.   CS-1 originally approached law enforcement and offered to assist due to concerns that CS-1 had about VILAVAZO's alleged criminal activity.   CS-1 was introduced to VILAVAZO in the past two years and has provided information to law enforcement about VILAVAZO and his organization that has been corroborated by a murder investigation and the drug trafficking activities of VILAVAZO.   CS-1 has received compensation from the FBI.   CS-1 has also received minimal compensation from the LAPD for operational expenses incurred while assisting the FBI and LAPD.   CS-1 has no documented criminal history.   Based on my training, experience, knowledge of this investigation and my conversations with LAPD Detective Efren Gutierrez regarding the aforementioned murder investigation, I believe CS-1 to be reliable.

4

## II.    Identification of VILAVAZO

11.    As further discussed below, CS-1 has met in person with VILAVAZO on numerous occasions and has positively identified the person CS-1 knows as VILAVAZO to be the same VILAVAZO with whom CS-1 spoke on the telephone calls that are set forth below.   VILAVAZO has been further identified by Department of Motor Vehicle records and analysis of telephone records.

## III.    September 26, 2013 Purchase of Methamphetamine

12.    CS-1 provided me with the following information:   On September 19, 2013, CS-1 sent VILAVAZO a text message stating that CS-1 "needed some of what I told you about last time."   CS-1 informed me that this was a reference to narcotics. [2]   Later that day, VILAVAZO asked CS-1 (a mechanic) to repair a vehicle.   CS-1 agreed and, after making the repairs, asked VILAVAZO about selling narcotics for VILAVAZO.   VILAVAZO told CS-1 that he had two pounds of methamphetamine, but had given the methamphetamine to someone else to hold for him because VILAVAZO felt that he was under close scrutiny for a recent murder.   VILAVAZO told CS-1 that he was not "slinging" anymore, but instead said he was spreading his two pounds of methamphetamine out.   VILAVAZO told CS-1 to contact him the next day and he would introduce CS-1 to the person who was holding the drugs for VILAVAZO.   VILAVAZO also asked CS-1 how quickly CS-1 could sell an ounce of methamphetamine to which CS-1 replied, "three days."

    a.   Based on my training and experience and my knowledge of this investigation,

---

[2] The conversations, text messages, and telephone calls described in this affidavit are not necessarily the entire conversation, nor are they necessarily the final exact verbatim transcript of each call.   The intercepted conversations used in this affidavit have been translated from Spanish and summarized/transcribed by Spanish speaking monitors and agents, but fully transcriptions have not been finalized.   Bracketed information in quotations has been inserted by me to provide context for the conversation or described coded language, based on the context of the communications, my training and experience, and my knowledge of the investigation.

including subsequent debriefs of CS-1, I believe that when VILAVAZO said he was not "slinging" anymore, VILAVAZO meant that he was not conducting smaller-quantity transactions of methamphetamine.   I also believe that when VILAVAZO told CS-1 that he would introduce CS-1 to the person who was holding the drugs for VILAVAZO, VILAVAZO may have been referring to the unnamed co-conspirator, who, as set forth below, sold methamphetamine to CS-1 on September 26, 2013 (this unnamed co-conspirator will be hereinafter referred to as "John Doe").

13.     On September 25, 2013, at approximately 3:22 p.m., CS-1 made a consensually recorded telephone call with VILAVAZO, to coordinate a future narcotics transaction.   During the conversation, CS-1 said, "Well, hey, they [John Doe] haven't called me."   VILAVAZO responded saying "I'm going to call the guy [John Doe] so you can go with him [purchase methamphetamine from John Doe]."   CS-1 responded saying, "….I need the work [methamphetamine].   You know I told you a while ago."   VILAVAZO said, "Look, let me – it's just that he [John Doe] said that – that he wants you to pay all of it, man [pay for all of the methamphetamine at once]."   CS-1 continued, "No, well, I'm going to – but look, but who am I going to make the deal with, with you or with him [John Doe]?"   VILAVAZO responded saying, "With him [John Doe].   You – you're going to deal with him."   CS-1 said, "I want the job [to purchase the methamphetamine], but listen, you know that I know you, I – I don't know him [John Doe]."   VILAVAZO said, "No, but that's why, but they – they're my people [John Doe is an associate of VILAVAZO's], well, only." VILAVAZO responded saying, "The thing is I'm not – I'm not doing that.   That's why I'm just passing it on to him [John Doe] so [Unintelligible (hereinafter "UI")]."   CS-1 responded, "Okay, so, uh, are you going to send me the number [for

6

John Doe] or what?"   VILAVAZO said, "Yeah, let – let me call him [John Doe] and I'm going to tell him to call you."   CS-1 and VILAVAZO subsequently ended the call.

      a.   Based upon my training, experience, knowledge of this investigation and my subsequent debrief of CS-1, I believe that, in this call, CS-1 informed VILAVAZO that VILAVAZO's narcotics associate, who I believe from subsequent events to be John Doe, had not yet called CS-1 to sell methamphetamine.   Based upon my training, experience, information provided by CS-1, statements made by John Doe to CS-1, and my knowledge of this investigation, I believe that when VILAVAZO told CS-1, "The thing is I'm not – I'm not doing that.   That's why I'm just passing it on to him [John Doe] so [UI]," VILAVAZO was referring to conducting smaller-quantity transactions of methamphetamine.   In this call, CS-1 expressed concern that CS-1 did not know John Doe and wanted to confirm that CS-1 was going to purchase methamphetamine from John Doe.   VILAVAZO reassured CS-1 that John Doe was an associate of his and that VILAVAZO would have John Doe call CS-1 in the future for the purposes of coordinating the narcotics transaction.

14.    On September 25, 2013, at approximately 3:53 p.m., CS-1 made a telephone call with VILAVAZO, which was consensually recorded.   During the conversation, VILAVAZO said "He – he's [John Doe] is working right now, man.   He gets off until [at] 4:00." CS-1 subsequently asked, "Where are you?"   VILAVAZO responded, saying, "I'm far." VILAVAZO subsequently said, "when he [John Doe] goes to work right now, uh, he – he's going to call me and that – that's when I'll tell him [John Doe] to call you."   CS-1 responded, "Yeah, I need it [methamphetamine], because, the truth is, well, I have some – some people that needs – well, that wants that stuff

[methamphetamine] and you know that if not [if John Doe does not call]...."   VILAVAZO

responded, "Yeah."   CS-1 said, "— the client will leave."   VILAVAZO later said, "As soon as he

[John Doe] gets off I'll call him and..."   CS-1 responded, "And what? Are you going to be there,

because I don't know him [John Doe], and the thing is to do the deal with you and with him [John

Doe], too, at the same time."   VILAVAZO responded, "It-it's the same thing [dealing with John

Doe is the same as dealing with me], he's [John Doe is] my nephew."   CS-1 responded, "Oh, he's

your nephew?"   And VILAVAZO responded, "yeah."

    a.  Based upon my training, experience, knowledge of this investigation, including my subsequent debrief of CS-1, I believe that in the call above, VILAVAZO explained to CS-1 that John Doe had not called CS-1 because John Doe was working, but that VILAVAZO would call John Doe.   VILAVAZO assured CS-1 that dealing with John Doe is "the same thing" as dealing with VILAVAZO because John Doe is VILAVAZO's nephew.   Thus, I believe that that John Doe is a member of VILAVAZO's DTO, but that John Doe handles smaller drug quantity.

15.    At 4:58 p.m., toll records show that John Doe contacted VILAVAZO.   Two minutes later, at 5:00 p.m., John Doe contacted CS-1, told CS-1 that he was VILAVAZO's relative, that VILAVAZO had given him CS-1's number, and asked if CS-1 was interested in purchasing narcotics.   This call was not recorded, CS-1 called me immediately after this call to inform me about it and I again debriefed CS-1 about the call the following day.

    a.  Based on my training and experience and my knowledge of the investigation, I believe that during the telephonic contact between John Doe and VILAVAZO shown in the toll records, it is likely that VILAVAZO told John Doe that CS-1 was looking to purchase methamphetamine and directed John Doe to contact CS-1 in

8

order to sell CS-1 methamphetamine.   This is further evidenced by the fact that John Doe called CS-1 within two minutes of John Doe's telephonic contact with VILAVAZO.

16.   CS-1 contacted VILAVAZO several times in the early evening of September 26, 2013, but did not reach him.   At 6:10 p.m., VILAVAZO returned CS-1's call and CS-1 informed him that John Doe's phone had been disconnected.   This call was recorded.   VILAVAZO and CS-1 spoke again about 30 minutes later, and CS-1 asked VILAVAZO to tell John Doe to lower the price of the methamphetamine because the price that John Doe had previously quoted was higher than the price that VILAVAZO and CS-1 had initially discussed.   This call was also recorded.   The majority of VILAVAZO's responses to CS-1's demands and questions during this call were unintelligible to the interpreters transcribing these calls.   CS-1 reviewed the transcripts and informed me about what CS-1 recalled VILAVAZO saying during the call.   Specifically, CS-1 told me that VILAVAZO agreed to tell John Doe to lower the price of the methamphetamine.

17.   During a subsequent consensually recorded call and various text messages, CS-1 and John Doe arranged the drug deal.   The majority of John Doe's side of the conversation was unintelligible to the interpreters transcribing these calls.   CS-1 reviewed the transcripts and informed me about what CS-1 recalled John Doe saying during the call.   Notably, CS-1 recalled that when CS-1 told John Doe that he had already negotiated a lower price with VILAVAZO for the two ounces of methamphetamine, John Doe told CS-1 to check out the methamphetamine and, if CS-1 liked it, John Doe would provide it to CS-1 for the lower price.

18.   At approximately 8:00 p.m. that evening, CS-1 met with a man later identified as John Doe in a restaurant parking lot in North Hollywood.   The meeting was recorded and observed by agents; however it was too dark for agents to clearly see John Doe.   John Doe was in

a white Chrysler Sedan and, according to CS-1, John Doe had his three-year-old son in the back seat of the car.

19.      During the conversation, CS-1 asked "are you working with Mike (VILAVAZO) … or is this your work."   John Doe responded, "this one … is from the same company."   John Doe later stated, "Mike (VILAVAZO) does not sell small ones… I'm the one in charge selling it like this."   Later, when CS-1 inquired about whether John Doe had a connection for "soda" (cocaine), John Doe responded, "I don't have it but … the one that works with me … we are all one hand … one finger of the hand."

   a.   Based on my training and experience and my knowledge of this investigation, I believe that John Doe's statements about "same company" and "one finger of the hand" indicate that VILAVAZO and John Doe are likely part of the same drug trafficking organization.

20.      John Doe charged CS-1 $950 for two bags containing what was later determined to be 55.9 grams of 87% pure methamphetamine (48.6 grams of actual methamphetamine).   CS-1 only had $20 bills, so CS-1 paid John Doe $960 and John Doe agreed to credit CS-1 the $10 toward his next methamphetamine purchase.   This information was reported by CS-1 and is corroborated by the audio recording.

21.      CS-1 described John Doe as a Hispanic male who appeared to be approximately 23 years old, 5'9" tall, weighed 160 pounds and had dark skin and black hair.   Immediately after the meeting, agents showed CS-1 a DMV photograph of the man to whom LAPD officers thought the Chrysler was registered.   CS-1 identified the man in this photograph as the person with whom CS-1 had purchased the narcotics.   Ultimately, however, agents discovered that (1) the man who was originally shown to CS-1 was not actually the registered owner of the Chrysler; and (2) the

registered owner of the Chrysler did not look like the person from whom CS-1 purchased the methamphetamine.   After further investigation including several surveillances, I presented CS-1 with the person who agents had repeatedly seen driving the Chrysler since the drug deal.   CS-1 recanted his original identification and identified the man in the surveillance photograph (later identified as John Doe) as the man who sold CS-1 the methamphetamine.

22.   On October 7, 2013, during a consensually recorded call, CS-1 contacted VILAVAZO to inform VILAVAZO that CS-1's customers liked the methamphetamine that John Doe provided to him and CS-1 wanted to purchase half a pound.   In an attempt to purchase methamphetamine from VILAVAZO and because John Doe previously told CS-1 that John Doe dealt in smaller quantities, CS-1 contacted VILAVAZO directly to attempt to purchase this larger quantity.   The following are two excerpts from that the conversation:

   ...

| | |
|---|---|
| CS-1: | No, well, uhm, you see, the thing your nephew gave me [noise] is good, man. |
| VILAVAZO: | Really? |
| CS-1: | Yes.   No, it's good, but I need a little more because people are—are now asking me for it and I have a buyer who's going to give me ... |
| VILAVAZO: | Call my – my nephew, man. |

| | |
|---|---|
| CS-1: | No, but could I make arrangements with him regarding mm ... Well, I really want half ou—half—half a pound. |
| VILAVAZO: | Uhm .. |
| CS-1: | But because, okay, I know he – the one who |
| VILAVAZO: | Look, let—let—let me get there. |
| CS-1: | Where to? |
| VILAVAZO: | I'll get there tomorrow. |
| CS-1: | Oh, really? |
| VILAVAZO: | Yes, I'll get there tomorrow.   I'm just ... I-I'm in Oklahoma right now. |
| CS-1: | Okay. |
| VILAVAZO: | I'll get there tomorrow.   I already ... But call him if you need a little bit because I think he has a little bit left. |
| CS-1: | No, no, well, I don't want a little bit because since it turned out good, people are buying from me and stuff.   Uhm, I need half a – a |

11

pound, man.
VILAVAZO:  Yeah. Let me – I'll – I'll get there tomorrow.
....
CS-1:         How much is half a pound more or less?
VILAVAZO:  Um, well, I'm giving half ...
CS-1:         But I want it to be good like the one—the one they gave me, man.
VILAVAZO:  No, good, well, good, good.   I'll give you all of it guaranteed.

a.  Based on my training and experience and my knowledge of this investigation, I

believe that this conversation shows that VILAVAZO was aware of the drug deal

that occurred between John Doe and CS-1, that VILAVAZO was aware of the

quantities of methamphetamine that John Doe had in his possession, and that

VILAVAZO can and does supply larger (here, half pound) quantities of

methamphetamine.

//
//
//

12

## CONCLUSION

23.     I believe that the facts contained in this affidavit provide probable cause to believe

that beginning on a date unknown and continuing until on or after September 26, 2013, in Los

Angeles County, within the Central District of California, Ismael Gutierrez VILAVAZO, the

unnamed co-conspirator identified herein as John Doe, and others unknown, conspired and agreed

with each other to knowingly and intentionally distribute at least five grams, that is 48.6 grams, of

methamphetamine, a schedule II controlled substance in violation of 21 U.S.C. §§ 841(a)(1),

(b)(1)(B)(viii).


_____/s/_____

Michael E. Alker
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me
on this  1st  day of April 2014.

Frederick F. Mumm
_____
UNITED STATES MAGISTRATE JUDGE

13