STEPHANIE YONEKURA
Acting United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
KIMBERLY D. JAIMEZ (Cal. Bar No. 271235)
MICHAEL O. AZAT (Cal Bar No. 278409)
Assistant United States Attorney
General Crimes Section
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3779
     Facsimile: (213) 894-0141
     E-mail:    kimberly.jaimez@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>         v.<br><br>ISMAEL GUTIERREZ VILAVAZO,<br>  aka "Ismael Gutierrez,"<br>  aka "Mike Gutierrez,"<br>  aka "Mikey",<br><br>        Defendant. | No. CR 14-00209-TJH<br><br><u>TRIAL MEMORANDUM</u><br><br>Trial Date: November 25, 2014<br>Time:        10:00 a.m.<br>Location:   Courtroom of the<br>              HON. TERRY J.<br>              HATTER, JR. |

     Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Kimberly D. Jaimez and Michael O. Azat, hereby files its trial memorandum.

//

//

//

The government reserves the right to supplement its trial memorandum, if necessary.

Dated: November 20, 2014          Respectfully submitted,

                                  STEPHANIE YONEKURA
                                  Acting United States Attorney

                                  ROBERT E. DUGDALE
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                     /s/ Kimberly D. Jaimez
                                  KIMBERLY D. JAIMEZ
                                  MICHAEL O. AZAT
                                  Assistant United States Attorney

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                                 <u>PAGE</u>

TABLE OF AUTHORITIES.................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    STATUS OF THE CASE............................................1

      A.    Procedural Background...................................1

      B.    Government's Case-in-Chief..............................1

      C.    Stipulations............................................2

II.   THE INDICTMENT................................................3

      A.    Count One: Conspiracy to Distribute Methamphetamine,
            21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(viii)............3

      B.    Count Two: Aiding and Abetting Distribution of
            Methamphetamine, 21 U.S.C.§§ 841(a)(1),
            (b)(1)(A)(viii); 18 U.S.C. § 2(a)......................4

      C.    Counts Three-Eight: Use of a Communication Facility in
            the Commission of a Felony, 21 U.S.C. § 843(b)...........6

III.  STATEMENT OF FACTS............................................6

      A.    September 19, 2013 Communications.......................7

      B.    September 25, 2013 Communications.......................8

      C.    September 26, 2013 Communications......................10

      D.    Meeting & Purchase.....................................11

      E.    October 7, 2013........................................13

      F.    818-263-3398...........................................13

      G.    Other Evidence.........................................13

            1.    State Search Warrant.............................14

            2.    Previous Statements by Defendant.................14

IV.   EVIDENTIARY AND LEGAL ISSUES.................................14

      A.    Recorded Conversations.................................14

            1.    Foreign Language Transcripts.....................15

            2.    Voice Identification.............................17

**<u>TABLE OF CONTENTS (CONTINUED)</u>**

<u>DESCRIPTION</u>                                                                                    <u>PAGE</u>

        3.   Audio Recordings.................................18

B.   Statements by the Defendant and the CI in the Video and Audio Recordings are Admissible Non-Hearsay..........20

C.   Co-Conspirator Statements are Admissible Non-Hearsay.....21

D.   Pinkerton & Vicarious Liability..........................24

E.   Physical Evidence and Photographs........................25

F.   Opinion Testimony Pursuant to Fed. R. Evid. 701 & 702....26

        1.   Lay Testimony Involving Opinions Based on Particularized Knowledge of a Subject...............27

        2.   Expert Evidence...................................29

G.   Cross-Examination of Defendant...........................32

H.   Charts and Summary Witnesses.............................34

I.   Duplicates..............................................36

J.   Business Records........................................37

        1.   Foundational Requirements.........................37

        2.   "Qualified Witness"...............................37

        3.   Circumstances of Preparation......................38

        4.   Authentication by Declaration.....................39

K.   Reciprocal Discovery....................................39

## **TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                                    <u>PAGES</u>

CASES

<u>Bourjaily v. United States</u>,
     483 U.S. 171 (1987).........................................21, 22

<u>Crawford v. Washington</u>,
     541 U.S. 36 (2004)...........................................21

<u>Gallego v. United States</u>,
     276 F.2d 914 (9th Cir. 1960).................................26

<u>La Porta v. United States</u>,
     300 F .2d 878 (9th Cir. 1962)................................37

<u>Ohler v. United States</u>,
     529 U.S. 753 (2000)..........................................32

<u>Pinkerton v. United States</u>,
     151 F.2d 499(5th Cir. 1945),.................................24

<u>Sendejas v. United States</u>,
     428 F.2d 1040 (9th Cir. 1970)................................23

<u>United States v . Franco</u>,
     874 F.2d 1136 (7th Cir. 1989)............................37, 38

<u>United States v. Alexander</u>,
     48 F.3d 1477 (9th Cir. 1995).............................34, 35

<u>United States v. Andressan</u>,
     813 F.2d 1450 (9th Cir. 1987)................................30

<u>United States v. Arambula-Ruiz</u>,
     987 F.2d 599 (9th Cir. 1993).................................23

<u>United States v. Basey</u>,
     613 F.2d 198 (9th Cir. 1979).................................38

<u>United States v. Beltran-Rios</u>,
     878 F.2d 1208 (9th Cir. 1989)................................30

<u>United States v. Black</u>,
     767 F.2d 1334 (9th Cir. 1985)............................25, 33

<u>United States v. Blackwood</u>,
     878 F.2d 1200 (9th Cir. 1989)............................19, 25

<u>United States v. Bland</u>,
     961 F.2d 123 (9th Cir. 1992).................................37

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                    <u>PAGE</u>

<u>United States v. Catabran</u>,
    836 F.2d 453 (9th Cir. 1988)...................................38

<u>United States v. Cerone</u>,
    830 F.2d 938 (8th Cir. 1987)...................................17

<u>United States v. Childs</u>,
    5 F .3d 1328 (9th Cir. 1993)...................................37

<u>United States v. Chu Kong Yin</u>,
    935 F.2d 990 (9th Cir. 1991)...................................25

<u>United States v. Collicott</u>,
    92 F.3d 973 (9th Cir. 1996)....................................21

<u>United States v. Cook</u>,
    794 F.2d 561 (10th Cir. 1986)..................................17

<u>United States v. Crespo de Llano</u>,
    838 F.2d 1006 (9th Cir. 1987)..................................22

<u>United States v. Cuozzo</u>,
    962 F.2d 945 (9th Cir. 1992)...................................33

<u>United States v. DeLeon</u>,
    187 F.3d 60 (1st Cir. 1999)....................................16

<u>United States v. DePeri</u>,
    778 F.2d 963 (3d Cir. 1985)....................................35

<u>United States v. Douglass</u>,
    780 F.2d 1472 (9th Cir. 1986)..................................24

<u>United States v. Echeverry</u>,
    759 F.2d 1451 (9th Cir. 1985)..................................23

<u>United States v. Espinosa</u>,
    827 F.2d 604 (9th Cir. 1987)...................................30

<u>United States v. Estrada</u>,
    430 F.3d 606 (2d Cir. 2005)....................................34

<u>United States v. Fernandez</u>,
    839 F.2d 639 (9th Cir. 1988)...................................20

<u>United States v. Fuentes-Montijo</u>,
    68 F.3d 352 (9th Cir. 1995)...............................15, 16

<u>United States v. Gardner</u>,
    611 F.2d 770 (9th Cir. 1980)...................................36

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                                <u>PAGE</u>

<u>United States v. Gil</u>,
    58 F.3d 1414 (9th Cir. 1995)...................................22

<u>United States v. Gonzalez</u>,
    319 F.3d 291 (7th Cir. 2003)...................................16

<u>United States v. Graham</u>,
    643 F.3d 885 (11th Cir. 2011)..................................28

<u>United States v. Hagege</u>,
    437 F.3d 943 (9th Cir. 2006)...................................39

<u>United States v. Hankey</u>,
    203 F.3d 1160 (9th Cir. 2000)..................................29

<u>United States v. Harrington</u>,
    923 F.2d 1371 (9th Cir. 1991)..................................26

<u>United States v. Hathaway</u>,
    798 F .2d 902 (6th Cir. 1986)..................................38

<u>United States v. Huber</u>,
    772 F.2d 585 (9th Cir. 1985)...................................38

<u>United States v. King</u>,
    472 F.2d 1 (9th Cir. 1972).....................................25

<u>United States v. Lechuga</u>,
    888 F.2d 1472 (5th Cir. 1989)..................................24

<u>United States v. Llinas</u>,
    603 F.2d 506 (5th Cir. 1979)...................................16

<u>United States v. Loya</u>,
    807 F.2d 1483 (9th Cir. 1987)..................................22

<u>United States v. Martinez-Martinez</u>,
    369 F.3d 1076 (9th Cir. 2004)..............................33, 34

<u>United States v. Matta-Ballesteros</u>,
    71 F.3d 754(9th Cir. 1995),....................................19

<u>United States v. Meyers</u>,
    847 F.2d 1408 (9th Cir. 1988)..................................35

<u>United States v. Milkiewicz</u>,
    470 F.3d 390 (1st Cir. 2006)...................................36

<u>United States v. Miller</u>,
    664 F.2d 94 (5th Cir. 1981)....................................24

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

United States v. Miranda-Uriarte,
        649 F.2d 1345 (9th Cir. 1981)...................................33

United States v. Murillo,
        255 F.3d 1169 (9th Cir. 2001)...................................30

United States v. Noushfar,
        78 F.3d 1442 (9th Cir. 1996)....................................16

United States v. Ortega,
        203 F.3d 675 (9th Cir. 2000)....................................20

United States v. Perez,
        658 F.2d 654 (9th Cir. 1981)....................................21

United States v. Plunk,
        153 F.3d 1011(9th Cir. 1998),...................................17

United States v. Ray,
        930 F .2d 1368 (9th Cir. 1990)..................................37

United States v. Roe,
        606 F.3d 180 (4th Cir. 2010)....................................27

United States v. Rrapi,
        175 F.3d 742 (9th Cir. 1999)....................................18

United States v. Rubino,
        431 F.2d 284 (6th Cir. 1970)....................................36

United States v. Santiago,
        560 F.3d 62 (1st Cir. 2009).....................................27

United States v. Santiago,
        837 F.2d 1545 (11th Cir. 1988)..................................24

United States v. Scales,
        594 F.2d 558 (6th Cir. 1979)....................................35

United States v. Schmit,
        881 F.2d 608 (9th Cir. 1989)....................................23

United States v. Smith,
        609 F.2d 1294 (9th Cir. 1979)...................................38

United States v. Smith,
        893 F.2d 1573 (9th Cir. 1990)...................................37

United States v. Spawr Optical Research, Inc.,
        685 F.2d 1076 (9th Cir. 1982)...................................22

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                        PAGE

United States v. Sutherland,
     656 F.2d 1181 (5th Cir. 1981)..................................16

United States v. Taghipour,
     964 F.2d 908 (9th Cir. 1992)...................................16

United States v. Thomas,
     887 F.2d 1341 (9th Cir. 1989)..................................24

United States v. Tille,
     729 F.2d 615 (9th Cir. 1984)...............................23, 24

United States v. Tisor,
     96 F.3d 370 (9th Cir. 1996)....................................18

United States v. Torres,
     908 F.2d 1417 (9th Cir. 1990)..................................17

United States v. Turner,
     528 F.2d 143 (9th Cir. 1975)...............................16, 17

United States v. Vera,
     2014 WL 5352727................................................30

United States v. VonWillie,
     59 F.3d 922 (9th Cir. 1995)....................................28

United States v. Weaver,
     594 F.2d 1272 (9th Cir. 1979)..................................21

United States v. Yarbrough,
     852 F.2d 1522 (9th Cir. 1988)..................................23

United States v. Young,
     248 F.3d 260 (4th Cir. 2001)...................................39

United States v. Zavala-Serra,
     853 F.2d 1512 (9th Cir. 1988)..............................22, 23

STATUTES

18 U.S.C. § 2(a)............................................... 3, 4

21 U.S.C. § 843(b)............................................ 3, 5

21 U.S.C. §§ 841(a)(1)...........................................3

21 U.S.C. §§ 846................................................ 3

8 U.S.C. § 1326(a)..............................................32

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

RULES

Fed. R. Evid. 1003....................................................36

Fed. R. Evid. 1006....................................................34

Fed. R. Evid. 104(a)..................................................21

Fed. R. Evid. 611(a)..................................................35

Fed. R. Evid. 701.................................................26, 27

Fed. R. Evid. 701 & 702.............................................. 25

Fed. R. Evid. 702.....................................................28

Fed. R. Evid. 703.....................................................28

Fed. R. Evid. 704.....................................................28

Fed. R. Evid. 801(c)..................................................19

Fed. R. Evid. 801(d)(2)...............................................19

Fed. R. Evid. 801(d)(2)(A)............................................19

Fed. R. Evid. 801(d)(2)(E)............................................20

Fed. R. Evid. 803(6)..................................................36

Fed. R. Evid. 901.....................................................25

Fed. R. Evid. 901(a)..................................................24

Fed. R. Evid. 901(b)(5)...........................................16, 17

Fed. R. Evid. 902(11).................................................38

Federal Rules of Criminal Procedure 12.1..............................39

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   STATUS OF THE CASE**

  **A.   Procedural Background**

  1.   Trial is set for November 25, 2014.

  2.   Estimated time for trial is 2-3 days.

  3.   Pending before the Court is the defense's Application for Order for Hearing Re: Second Confidential Source (CS-2) Discovery (Dkt No. 93) and the government's Response in Opposition (Dkt No. 95).  These matters are scheduled for hearing on November 21, 2014.

  4.   Defendant Ismael Gutierrez Vilavazo ("Defendant") is detained pending trial.

  5.   On September 22, 2014, the government dismissed the indictment as against co-defendant Jorge Beristain Huerta, also known as "Moreno" (hereinafter "Moreno").

  6.   As of this filing, trial by jury has not been waived.

  7.   The Defendant has not given notice of any intent to rely on the defenses of mental incapacity, entrapment, duress, or alibi.

  8.   An interpreter will be required at trial to translate the testimony of one Spanish speaking witness.

  **B.   Government's Case-in-Chief**

  The government anticipates calling approximately 16 witnesses at trial (depending on stipulations reached by the parties) including (i) law enforcement officers concerning consensual recordings, surveillance, the execution of a search warrant, and the Defendant's arrest, (ii) percipient witnesses concerning the controlled narcotics purchase in question, (iii) expert witnesses regarding drug trafficking practices, chemical analysis of purchased and recovered narcotics, Spanish language translation, voice identification,

telephone personal access code usage by inmates at the Metropolitan
Detention Center, Los Angeles ("MDC"), forensic analysis of seized
cellular devices, and the plotting of cell-site and global
positioning satellite information from the cellular devices, and (iv)
custodians of records for certain exhibits that the government
intends to introduce.

  **C. Stipulations**

  The government has proposed the following factual stipulations
to streamline the proof offered at trial:

  1. A stipulation regarding the expected testimony of (a) DEA
chemist Edward Kovacs regarding the content and weight of the
methamphetamine purchased from Defendant on September 26, 2014, and
(b) DEA chemist Trevor Equitz regarding the methamphetamine residue
found on the digital scale recovered from the Defendant's vehicle on
January 16, 2014, pursuant to a search warrant;

  2. A stipulation regarding the content recovered from Moreno's
iPhone following forensic analysis, including certain photographs,
message history, and browsing history;

  3. A stipulation regarding the accuracy and admissibility of
the transcripts and translations of Spanish language;

  4. A stipulation regarding the testimony of Bureau of Prisons
("BOP") Special Investigator Joshua Halstead concerning the
unauthorized use of telephonic personal access codes by MDC inmates;
and

  5. A stipulation regarding the authenticity and admissibility
of custodian of business records certifications and/or declarations.

//
//

## II.  THE INDICTMENT

The Defendant was indicted on April 10, 2014 (Dkt. No. 6). The indictment charges the Defendant with eight counts. Count One charges the Defendant with Conspiracy to Distribute Methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B)(viii). Count Two charges the Defendant with Aiding and Abetting the Distribution of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii), and 18 U.S.C. § 2(a). Counts Three through Eight charge the Defendant with Use of a Communication Facility in the Commission of a Felony in violation of 21 U.S.C. § 843(b).

### A.  Count One: Conspiracy to Distribute Methamphetamine, 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(viii)

The elements of Count One are: (1) The conspiracy, agreement, or understanding to distribute methamphetamine, as described in the indictment, was formed, reached, or entered into by two or more persons; (2) at some time during the existence or life of the conspiracy, agreement, or understanding, the Defendant knew the purpose(s) of the agreement; and (3) with knowledge of the purpose(s) of the conspiracy, agreement, or understanding, the Defendant then deliberately joined the conspiracy, agreement, or understanding. See O'Malley, Grenig & Lee, Federal Jury Practice and Instructions, § 31:03 (6th ed. 2008) (hereinafter, "O'Malley Instructions") (modified to remove 'overt act' requirement for 18 U.S.C. § 846).

The term "to distribute", as used in these instructions, means to deliver or to transfer possession or control of something from on person to another.  The term "to distribute" includes the sale of something by one person to another. See id. § 64:03.

3

1    Before the jury may find that the Defendant, or any other
2    person, became a member of the conspiracy charged in Count One of the
3    indictment, the evidence in the case must show beyond a reasonable
4    doubt that the Defendant knew the purpose or goal of the agreement or
5    understanding and then deliberately entered into the agreement
6    intending, in some way, to accomplish the goal or purpose by this
7    common plan or joint action. See id. § 31:05.

8    Merely associating with others and discussing common goals, mere
9    similarity of conduct between or among such persons, merely being
10   present at the place where a crime takes place or is discussed, or
11   even knowing about criminal conduct does not, of itself, make someone
12   a member of the conspiracy or a conspirator.  See id.

13   **B.   Count Two: Aiding and Abetting Distribution of**
         **Methamphetamine, 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii);**
14       **18 U.S.C. § 2(a)**

15   The elements of Count Two are:  (1) the Defendant knowingly and
16   intentionally distributed approximately 48.6 grams methamphetamine,
17   the controlled substance described in Count Two of the indictment;
18   and (2) at the time of such distribution, the Defendant knew that the
19   substance distributed was methamphetamine (the controlled substance).
20   See O'Malley Instructions, § 64:04.

21   The term "to distribute", as used in these instructions, means
22   to deliver or to transfer possession or control of something from on
23   person to another.  The term "to distribute" includes the sale of
24   something by one person to another. See id. § 64:03.

25   A person may violate the law even though he or she does not
26   personally do each and every act constituting the offense if that
27   person "aided and abetted" the commission of the offense. Section (a)
28   of Title 18 of the United States Code provides: "Whoever commits an

4

offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." Before a defendant may be held responsible for aiding and abetting others in the commission of a crime, it is necessary that the government prove beyond a reasonable doubt that the Defendant knowingly and deliberately associated himself in some way with the crime charged and participated in it with the intent to commit the crime. See id. § 18:01.

To prove a defendant guilty of aiding and abetting, the government must prove:  (1) the Defendant knew that the crime charged was to be committed or was being committed; (2) knowingly did some act for the purpose of aiding, commanding, or encouraging the commission of that crime; and (3) acted with the intention of causing the crime charged to be committed. See O'Malley Instructions, § 18:01.

Before the Defendant may be found guilty as an aider and abettor to the crime, the government must also prove, beyond a reasonable doubt, that some person or persons committed each of the essential elements of the offense charged. Id.

Merely being present at the scene of the crime or merely knowing that a crime is being committed or is about to be committed is not sufficient conduct for the jury to find that a defendant aided and abetted the commission of that crime. Id.

The government must prove that the defendant knowingly and deliberately associated himself with the crime in some way as a participant – someone who wanted the crime to be committed – not as a mere spectator. Id.

### C. Counts Three-Eight: Use of a Communication Facility in the Commission of a Felony, 21 U.S.C. § 843(b)

Counts Three through Eighth of the indictment charge that on or about: (1) the twenty-fifth day of September, 2013, at 3:22 p.m., 3:53 p.m., and 4:58 p.m., (2) the twenty-sixth day of September, 2013, at 6:10 p.m. and 6:43 p.m., and (3) the seventh day of October, 2013, at 5:24 p.m., in Los Angeles County, in the Central District of California, the Defendant knowingly and intentionally used a communication facility, namely, a telephone, in committing and in causing and facilitating the commission of an act constituting a felony under Title 21, United States Code, Section 846, namely, conspiracy to distribute methamphetamine, as charged in Count One, and aiding and abetting an act to be done in violation of Title 21, United States Code, Section 841(a)(1), namely, distribution of methamphetamine, as charged in Count Two. See O'Malley Instructions, § 31:01.

The elements of Counts Three through Eight are: (1) the defendant knowingly or intentionally used a telephone and (2) the defendant acted with intent to help bring about the conspiracy to distribute methamphetamine charged in Count One or to aid or abet the distribution of methamphetamine charged in Count Two. See Ninth Circuit Model Criminal Jury Instructions, No. 9.29.

### III. STATEMENT OF FACTS

Over the course of seven days, from September 19, 2013 to September 26, 2013, the Defendant brokered a deal between his nephew/runner (i.e., Moreno) and a confidential source for the sale of 55.9 grams of 87% pure methamphetamine (48.6 grams of actual methamphetamine). In total, the Defendant participated in at least

seven telephone calls and exchanged approximately eight text messages with the government's confidential source (the "CS") to facilitate and coordinate the controlled narcotics transaction, which ultimately took place on September 26, 2013.

The government intends to prove at trial the following facts, among others:

**A.    September 19, 2013 Communications**

On September 19, 2013, at 11:58 a.m.,[1] the CS sent the Defendant a text message stating that CS "needed what [the CS] told [the Defendant] about the last time."  One minute later, at 11:59 a.m., the Defendant answered, "I was asleep" and "I'm waking up."  The CS then stated via text that "I don't have work and I wanted to see if I could do something."  The Defendant responded (in a text message) at 12:00 p.m., "in an hour I'll call you, where are you?"  The CS texted back that he was around the house doing nothing.  At 12:05 p.m. the Defendant stated that "I'll call you in a little bit, I'm waking up."

Approximately three hours later, the Defendant called the CS at approximately 3:21 p.m. and then texted the CS at 3:22 p.m. asking, "Where are you?" and "I'm calling you, but you don't answer." At 3:42 p.m., the Defendant again called the CS, and the CS answered. The Defendant asked the CS if the CS (a mechanic) could complete some auto repair work for the Defendant's relative. The CS agreed. The Defendant then picked up the CS and drove the CS to the residence of the Defendant's relative, where the CS completed the auto repairs. Upon completing the repairs, the CS asked the Defendant about selling narcotics for the Defendant.  At this time, the Defendant confirmed

---

[1] Unless otherwise indicated, all times appear in Pacific Daylight Time.

that he had approximately two pounds of methamphetamine, but that a third-party was holding it for the Defendant because he believed he was under police scrutiny at the time.  The Defendant explained to the CS that although the narcotics were his, he was not "slinging" anymore.  The Defendant said that he was spreading his two pounds out and that the CS should contact him the next day so that the Defendant could introduce the CS to the individual holding the narcotics.  The Defendant also asked the CS how quickly he could sell an ounce; the CS represented that he could sell the amount in approximately three days.  Immediately upon finishing the meeting with the Defendant, the CS reported this conversation to the case agent and discussed the details of the conversation the next day at a debriefing.

**B.   September 25, 2013 Communications**

Days later, on September 25, 2013, the CS followed up with the Defendant about their previous conversation.  During two consensually recorded telephone calls at 3:22 p.m. and 3:53 p.m., the CS and the Defendant coordinated the CS's purchase of methamphetamine from the Defendant's nephew/runner, later identified as Moreno.

During the 3:22 p.m. call, the CS alerted the Defendant that the Defendant's nephew/runner had never called the CS. The CS asked the Defendant "who am I going to make the deal with, you or him?" The Defendant explained that the CS should deal with the nephew/runner and further stated that "I'm not doing that anymore" which the CS understood to mean the Defendant was not dealing in smaller quantities of drugs anymore.  When the CS expressed apprehension about dealing with someone unknown to the CS, the Defendant assured the CS that "they're my people, that's the thing" and then told the CS "let me call him and I'm going to tell him to call you."

8

Half an hour later, at 3:53 p.m., the CS called the Defendant
back. Immediately upon answering (as soon as the CS said, "what's up
Mikie"), the Defendant explained to the CS that his contact (i.e.,
Moreno) was working and would not get off until 4:00 p.m.  The
Defendant further explained that Moreno was going to call the
Defendant when Moreno finished work and that the Defendant would tell
Moreno to call the CS.  During this call the CS again expressed
concern about meeting with the unknown Moreno to which the Defendant
responded "[i]t's the same thing.  He's my nephew."

Toll records indicate that at 4:58 p.m., Moreno called the
Defendant (just as the Defendant predicted) from 818-471-2618.[2] Two
minutes later, at 5:00 p.m., Moreno contacted the CS from the same
phone number and told the CS that he was the Defendant's relative,
that the Defendant had given him the CS's number, and asked if the CS
was interested in purchasing narcotics.[3]

At 5:16 p.m., Moreno (who the CS noted as "El Contacto" in his
phone contact list) sent the CS the following text message: "In ten
minutes, I'll be there." At 5:19 p.m., the CS responded via text
message "Hey, if you want, I'll call you, I have to go to Los Angeles
with my friend and get the money. I'm going to want an ounce and a
half.  I'll give you a call when I arrive." Subsequently, at 5:20
p.m., Moreno texted "around what time?" to which the CS immediately
responded via text "around two hours, how much are you going to give

_____

[2] Subscriber information indicates that 818-471-2618 was
registered to "Jorge Huerta" also known as Moreno.

[3] This 5:00 p.m. call was not recorded, but is confirmed by toll
records. The CS called the agent immediately after this 5:00 p.m.
call and further debriefed law enforcement the next day (i.e.,
September 26, 2013) about the content of the interchange.

9

me?"  At 5:21 p.m., Moreno replied via text: "Well, I was going to let you pay $600, but when you see it we'll speak more about it."

## C.   September 26, 2013 Communications

The following day, September 26, 2013, the CS attempted to contact the Defendant several times (by phone and text) in the early evening, but could not reach him. The CS also attempted to contact Moreno a little before 5:10 p.m., but received an automated message that the 818-471-2618 number used by Moreno had been disconnected. Notwithstanding, the CS sent a text message to Moreno's 2618 number at 5:10 p.m. stating that he had the money and asking when the two could meet. The CS then called the Defendant at approximately 5:17 p.m., but received no answer.

At 6:08 p.m., Defendant finally returned the CS's call; this call was recorded although some portions are inaudible. During this call, the CS asked the Defendant if Moreno had disconnected his phone and stated "your nephew, your friend . . . he does not answer and well, we – we're still here."  To this, the Defendant stated, "right, right now I'll tell him."

Toll records from this date indicate that the Defendant called Moreno's 2618 number at 6:10 p.m. (that is, within two minutes of receiving CS's phone call about the line being disconnected). Immediately thereafter, from 6:11 p.m. to 6:25 p.m., toll records show that the Defendant called 818-915-7044 six times.  This number is registered to the Defendant's address (i.e., 11461 Oxnard Street, Van Nuys and is a number used by Maria Vilavazo, the Defendant's mother). Based on the context of the Defendant's call with CS and the fact that the Defendant told CS that Moreno was the Defendant's nephew, these toll records apparently reflect the Defendant's

attempts to contact a common relative or close associate of the two traffickers in order to obtain Moreno's new phone number (or otherwise speak with Moreno about the CS transaction).

At 6:43 p.m., the CS called the Defendant and told him that if he contacts Moreno, he should instruct Moreno to lower the price of the methamphetamine.  The Defendant agreed.

At 7:02 p.m.,[4] Moreno called the CS from his new number, (818) 720-7725.[5]  The CS informed Moreno that he had spoken with the Defendant stating "[w]ell, I had already arranged it with him [the Defendant] at $450."  Moreno told the CS to check out the methamphetamine and, if the CS liked it, Moreno would provide it to CS for the lower price.

At 7:27 p.m., during a consensually recorded telephone call, Moreno told the CS where to meet him (that is, at a McDonald's in Van Nuys).  During a telephone conversation at 7:30 p.m., Moreno confirmed to the CS that Moreno was parked in the McDonald's parking lot and told the CS that he was driving a white Chrysler.  A recording device captured both sides of the 7:30 p.m. conversation.

### D.   Meeting & Purchase

At 8:00 p.m. that evening, the CS met with Moreno in a McDonald's parking lot in Van Nuys.  Agents recorded and observed the meeting; however it was too dark for agents to clearly see the driver of the white Chrysler.  Agents, however, did see a white Chrysler Sedan (as the speaker on the phone indicated to the CS).

---

[4] This call is noted as 6:59 p.m. in toll records. Also, although this call was recorded, the majority of Moreno's responses are inaudible and require the CS's testimony regarding Moreno's statements at the time.

[5] Subscriber information indicates that (818) 720-7725 is registered to Jenny Ruiz (i.e., Jorge Huerta's wife).

11

At the meeting inside the car, the CS asked Moreno "are you working with Mike . . . or is this your work." Moreno responded, "this one . . . is from the same company." Moreno later stated, "Mike does not sell small ones . . . I'm the one in charge selling it like this." Later, when the CS inquired about whether Moreno had a connection for "soda" (that is, cocaine), Moreno responded that he could obtain the product from the "one that works with me. All of us are one . . . [w]e are all one hand . . . one finger of the hand." Also during the controlled purchase, the CS again asked ". . . if the work is yours, you better tell me. That way I can work with you instead." However, Moreno responded, ". . . no, no, no. Right now uh . . . Mike and I are the same . . . It's just that Mike doesn't – doesn't like to move small amounts."

Later during the conversation, Moreno began to teach the CS about the practice of drug trafficking and coded language. For example, Moreno stated that the CS should text Moreno and ask Moreno to call the CS when he wanted to work. He further informed that when they speak, the CS should simply say: "bring me one, about two or a half, whatever." Moreno added, "we don't use the telephone that much . . . I change the phone almost every month."

Ultimately, Moreno charged the CS $950[6] for two one-ounce bags containing what was later determined to be 55.9 grams of 87% pure methamphetamine. Because the CS only had $20 bills, the CS paid Moreno $960 and Moreno agreed to credit the CS the $10 toward his next methamphetamine purchase.

---

[6] The price (i.e., $950) was ultimately less than $600 per ounce as originally offered by Moreno and close to the amount discussed between the CS and the Defendant.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**E.    October 7, 2013 Communications**

On October 7, 2013, during a consensually recorded call, the CS contacted the Defendant to inform the Defendant that CS's customers liked the previously purchased methamphetamine and the CS wanted to purchase more.  Initially, the Defendant stated, "[c]all my – my nephew, man" and noted that his nephew had "a little bit left."  To this, the CS responded that because the last purchase turned out so well, people were willing to buy and the CS wanted half a pound, but that it should be "be good like the one - the one they gave me" last time.  The Defendant stated: "No, good, well, good, good.  I'll give you all of it guaranteed."

**F.    818-263-3398 is the Defendant's Phone Number**

During each of the above noted conversations, the Defendant communicated with the CS and Moreno from the following telephone number: 818-263-3398.  Although this number lacks subscriber information, all evidence points to the Defendant as the ultimate owner of this number.  Toll records reflect that this number called individuals close to the Defendant on numerous occasions.  For example, from July 1, 2013 to October 7, 2013, this number called the Defendant's mother 45 times and the Defendant's wife 234 times.  GPS tracking of this number corresponds to locations where the Defendant was observed during surveillance.  Furthermore, the CS referred to the 3398 speaker as Mikie or Maky and the Defendant's first name is Michael.

**G.    Other Evidence**

During the pre-trial conference held before this Court on November 3, 2014, the Court granted several motions in limine brought

by the government admitting the following evidence which the government intends to offer at trial:

### 1.   State Search Warrant

On January 16, 2014, agents executed a search warrant at a residence the Defendant used to house narcotics and roosters believed to be used for cock fighting (i.e., 13349 Reedley Street, Panorama City, Ca).  During the execution of the warrant the following evidence of drug trafficking was recovered from a Land Rover registered to the Defendant and parked on the property:  (i) a baggie with a white crystalline residue inside, (ii) a scale covered with methamphetamine residue, (iii) a package of 1x1 plastic baggies, and (iv) a pay/owe sheet (collectively, the "Reedley Street Evidence").

### 2.   Previous Statements by Defendant

The CS has had various interactions with the Defendant in the past during which the Defendant acknowledged his involvement in narcotics trafficking. These interactions will be summarized during the testimony of the CS.

## IV.   EVIDENTIARY AND LEGAL ISSUES

### A.   Recorded Conversations

At trial, the government expects to introduce nine audio and one video recording as follows:  (1) Recorded telephone call from the CS to Defendant on September 25, 2013 at 3:22 p.m., (2) Recorded telephone call from the CS to Defendant on September 25, 2013 at 3:53 p.m., (3) Recorded telephone call from Defendant to the CS on September 26, 2013 at 6:10 p.m., (4) Recorded telephone call from the CS to Defendant on September 26, 2013 at 6:43 p.m., (5) Recorded telephone call from Moreno to the CS on September 26, 2013 at 7:02 p.m., (6) Recorded telephone call from Moreno to the CS on September

14

26, 2013 at 7:27 p.m., (7) Recorded telephone call from Moreno to the CS on September 26, 2013 at 7:54 p.m., (8) Recorded telephone call from the CS to Moreno on September 26, 2013 at 7:59 p.m., (9) Video recording of the CS's meeting with Moreno on September 26, 2013 at approximately 8:00 p.m., and (10) Recorded telephone call from the CS to the Defendant on October 7, 2013 at 5:24 p.m. (each, a "recording," and collectively, the "Recordings"). Each recording has been produced to the defense and has been placed onto compact discs, which the government will mark as exhibits for identification at trial.  The conversations captured by the recordings occurred entirely in Spanish.  The government will seek to play the recordings and will have transcripts of the English translation displayed on a screen simultaneous to the playing of the recordings. However, none the recordings will be admitted into evidence (except for those used for voice identification purposes as further explained below). Transcript books for all recordings will also be prepared for the Court and jury.

> 1.   Foreign Language Transcripts

The government intends to introduce into evidence English-language transcripts of Spanish-language recordings.  Although the government will be playing the recordings during trial, the transcript containing the English translation will be moved into evidence rather than the recordings. For conversations in foreign languages, the Court of Appeals for the Ninth Circuit has recognized that (when the transcript is a translation from a foreign language into English) the transcripts of the English translation is the evidence rather than the recordings.  See United States v. Fuentes-Montijo, 68 F.3d 352, 355 (9th Cir. 1995) ("[W]hen faced with a taped

conversation in a language other than English and a disputed English translation transcript, the usual admonition that the tape is the evidence and the transcript only a guide is not only nonsensical, it has the potential for harm where the jurors are bilingual); United States v. Taghipour, 964 F.2d 908, 909 (9th Cir. 1992) (affirming court's instruction to the jury that recording was the evidence for the portion of the conversation that was in English while the translated transcript was the evidence for the portion of the conversation in Farsi). Accordingly, the transcript of the English translation is properly admitted into evidence, not the recorded conversation. Id.; see also United States v. Noushfar, 78 F.3d 1442 (9th Cir. 1996).

The foundational requirements for the admission of foreign language transcripts are left to the discretion of the trial judge. United States v. Turner, 528 F.2d 143, 168 (9th Cir. 1975); United States v. Llinas, 603 F.2d 506 (5th Cir. 1979). A translation is sufficiently accurate if it reasonably conveys the intent or the idea of the thought spoken. United States v. Gonzalez, 319 F.3d 291, 296 (7th Cir. 2003) (internal quotation marks omitted). A translation and transcript can be authenticated with testimony about how they were prepared, the sources used, and the qualifications of the person preparing the documents. United States v. DeLeon, 187 F.3d 60, 65-66 (1st Cir. 1999). Furthermore, the Court may instruct the jury that it is not free to reject the accuracy of the interpretation of the recordings. Fuentes- Montijo, 68 F.3d at 352.

With respect to the English translation transcripts here, the government will call an FBI Linguist, Maria Miranda-Rosas, to

1   authenticate each transcript prior to moving the transcripts into

2   evidence.

3          2.   Voice Identification

4          In order to prove the connection between a defendant and a

5   transcript offered as evidence, witnesses may testify competently as

6   to the identification of a defendant's voice on a recording which has

7   been transcribed.  A witness's opinion testimony in this regard may

8   be based upon his having heard the voice on another occasion under

9   circumstances connecting it with the alleged speaker. Fed. R. Evid.

10  901(b)(5); United States v. Torres, 908 F.2d 1417, 1425 (9th Cir.

11  1990) ("Testimony of voice recognition constitutes sufficient

12  authentication.").  The Ninth Circuit has further explained that

13  "Rule 901(b)(5) establishes a low threshold for voice identifications

14  offered to determine the admissibility of recorded conversations,"

15  and that "[s]o long as the identifying witness is 'minimally

16  familiar' with the voice he identifies, Rule 901(b) is satisfied."

17  See United States v. Plunk, 153 F.3d 1011, 1022-23 (9th Cir. 1998),

18  overruled on other grounds by United States v. Hankey, 203 F.3d 1160,

19  1169 n.7 (9th Cir. 2000). "Attacks on the accuracy of the

20  identification go to the weight of the evidence, and the issue is for

21  the jury to decide." United States v. Cerone, 830 F.2d 938, 949 (8th

22  Cir. 1987). Circumstantial evidence may also be introduced to

23  identify the speaker in a recorded conversation. Fed. R. Evid.

24  901(b)(5), (6); United States v. Cook, 794 F.2d 561, 567 (10th Cir.

25  1986) ("[C]ircumstantial evidence such as name references during the

26  conversation and the pen register records of the numbers called is a

27  sufficient voice identification foundation."); Turner, 528 F.2d at

28

17

163 (direct and circumstantial evidence may be used to establish the identity of the speaker's voice).

Prior to introduction of the transcripts, the government intends to establish the Defendant's identity on the audio recordings through an FBI contract monitor, Lilly Medina, who conducted a voice comparison analysis and determined that the Defendant's voice was the voice on the recordings.   In addition, the government may present voice exemplars from the Defendant supporting the voice identification offered by Ms. Medina. Once the voice identification testimony and voice exemplar evidence are presented, the government will introduce transcripts identifying the Defendant as the speaker in the recordings with the CS.

Therefore, the government will request to publish to the jury transcripts of the recordings after identifying Defendant as the speaker in the conversations attributed to the 3398 number.

3.   Audio Recordings

The government intends to offer into evidence certain audio recordings to support Ms. Medina's voice identification of the Defendant.   All duly admitted recorded conversations must be played in open court. [7]   The recordings have been placed onto compact disks, which the government intends to play at trial.   The recordings will be authenticated by declaration.   Ms. Medina, the FBI contract

---

[7] Recorded conversations are competent evidence even when they are partly inaudible, unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy. United States v. Rrapi, 175 F.3d 742, 746-48 (9th Cir. 1999) (court listens to recordings and admits portion of one recording and denies admissibility of two others in Albanian language that were very poor quality); United States v. Tisor, 96 F.3d 370, 376 (9th Cir. 1996) (a "recorded conversation is generally admissible unless the unintelligible portions are so substantial that the recording as a whole is untrustworthy") (citation omitted).

1    Monitor, will identify the voices of the persons speaking in the

2    calls, including the voice of the Defendant.

3        The foundation that must be laid for the introduction into

4    evidence of recorded conversations is a matter largely within the

5    discretion of the trial court.  There is no rigid set of foundational

6    requirements.  Rather, the Ninth Circuit has held that recordings are

7    sufficiently authenticated under Federal Rule of Evidence 901(a) if

8    sufficient proof has been introduced "so that a reasonable juror

9    could find in favor of authenticity or identification," which can be

10   done by "proving a connection between the evidence and the party

11   against whom the evidence is admitted" and can be done by both direct

12   and circumstantial evidence.  United States v. Matta-Ballesteros, 71

13   F.3d 754, 768 (9th Cir. 1995), modified by 98 F.3d 1100 (9th Cir.

14   1996) (holding tapes authentic because evidence showed that the

15   speakers were parties involved with the case).  Indeed, Federal Rule

16   of Evidence 901 requires only that the government make "a prima facie

17   showing of authenticity so that a reasonable juror could find in

18   favor of authenticity or identification," and the "probative force of

19   the evidence offered is, ultimately, an issue for the jury." United

20   States v. Blackwood, 878 F.2d 1200, 1202 (9th Cir. 1989) (citation

21   omitted).

22       Here, Agent Michael Alker, who administered most of the

23   consensual recordings, will authenticate each of the recordings prior

24   to the government's offering transcripts into evidence. Also, the

25   custodian of records declarations will authenticate the jail calls

26   referenced by Ms. Medina in her voice comparison analysis.

27   //

28   //

1
2

## B. Statements by the Defendant and the CI in the Video and Audio Recordings are Admissible Non-Hearsay

3  The audio and video recordings contain out-of-court statements
4  by defendant and the CS.  Rule 801(c) of the Federal Rules of
5  Evidence defines "hearsay" as "a statement, other than one made by
6  the declarant while testifying at the trial or hearing, offered in
7  evidence to prove the truth of the matter asserted."  Fed. R. Evid.
8  801(c).  However, statements by a party opponent are admissible non-
9  hearsay, as are statements which are not being admitted for the truth
10 of the matter asserted but rather to show the effect on the person
11 who heard the statement.  Fed. R. Evid. 801(c), 801(d)(2)(A).

12  Moreover, under the Federal Rules of Evidence, a defendant's
13 statement is admissible only if offered against him; a defendant may
14 not elicit his own prior statements.  Fed. R. Evid. 801(d)(2)(A);
15 United States v. Fernandez, 839 F.2d 639 (9th Cir. 1988).  When the
16 government admits a portion of a defendant's prior statement, the
17 defendant may not put in additional out-of-court statements by him
18 because such statements are hearsay when offered by the defendant.
19 Fed. R. Evid. 801(d)(2); Fernandez, 839 F.2d at 640; United States v.
20 Ortega, 203 F.3d 675, 681-82 (9th Cir. 2000) (defendant prohibited
21 from eliciting his own exculpatory statements during cross
22 examination of government agent).

23  The "rule of completeness" set forth in Rule 106 of the Federal
24 Rules of Evidence is applicable where one party seeks to introduce a
25 misleadingly tailored snippet of a statement that creates a
26 misleading impression by being taken out of context. It is entirely
27 proper, however, to admit segments of a statement or of a telephone
28 call without including everything, and adverse parties are not

1    entitled to offer additional statements just because they are

2    available and the proponent has not offered them.  United States v.

3    Collicott, 92 F.3d 973, 983 (9th Cir. 1996).  Rule 106 does not

4    render admissible evidence which is otherwise inadmissible under the

5    hearsay rules.  Id.

6    **C.   Co-Conspirator Statements are Admissible Non-Hearsay**

7        The audio and video recordings also contain out-of-court

8    statements by Moreno.  Declarations by one co-conspirator during the

9    course of and in furtherance of the conspiracy may be used against

10   another conspirator because such declarations are not hearsay.  Fed.

11   R. Evid. 801(d)(2)(E).  Further, statements made in furtherance of a

12   conspiracy were expressly held by the Supreme Court in Crawford v.

13   Washington, 541 U.S. 36, 56 (2004) to be "not testimonial" such that

14   their admission does not violate the Confrontation Clause.

15       As such, the admission of co-conspirator statements pursuant to

16   Fed. R. Evid. 801(d)(2)(E) requires only a foundation that: (1) the

17   declaration was made during the life of the conspiracy; (2) it was

18   made in furtherance of the conspiracy; and (3) there is, including

19   the co-conspirator's declaration itself, sufficient proof of the

20   existence of the conspiracy and of the defendant's connection to it.

21   See Bourjaily v. United States, 483 U.S. 171, 173, 181 (1987).

22   Circumstantial evidence is sufficient to establish the existence of a

23   conspiracy.  See United States v. Weaver, 594 F.2d 1272, 1274 (9th

24   Cir. 1979).  "Once the conspiracy has been proven under these

25   standards, only 'slight evidence' is necessary to connect a

26   coconspirator to the conspiracy."  United States v. Perez, 658 F.2d

27   654, 658 (9th Cir. 1981) (quoting Weaver, 594 F.2d at 1274).

28

21

1    The government must prove by a preponderance of the evidence
2    that a statement is a co-conspirator declaration in order for the
3    statement to be admissible under Rule 801(d)(2)(E).  Bourjaily, 483
4    U.S. at 176; United States v. Crespo de Llano, 838 F.2d 1006, 1017
5    (9th Cir. 1987).  Whether the government has met its burden is to be
6    determined by the trial judge, and not the jury.  United States v.
7    Zavala-Serra, 853 F.2d 1512, 1514 (9th Cir. 1988).  The Court may
8    rely on inadmissible evidence, such as a co-conspirator's plea
9    agreement, in determining whether the 801(d)(2)(E) exception applies.
10   Cf. United States v. Gil, 58 F.3d 1414, 1420 (9th Cir. 1995) (the
11   preliminary determination of whether Fed. R. Evid.  801(d)(2)(E)
12   applies is to be made by the court, not the jury, pursuant to Fed. R.
13   Evid. 104(a)); Fed. R. Evid. 104(a) ("the court must decide any
14   preliminary question about whether . . . evidence is admissible.  In
15   so deciding, the court is not bound by evidence rules, except those
16   on privilege").

17       The trial court has discretion to determine whether the
18   government may introduce co-conspirator statements before
19   establishing the conspiracy and the defendant's connection to it.
20   United States v. Loya, 807 F.2d 1483, 1490 (9th Cir. 1987).  It also
21   has the discretion to vary the order of proof in admitting a co-
22   conspirator's statement.  Id.  The court may allow the government to
23   introduce co-conspirator declarations before laying the required
24   foundation under the condition that the declarations will be stricken
25   if the government fails ultimately to establish by independent
26   evidence that the defendant was connected to the conspiracy.  Id.;
27   United States v. Spawr Optical Research, Inc., 685 F.2d 1076, 1083
28   (9th Cir. 1982).

It is not necessary for the defendant to be present at the time a co-conspirator statement was made for it to be introduced as evidence against that defendant.  See <u>Sendejas v. United States</u>, 428 F.2d 1040, 1045 (9th Cir. 1970).

To be admissible under Federal Rule of Evidence 801(d)(2)(E) as a statement made by a co-conspirator in furtherance of the conspiracy, a statement must "further the common objectives of the conspiracy," or "set in motion transactions that [are] an integral part of the [conspiracy]." <u>United States v. Arambula-Ruiz</u>, 987 F.2d 599, 607-08 (9th Cir. 1993); <u>United States v. Yarbrough</u>, 852 F.2d 1522, 1535 (9th Cir. 1988).  Such statements are admissible whether or not they actually result in any benefit to the conspiracy.  <u>United States v. Schmit</u>, 881 F.2d 608, 612 (9th Cir. 1989).  Thus, co-conspirator declarations need not be made to a member of the conspiracy to be admissible under Rule 810(d)(2)(E) and can be made to government informants and undercover agents.  <u>Zavala-Serra</u>, 853 F.2d at 1516 (statements to informants and undercover agents); <u>United States v. Tille</u>, 729 F.2d 615, 620 (9th Cir. 1984) (statements to informants); <u>United States v. Echeverry</u>, 759 F.2d 1451, 1457 (9th Cir. 1985) (statements to undercover agent).

Courts have interpreted the "in furtherance of" requirement broadly and have considered, among others, the following co-conspirator declarations as being made "in furtherance of the conspiracy:"

a) statements by a person involved in the conspiracy to induce a buyer's purchase of contraband by assuring the buyer of the person's ability to consummate the transaction. <u>Echeverry</u>, 759 F.2d at 1457;

23

b) statements identifying another co-conspirator as source for the contraband to be sold to purchaser. United States v. Lechuga, 888 F.2d 1472, 1480 (5th Cir. 1989);

c)  statements related to the concealment of the criminal enterprise. Tille, 729 F.2d at 620; and

d) "puffing", boasts, and other conversation designed to obtain the confidence of another conspirator (or apparent conspirator who actually was an undercover agent). United States v. Santiago, 837 F.2d 1545, 1549 (11th Cir. 1988); Lechuga, 888 F.2d 1472, 1480 (5th Cir. 1989); United States v. Miller, 664 F.2d 94, 98 (5th Cir. 1981).

Here, Moreno's statements to the CS on September 25 and 26, 2013 were made in furtherance of the conspiracy to distribute methamphetamine.

**D.   Pinkerton & Vicarious Liability**

A defendant is vicariously liable for the substantive acts of his co-conspirators whether or not he directly participates in such acts if those acts are committed in furtherance of the conspiracy (and the substantive offense fell within the scope of the unlawful project and could reasonably have been forseen as a necessary or natural consequence.) United States v. Thomas, 887 F.2d 1341, 1345 (9th Cir. 1989); United States v. Douglass, 780 F.2d 1472, 1475-76 (9th Cir. 1986); Pinkerton v. United States, 151 F.2d 499, 500 (5th Cir. 1945), aff'd, 328 U.S. 640 (1946).

Here, Moreno's sale of methamphetamine fell within the scope (and met the very objectives) of the conspiracy with which the Defendant is charged. As such, the Defendant would be held vicariously liable for the sale ultimately committed by his nephew/runner, that is Moreno.

24

### E.   Physical Evidence and Photographs

The government will seek to introduce physical evidence recovered from the September 26, 2013 controlled purchase (i.e., the bags of methamphetamine sold to the CS) as well as the Reedley Street Evidence. Rule 901(a) of the Federal Rule of Evidence provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must provide evidence sufficient to support a finding that the item is what the proponent claims it is." Accordingly, under Rule 901, issues of authenticity and identification are treated as "a special aspect of relevancy."  Fed. R. Evid. 901(a)(Advisory Committee Notes).

Rule 901(a) only requires the government to make a prima facie showing of authenticity or identification "so that a reasonable juror could find in favor of authenticity or identification." United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir. 1991) (quoting United States v. Blackwood, 878 F.2d 1200, 1202 (9th Cir. 1989) (per curiam)).  The authenticity of proposed exhibits may be proven by circumstantial evidence.  See United States v. King, 472 F.2d 1, 9-11 (9th Cir. 1972).  If the government makes a prima facie showing of authenticity, the Court should admit the evidence.  See United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985).

The credibility or probative force of the evidence offered is ultimately an issue for the trier of fact.  Chu Kong Yin, 935 F.2d at 996 (internal quotation marks omitted).

To be admitted into evidence, a physical exhibit must be in substantially the same condition as when the crime was committed. Fed. R. Evid. 901.  The Court may admit the evidence if there is a "reasonable probability the article has not been changed in important

respects." <u>United States v. Harrington</u>, 923 F.2d 1371, 1374 (9th Cir. 1991) (quoting <u>Gallego v. United States</u>, 276 F.2d 914, 917 (9th Cir. 1960)).  This determination is to be made by the trial judge and will not be overturned except for clear abuse of discretion.  Factors the Court may consider in making this determination include (i) the nature of the item, (ii) the circumstances surrounding its preservation, and (iii) the likelihood of intermeddlers having tampered with it.  <u>Gallego</u>, 276 F.2d at 917.

In establishing chain of custody as to an item of physical evidence, the government is not required to call all persons who may have come into contact with the piece of evidence.  <u>Harrington</u>, 923 F.2d at 1374.  Moreover, a presumption of regularity exists in the handling of exhibits by public officials.  <u>Id</u>.  Therefore, to the extent that alleged or actual gaps in the chain of custody exist, such gaps go to the weight of the evidence rather than to its admissibility.  <u>Id</u>.

**F.   Opinion Testimony Pursuant to Fed. R. Evid. 701 & 702**

The government will call several witnesses at trial who will provide opinions based on particularized knowledge of specific matters as well as expertise.  Specifically, the government will call (i) an FBI Linguist, Maria Miranda-Rosas, who will testify to the accuracy of the English translation transcripts; (ii) Lilly Medina, a monitor employed by the FBI to testify about her voice comparison analysis which identifies the Defendant as a voice on the recordings; (iii) Special Investigator Joshua Halstead, who will testify about inmates' sharing and unauthorized use of personal access codes for the purposes of making phone calls from MDC; and (iv) LAPD Officer David Miner, who will testify about his participation in the

execution of a January 2014 search warrant, items recovered during the search, and his interpretation of certain recovered items.  While the government does not concede that all of the above areas involve expert testimony, the government has noticed each of these witnesses as experts out of an abundance of caution.

In addition to the above, absent stipulations, the government anticipates that it will call three undisputable experts, including two chemists and a FBI Agent with expertise in cell site and GPS plotting of cellular signals.

### 1. Lay Testimony Involving Opinions Based on Particularized Knowledge of a Subject

Lay opinion testimony is admissible pursuant to Federal Rule of Evidence 701 where: (1) the testimony is rationally based on the witness's perception (i.e., the opinion is one a normal person would form based on the same perception); (2) the opinion or inference is helpful to the trier of fact, either in understanding the testimony or in determining a fact in issue; and (3) the opinion is not based on scientific, technical, or other specialized knowledge with the scope of Rule 702. Fed. R. Evid. 701.

The last requirement that the opinion is not based on expert testimony within the scope of Rule 702, does not necessarily exclude opinions based on particularized knowledge of a subject. See, e.g., United States v. Roe, 606 F.3d 180, 185-86 (4th Cir. 2010) (officer's testimony about the authority possessed by the holders of state private detective/security guard certifications and handgun permits based on his experience running the unit that issued them falls under Rule 701's definition of lay testimony); United States v. Santiago, 560 F.3d 62, 66 (1st Cir. 2009) (undercover officer's testimony about

1   the meaning of defendant's code words to designate drug quantities
2   was proper lay opinion); United States v. Graham, 643 F.3d 885, 898
3   (11th Cir. 2011) ("a witness who has particularized knowledge by
4   virtue of his position in a certain company can give an opinion about
5   the manner in which that company conducts its business, even if not
6   qualified as an expert under [Rule 702].”). "Rule 701 . . . is meant
7   to admit testimony based on the lay expertise a witness personally
8   acquires through experience, often on the job." Santiago, 560 F.3d at
9   66 (quoting Fed. R. Evid. 701 advisory committee's note).

10       Further, under Ninth Circuit law, opinion testimony by law
11   enforcement officers may qualify as particularized knowledge of a lay
12   witness (not amounting to expertise).  In United States v. VonWillie,
13   59 F.3d 922 (9th Cir. 1995), for instance, the Ninth Circuit held
14   that the district court properly admitted testimony by a law
15   enforcement agent that drug traffickers commonly use weapons "to
16   protect their drugs and to intimidate buyers” as lay testimony.  Id.
17   at 929.  The officer's observations, based on his experience "during
18   prior drug investigations,” the Court stated, "are common enough and
19   require such a limited amount of expertise, if any, that they can,
20   indeed, be deemed lay witness opinion." Id.

21       Here, the government will call (i) a FBI contract linguist to
22   testify regarding voice comparison and (ii) a LAPD officer working in
23   narcotics enforcement to testify regarding the recovery (and the
24   officer's interpretation) of the Reedley Street Evidence. The subject
25   matter of such testimony involves particularized knowledge that these
26   witnesses gained by virtue of their employment and does not involve
27   the highly specialized training involved in Rule 702 expert
28   testimony.  Notwithstanding, the government has provided expert

witness disclosure regarding both of these witnesses pursuant to Rule 16 of the Federal Rules of Criminal Procedure out of an abundance of caution.

        2.   <u>Expert Evidence</u>

If specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a qualified expert witness may provide opinion testimony on the issue in question.  Fed. R. Evid. 702.  Expert opinion may be based on hearsay or facts not in evidence, where the facts or data relied upon are of the type reasonably relied upon by experts in the field.  Fed. R. Evid. 703.  An expert may also provide opinion testimony even if it embraces an ultimate issue to be decided by the trier of fact. Fed. R. Evid. 704.

The Ninth Circuit has held that the admissibility of expert testimony generally turns on the trial court answering the following questions:

a)   whether the opinion is based upon scientific, technical, or other specialized knowledge;

b)   whether the expert's opinion would assist the trier of fact in understanding the evidence or determining a fact in issue;

c)   whether the expert has appropriate qualifications;

d)   whether the testimony is relevant and reliable;

e)   whether the methodology or technique the expert uses "fits" the conclusions; and

f)   Whether the probative value is substantially outweighed by the risk of unfair prejudice, confusion of issues, or undue consumption of time.

<u>United States v. Hankey</u>, 203 F.3d 1160, 1168 (9th Cir. 2000).

Courts have admitted expert opinion testimony by law enforcement agents on a number of issues, such as the value of drugs, number of doses, and the modus operandi of drug traffickers, United States v. Espinosa, 827 F.2d 604, 612 (9th Cir. 1987) (holding that district court properly admitted law enforcement officer's expert testimony expert on the modus operandi of narcotics traffickers, including use of "stash pads" for drugs). An experienced narcotics agent's opinion testimony may be based in part on information from other agents familiar with the issue. United States v. Beltran-Rios, 878 F.2d 1208, 1213 n.3 (9th Cir. 1989); United States v. Andressan, 813 F.2d 1450, 1458 (9th Cir. 1987).

Furthermore, law enforcement officers may offer both expert and lay opinion testimony, so long as the expert portion of the testimony rests on reliable methodology and the lay portion is not supported by speculation and hearsay. United States v. Vera, 2014 WL 5352727, No. 12-50294, at *1, 10-14 (9th Cir. Oct. 22, 2014).

As noted above, in the absence of a stipulation, the government anticipates that it will call DEA Forensic Chemists Edward Kovacs and Trevor Equitz as expert witnesses. Both witnesses have substantial experience testing drugs and analyzing their chemical compositions. Mr. Kovacs performed chemical analysis of the methamphetamine sold to the CS during the controlled purchase on September 26, 2013. Mr. Equitz performed a chemical analysis of the scale recovered from Reedley Street. The government expects that both witnesses will testify regarding: (1) the methodologies used to analyze the drugs; (2) the reliability of the methods used; and (3) the results of their analysis, which determined the presence of methamphetamine in each instance.

Additionally, the government is prepared to qualify Ms. Medina as an expert witness as well. Ms. Medina, a contract linguist for the FBI, will testify about (i) her methodology used for voice comparison (that is, comparison of various recordings from the investigation with a sample of jail calls made from the personal access code registered to the Defendant), (ii) the reliability of her method, and (iii) the results of her analysis (i.e., that three of the four jail calls used in the sample matched the voice in the recordings).

The government is also prepared to qualify Special Investigator Halstead as an expert witness as well. Special Investigator Halstead will testify about his experience with inmate practices as well as (i) his methodology for comparing typical inmate practices with the circumstances surrounding the jail calls sampled in this case, (ii) the reliability of such methods, and (iii) the results of his analysis, which is the conclusion that the Defendant may have lent out his personal access code for the single jail call that did not match.

Further, the government is prepared to introduce a portion of the testimony of LAPD Officer David Miner as expert testimony to extent he is asked to provide an opinion on certain Reedley Street Evidence. Officer Miner is prepared to testify about his qualifications, training and experience in narcotics investigations and his acquired familiarity with drug paraphernalia, pay/owe sheets and the "street" value of methamphetamine. Officer Miner will further testify about his methodology for analyzing the Reedley Street Evidence (i.e., how these items compare to drug paraphernalia recovered in prior narcotics investigations). Finally, Officer Miner will testify about the results of his analysis, which is that Reedley

Street Evidence relates to drug trafficking. Such testimony complies with _Vera_, because any "expert" testimony offered by Officer Miner will be based on a reliable methodology (and would not constitute lay opinion relying on hearsay). See _Vera_, 2014 WL 5352727, at *1, 10-14.

Further, the government will call FBI forensic cellular analyst, Michael Easter, who will testify about cell-site and global positioning satellite ("GPS") information related to cellular devices. Agent Easter will also explain the (i) methodology used for analyzing and plotting location information, (ii) reliability of such methodology, and (iii) the results of his analysis, including GPS information related to the (818) 263-3398 cellular device used by the Defendant.

Finally, the government anticipates that it will call FBI Linguist, Maria Miranda-Rosas, who will authenticate the English translation transcripts of the Spanish-language recordings. Ms. Rosas will testify regarding the (i) methodologies she used for translating, (ii) the reliability of such methodology, and (iii) the results of her analysis or her ultimate translation of the recordings.

The defense has received expert witness disclosures with respect to each witness noted above. To date, the defense has not yet raised any objections to the testimony of these witnesses.

### G.    Cross-Examination of Defendant

A defendant who testifies at trial waives his right against self-incrimination and subjects himself to cross-examination concerning all matters reasonably related to the subject matter of his testimony. See, e.g., _Ohler v. United States_, 529 U.S. 753, 759 (2000). A defendant has no right to avoid cross-examination on

matters which call into question his claim of innocence.  United States v. Miranda-Uriarte, 649 F.2d 1345, 1353-54 (9th Cir. 1981). The scope of a defendant's waiver is co-extensive with the scope of relevant cross-examination.  United States v. Cuozzo, 962 F.2d 945, 948 (9th Cir. 1992); United States v. Black, 767 F.2d 1334, 1341 (9th Cir. 1985) ("What the defendant actually discusses on direct does not determine the extent of permissible cross-examination or his waiver. Rather, the inquiry is whether 'the government's questions are reasonably related' to the subjects covered by the defendant's testimony.").

Federal Rule of Evidence 609(a)(1) allows a defendant to be impeached by evidence of a prior conviction if (1) the crime was punishable by death or imprisonment in excess of one year, and (2) the probative value of the evidence outweighs its prejudicial effect to the defendant.  Here, the Defendant's 2014 conviction for illegal reentry by a removed alien, in violation of 8 U.S.C. § 1326(a), carried a maximum penalty of two years of imprisonment and, therefore, satisfies the requirements of Rule 609 of the Federal Rules of Evidence.

The Ninth Circuit has held that trial courts should employ the following five-factor test in performing the balancing test between the probative value of a prior conviction and its prejudicial effect: "(1) the impeachment value of the prior crime; (2) the temporal relationship between the conviction and the defendant's subsequent criminal history; (3) the similarity between the past and the charged crime; (4) the importance of defendant's testimony; and (5) the centrality of the credibility issue." United States v. Martinez-Martinez, 369 F.3d 1076, 1088 (9th Cir. 2004).  The Ninth Circuit

further held that although "a trial court need not analyze each of the five factors explicitly, the record should reveal . . . that the trial judge was aware of the requirements of Rule 609(a)(1)."  Id. (internal quotation omitted).

Here, four of the five factors weigh in favor of admitting defendant's recent felony convictions for impeachment.  Illegal reentry involves the deliberate defiance of legal requirements, rather than an impulsive or careless act, and, therefore, is highly probative of defendant's history of engaging in calculated law-breaking like perjury.  See United States v. Estrada, 430 F.3d 606, 618 (2d Cir. 2005) (noting that crimes involving planning and preparation reflect on veracity and credibility).  The defendant's felony conviction is so recent that the second factor regarding temporal relationship to the charged offense is not an issue. Finally, the importance of defendant's testimony and the centrality of the credibility issue both favor admission.  See United States v. Alexander, 48 F.3d 1477, 1489 (9th Cir. 1995)("When a defendant takes the stand and denies having committed the charged offense, he places his credibility directly at issue.")  Should defendant take the stand and deny having committed the charged offenses, such testimony would be of primary importance, and defendant's credibility would be directly at issue.

## H.   Charts and Summary Witnesses

To streamline the presentation of evidence for the fact-finder, the government intends to use summary charts regarding, toll records, cell site data, and related GPS information in its case-in-chief. Charts and summaries of evidence are governed by Federal Rule of Evidence 1006, which permits the introduction of charts, summaries,

34

or calculations of voluminous writings, recordings, or photographs
which cannot conveniently be examined in court. See Fed. R. Evid.
1006.  Accordingly, a summary chart may be admitted as substantive
evidence when the proponent establishes that the underlying documents
upon which the summary is based are voluminous, admissible, and
available for inspection. Id.; see also United States v. Meyers, 847
F.2d 1408, 1412 (9th Cir. 1988).  All that is required for the rule
to apply is that the underlying writings be voluminous and that in-
court examination not be convenient. United States v. Scales, 594
F.2d 558, 562 (6th Cir. 1979).

Although the materials underlying the summary must be
"admissible," they need not themselves be "admitted" into evidence.
Meyers, 847 F.2d at 1412. In addition, the summary chart must be
accurate, authentic, and properly introduced. Scales, 594 F.2d at
562. Where a chart does not contain complicated calculations that
would require an expert for accuracy, authentication of the chart
requires only that the witness (1) have properly catalogued the
exhibits and records upon which the chart is based; and (2) have
knowledge of the analysis of the records referred to in the chart.
Neither of these requirements necessitates any special expertise. The
person who supervises the compilation of the summary chart is the
proper person to attest to its authenticity and accuracy.  Scales,
594 F.2d at 563.

In addition, summary charts may be used by the government in its
opening statement. Indeed, "such charts are often employed in complex
conspiracy cases to provide the jury with an outline of what the
government will attempt to prove." United States v. DePeri, 778 F.2d

35

1   963, 979 (3d Cir. 1985) (approving government's use of chart); <u>United</u>

2   <u>States v. Rubino</u>, 431 F.2d 284, 290 (6th Cir. 1970) (same).

3   Furthermore, summary charts may be admitted to summarize

4   information relied upon by an expert for the purpose of facilitating

5   expert testimony.  <u>See</u> Fed. R. Evid. 703; <u>United States v.</u>

6   <u>Milkiewicz</u>, 470 F.3d 390, 400 (1st Cir. 2006) (affirming the

7   admissibility of summary charts which involved a "kind of expert

8   interpretation" beyond summary of documents.)

9   Also, apart from Rule 1006, a summary of evidence may be

10   presented to the jury with proper limiting instructions.  Rule

11   611(a), recognizes that the trial court must "exercise reasonable

12   control over the mode and order of interrogating witnesses and

13   presenting evidence so as to (1) make the interrogation and

14   presentation effective for the ascertainment of the truth, [and] (2)

15   avoid needless consumption of time . . . ."  Fed. R. Evid. 611(a); <u>see</u>

16   <u>also</u> <u>United States v. Gardner</u>, 611 F.2d 770, 776 (9th Cir. 1980) (in

17   tax case, use of chart summarizing defendant's assets, liabilities,

18   and expenditures "contributed to the clarity of the presentation to

19   the jury, avoided needless consumption of time, and was a reasonable

20   method of presenting the evidence").

21   Here, the government will be offering various summary charts

22   which rely upon voluminous records including toll records. All of the

23   underlying documentation has been previously produced to defense in

24   discovery.  On November 20, 2014, the summary charts themselves were

25   also disclosed to defense.

26   **I.   Duplicates**

27   "A duplicate is admissible to the same extent as an original

28   unless a genuine question is raised about the original's authenticity

1    or the circumstances make it unfair to admit the duplicate." Fed. R.

2    Evid. 1003; see also United States v. Smith, 893 F.2d 1573, 1579 (9th

3    Cir. 1990).

4         **J.   Business Records**

5              1.   Foundational Requirements

6         For business records to be admissible, the following

7    foundational facts must be established through the custodian of the

8    records or another qualified witness: (1) the records must have been

9    made at or near the time by, or from information transmitted by, a

10   person with knowledge; and (2) the records must have been made and

11   kept in the course of a regularly conducted business activity. Fed.

12   R. Evid. 803(6); United States v. Bland, 961 F.2d 123, 126-28 (9th

13   Cir. 1992).  In determining whether these foundational facts are

14   established, the court may consider hearsay and other evidence not

15   admissible at trial. See Fed. R. Evid. 104(a), 1101(d) (1);

16   Bourjaily, 483 U.S. at 178-79.  Challenges to the accuracy or

17   completeness of business records ordinarily go to the weight of the

18   evidence and not its admissibility.  See, e.g., La Porta v. United

19   States, 300 F.2d 878, 880 (9th Cir. 1962).

20              2.   "Qualified Witness"

21        The phrase "other qualified witness" is broadly interpreted to

22   require only that the witness understand the record keeping system.

23   United States v. Childs, 5 F.3d 1328, 1334 (9th Cir. 1993); United

24   States v. Ray, 930 F.2d 1368, 1370-71 (9th Cir. 1990) (welfare fraud

25   investigator may testify about contents of defendant's welfare file

26   where investigator was familiar with filing and reporting

27   requirements and forms used, even though she did not record

28   information and was not custodian); United States v. Franco, 874 F.2d

                                    37

1136, 1139 (7th Cir. 1989) ("The witness need only be someone with knowledge of the procedure governing the creation and maintenance of the type of records sought to be admitted.").  A qualified witness need not be employed by, or related to, the entity to whom the records belong; a federal agent or an independent witness may be a qualified witness for records seized from a company. See Franco, 874 F.2d at 1139-40 (narcotics agent qualified to testify about record-keeping practices of a money-exchange for purposes of Rule 803(6)); United States v. Hathaway, 798 F.2d 902, 905-07 (6th Cir. 1986) (FBI agent could provide foundation testimony for admission of company records under Rule 803(6); holding: "There is no reason why a proper foundation for application of Rule 803(6) cannot be laid, in part or in whole, by the testimony of a government agent or other person outside the organization whose records are sought to be admitted . . . . . [A]ll that is required is that the witness be familiar with the record keeping system").

### 3.   Circumstances of Preparation

The government need not establish precisely when or by whom the document was prepared; all the rule requires is that the document be made "at or near the time" of the act or event it purports to record. See United States v. Huber, 772 F.2d 585, 591 (9th Cir. 1985); United States v. Basey, 613 F.2d 198, 201 n.1 (9th Cir. 1979).  Rule 803(6) does not require that the business rely on the document in a specific way; the rule merely requires that the record be "kept in the course of regularly conducted business activity." See United States v. Catabran, 836 F.2d 453, 457 (9th Cir. 1988); United States v. Smith, 609 F.2d 1294, 1301 (9th Cir. 1979)).

4.   <u>Authentication by Declaration</u>

Certified domestic records of regularly conducted activity are self-authenticating when accompanied by a written declaration establishing that (1) the records must have been made at or near the time by, or from information transmitted by, a person with knowledge; and (2) the records must have been made and kept in the course of a regularly conducted business activity. Fed. R. Evid. 902(11).

Custodian of records declarations may be utilized by the court to provide a foundation for the admission in evidence of business records without creating any confrontation issue under <u>Crawford v. Washington</u>, 541 U.S. 36 (2004).  <u>See</u> <u>United States v. Hagege</u>, 437 F.3d 943, 957 (9th Cir. 2006).

On August 2, 2014, the government advised the Defendant that it intends to offer into evidence certain business records, accompanied by Custodian of Records Declaration or Certification of an Official Record from the respective custodians of the respective records. The government has produced these materials in discovery. As of the date and time of this filing, the defendant has given no notice of any intention to challenge such admission.

**K.   Reciprocal Discovery**

Despite the government's requests, the Defendant has not produced any reciprocal discovery to the government.  Accordingly, to the extent that there exists reciprocal discovery to which the government is entitled under Federal Rules of Criminal Procedure 12.1, 12.2, 16(b), or 26.2 that the Defendant has not produced, the government reserves the right to seek to have such materials excluded at trial.  <u>See</u> <u>United States v. Young</u>, 248 F.3d 260, 269-70 (4th Cir. 2001) (upholding exclusion under Rule 16 of audiotape evidence

defendant did not produce in pretrial discovery where defendant sought to introduce audiotape on cross-examination of government witness not for impeachment purposes, but as substantive "evidence in chief" that someone else committed the crime).

Dated: November 20, 2014          Respectfully submitted,

                                  STEPHANIE YONEKURA
                                  Acting United States Attorney

                                  ROBERT E. DUGDALE
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                        /s/ Kimberly D. Jaimez
                                  _____
                                  KIMBERLY D. JAIMEZ
                                  MICHAEL O. AZAT
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA