```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                    WESTERN DIVISION

 4    THE HON. JUDGE TERRY J. HATTER JR., JUDGE PRESIDING

 5

 6  UNITED STATES OF AMERICA,         )
                                      )
 7                    Plaintiff,      )
                                      )
 8         vs.                        ) NO. 14-CR-0209-TJH
                                      )
 9  ISMAEL GUTIERREZ VILAVAZO,        )
                                      )
10                    Defendant.      )
    _____)
11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                Los Angeles, California

16               Monday, November 3, 2014

17

18

19

20          Lisa M. Gonzalez, CSR 5920, CCRR
                    Official Reporter
21          United States District Courthouse
            312 North Spring Street, Room 438
22           Los Angeles, California  90012
                     (213) 894-2979
23                 csrlisag@aol.com
                  www.lisamariecsr.com
24

25
```

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:   EILEEN DECKER
                           U.S. ATTORNEY
 3                         BY:  ANGELA L. SCOTT
                           ASSISTANT UNITED STATES ATTORNEY
 4                         Criminal Division
                           United States Courthouse
 5                         312 N. Spring Street
                           Los Angeles, California 90012
 6                         213.894.6683

 7   FOR THE DEFENDANT:    ANGEL NAVARRO LAW OFFICE
                           BY:  ANGEL NAVARRO, ESQ.
 8                         714 West Olympic Boulevard Suite 450
                           Los Angeles, CA 90015
 9                         213-744-0216
                           Fax: 213-746-4435
10                         Email: angel_navarro@me.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          *Los Angeles, California, Monday, November 3, 2014;*

2                              *10:00 a.m.*

3                                *-o0o-*

4          THE CLERK:  Item Number 1, criminal case 14-00209,

5    United States of America v. Ismael Gutierrez-Vilavazo.

6          Counsel.

7          MS. SCOTT:  Good morning, Your Honor.  Angela

8    Scott for the United States.

9          THE COURT:  Thank you, Ms. Scott.

10         MR. NAVARRO:  Good morning, Your Honor.  Angel

11   Navarro with Mr. Gutierrez-Vilavazo, who is seated to my

12   left.

13         THE COURT:  All right.  Thank you, Mr. Navarro.

14         All right.  We have several in limine motions

15   here.

16         Ms. Scott, do you wish to be heard?

17         MS. SCOTT:  Thank you, Your Honor.  And initially

18   to clarify something.  In August, I filed the motion in

19   limine regarding the government's testifying source's

20   conversations with Defendant Vilavazo.

21         THE COURT:  Yes.

22         MS. SCOTT:  In that motion, I stated that the

23   testifying source was not a drug trafficker, and that was

24   based on information that the government had about the

25   testifying source's criminal history, as well as statements

1    that the testifying source had made to the case agent and to

2    the prosecutors, including myself.

3              Last week, I learned that another confidential

4    source, who I'll refer to as CS-2, made some statements

5    regarding the government's testifying source's participation

6    in drug trafficking.  I have produced those statements to

7    the defense, and I contacted --

8              THE COURT:  Excuse me, a minute.

9              Would you stop the talking, please.  The only

10   talking takes place within the bar of the court, when we're

11   in session.

12             Go ahead.  I'm sorry.

13             MS. SCOTT:  I produced those statements to the

14   defense, and I contacted CS-2 myself to interview CS-2 about

15   those statements, and I produced my interview notes to the

16   defense.

17             I learned that, while CS-2 has never seen the

18   government's testifying source deal drugs or pay money to

19   buy drugs, CS-2 stated that the government's testifying

20   source has, for instance, mentioned to another person, who

21   was looking for better quality drugs, that the testifying

22   source had a good drug connection.  Such statements could be

23   just mere puffery, as the government's testifying source did

24   run with drug traffickers.

25             However, to the extent it weighs against the

1    reliability under 404(b) analysis, I wanted to bring it to

2    the Court's attention.

3            I do not, however, believe that it precludes the

4    source from testifying about these conversations.

5            For instance, in *United States v. Romero*, 282

6    F.3d, 683, a Ninth Circuit case in 2002, a defendant was

7    charged with conspiracy to distribute cocaine, but he

8    claimed that he intended just to steal money from the drug

9    dealer, not sell drugs.  The government called a

10   confidential informant, who testified about her prior drug

11   dealings with the defendant, including when she began

12   selling drugs for the defendant and her travel with him to

13   sell cocaine.

14           The Ninth Circuit held that that was admissible

15   under 404(b), and regarding reliability, stated that this

16   evidence also meets the low threshold of the third prong of

17   our 404(b) analysis.  There was sufficient proof of the

18   prior acts at issue because they were admitted through the

19   testimony of a confidential source whose credibility was

20   left to the jury.

21           And the government would submit that the

22   testifying source will be testifying in this case, and the

23   defense will have the opportunity to cross-examine him on

24   any prior drug trafficking.

25           So for that reason, I don't -- the government does

1  not believe that, despite the -- the statements of CS-2,

2  that the testifying source should be precluded from

3  testifying about these conversations that the testifying

4  source had with Defendant Vilavazo.

5         THE COURT:  Mr. Navarro, do you want to respond to

6  this clarification by the government?

7         MR. NAVARRO:  Well, Your Honor, first of all --

8         THE COURT:  Well, why don't you come to the

9  lectern.  And the both of you in the future for the benefit

10  of the reporter.

11         MR. NAVARRO:  Good morning, Your Honor.

12         THE COURT:  Good morning.

13         MR. NAVARRO:  With regard to this new evidence,

14  Your Honor, I believe government counsel produced it on

15  October 31st; and for reasons that are a mystery to me, they

16  were not in the -- I didn't get them till this morning.  I

17  had to double-check the emails.  There were about five

18  emails with a number of attachments.  And government counsel

19  did provide them to me this morning.  I haven't had a chance

20  to do any research on this issue, so I would ask for the

21  Court to allow me, if necessary, to file additional briefing

22  on this issue.

23         I do believe, though, that it's pretty

24  straightforward, and I may cross-examine the witness with

25  regard to those issues, Your Honor.  I think I'm entitled to

1    that, and I don't think government counsel opposes that.

2            THE COURT:  All right.  Thank you.

3            Let's get to the matters that we have before us

4    today, Ms. Scott.  If you'll come to the lectern.

5            MS. SCOTT:  There are three motions in limine that

6    the government filed.  The first two that the government

7    would like to discuss are related, and they concern, as the

8    government already mentioned, the testifying source's

9    conversations that he had with Defendant Vilavazo about

10   Defendant Vilavazo's drug trafficking.

11           And the second are the items of drug trafficking

12   evidence seized from a location associated with Defendant

13   Vilavazo.

14           Regarding the first, as the government stated in

15   its brief, the conversations are inextricably intertwined

16   with this case, because the source is going to -- the case

17   involves recordings of Defendant Vilavazo arranging a drug

18   deal that Defendant Vilavazo never actually attended.

19   Another former defendant in this case actually delivered the

20   drugs to the testifying source, so it's imperative that the

21   testifying source be allowed to explain how all of this came

22   to be, because otherwise all the jury will be hearing is

23   recordings in a vacuum.

24           So, for that reason, the government would submit

25   that these conversations, this background, permits the

1   government to tell a comprehensible story about how this

2   narcotics trafficking deal evolved.

3          Additionally, the government also believes it is

4   proper 404(b) evidence, if the Court does not find it

5   inextricably intertwined, for the reasons stated in the

6   government's brief, especially because it does go directly

7   to the defendant's knowledge.  And the government isn't

8   certain of the defendant's defense in this case, but I

9   suspect that the defendant, if he does admit that that's him

10  on the recordings, it would be something to the effect of he

11  did not know that he was arranging a drug deal, or something

12  to that extent.  So the testimony about his knowledge from

13  the confidential source would go directly to that defense.

14          And then regarding the drug trafficking

15  evidence --

16          THE COURT:  Well, before that, with regard to this

17  alleged drug dealing that was overheard and the

18  conversation, what was the amount of drugs involved there?

19          MS. SCOTT:  The amount of drugs that the

20  confidential source -- the conversations?

21          THE COURT:  Supposedly.

22          MS. SCOTT:  I'm unaware of the specific amount of

23  drugs, and I think it was --

24          THE COURT:  Is it important at all?

25          MS. SCOTT:  I don't believe so.  I think it is

1  more generally just the knowledge that the defendant had of

2  drug trafficking and his experience in it.

3          THE COURT:  Well, suppose he was just a

4  nickel/dime dealer.

5          MS. SCOTT:  Well, actually --

6          THE COURT:  And that's not what's alleged in this

7  indictment.

8          MS. SCOTT:  In this indictment, the amount alleged

9  is 48.6 grams, I believe, which isn't a large amount, at

10 least by federal standards, but I believe that the

11 conversations that the source had would demonstrate that.

12 While it doesn't go to quantity, it would demonstrate his

13 mode of operation, and the fact that he was quite involved

14 in drug trafficking, which would correspond to the amount of

15 drugs dealt here.

16         THE COURT:  And you get this from his telling

17 someone who's never been involved in drugs himself in a

18 conversation that he had with this defendant; is that right?

19         MS. SCOTT:  Yes.  And, as the government indicated

20 in its brief, a lot of these conversations took place in the

21 presence of a person by the name of Nester Hernandez, who is

22 now deceased.

23         THE COURT:  Yes.

24         MS. SCOTT:  And that is the confidential source's

25 connection to Defendant Vilavazo; he was a friend of Nester

1   Hernandez.  So whether or not he was a drug trafficker, he

2   did learn, I think, a lot about the business from Nester

3   Hernandez.  And in so doing, had overheard conversations by

4   Defendant Vilavazo about that.  And, of course, as the Court

5   is indicating here, the defense could very easily

6   cross-examine him on those issues about whether he really

7   understood what he heard.

8           THE COURT:  Yes, I understand they intend to.

9           I came into this case late.  There was another

10  defendant.  What happened to that defendant?

11          MS. SCOTT:  That defendant, Defendant Huerta, the

12  government still believes to this day was the person who

13  delivered the methamphetamine to the confidential source.

14          THE COURT:  But he's been dismissed?

15          MS. SCOTT:  He's been dismissed because initially

16  there was -- the confidential source misidentified him.  The

17  confidential source later identified Defendant Huerta under

18  circumstances that seemed reliable, but in preparation for a

19  suppression hearing on the confidential source's

20  identification, the confidential source again misidentified

21  Defendant Huerta.  And at that point, the government didn't

22  feel that it could proceed with the case with those two

23  misidentifications.

24          Now the difference between those situations and

25  Defendant Vilavazo is:  The source met with Defendant Huerta

1    in a parking lot for five minutes and had not met with him

2    prior to that, whereas Defendant Vilavazo, the sources met

3    repeatedly and known for a significant period of time.  So

4    the government does not feel that there will be the same

5    credibility issues there with identification.

6                THE COURT:  All right.  Thank you for that.

7                Go ahead.

8                MS. SCOTT:  Regarding the drug trafficking

9    evidence that was found in -- at a residence that the

10   government can establish was associated with Defendant

11   Vilavazo, and it is strong evidence again of defendant's

12   knowledge of drug trafficking.

13               THE COURT:  And, of course, it was found after.

14               MS. SCOTT:  It was found after, and I did research

15   that issue and found case law that despite that, it can

16   still go to defendant's knowledge.  And especially in this

17   case when it was only four months after and it was, you

18   know, it was evidence so clearly indicative of narcotics

19   trafficking, such as a scale with methamphetamine residue on

20   it, and baggies, and a pay-owe sheet.  Again, for those

21   reasons, the government would seek to admit that as

22   knowledge.

23               THE COURT:  How do you prove that it's a pay-owe

24   sheet for something -- for drugs, when it's found supposedly

25   at a cockfighting residence?

```
 1              MS. SCOTT:  And that would be something for the

 2    expert to testify about, and certainly if that is at

 3    issue --

 4              THE COURT:  And the expert's a DEA agent?

 5              MS. SCOTT:  Yes.  But I recognize that, that is an

 6    issue, and perhaps -- well, defense, of course, could

 7    cross-examine the DEA agent about that.  But, secondly, it

 8    was found in a vehicle that had evidence of narcotics

 9    trafficking in it.

10              THE COURT:  All right.

11              MS. SCOTT:  And then with regard to the last

12    motion, the motion to exclude the joke made by the --

13              THE COURT:  That will be excluded.

14              MS. SCOTT:  Sorry.

15              THE COURT:  I think -- don't think there was any

16    intent on your part, was there, Mr. Navarro?

17              MR. NAVARRO:  No, Your Honor.  Not at all.

18              THE COURT:  All right.  As long as the rest of it

19    comes in.

20              MS. SCOTT:  And with that, then the government

21    would submit on its briefing.  Thank you, Your Honor.

22              THE COURT:  Very well.  Mr. Navarro.

23              MR. NAVARRO:  Thank you, Your Honor.

24              Your Honor, it's been a long time since I've been

25    in a trial before you, probably been about 19 years, maybe a
```

1    little less.

2         THE COURT:  Still remembering some of the

3    parameters, do you?

4         MR. NAVARRO:  As do I, Your Honor.  The point I

5    want to make is:  We have experts of all kinds, which the

6    government tries to use in cases, and it's particularly

7    dangerous in this case.  As Your Honor pointed out, for

8    example, the pay-owe sheets, I believe, may have to do with

9    cockfighting, and I don't see how an expert can come in and

10   say that those pieces of evidence, which were found months

11   after our investigation, have to do with my client's drug

12   dealing.  And, to me, that's classic 404(b), but let me back

13   up a little bit.

14        As Your Honor is correct and, as the government

15   has pointed out, this was a two-defendant case where one of

16   the defendants was dismissed after the informant

17   misidentified him for the second time.  And he had

18   misidentified him initially at the criminal complaint stage

19   of the case, so the government was aware there was an issue

20   with identification of Defendant Number 2.  Not my client,

21   public defender client.  He was dismissed probably properly

22   so.  If the informant can't identify him, I don't see how he

23   can testify against him.

24        With regard to my client, Your Honor, the

25   government is trying to introduce, I believe, ten separate

1    pieces of evidence.  The first four have to do with

2    conversations which took place months before the

3    investigation of this case, from what I understand.  These

4    were unrecorded, they're unsubstantiated.  The only way they

5    could be authenticated is through the witness's testimony,

6    and it creates such an unfair setting for my client because

7    he can come in and say a number of things.

8            And I'm particularly concerned about him going

9    back and testifying about meetings that took place and

10   things he overheard, because what I've gathered, from

11   reviewing that discovery, is that this informant believes my

12   client was involved in a murder of this Nester Hernandez,

13   and to me that gives him the motive to try to pin something

14   on my client.  And it's dangerous -- if I start asking

15   questions about a murder, the jurors may focus on a murder.

16   And this is not a murder case.  That's across the street.

17   That's not here.  And I'm very concerned about that

18   informant coming in and talking about those four things.

19           With regard to the evidence that was found at the

20   residence involving the scale --

21           THE COURT:  Let's stop right now.  With regard to

22   the murder, what is the government's position?

23           MS. SCOTT:  The government does understand the

24   prejudice that could inject into a trial, and the government

25   would be willing to sanitize it, if at all possible.

1          THE COURT:  Well, it's not a matter of being

2     willing to.  We're not going to have a side trial regarding

3     the murder, so instruct your witness properly.

4          MS. SCOTT:  The government will.

5          And, Your Honor, the other thing I was considering

6     is the defense, though, will probably want to cross-examine

7     the source about his motive, which is exactly as the

8     defendant claimed so --

9          THE COURT:  The defense is not going to have it

10    both ways.  It's going to be excluded, and we're just not

11    going to go into any motive that leads to the murder.

12         Go ahead.  Thank you for that.

13         Go ahead.

14         MR. NAVARRO:  Thank you, Your Honor.

15         There were two physical pieces of evidence which

16    were referenced by the government in their second motion in

17    limine having to do with a scale that was found at the

18    residence, which apparently --

19         THE COURT:  It was found in his car, wasn't it?

20         MR. NAVARRO:  I believe it was in the car, yes.

21    I'm sorry.  It was in the car.

22         THE COURT:  But the car was in the garage of this

23    residence?

24         MR. NAVARRO:  I believe that's --

25         MS. SCOTT:  At the rear of the property.

1          MR. NAVARRO:  At the rear of the property.

2          There was a scale found.  There was this pay-owe

3    sheet, but there was also documents found which tie

4    ownership of that vehicle to both my client and Mr. Nester

5    Hernandez.

6          THE COURT:  Yes.

7          MR. NAVARRO:  So there's really a question as to

8    who the scale belongs to and who the pay-owe belongs to.

9    I'm not going to tell the government what to do, but if they

10   had a handwriting expert, for example, who would establish

11   that it's my client's handwriting, that's one issue.  But,

12   again, we're talking about months later, though.  To me,

13   there's a problem with that, at least from our perspective,

14   that that type of evidence should be coming in.

15         Then there's Exhibits A through D, which the

16   government has filed in its second motion, and those were

17   also items of evidence that were found at the residence.  I

18   can't object to the government introducing evidence having

19   to do with ownership of a vehicle, as long as it's relevant,

20   and I think --

21         THE COURT:  And the ownership, as I understand it,

22   goes to both the murdered individual as well as your

23   defendant; is that right?

24         MR. NAVARRO:  That's correct.  I just don't see --

25   there's so many -- there's so many ways this evidence could

1   be misinterpreted by a jury, that I'm very much concerned of

2   my client asserting his right to go to trial, remaining

3   silent and having the government prove or not prove the

4   charges, and yet somehow all this evidence is coming in as

5   404(b) against him.  It will be one thing if he took the

6   stand, then that's a different story, and I probably can't

7   make these arguments if my client testifies.  But if my

8   client asserts his right to remain silent, as he has a right

9   to do so, I should be able to defend him.

10          And if the government is allowed to bring in

11  additional evidence without -- that's not authenticated,

12  that's months after the fact that I don't see related to my

13  client's investigation of this case, I think it's going to

14  create a prejudicial effect to my client.  And I think I've

15  referenced 403, Your Honor, as well.  Rule 403 in my

16  opposition, Your Honor.

17          Unless you have additional questions, Your Honor,

18  I would submit it.

19          THE COURT:  All right.  Something further from the

20  government?

21          MS. SCOTT:  No, Your Honor.  Thank you.

22          THE COURT:  All right.  It seems, to me, it is

23  going to be somewhat difficult for the government in this

24  instance, and there is no requirement -- whether there ought

25  to be or not is another thing -- but as I understand it,

```
 1   there is no requirement that the defense inform the
 2   government, at this stage at least, whether his client, his
 3   or her client, tends to testify, and I'm not really sure
 4   what we're going to be able to do until such a determination
 5   is made.
 6            I take it that you've discussed with your client
 7   both the pros and cons, his right to testify, if he chose to
 8   do so, and, of course, his constitutional right not to
 9   testify.  And if he were to testify, that puts himself in
10   jeopardy and not only from questions from the government,
11   but perhaps even from you on direct.  I don't know if you've
12   had any of these conversations with your client yet or not.
13   Have you, Mr. Navarro?
14            MR. NAVARRO:  Your Honor, we've had these
15   discussions probably every time we meet.  And when the
16   latest motion was filed, it really sheds new light into
17   reasons as to why my client should not be testifying.
18            And you're correct, he hasn't decided whether he
19   will testify or not.  I'm advising him as to what I think he
20   should do, but ultimately it will be his decision.  And
21   depending, if he testifies, the case will go a certain way;
22   and if he doesn't testify, the case will go a different way,
23   Your Honor.  That's the best I can tell you.
24            THE COURT:  All right.  Well, it appears, to me,
25   that, with regard to the "admission of the narcotics
```

1   trafficking" -- ought to be in quotes -- evidence that was

2   seized from the Gridley address, the government should be

3   able to put it in.

4          You, of course, Mr. Navarro, on cross-examination,

5   if the government doesn't in its case-in-chief point out

6   that it's found in a vehicle, the ownership of which was in

7   several hands at the time, and also on the previous person's

8   hands before the two -- defendant, as well as the individual

9   who was murdered -- so that will come in.

10          What is the other one?  I've already indicated

11   that the reference to the joke made by a translator will not

12   come in, but the rest of that statement by the translator, I

13   would imagine the defense would want to have come in, it

14   will come in.

15          And what else do we have?  There were three.  What

16   is the other?

17          MS. SCOTT:  And then the remaining is the

18   conversation that the testifying source overheard or had

19   with Defendant Vilavazo.

20          THE COURT:  And it goes even beyond that, as I

21   understand it.  Not only supposed conversations overheard

22   with this defendant, but also with the individual who was

23   murdered; is that right?

24          MS. SCOTT:  That is correct, Your Honor.

25          THE COURT:  We're certainly not going to have that

1  come in.  With regard to what he supposedly overheard with

2  regard to this defendant, it will come in.

3           MS. SCOTT:  Yes, Your Honor.

4           THE COURT:  All right.  Anything else from either

5  counsel?

6           MS. SCOTT:  Nothing from the government,

7  Your Honor.

8           MR. NAVARRO:  No, Your Honor.  Thank you.

9           THE COURT:  Thank you.

10          Ms. Skipper, we have a trial date still, do we, on

11 this?

12          THE CLERK:  Yes, November 25th.

13          THE COURT:  All right.  It will be a nice

14 Thanksgiving for somebody.  I don't know who.  The

15 government, defense, somebody.

16          MR. NAVARRO:  We will be here.

17          THE COURT:  All right.  Thank you both.

18          MR. NAVARRO:  Thank you, Your Honor.

19     *(Thereupon, at 10:28 a.m., proceedings adjourned)*

20

21                          *-oOo-*

22

23

24

25

1

2

3                              *CERTIFICATE*

4

5          *I hereby certify that pursuant to Section 753,*

6    *Title 28, United States Code, the foregoing is a true and*

7    *correct transcript of the stenographically reported*

8    *proceedings held in the above-entitled matter and that the*

9    *transcript format is in conformance with the regulations of*

10   *the Judicial Conference of the United States.*

11

12   *Date:  October 8, 2015*

13

14                                 *Lisa M. Gonzalez*
                          */s/_____*
15                        *Lisa M. Gonzalez, U.S. Court Reporter*
                          *CSR No. 5920*
16

17

18

19

20

21

22

23

24

25