1          **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3       **HONORABLE TERRY J. HATTER, U.S. DISTRICT JUDGE**

4

5  **UNITED STATES OF AMERICA,**       )
                             )

6            **Plaintiff,**     )
                             )

7     **vs.**              )   **Case No. CR-14-0209-TJH**
                             )        **Volume I**

8  **ISMAEL GUTIERREZ VILAVAZO,**   )    **(Pages 1 - 240)**
                             )

9           **Defendant.**     )
                             )

10

11

12       **REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS**
                 **TRIAL DAY 1**

13          **TUESDAY, MAY 19, 2015**
                 **10:07 A.M.**

14        **LOS ANGELES, CALIFORNIA**

15

16

17

18

19

20

21

22

23     **CAROL JEAN ZURBORG, CSR NO. 7921, CCRR**
         FEDERAL OFFICIAL COURT REPORTER

24      312 NORTH SPRING STREET, ROOM 414
        LOS ANGELES, CALIFORNIA  90012

25           (213) 894-3539

1        **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4        EILEEN DECKER
         United States Attorney
5        BY:  KIMBERLY D. JAIMEZ
              MICHAEL AZAT
6             STEPHANIE CHRISTENSEN
              Assistant United States Attorneys
7        United States Courthouse
         312 North Spring Street
8        Los Angeles, California  90012

9   **FOR THE DEFENDANT:**

10       ANGEL J. NAVARRO
         Attorney at Law
11       714 West Olympic Boulevard, Suite 450
         Los Angeles, California  90015

12  **ALSO PRESENT:**

13
         **MICHAEL ALKER, Federal Bureau of Investigation**
14

15

16

17

18

19

20

21

22

23

24

25

1          **INDEX OF WITNESSES**

2

3     PLAINTIFF'S WITNESSES                                    PAGE

4     McGRAW, Jonathan

5          Direct Examination by Ms. Jaimez              154

6          Cross-Examination by Mr. Navarro             158

7

8     ALKER, Michael

9          Direct Examination by Mr. Azat               160

10         Cross-Examination by Mr. Navarro             207

11         Redirect Examination by Mr. Azat             230

12         Recross-Examination by Mr. Navarro           235

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1                       INDEX OF EXHIBITS

 2                                      FOR              FOR
                                   IDENTIFICATION     EVIDENCE
 3      NUMBER   DESCRIPTION            PG.              PG.

 4      708  -  Collierville, Tennessee Police                157
                Department Incident Report
 5
        101  -  Photos of texts dated 9/19/13               165
 6
        102  -  Audio for telephone call on 9/25/13         165
 7
        103  -  Audio for telephone call on 9/25/13         165
 8
        104  -  Photos of texts dated 9/25/13               165
 9
        105  -  Photos of texts dated 9/26/13               165
10
        106  -  Photos of texts dated 9/26/13               165
11
        107  -  Audio for telephone call on 9/26/13         165
12
        108  -  Audio for telephone call on 9/26/13         165
13
        109  -  Audio for telephone call on 9/26/13         165
14
        110  -  Audio for telephone call on 9/26/13         165
15
        111  -  Audio recording of controlled purchase      165
16              on 9/26/13

17      112  -  Audio for telephone call on 10/7/13         165

18      113  -  Audio for telephone call on 10/7/13         165

19      114  -  Audio for BOP call on 7/5/14                165

20      905  -  Photograph of DMV record                    165

21      101A -  Transcript of texts on 9/19/13              167

22      102A -  Transcript of call on 9/25/13               167

23      103A -  Transcript of call on 9/25/13               167

24      104A -  Transcript of texts on 9/25/13              167

25      105A -  Transcript of texts on 9/26/13              167
```

**UNITED STATES DISTRICT COURT**

**INDEX OF EXHIBITS (Continued)**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|:---:|:---:|
| 106A - | Transcript of texts on 9/26/13 | | 167 |
| 107A - | Transcript of call on 9/25/13 | | 167 |
| 108A - | Transcript of call on 9/26/13 | | 167 |
| 109A - | Transcript of call on 9/26/13 | | 167 |
| 110A - | Transcript of call on 9/26/13 | | 167 |
| 112A - | Transcript of call on 10/7/13 | | 167 |
| 113A - | Transcript of call on 10/7/13 | | 167 |
| 401 - | Toll records and historical cell site information re (818) 263-3398 | | 168 |
| 401A - | Custodian of records re toll records and historical cell site information for (818) 263-3398 | | 168 |
| 402 - | Toll records re (818) 602-1716 | | 168 |
| 402A - | Custodian of records re toll records for (818) 602-1716 | | 168 |
| 403 - | Toll records re (818) 471-2618 | | 168 |
| 403A - | Custodian of records re toll records for (818) 471-2618 | | 168 |
| 404 - | Toll records re (818) 720-7725 | | 168 |
| 404A - | Custodian of records re toll records for (818) 720-7725 | | 168 |
| 511 - | Historical cell site information for (818) 263-3398 | | 168 |
| 511A - | Custodian of records re historical cell site information for (818) 263-3398 | | 168 |
| 704 - | Trulincs inmate information | | 168 |

**INDEX OF EXHIBITS (Continued)**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 704A - | Custodian of records for Truview logs | | 168 |
| 705 - | DMV certified records of Rosalva Gutierrez | | 168 |
| 706 - | DMV certified records of Maria de Los Angeles Vilavazo | | 168 |
| 707 - | DMV certified records of Maria Azucena Alvarez Chavez | | 168 |
| 801 - | Subscriber information for (310) 529-0607 | | 168 |
| 802 - | Custodian of records for (310) 529-0607 | | 168 |
| 803 - | Subscriber information for (818) 915-7044 | | 168 |
| 804 - | Custodian of records re subscriber information for (818) 915-7044 | | 168 |
| 805 - | Subscriber information for (818) 471-2618 | | 168 |
| 805A - | Custodian of records for (818) 471-2618 | | 168 |
| 806 - | Subscriber information for (818) 720-7725 | | 168 |
| 806A - | Custodian of records re subscriber information for (818) 720-7725 | | 168 |
| 901 - | DMV certified records of Ismael Gutierrez Vilavazo | | 168 |
| 912 - | Marriage certificate | | 168 |
| 914 - | Certified booking photograph of Jorge Beristain Huerta | | 168 |

**INDEX OF EXHIBITS (Continued)**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|------------------|
| 405 – | Toll summary for (818) 602-1716 on 9/19/13 | | 173 |
| 406 – | Toll summary for (818) 602-1716 on 9/25/13 | | 173 |
| 407 – | Toll summary for (818) 263-3398 on 9/25/13 | | 173 |
| 408 – | Toll summary for (818) 602-1716 on 9/25/13 | | 173 |
| 409 – | Toll summary for (818) 471-2618 on 9/25/13 | | 173 |
| 410 – | Toll summary for (818) 602-1716 on 9/26/13 | | 173 |
| 411 – | Toll summary for (818) 263-3398 on 9/26/13 | | 173 |
| 412 – | Toll summary for (818) 602-1716 on 9/26/13 | | 173 |
| 413 – | Toll summary for (818) 263-3398 on 10/7/13 | | 173 |
| 910 – | Photograph of Audi | | 177 |
| 414 – | Pivot table for (818) 263-3398 | | 195 |
| 201A – | Photograph of 55.9 grams of a mixture containing methamphetamine | | 200 |
| 902 – | 2008 Chrysler 300 registration | | 203 |
| 919 – | 2002 Ford Explorer registration | | 204 |

1        **LOS ANGELES, CALIFORNIA; TUESDAY, MAY 19, 2015**

2                        **10:07 A.M.**

3                        **--oOo--**

4        THE COURTROOM DEPUTY:  Please remain seated and come

5   to order.  This court is now in session.  The Honorable Terry

6   J. Hatter, Jr., presiding.  Criminal case 14-209; United States

7   of America versus Ismael Gutierrez Vilavazo.

8        Counsel?

9        MS. JAIMEZ:  Good morning, Your Honor.  Kimberly

10  Jaimez on behalf of the United States.  With me at counsel

11  table are Assistant United States Attorneys Michael Azat and

12  Stephanie Christensen, as well as FBI Case Agent Michael Alker.

13       THE COURT:  Good morning, all.

14       MR. NAVARRO:  Good morning, Your Honor.  Angel

15  Navarro, present with Mr. Vilavazo.

16       THE COURT:  Good morning both.

17     The special agent is with which agency?

18       SPECIAL AGENT ALKER:  FBI, Your Honor.

19       THE COURT:  FBI, okay.

20     Anyone have any matters to take up?  Because I have a few.

21       MS. JAIMEZ:  Yes, Your Honor, the Government does

22  have a few housekeeping matters.

23       THE COURT:  Go ahead, Ms. Jaimez.

24       MS. JAIMEZ:  Your Honor, the Government would like

25  to note that during our presentation, we intend to play Spanish

1  recordings with simultaneous translations on the monitors in

2  English.  We intend to actually admit into evidence the

3  translations -- or transcripts of the translations.  We've met

4  and conferred with the defense, and there is no objection from

5  the defense.  We just wanted to know whether or not it's

6  amenable to the Court.

7           THE COURT:  It's fine.

8           MS. JAIMEZ:  In addition, as I mentioned, the

9  Government has transcript binders of the English translations.

10 It is the Government's preference to provide those transcript

11 binders at the end of the trial so that the jurors are not

12 distracted, if that's okay with the Court.

13          THE COURT:  Yes, you may do so.

14          MS. JAIMEZ:  In addition, Your Honor, the Government

15 would like to ask for permission to refer to the CI as either

16 Nica, his nickname, or by his first name, and the reason being

17 is that he has the same last name as one of the defendant's

18 last name, Gutierrez.

19          THE COURT:  When you say "one of the defendant's,"

20 that's one of the items we need to take up.  There's only one

21 defendant.

22          MS. JAIMEZ:  So the defendant has two last names,

23 Gutierrez Vilavazo, and on some of the exhibits it simply says

24 Ismael Gutierrez.  So if we are referring to the confidential

25 informant as Mr. Gutierrez, it could potentially become

1    confusing for the jurors.  And so one solution may be to either

2    refer to him by his first name or by his nickname.

3              THE COURT:  Well, you might use his complete name.

4              MS. JAIMEZ:  Yader Gutierrez?

5              THE COURT:  Yes.

6              MS. JAIMEZ:  Okay.  Thank you, Your Honor.

7         In addition, the Government would simply note that

8    Your Honor will recall that there was an application to

9    disclose the identity of a CI involved with this investigation

10   that went by the name of CS-2, and at the conclusion of the

11   hearing on that matter, the Court instructed the defense to

12   provide questions for the Government to ask CS-2.  After

13   meeting and conferring, the defense ultimately decided not to

14   provide any questions.

15             THE COURT:  I see.

16             MS. JAIMEZ:  I would also note, Your Honor, that

17   FBI Agent Alker will be in the courtroom during the trial as

18   he's assisting us with the exhibits, if that's okay with the

19   Court.

20             THE COURT:  It is.

21             MS. JAIMEZ:  And he will be going back and forth to

22   get the witnesses.

23             THE COURT:  Of course.  And to make sure that any

24   law enforcement witnesses have checked their weapons before

25   coming here into the courtroom.

1           And have you checked yours, Agent?

2               SPECIAL AGENT ALKER:  Yes, sir.

3               MS. JAIMEZ:  Also, Your Honor, we would note there

4    is one motion in limine that is pending that was filed by the

5    Government, but given the defendant's representations that the

6    defense will not be using the evidence the Government sought to

7    exclude, that motion in limine is now moot.

8               THE COURT:  Is that the one with regard to --

9               MS. JAIMEZ:  Extramarital affairs, Your Honor.

10              THE COURT:  It wouldn't come in.

11              MS. JAIMEZ:  And finally, one matter, one final

12   matter, during the Government's opening, we do intend to use

13   one slide of the -- a picture of the drugs, Your Honor.  And

14   the Government has already conferred with the defense, and

15   again, the defendant had no objection, if that's okay, again,

16   with the Court.

17              THE COURT:  That's fine.

18              MS. JAIMEZ:  Finally, Your Honor, one additional

19   matter.  We do have drugs, the actual physical evidence, the

20   drugs that were purchased in the September 2013 deal in the

21   Court, and we were going to refer to those during witness

22   examination, if that's okay.

23              THE COURT:  And where are they at this point?

24              MS. JAIMEZ:  They're currently here below counsel

25   table with the FBI agent.

```
 1              THE COURT:  All right.  So the agent would bring it
 2   up at the needed time?
 3              MS. JAIMEZ:  Yes, Your Honor.
 4              THE COURT:  All right.
 5              MS. JAIMEZ:  Thank you, Your Honor.  Nothing
 6   further.
 7              THE COURT:  And those drugs would be kept with the
 8   agent.  We don't need to keep them here in the courtroom.
 9              MS. JAIMEZ:  Yes, at all times the drugs would be
10   kept with the agent, Your Honor.
11              THE COURT:  All right.  Anything else?
12              MS. JAIMEZ:  Actually, there is one more matter,
13   Your Honor, I would note.  We will not be seeking to admit
14   particular evidence, 404(b) evidence that was admitted in a
15   motion in limine that the Court granted with respect to the
16   Ridley Street items:  The scale, some baggies and a small baggy
17   with methamphetamine residue in it.  We won't be seeking to use
18   any of that evidence in our case.
19              THE COURT:  Very well.
20              MS. JAIMEZ:  All right.  Thank you, Your Honor.
21              THE COURT:  All right.  Mr. Navarro, anything?
22              MR. NAVARRO:  Good morning, Your Honor.
23              THE COURT:  Good morning.
24              MR. NAVARRO:  Your Honor, I have looked at your
25   order, and you require a witness list.  As of right now I don't
```

```
 1   have a witness list.  That may change, though, as the case
 2   progresses.  I have seen that the Government has seven
 3   witnesses, and there is really one in particular that I'm
 4   concerned with.  That's the informant.  And depending on what
 5   he testifies to, I may have witnesses, Your Honor.
 6             THE COURT:  All right.  Which witness is that?
 7             MR. NAVARRO:  That's Mr. Yader Gutierrez,
 8   Your Honor.  I believe it's Witness No. 3.  I don't expect to
 9   have any witness with regard to the other witnesses, but just
10   with him, Your Honor, perhaps.
11             THE COURT:  And with regard to your client, have you
12   discussed with him his right to testify?
13             MR. NAVARRO:  We have, Your Honor.
14             THE COURT:  And also possible perils that might take
15   place if he were to do so, not only with regard to questions
16   from the prosecution, but, indeed, in response to some
17   questions from you, indeed?  Have you talked to him fully about
18   those things?
19             MR. NAVARRO:  Your Honor, we have discussed it, and
20   I will let you know.  My client does not intend to testify in
21   this trial.
22             THE COURT:  All right.  That's up to you after you
23   have made this intelligent decision and made sure that your
24   attorney and you go over these matters.  All right.
25             MR. NAVARRO:  As of right now, Your Honor, his
```

```
 1   intention is not to testify.
 2            THE COURT:  I see, but it could change.  All right.
 3       Anything further from either side?  If not --
 4            MS. JAIMEZ:  No, Your Honor.
 5            THE COURT:  You pronounce your name Jaimez?
 6            MS. JAIMEZ:  Your Honor, I pronounce may name
 7   Jaimez.
 8            THE COURT:  All right.  If we did that with La
 9   Jolla, I don't know if it would be La Jolla.  All right.  Thank
10   you for that.
11       With regard to the indictment, which is going to have to
12   be redacted, we are here with one defendant now, not two.  And
13   I'm not a fan of these AKAs and all.  It has nothing to do with
14   a sorority by the same name.  Is there something in the
15   evidence where there's a possibility that this defendant,
16   Ismael Gutierrez Vilavazo, might be called Ismael Gutierrez?
17   Mike Gutierrez?  Mikey?  Is there something that where it's
18   really necessary to have this?
19            MS. JAIMEZ:  Yes, Your Honor.  In fact, with respect
20   to the recorded calls, part of the case by the Government will
21   be that one of the things that connects the calls to the
22   defendant is the fact that the CI refers to Mikey, which is one
23   of the aliases of the defendant.
24            THE COURT:  All right.  So that's one.  What about
25   Ismael Gutierrez?
```

1          MS. JAIMEZ:  Also, with respect to some exhibits,

2   Your Honor, there were just some exhibits that just refer to

3   Ismael Gutierrez, as opposed to Ismael Gutierrez Vilavazo, the

4   full name.  So that was another reason for including the alias.

5          THE COURT:  Same with Mike Gutierrez?

6          MS. JAIMEZ:  Mike and Mikey is used throughout

7   interchangeably on the calls.

8          THE COURT:  Could we have a stipulation that there

9   are these other names that are used by your client,

10  Mr. Navarro, so we can take these AKAs off of here?

11         MR. NAVARRO:  That's fine with me, Your Honor.

12         THE COURT:  Can we do that?

13         MS. JAIMEZ:  Yes, Your Honor.

14         THE COURT:  So we will clean up that and remove

15  Mr. Huerta as a defendant.  And then that would put us into

16  the -- first of all -- well, I guess you could still have the

17  aiding and abetting as alleged, but where you make mention of

18  Mr. Huerta as a defendant, in each of those places I would

19  suggest that you say "co-conspirator."

20         MS. JAIMEZ:  Yes, Your Honor.

21         THE COURT:  And every place where there's mention of

22  Mr. Huerta preceding it with "defendant," in each of those

23  places would be replaced with "co-conspirator."

24      And Counts Nine through Eleven, of course, are dismissed.

25  So we have an eight-count indictment as redacted; is that

```
 1   right?
 2              MS. JAIMEZ:  Yes, Your Honor.
 3              MR. AZAT:  That's correct.
 4              THE COURT:  I am looking at your witness list.  I
 5   don't see anything else with regard to the indictment at this
 6   time.  Two of the witnesses -- three are listed as experts:
 7   One a narcotics expert; one a forensic analysis expert, I take
 8   it; and one an expert in mapping of historical cell site
 9   analyses.
10       Let's take that last one.  Why do we need such an
11   individual, mapping of historical cell site analysis?  What is
12   that about?
13              MR. AZAT:  Your Honor?
14              THE COURT:  Mr. Azat.
15              MR. AZAT:  The historical cell site analysis is with
16   regards to Mr. Hansen testifying with regard to historical cell
17   phone records that were obtained from Defendant's phone in this
18   matter.
19              THE COURT:  Yes.
20              MR. AZAT:  From these records this witness will be
21   able to testify that certain maps were created from that
22   telephone when important calls were made in this case.  One of
23   the issues in this trial, Your Honor, is whether or not the
24   defendant was the individual on that phone coordinating this
25   drug deal.
```

1          THE COURT:  And some way you can place him somewhere

2    that shows that he is, indeed, the person?

3          MR. AZAT:  Yes, Your Honor.

4          THE COURT:  All right.  So then why do we need a

5    phone forensic analysis?

6          MR. AZAT:  The phone forensic analysis, Your Honor,

7    is a separate issue.  The phone forensic analysis, Your Honor,

8    pertains to an analysis of the sole phone belonging to Jorge

9    Huerta that was taken into custody at the time of his arrest.

10   Subsequently, the FBI conducted an analysis of that cell phone,

11   removing text messages, photographs, things of that nature,

12   Your Honor.

13         THE COURT:  Why do we need a witness to testify to

14   that?  Have you talked to the defense about stipulations with

15   regard to any of these matters?

16         MR. AZAT:  We have, Your Honor.  We have, indeed,

17   and we have three stipulations -- excuse me, one stipulation

18   was agreed to back in November.  However, after that point we

19   were unable -- or the defendant was unable to sign any further

20   stipulations, Your Honor.

21         THE COURT:  I see.

22      Mr. Navarro, have you looked at these matters, and you

23   prefer to have a witness come in here and talk about it with a

24   jury rather than stipulating?

25         MR. NAVARRO:  Well, Your Honor, if I may.

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Yes.
 2              MR. NAVARRO:  I don't really think it's relevant
 3    testimony, and if they want to bring in a witness -- the
 4    Government -- one of the prosecutors has indicated that one of
 5    the issues in this case is whether or not my client is the
 6    person on the phone.  I can tell you, Your Honor, I will tell
 7    the Government, I am not intending to argue that.  I would be a
 8    fool to do that.  I may be a fool, but not that much of a fool.
 9    So I am not going to argue that the person on the phone is
10    Ismael Gutierrez Vilavazo.
11       I haven't said otherwise, but if the Government wants to
12    bring in an expert and map that my client was in Tennessee at a
13    certain time, that's up to them.  I am not going to ask any
14    questions of these witnesses.  I don't think they add anything
15    to this case other than being experts.
16       In regards to Mr. Huerta's cell phone and the contents of
17    his cell phone, again, it's a little tricky there, because as
18    Your Honor knows, the case for Mr. Huerta has been dismissed --
19              THE COURT:  Yeah.
20              MR. NAVARRO:  -- for reasons that are not going to
21    be before this jury.
22              THE COURT:  Right.
23              MR. NAVARRO:  So that's a little complicated, and I
24    don't see the relevance of bringing in -- I don't think there's
25    anything -- I have looked at the cell phone.  I have looked at
```

1    the photographs.  I don't think there's anything in there that

2    I think is either relevant, or I don't think it is going to

3    help my client or is inculpatory or exculpatory, Your Honor,

4    unless I'm missing something.

5           THE COURT:  Thank you for that.

6       My eyesight isn't as good as it used to be.  I see someone

7    working in the back, maybe looking for the library, perhaps.

8           MR. NAVARRO:  That is the court interpreter,

9    Your Honor.

10          THE COURT:  Like I said, my eyesight isn't as good

11   as it used to be.  That's fine.

12      What else do we have?  Why do we need this Tennessee

13   arresting officer, Mr. Azat?

14          MR. AZAT:  For two reasons, Your Honor:  First, the

15   defendant admits his address and that that is actually his cell

16   phone that is at issue in this case to the arresting officer,

17   and also he was arrested at the same time that he made certain

18   calls relevant in this case, again tying into that phone,

19   Your Honor.  We think that information is relevant, and it

20   should be in front of the jury.

21      And to briefly respond to Mr. Navarro's comments regarding

22   Jorge Huerta's cell phone, Your Honor, we think that also is

23   relevant and should be in front of the jury, Your Honor,

24   because it does involve acts of a co-conspirator.

25          THE COURT:  All right.  Let's go over the procedure

```
1    that will be followed with regard to voir dire.  We are going
2    to bring the panel up shortly.
3        In that regard, Ms. Skipper, would you advise them before
4    they even come here to use the restroom, and we will wait.  And
5    when they get down here, if some of them have problems, go
6    again.  See if we can get through this without having to
7    interrupt it.  It's a problem sometimes.
8              THE COURTROOM DEPUTY:  Yes.
9              THE COURT:  All right.  We will have 12 of the
10   venirepersons seated before we commence the colloquy with them.
11   The first person coming in will seat his or herself in the
12   second row in the seat farthest from me, thereby becoming Juror
13   No. 1.  When six of those seats in the second row are filled,
14   leaving the last seat in the second row closest to me vacant,
15   for the time being, we will have six jurors there.  And the
16   seventh person who comes in will seat his or herself
17   immediately in front of Juror No. 1.
18       And after 12 of the venirepersons have seated themselves,
19   leaving both seats closest to me, back row and front row,
20   vacant, I will ask general questions of the venirepersons.
21   After I finish asking those general questions, I will turn to
22   counsel and both sides and ask if there are any additional
23   questions and/or challenge for cause.  I have proposed voir
24   dire questions from the Government.  I have not seen any from
25   the defense.
```

1      Mr. Navarro, have you filed some I haven't seen?

2           MR. NAVARRO:  Your Honor, I did not file any voir

3   dire questions.  I expect that the questions asked by

4   Your Honor will be sufficient, based on my experience.

5           THE COURT:  Thank you.

6      And if the Government has some questions, you should refer

7   to it by number, and I may or I may not ask it.  After we've

8   completed the general questions, then I will ask more specific

9   questions of each individual juror, particularly where they

10  reside, how long, what kind of work do they do, do they reside

11  with anyone, what do those individuals do if there is someone,

12  things of that nature, if they have children, they can tell us

13  about those kinds of things.

14     And again, after I have completed those kinds of

15  questions, I will ask counsel if there are any other additional

16  questions and/or challenge for cause.  Any questions about

17  that?

18          MS. JAIMEZ:  No, Your Honor.

19          THE COURT:  Mr. Azat?

20          MR. AZAT:  One question, Your Honor.

21          THE COURT:  Yes.

22          MR. AZAT:  When Your Honor asks if we have

23  additional questions and we do, in fact, have additional

24  questions, do we approach the Court and have a sidebar?

25          THE COURT:  No, no.  We are not going to have an

1   O.J. Simpson reprise here.  I don't like sidebars.  We will

2   keep those to a minimum.  There may be time even with the voir

3   dire that we will have the prospective juror come to the

4   sidebar.  If we have a sidebar, I expect counsel to come

5   around, come to the sidebar and --

6        Are we set up so that the reporter doesn't have to come

7   up, do we know?

8             THE COURTROOM DEPUTY:  Yes.  We just checked it.  It

9   works.

10            THE COURT:  All right.  It works.

11       Then when the reporter tells us that she's ready, we will

12   proceed at the sidebar.  But no, you just tell me which number

13   that you prefer me to, and I will look at it and decide whether

14   I will ask it or not.

15       The two seats that are left vacant, once we complete

16   seating the initial 12, we will have Alternate No. 1 in the

17   second vacant seat, and that is the second row, and then we

18   will seat two people.  The next person will be Alternate No. 2

19   in the front row.  If Alternate No. 2 is excused by either

20   side, then Alternate No. -- well, let's see.

21       If Alternate No. 1 is excused, then Alternate No. 2 will

22   move back to that seat becoming Alternate No. 1, and another

23   person will be called who will then be Alternate No. 2.

24       And as you know, the Government has six challenges; the

25   defense has ten.  You don't have to use them all, but they are

1    there.  With regard to the alternates, two of whom will be

2    selected, you have one preemptory challenge per side.

3         Any questions about that?

4              MS. JAIMEZ:  Your Honor, one more procedural

5    question.

6              THE COURT:  Yes.

7              MS. JAIMEZ:  Will the parties be able to confer

8    before exercising the preemptory challenges?

9              THE COURT:  You mean with the other side or --

10             MS. JAIMEZ:  With the other side.

11             THE COURT:  -- or at your table?

12             MS. JAIMEZ:  No, with the other side.

13             THE COURT:  I have never seen any reason to have the

14   sides confer, but perhaps it could arise at some time.

15        Yes?

16             MS. JAIMEZ:  Your Honor, I think that some courts

17   prefer that the parties confer rather than standing up to make

18   a Batson challenge in front of the jury.

19             THE COURT:  If it's something of that nature.

20             MS. JAIMEZ:  Yes, if it presents the opportunity.

21             THE COURT:  You can do that.  Just ask for a

22   sidebar, and on those occasions we will have to have a sidebar.

23   But if it is necessary, you can confer at your own tables among

24   each other.

25        And you with your client, Mr. Navarro, as you know.  You

1    have been here before.

2        Once we have completed the voir dire -- and I do intend to

3    read from the indictment to let the prospective jurors know

4    what the case is about and also inform them it is merely the

5    manner in which we commence the trial.  And there is nothing in

6    the reading of it or nothing in the indictment itself that

7    detracts from the fact, indeed, the fact that this defendant is

8    innocent until proven guilty beyond a reasonable doubt, and I

9    will stress that point.  There is that.

10        If you have any kind of an objection of any kind, just

11    rise and state what it is, and don't attempt to argue it unless

12    I tell you to do so, and that's not likely.

13        Any other questions either side?

14        I was taught in law school, but it was so long ago, that

15    silence is acceptance, but I don't know.

16            MR. NAVARRO:  Your Honor, I do have one matter,

17    Your Honor.

18            THE COURT:  Yes.

19            MR. NAVARRO:  Depending on what the confidential

20    informant testifies to, I may have two witnesses.

21            THE COURT:  Certainly.

22            MR. NAVARRO:  And one of those witnesses has

23    childcare issues.  And I'm looking at the Government's witness

24    list, that I think we are going to be done tomorrow right

25    around lunch.  That's my feeling.  If I may tomorrow -- I mean,

1  I am going to let you know ahead of time that I may call one of

2  them tomorrow and one of them on Thursday morning, if I can do

3  that, Your Honor.  I don't know where we are going to be

4  tomorrow.  I just don't want to be in the position where it's

5  2:00 and I can't call the witness because --

6          THE COURT:  No, but if you know by -- the witness

7  you are talking about on behalf of the Government is testifying

8  today, you should know certainly today, and you can have

9  whatever list that you're going to have, tomorrow morning at

10  the latest to the Government and to the Court.

11          MR. NAVARRO:  I should know by the end of today.

12          THE COURT:  All right.  We will proceed that way.

13          MR. NAVARRO:  Thank you.

14          THE COURT:  Both sides have been very good about

15  communicating with each other, and that's greatly appreciated,

16  and I want to continue that.

17      Mr. Azat, do you pronounce it Azat or what?

18          MR. AZAT:  I pronounce it Azat, but whatever the

19  court pleases.

20          THE COURT:  No, no, it's as you please, Mr. Azat.

21      And any word from your wife recently?

22          MR. AZAT:  She is standing by.  I told her to wait

23  until the trial is over.

24          THE COURT:  You're standing by.  She's hopefully not

25  standing.  Any word yet?

1          MR. AZAT:  No, Your Honor, no word yet, but she

2    knows to contact my supervisor in case anything is happening.

3          THE COURT:  Oh, good.  Is this the first?

4          MR. AZAT:  No, second.

5          THE COURT:  Second.  So you know how it goes then.

6    Good.

7          MR. AZAT:  Thank you, Your Honor.

8          MR. NAVARRO:  One final thing.

9          THE COURT:  Yes, Mr. Navarro.

10         MR. NAVARRO:  I brought this up with counsel before.

11   I have a matter in Detroit next week.  I am going to be flying

12   out of L.A. on Tuesday.

13         THE COURT:  Do you do bankruptcy too?

14         MR. NAVARRO:  No.  It's a federal matter,

15   Your Honor.

16         THE COURT:  Yeah, I know.

17         MR. NAVARRO:  I have to be there before Judge Steeh

18   on Wednesday.  I am flying out Tuesday, coming back on

19   Thursday.  I really think the case will be over by then.  I

20   talked with counsel about putting it over, but I think we will

21   be done this week.

22         THE COURT:  We don't want to put it over.  I can

23   speak to my colleague, and he's in the district of Michigan,

24   and tell him he won't have you until this matter is over.

25         MR. NAVARRO:  Well, that is what it is, Your Honor,

```
 1    and I will -- I had made arrangements, but if I have to change
 2    arrangements, I will change arrangements.
 3              THE COURT:  All right.  Fine.
 4         Anything else from anyone before we send for the panel?
 5    If not, we will be in recess until they get here.
 6         Make sure they go to the restroom, please.  If they have
 7    to go twice, let them.
 8         All right.  We are in recess.
 9         (Recess taken from 10:33 A.M. to 10:44 A.M.)
10              THE COURT:  We are going to go back on the record
11    and alert you to an instruction that we put together ourselves
12    and see if you have any objection to it.  I intend to give it
13    to the 14 members of the jury once they have been selected, see
14    if you have any problem.  It has much to do with social media.
15    As you can see, things that I don't even know.
16              MR. NAVARRO:  That's very good, Your Honor.  I like
17    it.  I have never seen one of these before, but I like it.
18              THE COURT:  Good.
19              MR. NAVARRO:  I am not saying you and I are older,
20    but --
21              THE COURT:  You don't have to say that about me; I
22    am.
23              MR. NAVARRO:  That's fine, Your Honor.  It's good.
24              THE COURT:  Thank you.
25              MS. JAIMEZ:  Your Honor, this is fine with the
```

```
 1   Government.  Thank you.
 2               THE COURT:  Thank you.
 3               MR. AZAT:  Thank you.
 4          (Pause in proceedings.)
 5               THE COURTROOM DEPUTY:  We're ready.  I'm bringing
 6   the jury in.
 7               THE COURT:  Hold on just a minute.
 8          We are back on the record.
 9          There is one other item that I forgot to go over with
10   counsel.  I indicated to you about your peremptories.  Let me
11   just indicate that if you accept, that is the use of the
12   preemptory challenge.  If you pass, that is also going to be
13   considered a use of your preemptory challenges.  If, however,
14   after either having accepted or passed there is a change in the
15   makeup of the venirepersons and you still have challenges
16   remaining, you are free to use them.
17          Any questions about that?  If not --
18          Mr. Navarro?
19               MR. NAVARRO:  I believe the order of challenges is
20   going to be --
21               THE COURT:  I'm sorry, I should have told you that
22   too.  Yes, we start with the Government and then go to the
23   defense.  Then it's government, defense, defense, government,
24   defense, defense, until we get down to the final government,
25   defendant.  All right?
```

```
 1          You may bring the panel in.

 2              THE COURTROOM DEPUTY:  Please rise.

 3      (In the presence of the prospective jurors.)

 4              THE COURT:  Please be seated, ladies and gentlemen.

 5      The two individuals in the back on my left, please move

 6  over to the right until we complete the voir dire.

 7      You may be seated.

 8      This a prospective juror right here as well?

 9              THE COURTROOM DEPUTY:  Yes.

10              THE COURT:  Would you go over on the other side,

11  ma'am?  There's plenty of seats.

12      Thank you.

13      Well, good morning, ladies and gentlemen.  I'm

14  Judge Hatter, and I want to introduce you to the district court

15  for those who have not served previously, and even if you have,

16  you have not been to this courtroom.  You are about to

17  participate in the voir dire; that is, the jury selection

18  process.  And it's the Vilavazo matter.

19      And I want to introduce to you various of the people, but

20  before that, would you please rise to be sworn.

21              THE COURTROOM DEPUTY:  Ladies and gentlemen of the

22  jury, of the jury panel, please raise your right hand.

23              **THE PROSPECTIVE JURORS WERE SWORN**

24      (The prospective jury answered "I do.")

25              THE COURT:  You may be seated.
```

1      As I indicated, this is a criminal trial, and the

2  defendant in this case, as in all cases, whether they be state

3  court or federal court, as here, is presumed innocent until

4  proven guilty beyond a reasonable doubt.  This defendant enjoys

5  that same presumption.

6      Let me introduce to you the individuals who you need to

7  know who are part of this case.  The defendant in this matter

8  is Mr. Ismael Gutierrez Vilavazo.

9      Would you please rise.

10      (Defendant complies.)

11          THE COURT:  Thank you.

12      And representing Mr. Vilavazo is Mr. Angel Navarro.

13      Thank you, Mr. Navarro.

14      The Government prosecuting this case, there are three

15  assistant United States attorneys here, and I will introduce

16  each of them to you.  Ms. Kimberly Jaimez, Mr. Michael Azat,

17  and Ms. Stephanie Christensen.

18      And aiding the assistant United States attorneys, the

19  prosecutors in this case, is a person that we refer to as the

20  case agent.  That is the person who's investigated the matter

21  and then helps the lawyers in the presentation of the case

22  itself.  And that is Mr. Michael Alker.  He's a special

23  assistant with the Federal Bureau of Investigation, FBI.

24      Thank you.

25      Let me ask you, ladies and gentlemen, do you recognize any

1    of the individuals that I've just introduced to you?  If so,

2    just raise a hand.

3         I see no hands having been raised.

4         I am going to ask you, too, if any of you know anyone in

5    the United States attorney's offices, one of the largest United

6    States attorney's offices in the country, indeed, the largest,

7    except for Washington, D.C. where they also do local work.  If

8    you know anyone in that office or related to anyone in that

9    office -- it doesn't have to be a lawyer.  It could be a

10   paralegal or secretary or anyone in that office -- just raise a

11   hand.  It's not unusual that we sometimes get someone who is

12   related.

13        Does anyone recognize Mr. Navarro, who's a defense lawyer?

14   If so, raise a hand.

15        I see no hands having been raised.

16        Well, ladies and gentlemen, if you're called to serve as

17   jurors here, you are going to have several obligations to

18   perform as good citizens.  One, of course, is to accept the law

19   as given to you by the Court whether you agree with it or not.

20        Are there any among you who because of religious,

21   philosophical or other reasons cannot accept the law as given

22   to you by the Court?  If so, please raise a hand.

23        And again, I see no hands having been raised.

24        This matter will be completed this week, so if you have

25   plans for next week, not a problem; we will be finished.  Also,

1    if you do serve, you must not go outside of this courtroom for

2    any purpose.  In fact, let me just read to you an instruction

3    that you must follow, and then I have to read it to you because

4    I'm pretty much of a dinosaur when it comes to this social

5    media stuff.  My grandkids help me with, you know, just using

6    the iPhone.

7         So now, you as jurors are going to have to decide this

8    case based solely on the evidence which will be presented here

9    within the four walls of this courtroom.  In other words, you

10   can't go outside of this courtroom to investigate or do

11   anything on your own.  There are good lawyers on both sides.

12   Everything will be presented to you right here, so this means

13   that during the trial, you must not conduct -- it should be you

14   must not conduct any independent research about the case or the

15   matters in the case, as well as the individuals who are

16   involved in the case, the ones who have been introduced to you,

17   and any witnesses.  And I will give you the names of the

18   witnesses in a moment.

19        In other words, you must not consult dictionaries or

20   reference materials.  You cannot search the Internet, websites,

21   blogs or use any other electronic tools to obtain information

22   about this case or to help you decide the case.  And please do

23   not try to find out information from any source outside the

24   confines of this very courtroom.

25        And until you retire to deliberate, you may not discuss

1    this case with anyone, even your fellow jurors.  And after you

2    retire to deliberate, the 12 of you who will be doing that, you

3    may begin discussing the case with your fellow jurors.  That

4    should be the very first time.  But you cannot discuss the case

5    with anyone else until you have returned a verdict and the case

6    is at an end.

7         And I know that many of you use cell phones, the Internet

8    and other tools of technology.  You also must not talk to

9    anyone at any time about this case or use these tools to

10   communicate electronically with anyone about the case.  This

11   includes your family, as well as your friends.  And you may not

12   communicate with anyone about the case directly on a telephone;

13   on a cell phone; through e-mail; text messaging or on Twitter;

14   through any blog or website, including Facebook, Myspace,

15   Google Plus, Snapchat -- whatever that is -- Instagram, YouTube

16   or any other social media.

17        You may not use any similar technology or social media

18   even if I have not specifically mentioned it here.  And I

19   expect you will inform me as soon as you become aware of

20   another juror's violation of these instructions, because there

21   will be a contempt hearing if that indeed is the case.

22        Now, ladies and gentlemen, let me give you some background

23   about the case, and I will refer to the indictment, which has

24   been returned by a grand jury.  And there is no presumption

25   about guilt with a return of an indictment in the federal

1    judicial system.  It's merely the manner in which we commence,

2    that is, begin, a criminal case.  I will read from it to you

3    only to inform you what the charges are, and remind you again

4    that this defendant is presumed innocent until found guilty

5    beyond a reasonable doubt.

6        Now, the grand jury charges in Count One of this

7    indictment:

8        "A. Object of a Conspiracy.

9        "Beginning on a date unknown and continuing to on or about

10   October the 7th, 2013, in Los Angeles County, within the

11   Central District of California, and elsewhere defendants Ismael

12   Gutierrez Vilavazo, also known as 'Ismael Gutierrez,' also

13   known as 'Mike Gutierrez,' also known as 'Mikey,' and Jorge

14   Beristain Huerta, AKA..." also known as "...'Moreno,' and

15   others known and unknown to the Grand Jury, conspired and

16   agreed with each other to knowingly and intentionally

17   distribute at least five grams of methamphetamine, a Schedule

18   II controlled substance, in violation of Title 21, United

19   States Code, Sections 841(a)(1) and 841(b)(1)(B)(viii).

20       "B. Means By Which the Object of the Conspiracy Was to Be

21   Accomplished.

22       "The object of the conspiracy was to be accomplished in

23   substance as follows:

24       "1. Defendant Vilavazo would obtain methamphetamine for

25   distribution to customers in the Los Angeles area and

1    elsewhere.

2        "2. Co-Conspirator Huerta, on behalf of Defendant

3    Vilavazo, would store methamphetamine for later distribution to

4    customers.

5        "3. Defendant Vilavazo would arrange the basic terms of

6    the sale of methamphetamine to customers.

7        "4. As arranged by Defendant Vilavazo,

8    Co-Conspirator Huerta would deliver methamphetamine to, and

9    pick up payment for the methamphetamine from, the customers.

10       "C.  Overt Acts."

11       And I will explain to you later what overt acts are.

12       "In furtherance of the conspiracy, and to accomplish the

13   objects of the conspiracy, on or about the following dates,

14   Defendants Vilavazo and Co-Conspirator Huerta, and others known

15   and unknown to the Grand Jury, committed various overt acts

16   within the Central District of California, including but not

17   limited to the following:

18       "1. On September the 19th, 2013, Defendant Vilavazo told

19   an individual whom Defendant Vilavazo believed to be a

20   methamphetamine customer but who was, in fact, a confidential

21   source working for law enforcement (hereinafter, 'the CS') to

22   call Defendant Vilavazo the following day and

23   Defendant Vilavazo would introduce the CS to a person who was

24   holding methamphetamine on behalf of Defendant Vilavazo.

25       "2. On September the 25th, 2013, using coded language in a

UNITED STATES DISTRICT COURT

telephone call, Defendant Vilavazo explained to the CS that methamphetamine would be distributed to the CS by individuals whom Defendant Vilavazo referred to as 'my people.'

"3. On September the 25th, 2013, using coded language in a telephone call, Defendant Vilavazo explained to the CS that the individual who would distribute the methamphetamine to the CS was his nephew.

"4. On September the 25th, 2013, Defendant Vilavazo spoke with Co-Conspirator Huerta about the methamphetamine transaction that Defendant Vilavazo had negotiated with the CS.

"5. On September the 25th, 2013, at the direction of Defendant Vilavazo, Co-Conspirator Huerta contacted the CS to discuss when they would be able to meet to complete the methamphetamine transaction.

"6. On September the 26th, 2013, using coded language in a telephone call, Defendant Vilavazo agreed with the CS that he would tell Co-Conspirator Huerta to lower the price of the methamphetamine Defendant Vilavazo had arranged to sell to the CS.

"7. On September the 26, 2013, using coded language in a telephone call, Co-Conspirator Huerta told the CS that the methamphetamine the CS wanted to purchase would be sold to the CS at a lower price.

"8. On September the 26, 2013, in the parking lot of a North Hollywood restaurant, Co-Conspirator Huerta distributed

1    approximately 48.6 grams of methamphetamine to the CS.

2        "9. On September the 26, 2013, Co-Conspirator Huerta

3    received $960 from the CS, $950 of which was payment for the

4    methamphetamine that Co-Conspirator Huerta sold to the CS that

5    day and $10 of which Co-Conspirator Huerta held as credit for a

6    future narcotics transaction with the CS.

7        "10. On October the 7th, 2013, using coded language in a

8    telephone call, Defendant Vilavazo told the CS that he was out

9    of town and was not immediately available to meet the CS, but

10   that Co-Conspirator Huerta had a small quantity of

11   methamphetamine left that the CS could purchase in

12   Defendant Vilavazo's absence."

13       Those are the ten overt acts, and I will explain to you

14   later what overt acts are.

15       "Count Two, 21 United States Code Sections 841(a)(1),

16   (b)(1)(B)(viii) and 18 United States Code Section 2(a):

17       "On or about September the 26th, 2013, in Los Angeles

18   County, within the Central District of California,

19   Co-Conspirator Jorge Beristain Huerta, also known as 'Moreno,'

20   aided and abetted by Defendant Ismael Gutierrez Vilavazo, also

21   known as 'Ismael Gutierrez,' also known as 'Mike Gutierrez,'

22   also known as 'Mikey,' knowingly and intentionally distributed

23   at least five grams, that is, approximately 48.6 grams, of

24   methamphetamine, a Schedule II controlled substance.

25       "Counts Three Through Eight, 21 United States Code section

1  843(b):

2      "On or about the dates and times set forth below, in Los

3  Angeles County, within the Central District of California, and

4  elsewhere, Defendant Ismael Gutierrez Vilavazo, also known as

5  'Ismael Gutierrez,' also known as 'Mike Gutierrez,' also known

6  as 'Mikey,' knowingly and intentionally used a communication

7  facility, namely, a telephone, in committing and in causing and

8  facilitating the commission of an act constituting a felony

9  under Title 21, United States Code, Section 846, namely,

10  conspiracy to distribute methamphetamine, as charged in Count

11  One, and under Title 21, United States Code, Section 841(a)(1),

12  namely, distribution of methamphetamine, as charged in Count

13  Two."

14      In Count Three there's a date of 9/25/13, and a time of

15  3:22 P.M.  Count Four has a date of 9/25/13 as well, and a time

16  of 3:53 P.M.  Count Five has a date of also 9/25/13, and a time

17  of 4:58 P.M.  Count Six has a date of 9/26/13, and a time of

18  6:10 P.M.  Count Seven has a date of 9/26/13 and a time -- the

19  date of 9/26 and a time of 6:43 P.M., and finally, Count Eight

20  has a time -- I'm sorry, a date of 10/7/13, and a time of 5:24

21  P.M.

22      The indictment in its entirety has been signed by the

23  foreperson of the grand jury and counter-signed by the proper

24  officials in the United States attorney's office.  And again,

25  my only reason in reading to you from this indictment is to

UNITED STATES DISTRICT COURT

1    inform you of the charges that are pending against this

2    defendant and to remind you he is presumed innocent of any of

3    these charges until and if he is proven guilty beyond a

4    reasonable doubt.

5         Now, the Government intends to call six or seven

6    witnesses, and I am going to ask you if you recognize any of

7    these names.  If so, please raise a hand.  One is Jonathan

8    McGraw.  He is a Tennessee arresting officer.  He's in

9    Collierville Police Department in Tennessee, I take it.

10        Anyone recognize that name?  If so, raise a hand.

11        I see no hands.

12        Michael Alker, who is our case agent, he has been

13   introduced to you, and you indicated you do not know him

14   personally or indicated know of him.

15        Yader Gutierrez, who is going to testify regarding

16   purchase of methamphetamine, does anyone know Yader Gutierrez?

17        I see no hands having been raised.

18        Doug Johnson?

19        Again, I see no hands.  He is going to say he saw a

20   Chrysler at a particular buy or walk sale.

21        Jeremy Stebbins, again, is a witness on surveillance in

22   this case on 9/25.

23        Again, I see no hands raised.

24        Michael Sader, he is a narcotics expert.

25        And again, I see no hands.

1      Scott Saul, S-a-u-l, a phone forensic analyst.

2      And again, I see no hands.

3      Sean Hansen, again, an expert in mapping of historical

4  cell sites calls.

5      Again, I see no hands.

6      Lily Medina, she's a voice exemplar specialist.

7      I see no hands.

8      Michael Hughes, an expert on personal access and cold

9  switch, whatever that is.  Anyone heard of Michael Hughes?

10     I see no hands.

11     David Miner.

12     Again, I see no hands.

13     Ladies and gentlemen, let me tell you a little bit about

14 how the voir dire or selection process will proceed.  Our clerk

15 here, Ms. Skipper, is going to call some names, and if you're

16 the lucky individual, you will come into the jury box.  The

17 first person whose name is called will seat his or herself in

18 the far seat in the second row thereby becoming Juror No. 1.

19 There is only one entrance to the jury box.  You will have to

20 come up here near me and go in and go to the far end.

21     After six of you fellows have seated themselves in the

22 second row, we will leave that seventh seat in the second row

23 vacant for the time being.  When the seventh individual's name

24 is called, he or she will go into the front row immediately in

25 front of Juror No. 1.  And then after 12 of you fellows have

1   had your names called and are seated in the jury box, I will

2   commence a colloquy with them, simply a question-and-answer

3   session.

4       It's very important for those of you who remain in the

5   general courtroom area that you listen carefully not only to my

6   questions of your fellow jurors in the jury box, but their

7   answers as well.  And if one of them is excused and your name

8   is called, you will take the seat that's just been vacated.

9   And if you've listened carefully, I won't have to repeat all of

10  those questions, and we can shorten the voir dire or selection

11  process.

12      Now, during this process, ladies and gentlemen, there are

13  two kinds of challenges that are used by the lawyers:  One is a

14  challenge for cause.  For example, when I ask if any of you

15  happen to be related to anyone in the U.S. Attorney's Office or

16  knew anyone there, and you indicated that you were related to

17  someone but you could still be fair, more than likely I would

18  have excused you anyway because there would have been -- well,

19  just a look of unfairness in having someone who's related to

20  one side or the other's office even if it's not the individuals

21  actually trying the case.

22      There are very few challenges for cause, but there are

23  some.  The kind of challenge that you will hear most today is

24  what is called a preemptory challenge.  All that means is that

25  the attorney who exercises that particular challenge doesn't

1   have to indicate why he or she is doing it at the time.

2        And if you happen to be peremptorily challenged or if

3   someone you've become friendly with is, don't give it a second

4   thought, because in all my years here in the court, we have had

5   people who have been excused from this courtroom, and they

6   merely go across the hall or upstairs and sit quite easily in

7   another courtroom in a different setting with a different type

8   of case.  So don't even think about it.  It just means that the

9   lawyer who is exercising that challenge at that time is not

10  satisfied with the entire makeup of the jury panel as he or she

11  happens to see it at that particular time.

12       Now we are going to commence the calling of the names.  If

13  your name is called, you will come forward and go to the jury

14  box as I have just indicated.

15            THE COURTROOM DEPUTY:  Carolina Boesch, B-o-e-s-c-h.

16            THE COURT:  Just come right up here and go right

17  into that seat in the back row, that far seat.

18       Thank you.

19            THE COURTROOM DEPUTY:  Tuey Lee, L-e-e.

20       Zara Agvanian, A-g-v-a-n-i-a-n.

21       Justin Stauffer, S-t-a-u-f-f-e-r.

22       Heather Marie Strong, S-t-r-o-n-g.

23       Rhonda Chang, C-h-a-n-g.

24       Ricardo Lemus, L-e-m-u-s.

25            THE COURT:  Mr. Lemus, come forward and go into the

```
 1    front row, please.
 2            THE COURTROOM DEPUTY:  Athar Khan, K-h-a-n.
 3        Sherleen Denise Sladek, S-l-a-d-e-k.
 4        Marshelle Jacqueline Espy, E-s-p-y.
 5        Joseph Victor Hafner, H-a-f-n-e-r.
 6        Irma Orozco, O-r-o-z-c-o.
 7            THE COURT:  Ladies and gentlemen in the jury box,
 8    let me ask you once again, are there any among you because of
 9    religious or philosophical or any reason cannot accept the laws
10    given to you by the Court, whether you agree with them or not?
11    If so, please raise a hand.
12        I see no hands having been raised.
13        Are there any among you, ladies and gentlemen, who have
14    studied law?  And I don't care if you did it in a community
15    college course or a real estate course or any other way.  Any
16    of you studied law?
17        All right.  I am going to call on you by numbers.
18        And Juror No. 4 -- well, 3 first.  Now, you raised a hand.
19    We are going to give you a microphone so everyone can hear you,
20    your answers.  Maybe it's a temperamental microphone.
21            PROSPECTIVE JUROR NO. 3:  I have taken an elective
22    course.
23            THE COURT:  At what level?
24            PROSPECTIVE JUROR NO. 3:  Introductory, 101.
25            THE COURT:  I know, but in college or --
```

44

```
 1              PROSPECTIVE JUROR NO. 3:  Right.
 2              THE COURT:  Law school or college?
 3              PROSPECTIVE JUROR NO. 3:  College.  Then at the
 4   university level also when we have to choose the elective.  I
 5   am interested -- I religiously watch Law and Order.
 6              THE COURT:  Well, you understand that that's not
 7   real life.
 8              PROSPECTIVE JUROR NO. 3:  Right.
 9              THE COURT:  And we have no commercials either.
10              PROSPECTIVE JUROR NO. 3:  I don't know if it will
11   influence.
12              THE COURT:  Well, you cannot let it influence you.
13   You must accept the law as I have given it to you, not what you
14   have heard on Law and Order or anything else.
15         Anything else?
16              PROSPECTIVE JUROR NO. 3:  I just want to bring it to
17   your attention.
18              THE COURT:  I know that, but can you accept the law
19   as I give it to you and not anything you may have heard on any
20   television show or even in those classes that you took?  Can
21   you accept the law as I give it to you, apply it to the facts
22   here?
23              PROSPECTIVE JUROR NO. 3:  To the best of my
24   abilities, yes.
25              THE COURT:  All right.
```

```
 1          Juror No. 4?
 2              PROSPECTIVE JUROR NO. 4:  Yeah, how -- I did my
 3   master's degree in sports management and had a class in sports
 4   management, risk management.
 5              THE COURT:  And there were some elements of law in
 6   there; is that right?
 7              PROSPECTIVE JUROR NO. 4:  Yes.
 8              THE COURT:  Can you put aside what you may have
 9   learned in that sports management course and accept the law as
10   given to you by the Court here?
11              PROSPECTIVE JUROR NO. 4:  Yes.
12              THE COURT:  Thank you.
13         Anyone else who has studied law at any level?
14         Juror No. 8, yes, sir.
15              PROSPECTIVE JUROR NO. 8:  I have a law degree.  I am
16   a practicing attorney back home.
17              THE COURT:  Where is "back home"?
18              PROSPECTIVE JUROR NO. 8:  Pakistan.
19              THE COURT:  Pakistan.
20         And you understand -- well, let me ask you, when was the
21   last time you practiced law, Pakistan or anywhere?
22              PROSPECTIVE JUROR NO. 8:  It's about 12 years.
23              THE COURT:  All right.  Because I don't accept
24   practicing lawyers on the jury, but then since you are retired,
25   you understand -- and I take it it was a type of civil law that
```

```
 1   you had in Pakistan, as opposed to our judicial system here; is
 2   that right?
 3              PROSPECTIVE JUROR NO. 8:  Yes.
 4              THE COURT:  Can you put aside all of your training
 5   as a lawyer, your practice as a lawyer in Pakistan, and accept
 6   the law as I give it to you to apply to the facts which you
 7   would find here as a juror?
 8              PROSPECTIVE JUROR NO. 8:  Yes.
 9              THE COURT:  Thank you.
10       Anyone else?
11       Oh, Juror No. 2 now tells me.  People don't want to admit
12   that they have anything to do with lawyers.  All right.
13       Go ahead.  Tell me, ma'am.
14              PROSPECTIVE JUROR NO. 2:  I have taken a course at
15   UCLA extension.  My work required me to learn about human
16   resource law.
17              THE COURT:  Yes.
18              PROSPECTIVE JUROR NO. 2:  And the field of practice
19   in social work was in child protective services.
20              THE COURT:  Yes.
21              PROSPECTIVE JUROR NO. 2:  So that was Dependency
22   300.
23              THE COURT:  All right.  I am not going to ask you
24   what grade you got, but let me just ask you this:  Can you put
25   aside all that you learned in those courses, which is valuable,
```

UNITED STATES DISTRICT COURT

```
 1    but be able to accept the law as I give it to you to apply to
 2    this case?  Can you do that?
 3              PROSPECTIVE JUROR NO. 2:  Yes, I can do that.
 4              THE COURT:  Thank you.  Thank you.
 5         Let me ask you now, don't be shy about it, any of you have
 6    lawyers in your families?  I mean, I have a few.
 7         All right.  Juror No. 4, he admits it.
 8              PROSPECTIVE JUROR NO. 4:  My wife's mother and
 9    father are both public defenders or retired public defenders in
10    Ventura.
11              THE COURT:  In Ventura County?
12              PROSPECTIVE JUROR NO. 4:  Yes.
13              THE COURT:  Yes?
14              PROSPECTIVE JUROR NO. 4:  Yes.
15              THE COURT:  You have to speak out loud.
16         Are they still working as public defenders there?
17              PROSPECTIVE JUROR NO. 4:  Both are retired recently.
18              THE COURT:  I see.  Did they talk to you about their
19    work as public defenders there when they were?
20              PROSPECTIVE JUROR NO. 4:  No.
21              THE COURT:  Do you think that you might be leaning
22    more towards the defense than the Government because you have
23    these relatives who have been defense lawyers?
24              PROSPECTIVE JUROR NO. 4:  No.
25              THE COURT:  And you understand that you can't talk
```

1    to them or anyone about this case until it's actually over?

2              PROSPECTIVE JUROR NO. 4:  Yes.

3              THE COURT:  All right.  Thank you for that.

4        And let me ask you, ladies and gentlemen, are there any

5    among you who, because of the charges that I read to you, what

6    the charges allege, find that you just could not be fair to

7    both sides?  Because you have to be fair to both sides, not to

8    just one side here, but to both sides.

9        Is there anything at all about the charges in this case --

10   and they are only charges -- that would prevent you from being

11   fair to the Government as well as to this defendant?  If so,

12   raise a hand.

13       I see no hands having been raised.

14       Are there any among you, ladies and gentlemen, that belong

15   to any kind of organization that has as one of its principles

16   the changing of the drug laws in this country?  If so, just

17   raise a hand.

18       And again, I see no hands having been raised.

19       Are there any among you, ladies and gentlemen, who have

20   ever been in police work yourselves?  And I don't mean just

21   privately, publicly, but perhaps in the military as a military

22   police person, an air patrol person, a naval patrol person, any

23   of those kinds of things?

24       And when I say "police work," I don't mean just L.A.P.D.

25   or other local police, but county sheriffs, state police

```
 1    office, and particularly federal, such as our case agent with

 2    the FBI, someone with the DEA, the Drug Enforcement

 3    Administration, or any other law enforcement, any of you ever

 4    been involved as law enforcement officers?

 5         I see Juror No. 11 just --

 6             PROSPECTIVE JUROR NO. 11:  I'm sorry, my hand was

 7    cramped.  Pardon me.

 8             THE COURT:  It happens to me too.  It happens a lot

 9    more when you get older.

10         Again, I see no hands here.

11         Let me ask you this, ladies and gentlemen in the jury box,

12    are there any among you who have ever had an unpleasant contact

13    with a law enforcement officer at any level?  If so, raise a

14    hand.  Maybe one of these parking ticket maids or something

15    that you thought you just got back in time to save the ticket

16    but didn't get it.  Anybody ever have an unpleasant experience

17    with any law enforcement officer at any level?  If so, raise a

18    hand.

19         Again, I don't see any hands.

20         Are there any among you, ladies and gentlemen, who have

21    had family members who have had problems with drugs?  And if

22    you don't want to answer there in front of everyone, I can have

23    you come over to the sidebar here and we will have the

24    lawyers --

25         All right.  Juror No. 11.  And we will take another 12
```

1    afterwards.  Well, I see some others.  All right.  If you want

2    to discuss it out here, you can.  If you want to come to the

3    sidebar, you can.  We will have to start with Juror No. 7, I

4    think, if we are doing it by the numbers.

5         Would you prefer to come to the sidebar or speak from

6    there?

7              PROSPECTIVE JUROR NO. 7:  I had a brother who had an

8    addiction problem to drugs.

9              THE COURT:  How long ago was that?

10             PROSPECTIVE JUROR NO. 7:  About six years ago.

11             THE COURT:  And did he have criminal proceedings

12   brought against him?

13             PROSPECTIVE JUROR NO. 7:  No.

14             THE COURT:  And can you put aside having that kind

15   of situation that exists in a lot of families and decide this

16   case on its own facts and the law that I give to you to apply

17   to those facts?

18             PROSPECTIVE JUROR NO. 7:  Yes.

19             THE COURT:  Do you know what his addiction -- what

20   particular drug formed his addiction?

21             PROSPECTIVE JUROR NO. 7:  I believe it was cocaine.

22             THE COURT:  I see.

23        All right.  And do you feel that even having that

24   experience in your family would not prevent you from being fair

25   to both the Government and to the defendant.

```
 1                    PROSPECTIVE JUROR NO. 7:  Yes.
 2                    THE COURT:  Thank you.
 3              Who else do we have in order?  All right.  Juror No. 9.
 4                    PROSPECTIVE JUROR NO. 9:  I also had a brother
 5     addicted to heroin.
 6                    THE COURT:  How long ago was that?
 7                    PROSPECTIVE JUROR NO. 9:  Well, from the time he was
 8     13 until he died two and a half years ago.
 9                    THE COURT:  Oh, my goodness.  Did he have any
10     contacts with law enforcement as a result of that?
11                    PROSPECTIVE JUROR NO. 9:  Yes, many years of
12     imprisonment.
13                    THE COURT:  I see.
14              And as a result of that, do you think that you could be
15     fair to both sides in this case?  Of course it has nothing to
16     do with heroin.  And what do you think?
17                    PROSPECTIVE JUROR NO. 9:  I think so.
18                    THE COURT:  If you feel that you can't, let me know.
19     Would you?
20                    PROSPECTIVE JUROR NO. 9:  Okay.
21                    THE COURT:  All right.  Thank you.
22              Whom else do we have?
23              Juror No. 11, yes, sir.
24                    PROSPECTIVE JUROR NO. 11:  Thank you.  My sister is
25     a recovering heroin addict.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  And has she had an experience in the

2     criminal justice system?

3          PROSPECTIVE JUROR NO. 11:  No, no, but several

4     family friends have passed away from drug use.  They're all

5     connected with her.  There's a whole bunch of high school kids

6     that got into it.

7          THE COURT:  I see.

8      Yes.  Well, those are always traumatic kinds of things,

9     and sometimes it's difficult to put it aside.  But I don't want

10    anyone to try to relate what has happened in those traumatic

11    kinds of situations to this case and to this defendant and to

12    the Government here.  So can you be fair to both sides here,

13    even apart from what would have had to have been a very

14    traumatic situation?

15          PROSPECTIVE JUROR NO. 11:  Yes.

16          THE COURT:  All right.  Thank you.

17      Let me -- I really want to ask some more -- oh, is there

18    someone else?  I didn't see.  Oh, Juror No. 12.

19      Thank you, Ms. Skipper.

20      Yes, ma'am.

21          PROSPECTIVE JUROR NO. 12:  I have two cousins that

22    are addicts.  I don't know what drug, though.

23          THE COURT:  How often do you see these cousins?

24          PROSPECTIVE JUROR NO. 12:  Not often.

25          THE COURT:  Any of them been -- either one of them

1    been in the judicial system, criminal justice system, to your

2    knowledge?

3              PROSPECTIVE JUROR NO. 12:  I believe they have been

4    in court, but I don't know much of, you know, what happened.

5              THE COURT:  I see.

6         And they have not talked to you about their situations,

7    their respective situations?

8              PROSPECTIVE JUROR NO. 12:  No.

9              THE COURT:  And having these relatives who have had

10   these problems, do you think that you could be fair to both

11   sides in this case?

12             PROSPECTIVE JUROR NO. 12:  Yes.

13             THE COURT:  All right.  Thank you.

14        Let me ask you, ladies and gentlemen, how many of you have

15   had prior jury experience?  And I don't mean just in the

16   federal court, but in state court, no matter what state it may

17   have been, or in another country.  And we know at least one

18   individual in Pakistan had some experience with the court

19   system, but how many of you have served on juries, state or

20   federal?

21        All right.  And again, I am going to take you by numbers.

22   Juror No. 1.  Would you pass that microphone over to her,

23   please.

24        I would like to know when you served and where, how long

25   ago.

54

```
1              PROSPECTIVE JUROR NO. 1:  In 2002 I served as a

2   juror in a criminal case in Pasadena, California.

3              THE COURT:  Did you reach a verdict in that case?

4              PROSPECTIVE JUROR NO. 1:  Yes.  I was an alternate

5   juror.

6              THE COURT:  I see.  So you didn't actually

7   deliberate?

8              PROSPECTIVE JUROR NO. 1:  Correct.

9              THE COURT:  But you sat through all of it?

10             PROSPECTIVE JUROR NO. 1:  Correct.

11             THE COURT:  And can you put aside that experience

12  and decide this case on its own facts and the law that I give

13  to you to apply to those facts?

14             PROSPECTIVE JUROR NO. 1:  Yes.

15             THE COURT:  Thank you for that.

16        And Juror No. 2.  Yes, ma'am.

17             PROSPECTIVE JUROR NO. 2:  It was over 30 years ago.

18  It was a murder case in superior court.

19             THE COURT:  All right.  And you understand that many

20  of the same laws apply, and certainly the presumption of

21  innocence is the same at the state level as it is at the

22  federal level.  One is presumed innocent until convicted beyond

23  a reasonable doubt.  And do you accept that?

24             PROSPECTIVE JUROR NO. 2:  Yes.

25             THE COURT:  And can you put aside that murder case
```

1    and decide this case on its own facts?

2              PROSPECTIVE JUROR NO. 2:  Yes.

3              THE COURT:  Thank you.

4         Anyone else?

5         Juror No. 3.  We are going right down the line.

6              PROSPECTIVE JUROR NO. 3:  I was excused.

7              THE COURT:  When?  From what kind of a case?

8              PROSPECTIVE JUROR NO. 3:  Gang-related.

9              THE COURT:  And where was this?

10             PROSPECTIVE JUROR NO. 3:  Pasadena.

11             THE COURT:  And how long ago?

12             PROSPECTIVE JUROR NO. 3:  Five years ago.

13             THE COURT:  All right.  And having the experience of

14   being excused, is that going to affect your being fair in this

15   case?

16             PROSPECTIVE JUROR NO. 3:  Can I share my reason why

17   I was excused?

18             THE COURT:  I think the lawyers might want to know.

19   Go ahead.

20             PROSPECTIVE JUROR NO. 3:  Actually, one of the

21   attorneys asked me to step down because of the reason that I

22   provided, but it has to do with the type of work that I do.  So

23   I prefer to -- I don't know.  I teach -- I'm in a classroom,

24   and the defendant looked like one of my students.

25             THE COURT:  All right.

1        PROSPECTIVE JUROR NO. 3:  So it was --

2        THE COURT:  That's good enough.

3        PROSPECTIVE JUROR NO. 3:  So I brought it to their

4   attention.

5        THE COURT:  I am going to ask all of the jurors,

6   when we get to the next phase here, what they do, but thank you

7   for sharing that.

8        PROSPECTIVE JUROR NO. 3:  Sure.

9        THE COURT:  Can you put aside, though, that

10  experience in Pasadena in the superior court and decide this

11  case on its own facts and the law I give to you to apply to

12  those facts?

13       PROSPECTIVE JUROR NO. 3:  We do have drug-related

14  problems on campus.

15       THE COURT:  I understand that.

16       PROSPECTIVE JUROR NO. 3:  So I'll try, yes.

17       THE COURT:  But you understand it has nothing to do

18  with this particular case?

19       PROSPECTIVE JUROR NO. 3:  Correct.

20       THE COURT:  And I am asking if you can't put it

21  aside, you should let us know.

22       All right.  Anyone else here who's had prior jury

23  experience?

24       All right.  Juror No. 10.

25       PROSPECTIVE JUROR NO. 10:  Don't remember the years,

 1  but it was criminal and federal.

 2          THE COURT:  And was it here at 312 North Spring

 3  Street?

 4          PROSPECTIVE JUROR NO. 10:  Yes.

 5          THE COURT:  Do you remember what kind of case it

 6  was?

 7          PROSPECTIVE JUROR NO. 10:  It was a drug case.

 8          THE COURT:  Did you reach a verdict in that case?

 9          PROSPECTIVE JUROR NO. 10:  Yes.

10          THE COURT:  Can you put that case aside entirely and

11  decide this case on the law that I give to you to apply to

12  those facts?

13          PROSPECTIVE JUROR NO. 10:  Yes.

14          THE COURT:  Thank you.

15      Anyone else?

16      No one else.

17      Okay.  I am going to turn to some more specific questions

18  shortly, but let me ask counsel if there are any additional

19  questions and/or challenge for cause with these general

20  questions.

21          MS. JAIMEZ:  Your Honor, no challenges for cause.

22          THE COURT:  All right.  Anything Mr. Navarro?

23          MR. NAVARRO:  No, Your Honor.

24          THE COURT:  Thank you.

25      When I say I am going to move to more specific questions,

```
 1    it's nothing like on television, on any of those talk shows or
 2    anything else.  I don't get as personal as they do.  But I am
 3    going to ask you where you reside, how long you have been at
 4    your residence.  If you are in Los Angeles, tell us what part
 5    of the city since it's so large.  And tell us what you do.  If
 6    you are in a relationship with someone, don't care about the
 7    nature of it, just tell us.  If you have children, tell us
 8    their ages if they are not adults.  If they're adults, you
 9    don't have to tell us their ages thereby giving away your age.
10         But we will start with Juror No. 1.  Where do you live,
11    ma'am?
12              PROSPECTIVE JUROR NO. 1:  I live in La Verne.
13              THE COURT:  And how long have you been at your
14    present address?
15              PROSPECTIVE JUROR NO. 1:  17 years.
16              THE COURT:  What do you do?
17              PROSPECTIVE JUROR NO. 1:  I work at Metro in the
18    procurement department.
19              THE COURT:  All right.  And are you married?
20              PROSPECTIVE JUROR NO. 1:  Yes, I am.
21              THE COURT:  What does your husband do?
22              PROSPECTIVE JUROR NO. 1:  He's disabled.
23              THE COURT:  I see.
24         And what did he do before being disabled?
25              PROSPECTIVE JUROR NO. 1:  Auto mechanic.
```

```
 1              THE COURT:  All right.  Do you have children?

 2              PROSPECTIVE JUROR NO. 1:  Yes, I do.

 3              THE COURT:  Tell us.

 4              PROSPECTIVE JUROR NO. 1:  I have four children.  The

 5    minor ages are 17, 13 and 6.

 6              THE COURT:  Are they all in school?

 7              PROSPECTIVE JUROR NO. 1:  Yes.

 8              THE COURT:  Anyone else in the home with you and

 9    your husband?

10              PROSPECTIVE JUROR NO. 1:  My son who's not a minor.

11              THE COURT:  I see.

12         And does he help with -- what does he do?

13              PROSPECTIVE JUROR NO. 1:  He's a college student.

14              THE COURT:  What's he studying?

15              PROSPECTIVE JUROR NO. 1:  Business.

16              THE COURT:  Where?

17              PROSPECTIVE JUROR NO. 1:  Cal State San Marcos.

18              THE COURT:  All right.  And no one else in the home?

19              PROSPECTIVE JUROR NO. 1:  No.

20              THE COURT:  All right.  Thank you.  If you pass that

21    to Juror No. 2.

22         Where do you live, ma'am?

23              PROSPECTIVE JUROR NO. 2:  Hacienda Heights.

24              THE COURT:  And how long have you been at your

25    present address?
```

```
 1              PROSPECTIVE JUROR NO. 2:  Over 30 years.

 2              THE COURT:  And what do you currently do?

 3              PROSPECTIVE JUROR NO. 2:  I am currently retired.

 4              THE COURT:  From what?

 5              PROSPECTIVE JUROR NO. 2:  I was working with the

 6   County of Orange in child protective services.

 7              THE COURT:  I see.

 8         And are you married?

 9              PROSPECTIVE JUROR NO. 2:  No, I'm not.

10              THE COURT:  Do you reside with anyone?

11              PROSPECTIVE JUROR NO. 2:  No, I do not.

12              THE COURT:  All right.  You may pass that over.

13   Thank you.

14         Juror No. 3, where do you live, ma'am?

15              PROSPECTIVE JUROR NO. 3:  Pasadena.

16              THE COURT:  And what part of Pasadena?

17              PROSPECTIVE JUROR NO. 3:  East Pasadena.

18              THE COURT:  Pasadena Pasadena?

19              PROSPECTIVE JUROR NO. 3:  No, East Pasadena.

20              THE COURT:  I see.

21         How long have you been at your address?

22              PROSPECTIVE JUROR NO. 3:  Since 1998.

23              THE COURT:  What do you teach, and where do you

24   teach?

25              PROSPECTIVE JUROR NO. 3:  I teach at Pasadena
```

```
 1   Unified.
 2              THE COURT:  And which school?
 3              PROSPECTIVE JUROR NO. 3:  Marshall.
 4              THE COURT:  Marshall Fundamental?
 5              PROSPECTIVE JUROR NO. 3:  Marshall Fundamental.
 6              THE COURT:  And are you married, ma'am?
 7              PROSPECTIVE JUROR NO. 3:  Yes, I am.
 8              THE COURT:  And what does your husband do?
 9              PROSPECTIVE JUROR NO. 3:  He is in engineering.
10              THE COURT:  What kind of engineering?
11              PROSPECTIVE JUROR NO. 3:  Electrical engineer.
12              THE COURT:  Do you have children?  Girls?
13              PROSPECTIVE JUROR NO. 3:  Four and a half, almost
14   five, and I have two boys, and I'm expecting my third boy,
15   almost three.
16              THE COURT:  So you can reprise some of My Three
17   Sons.  That's wonderful.
18          Anyone else in the home?
19              PROSPECTIVE JUROR NO. 3:  No, no.
20              THE COURT:  All right.  Thank you.
21          Juror No. 4, where do you reside, sir?
22              PROSPECTIVE JUROR NO. 4:  Ventura.
23              THE COURT:  And how long have you been at your
24   present address?
25              PROSPECTIVE JUROR NO. 4:  Present address two
```

```
 1    months, but Ventura my whole life.
 2              THE COURT:  And tell us what you do, sir.
 3              PROSPECTIVE JUROR NO. 4:  Currently working for KDS
 4    Marketing, food demos.
 5              THE COURT:  And are you married?
 6              PROSPECTIVE JUROR NO. 4:  Yes.
 7              THE COURT:  And what does your wife do?
 8              PROSPECTIVE JUROR NO. 4:  Store manager for VTF
 9    Corporation, women's clothing.
10              THE COURT:  And do you have children?
11              PROSPECTIVE JUROR NO. 4:  We have one on the way.
12              THE COURT:  Congratulations.  A lot going -- one of
13    our lawyers wife is expecting too.  We will see who gets there
14    first.  I don't know.
15         Anyone else in the home with you?
16              PROSPECTIVE JUROR NO. 4:  No.
17              THE COURT:  All right.  Thank you, sir.
18         Juror No. 5, where do you reside, ma'am?
19              PROSPECTIVE JUROR NO. 5:  Northridge.
20              THE COURT:  And how long have you been at your
21    present address?
22              PROSPECTIVE JUROR NO. 5:  13 years.
23              THE COURT:  And what do you do?
24              PROSPECTIVE JUROR NO. 5:  I am a realtime captioner.
25    It is very similar to a stenographer.
```

```
 1                THE COURT:  I see.

 2        And who do you do that for?

 3                PROSPECTIVE JUROR NO. 5:  University of Northridge.

 4   I do that for deaf and hard-of-hearing students.

 5                THE COURT:  And are you married?

 6                PROSPECTIVE JUROR NO. 5:  Yes.

 7                THE COURT:  And what does your husband do?

 8                PROSPECTIVE JUROR NO. 5:  Same thing.

 9                THE COURT:  Really?  Is that how you met?

10                PROSPECTIVE JUROR NO. 5:  No, actually.

11                THE COURT:  Do you have children?

12                PROSPECTIVE JUROR NO. 5:  No.

13                THE COURT:  And anyone residing with you and your

14   husband?

15                PROSPECTIVE JUROR NO. 5:  No.

16                THE COURT:  Thank you.

17        Juror No. 6, where do you live, ma'am?

18                PROSPECTIVE JUROR NO. 6:  Lakewood.

19                THE COURT:  And how long have you been at your

20   present address?

21                PROSPECTIVE JUROR NO. 6:  Three years.

22                THE COURT:  Where were you before that?

23                PROSPECTIVE JUROR NO. 6:  Villa Park.

24                THE COURT:  For how long?

25                PROSPECTIVE JUROR NO. 6:  For about a year and a
```

```
 1   half.
 2              THE COURT:  And how long have you been in Southern
 3   California altogether?
 4              PROSPECTIVE JUROR NO. 6:  15 years.
 5              THE COURT:  What do you do?
 6              PROSPECTIVE JUROR NO. 6:  I'm a supply chain
 7   specialist for a chemical company.
 8              THE COURT:  I see.
 9         And are you married?
10              PROSPECTIVE JUROR NO. 6:  No.
11              THE COURT:  Do you reside with anyone?
12              PROSPECTIVE JUROR NO. 6:  No.
13              THE COURT:  Thank you.  If you pass that over to
14   Juror No. 7.
15         Where do you live, sir?
16              PROSPECTIVE JUROR NO. 7:  Alhambra.
17              THE COURT:  And how long have you been at your
18   present address?
19              PROSPECTIVE JUROR NO. 7:  Two years.
20              THE COURT:  Where were you before?
21              PROSPECTIVE JUROR NO. 7:  La Puente.
22              THE COURT:  For how long?
23              PROSPECTIVE JUROR NO. 7:  36 years.
24              THE COURT:  All right.  Tell us what you do.
25              PROSPECTIVE JUROR NO. 7:  I'm a medical equipment
```

```
 1   technician for Kaiser.
 2            THE COURT:  And are you married?
 3            PROSPECTIVE JUROR NO. 7:  No.
 4            THE COURT:  Do you reside with anyone?
 5            PROSPECTIVE JUROR NO. 7:  Yes.
 6            THE COURT:  Tell us.
 7            PROSPECTIVE JUROR NO. 7:  My girlfriend.
 8            THE COURT:  What does she do?
 9            PROSPECTIVE JUROR NO. 7:  She's a secretary at a
10   hospital.
11            THE COURT:  Are there any kids?
12            PROSPECTIVE JUROR NO. 7:  No.  I have two children,
13   but they don't live with me.
14            THE COURT:  All right.  What do those kids do that
15   they're yours?
16            PROSPECTIVE JUROR NO. 7:  What do they do?
17            THE COURT:  What do your children do, yes.
18            PROSPECTIVE JUROR NO. 7:  Well, one's -- I don't
19   understand the question.
20            THE COURT:  What do your children do?
21            PROSPECTIVE JUROR NO. 7:  What do they do?
22            THE COURT:  Are they students?
23            PROSPECTIVE JUROR NO. 7:  They go to school, yes.  I
24   have a 14-year-old and a 9-year-old.
25            THE COURT:  They are students.  And are they with
```

```
 1    their mother?
 2              PROSPECTIVE JUROR NO. 7:  Yes.
 3              THE COURT:  Thank you.
 4         And, Juror No. 8, where do you reside, sir?
 5              PROSPECTIVE JUROR NO. 8:  I live in Torrance.
 6              THE COURT:  How long have you been at your address?
 7              PROSPECTIVE JUROR NO. 8:  This address two years,
 8    and the previous address about 11 years.
 9              THE COURT:  And tell us what you do here in the
10    United States.
11              PROSPECTIVE JUROR NO. 8:  I am a store manager of a
12    retail store.
13              THE COURT:  And are you married?
14              PROSPECTIVE JUROR NO. 8:  Yes, I'm married.
15              THE COURT:  What does your wife do?
16              PROSPECTIVE JUROR NO. 8:  She is a beauty artist,
17    like a threading or this kind of things.
18              THE COURT:  Tell us again.  She does what?
19              PROSPECTIVE JUROR NO. 8:  Beauty artist.
20              THE COURT:  Duty?
21              PROSPECTIVE JUROR NO. 8:  Beauty.
22              THE COURT:  Oh, I'm sorry.  I didn't hear you right.
23              PROSPECTIVE JUROR NO. 8:  Beauty.  She never did
24    mine, So I don't know.
25              THE COURT:  Interesting.
```

```
1          Do you have children?
2               PROSPECTIVE JUROR NO. 8:  Yes.  I have three kids.
3               THE COURT:  And what do your kids do.
4               PROSPECTIVE JUROR NO. 8:  The oldest one is 24.
5               THE COURT:  Male or female?
6               PROSPECTIVE JUROR NO. 8:  Female.  She is a student
7     of criminal justice.  She is going to graduate this year.  The
8     other daughter is 15, she just turned 15, and 13 is my son.
9               THE COURT:  Anyone else in the home?
10              PROSPECTIVE JUROR NO. 8:  No.
11              THE COURT:  Tell us what kind of law you practiced
12    in Pakistan.
13              PROSPECTIVE JUROR NO. 8:  In Pakistan is I did
14    criminal and civil both.  And in Pakistan there's no like
15    immigration kind of a thing, but in civil is a different kind
16    of -- I was doing electric company.  I was a legal advisor to
17    PTCL, the telephone company.  All these things I used to do
18    over there.
19              THE COURT:  I see.
20          And of course they don't have juries in Pakistan, do they?
21              PROSPECTIVE JUROR NO. 8:  No.
22              THE COURT:  All right.  Can you put aside your
23    experience as a lawyer there and decide this case fairly for
24    both sides here?
25              PROSPECTIVE JUROR NO. 8:  Yes, Your Honor.
```

**UNITED STATES DISTRICT COURT**

```
1                    THE COURT:  Thank you.
2           All right, Juror No. 9.
3                    PROSPECTIVE JUROR NO. 9:  I'm from Santa Maria,
4      California.
5                    THE COURT:  You have come a long way, and we
6      appreciate it.  This is a large, large district, the largest in
7      terms of population, 20 million people.  And one of these days
8      we are going to have to get a court over there for Ventura,
9      Santa Barbara.
10                   PROSPECTIVE JUROR NO. 9:  And San Luis.
11                   THE COURT:  San Luis Obispo, yes.
12          How long have you been at that address?
13                   PROSPECTIVE JUROR NO. 9:  Ten years.
14                   THE COURT:  What do you do now?
15                   PROSPECTIVE JUROR NO. 9:  Retired from financial
16     management.
17                   THE COURT:  Are you married?
18                   PROSPECTIVE JUROR NO. 9:  Widow.
19                   THE COURT:  I see.
20          What did your husband do?
21                   PROSPECTIVE JUROR NO. 9:  Sales.
22                   THE COURT:  What kind of sales?
23                   PROSPECTIVE JUROR NO. 9:  Cabinets, kitchen
24     cabinets.
25                   THE COURT:  I see.
```

```
 1        And do you have children?

 2               PROSPECTIVE JUROR NO. 9:  No.

 3               THE COURT:  Do you reside with anyone presently?

 4               PROSPECTIVE JUROR NO. 9:  No.

 5               THE COURT:  All right.  Thank you, ma'am.

 6        Juror No. 10, where do you reside?

 7               PROSPECTIVE JUROR NO. 10:  South Central Los

 8  Angeles.

 9               THE COURT:  And how long?

10               PROSPECTIVE JUROR NO. 10:  Ten years.

11               THE COURT:  What do you do?

12               PROSPECTIVE JUROR NO. 10:  Medical billing.

13               THE COURT:  And are you married?

14               PROSPECTIVE JUROR NO. 10:  Yes.

15               THE COURT:  What does your husband do?

16               PROSPECTIVE JUROR NO. 10:  AT&T phone technician.

17               THE COURT:  Do you have any children?

18               PROSPECTIVE JUROR NO. 10:  Son, 16.

19               THE COURT:  Anyone else in the home?

20               PROSPECTIVE JUROR NO. 10:  No.

21               THE COURT:  Thank you, ma'am.

22        Juror No. 11, where do you live, sir?

23               PROSPECTIVE JUROR NO. 11:  Santa Barbara.

24               THE COURT:  How long have you been at your present

25  address?
```

```
 1              PROSPECTIVE JUROR NO. 11:  That address, two years.
 2    Santa Barbara in total, three and a half.
 3              THE COURT:  How long have you been in Southern
 4    California?
 5              PROSPECTIVE JUROR NO. 11:  Three and a half years.
 6    I moved from Rhode Island.
 7              THE COURT:  My goodness.  Those potholes there in
 8    Providence were getting to you?
 9              PROSPECTIVE JUROR NO. 11:  It's a nightmare.  The
10    roads are so bad.  You go back from Santa Barbara, the roads in
11    Rhode Island are so bad.
12              THE COURT:  Well, if you go back from Santa Barbara,
13    that's true of a lot of places, too.
14              PROSPECTIVE JUROR NO. 11:  Everything is bad, yeah.
15              THE COURT:  What do you do, sir?
16              PROSPECTIVE JUROR NO. 11:  I am a private chef for a
17    CEO.
18              THE COURT:  And are you married?
19              PROSPECTIVE JUROR NO. 11:  No.  I'm engaged.
20              THE COURT:  And what does your fiancee do?
21              PROSPECTIVE JUROR NO. 11:  She studies winemaking at
22    UC Davis.
23              THE COURT:  My goodness.  You are going to have a
24    nice paring there.
25              PROSPECTIVE JUROR NO. 11:  It should work out if we
```

```
 1    ever see each other.

 2              THE COURT:  You have to work on some of the same

 3    things.

 4              PROSPECTIVE JUROR NO. 11:  Yes.

 5              THE COURT:  Get her to work for the same CEO.

 6         Anyone else in the home with you and your fiancee now?

 7              PROSPECTIVE JUROR NO. 11:  No.  Our second place is

 8    up in Davis.  I live alone, and she lives up there.  We go back

 9    and forth.

10              THE COURT:  All right.  Has she been at the

11    university there at Davis or what?

12              PROSPECTIVE JUROR NO. 11:  Uh-huh, she goes there,

13    yeah.

14              THE COURT:  Thank you.

15              PROSPECTIVE JUROR NO. 11:  Thank you.

16              THE COURT:  And, Juror No. 12, where do you reside,

17    ma'am?

18              PROSPECTIVE JUROR NO. 12:  El Sereno, Los Angeles.

19              THE COURT:  And how long have you been at your

20    present address?

21              PROSPECTIVE JUROR NO. 12:  18 years.

22              THE COURT:  And what do you do?

23              PROSPECTIVE JUROR NO. 12:  I am a call receptionist

24    for a mental health patient.

25              THE COURT:  I see.
```

```
 1        Are you married, ma'am?

 2              PROSPECTIVE JUROR NO. 12:  Yes.

 3              THE COURT:  What does your husband do?

 4              PROSPECTIVE JUROR NO. 12:  Heating and air

 5    conditioning technician.

 6              THE COURT:  And do you have children?

 7              PROSPECTIVE JUROR NO. 12:  Yes, four.

 8              THE COURT:  Tell us about them.

 9              PROSPECTIVE JUROR NO. 12:  17, 15, 10 and 9.

10              THE COURT:  Girls and boys?

11              PROSPECTIVE JUROR NO. 12:  Three girls, one boy.

12              THE COURT:  Anyone else in the home?

13              PROSPECTIVE JUROR NO. 12:  Not right now.  Soon,

14    yes.  My husband's niece, she is going to move from Arizona to

15    home.  She doesn't go to college.

16              THE COURT:  I see.  All right.  Thank you.

17         Let me ask counsel for the Government, first of all, any

18    additional questions and/or challenge for cause?

19              MS. JAIMEZ:  One moment, Your Honor.

20              THE COURT:  Certainly.  Take your time.

21         (Counsel conferred off the record.)

22              MS. JAIMEZ:  Your Honor, no additional questions and

23    no challenges for cause.

24              THE COURT:  Thank you.

25         Mr. Navarro?
```

1          MR. NAVARRO:  No questions or challenges,

2    Your Honor.

3          THE COURT:  Thank you.

4      The Government may exercise its first preemptory

5    challenge.

6          MS. JAIMEZ:  One moment, Your Honor.

7          THE COURT:  Truly.

8      (Counsel conferred off the record.)

9          MS. JAIMEZ:  Your Honor, the Government thanks and

10   excuses Prospective Juror No. 4.

11         THE COURT:  All right.  Thank you.  If you will go

12   back to the jury assembly room.  Thank you, sir.

13         THE COURTROOM DEPUTY:  Christina Vose, V-o-s-e.

14         THE COURT:  Ms. Vose, would you take the seat that's

15   just been vacated.

16         PROSPECTIVE JUROR NO. 4:  Yes.

17         THE COURT:  Thank you.

18     Does she have that microphone?

19     Thank you.

20     Ms. Vose, have you been able to hear the questions, as

21   well as the answers, so far?

22         PROSPECTIVE JUROR NO. 4:  Yes, Your Honor.

23         THE COURT:  And based on what you've heard, do you

24   feel that you can be fair to both sides in this case?

25         PROSPECTIVE JUROR NO. 4:  Yes.

1          THE COURT:  Have you ever worked in law enforcement?

2          PROSPECTIVE JUROR NO. 4:  No, sir.

3          THE COURT:  Ever studied law?

4          PROSPECTIVE JUROR NO. 4:  No.

5          THE COURT:  Anybody in your family have problems

6   with drugs, to your knowledge?

7          PROSPECTIVE JUROR NO. 4:  No, sir.

8          THE COURT:  Anything at all about the charges that

9   you've heard me read to you going to affect your being fair?

10          PROSPECTIVE JUROR NO. 4:  I can be fair.

11          THE COURT:  All right.  Then have you had prior jury

12   experience?

13          PROSPECTIVE JUROR NO. 4:  No, sir.

14          THE COURT:  But you understand that in a criminal

15   case, whether it be state court or federal court, a defendant

16   is presumed innocent until or if proven guilty beyond a

17   reasonable doubt?

18          PROSPECTIVE JUROR NO. 4:  Yes.

19          THE COURT:  Do you accept that?

20          PROSPECTIVE JUROR NO. 4:  Yes.

21          THE COURT:  You understand that, too, that a

22   defendant in a criminal case in our system of law doesn't have

23   to take the witness stand, doesn't have to put on any evidence,

24   doesn't have to do anything?

25          PROSPECTIVE JUROR NO. 4:  Yes.

```
 1              THE COURT:  And do you accept that?
 2              PROSPECTIVE JUROR NO. 4:  Yes, I do.
 3              THE COURT:  Where do you live, ma'am?
 4              PROSPECTIVE JUROR NO. 4:  I live in Lancaster,
 5    California.
 6              THE COURT:  That's a long trip here, too.
 7         And how long have you been at your present address?
 8              PROSPECTIVE JUROR NO. 4:  About 20 years.
 9              THE COURT:  What do you do, ma'am?
10              PROSPECTIVE JUROR NO. 4:  I work at a high school
11    district in a personnel office, human resources.
12              THE COURT:  I see.
13         And are you married?
14              PROSPECTIVE JUROR NO. 4:  I am not, but I am in a
15    relationship.
16              THE COURT:  All right.  Tell us what the other
17    person in the relationship -- I take it there's only one
18    person.
19              PROSPECTIVE JUROR NO. 4:  One person.  He's retired.
20    And I have three stepchildren with him and my own daughter
21    who's 21.
22              THE COURT:  I see.
23         What does your daughter do?
24              PROSPECTIVE JUROR NO. 4:  She's a college student.
25              THE COURT:  What's she studying?
```

```
1              PROSPECTIVE JUROR NO. 4:  Right now she is in
2    general ed, but she wants to be an English major.
3              THE COURT:  Good, good.
4         And do you know what the three stepkids do?
5              PROSPECTIVE JUROR NO. 4:  They are all in school.
6              THE COURT:  All students?
7              PROSPECTIVE JUROR NO. 4:  They are 17, 15 and 12.
8              THE COURT:  I see.
9         Any of them reside with you?
10             PROSPECTIVE JUROR NO. 4:  They do.
11             THE COURT:  All right.  Anyone else in the home?
12             PROSPECTIVE JUROR NO. 4:  No.
13             THE COURT:  All right.  Thank you.
14        Let me ask if there are any additional questions and/or
15   challenge for cause first from the Government.
16             MS. JAIMEZ:  No additional questions, Your Honor, no
17   challenges.
18             THE COURT:  Thank you.
19        Mr. Navarro?
20             MR. NAVARRO:  No questions or challenges,
21   Your Honor.  Thank you.
22             THE COURT:  Thank you.
23        We are now with the defense.
24             MR. NAVARRO:  Can I have a second, Your Honor?
25             THE COURT:  Of course.
```

77

```
 1          (Counsel and defendant conferred off the record.)
 2          MR. NAVARRO:  Your Honor, we would like to thank and
 3   excuse Juror No. 2, Ms. Lee.
 4          THE COURT:  All right.  Thank you very much,
 5   Ms. Lee.  You will go back to the jury assembly room, ma'am.
 6          THE COURTROOM DEPUTY:  Stephanie Paulson,
 7   P-a-u-l-s-o-n.
 8          THE COURT:  Ms. Paulson, have you been able to hear
 9   the questions and answers so far, ma'am?
10          PROSPECTIVE JUROR NO. 2:  Yes, Your Honor.
11          THE COURT:  And based on what you've heard, could
12   you be fair to the Government as well as to the defendant?
13          PROSPECTIVE JUROR NO. 2:  Yes.
14          THE COURT:  Have you ever studied law?
15          PROSPECTIVE JUROR NO. 2:  No, but I have taken a
16   criminal law class.
17          THE COURT:  All right.  At what level?
18          PROSPECTIVE JUROR NO. 2:  University.  I am a
19   student currently at Texas Christian University in Forth Worth.
20          THE COURT:  I see.
21       And I am not going to ask you how well, and I'm sure you
22   did well in the class, but can you put aside what you learned
23   there and accept the law as given to you in this case?
24          PROSPECTIVE JUROR NO. 2:  Yes.
25          THE COURT:  Anyone in your family, as far as you
```

```
1    know, had any problems with drugs?

2              PROSPECTIVE JUROR NO. 2:  No, Your Honor.

3              THE COURT:  Have you ever had an unpleasant contact

4    with any law enforcement officer yourself?

5              PROSPECTIVE JUROR NO. 2:  No.

6              THE COURT:  Anyone in your family, to your

7    knowledge?

8              PROSPECTIVE JUROR NO. 2:  No.

9              THE COURT:  Would you tend to give a law enforcement

10   officer who's a witness more credibility than you would any

11   other witness?

12             PROSPECTIVE JUROR NO. 2:  No.

13             THE COURT:  Have you had prior jury experience?

14             PROSPECTIVE JUROR NO. 2:  No.

15             THE COURT:  And you understand that the Government

16   alone bears the burden of proof in a criminal case?  It's

17   called "the People" at the state level, but the Government at

18   the federal level.

19             PROSPECTIVE JUROR NO. 2:  Yes.

20             THE COURT:  Where do you live?

21             PROSPECTIVE JUROR NO. 2:  Torrance.

22             THE COURT:  And how long have you been at your

23   present address?

24             PROSPECTIVE JUROR NO. 2:  18 years, ever since I

25   left for college.
```

1          THE COURT:  I thought you were going to say your

2    whole life.  You don't look much more than 18.

3         And where are you in college?

4          PROSPECTIVE JUROR NO. 2:  Like where --

5          THE COURT:  You're at Texas Christian?

6          PROSPECTIVE JUROR NO. 2:  Yeah, in Fort Worth.

7          THE COURT:  I see.

8         And you're out already?

9          PROSPECTIVE JUROR NO. 2:  No.  I'm going to be a

10   junior.  I go back on the 25th of this month.

11         THE COURT:  They have some kind of a quarter system

12   or what?

13         PROSPECTIVE JUROR NO. 2:  I have an internship

14   there.

15         THE COURT:  Very good.

16        And with whom do you reside?

17         PROSPECTIVE JUROR NO. 2:  Here?

18         THE COURT:  Yes, when you're home.

19         PROSPECTIVE JUROR NO. 2:  With my parents.

20         THE COURT:  And tell us what they do.

21         PROSPECTIVE JUROR NO. 2:  My mom is a children's

22   pastor at our church, and my dad is a Redondo Beach fireman.

23         THE COURT:  And anyone else in the home?

24         PROSPECTIVE JUROR NO. 2:  My brother's moving back.

25   He just graduated from USC.

```
1              THE COURT:  He's a Trojan?

2              PROSPECTIVE JUROR NO. 2:  Uh-huh.

3              THE COURT:  And what was his major?

4              PROSPECTIVE JUROR NO. 2:  Communication.

5              THE COURT:  I see.

6        And anybody else there?

7              PROSPECTIVE JUROR NO. 2:  No.

8              THE COURT:  Not expecting any other siblings back or

9    anything?

10             PROSPECTIVE JUROR NO. 2:  No, no other siblings.

11             THE COURT:  All right.  Thank you.

12       Let me ask if there are any other additional questions

13   and/or challenge for cause.  First of all, the Government.

14             MS. JAIMEZ:  No additional questions, Your Honor, no

15   challenges for cause.

16             THE COURT:  Thank you.

17       Mr. Navarro?

18             MR. NAVARRO:  No, Your Honor.  Thank you.

19             THE COURT:  We are back to the Government.

20             MS. JAIMEZ:  Your Honor, the Government thanks and

21   excuses Prospective Juror No. 8.

22             THE COURT:  All right.  Thank you.  Yes, sir,

23   Mr. Khan.  Thank you.  If you go back to the jury assembly

24   room, sir.  Thank you.

25             THE COURTROOM DEPUTY:  Steven Michael Klingenberger,
```

**UNITED STATES DISTRICT COURT**

```
 1   K-l-i-n-g-e-n-b-e-r-g-e-r, II.
 2              THE COURT:  Mr. Klingenberger, have you been able to
 3   follow the questions and answers so far, sir?
 4              PROSPECTIVE JUROR NO. 8:  Yes.
 5              THE COURT:  And based on what you've heard, can you
 6   be fair to both sides?
 7              PROSPECTIVE JUROR NO. 8:  Yes.
 8              THE COURT:  Have you ever worked in law enforcement?
 9              PROSPECTIVE JUROR NO. 8:  No.
10              THE COURT:  Ever had any problems with law
11   enforcement?
12              PROSPECTIVE JUROR NO. 8:  I've got tickets and stuff
13   before.
14              THE COURT:  I think we all have.
15              PROSPECTIVE JUROR NO. 8:  Yeah.  Other than that,
16   no.
17              THE COURT:  Is there anything about the charges
18   you've heard me read going to affect your being fair to both
19   sides?
20              PROSPECTIVE JUROR NO. 8:  No.
21              THE COURT:  Have you ever belonged to any kind of an
22   organization that wants to change the drug laws in the country?
23              PROSPECTIVE JUROR NO. 8:  Not officially a member,
24   no.
25              THE COURT:  Well, have you been involved with any
```

1    kind of an organization that's doing that?

2              PROSPECTIVE JUROR NO. 8:  Yes.

3              THE COURT:  Tell us about that organization.

4              PROSPECTIVE JUROR NO. 8:  Well, I'm just -- I back a

5    lot of people that are against the drug war.

6              THE COURT:  All right.  And since you've done that,

7    do you think that you can be fair to the Government in this

8    case as well as to the defendant?

9              PROSPECTIVE JUROR NO. 8:  I think I could, yeah.

10             THE COURT:  Do you have any problems with the

11   charges that have been brought here?

12             PROSPECTIVE JUROR NO. 8:  No.

13             THE COURT:  Have you had any prior jury experience?

14             PROSPECTIVE JUROR NO. 8:  I've shown up a bunch, but

15   never been picked.

16             THE COURT:  And you understand that the Government

17   alone bears the burden of proof in a criminal case?

18             PROSPECTIVE JUROR NO. 8:  What?

19             THE COURT:  The Government alone bears the burden of

20   proof in a criminal case.

21             PROSPECTIVE JUROR NO. 8:  Okay.  Yes.

22             THE COURT:  You accept that?

23             PROSPECTIVE JUROR NO. 8:  Yes.

24             THE COURT:  Would you hold it against the defendant

25   if he chose not to take the witness stand, which is his

83

```
 1    constitutional right?
 2              PROSPECTIVE JUROR NO. 8:  No.
 3              THE COURT:  Where do you live, sir?
 4              PROSPECTIVE JUROR NO. 8:  Oak View.
 5              THE COURT:  And where is that?
 6              PROSPECTIVE JUROR NO. 8:  By Ojai.
 7              THE COURT:  And how long have you been at your
 8    present address?
 9              PROSPECTIVE JUROR NO. 8:  Present address, one year.
10              THE COURT:  Where were you before that?
11              PROSPECTIVE JUROR NO. 8:  Silver Strand, Oxnard, the
12    beach.
13              THE COURT:  Yeah, I know.
14         And how long there.
15              PROSPECTIVE JUROR NO. 8:  Four years.
16              THE COURT:  How long altogether in Southern
17    California?
18              PROSPECTIVE JUROR NO. 8:  36 years.
19              THE COURT:  All right.  And tell us what you do,
20    sir.
21              PROSPECTIVE JUROR NO. 8:  I build dance floors.
22              THE COURT:  I'm sorry, I missed it.
23              PROSPECTIVE JUROR NO. 8:  I build dance floors.
24              THE COURT:  Oh, all right.  I take it they're coming
25    back in.
```

```
 1              PROSPECTIVE JUROR NO. 8:  We build the portables
 2  that all the party supply companies have.
 3              THE COURT:  I see.  Very good.
 4        And are you married, sir?
 5              PROSPECTIVE JUROR NO. 8:  No, I'm not.
 6              THE COURT:  Are you in a relationship with anyone?
 7              PROSPECTIVE JUROR NO. 8:  Yes, I am.
 8              THE COURT:  Tell us.
 9              PROSPECTIVE JUROR NO. 8:  Yes.  I live with her.
10  What do you need to know?
11              THE COURT:  Well, what she does, for one.
12              PROSPECTIVE JUROR NO. 8:  Oh, she works for a
13  property management company.
14              THE COURT:  And are there any children?
15              PROSPECTIVE JUROR NO. 8:  I have one myself, and
16  she's seven.
17              THE COURT:  All right.  Is she with you?
18              PROSPECTIVE JUROR NO. 8:  Just every weekend.  Her
19  mom has her on the weekdays.
20              THE COURT:  All right.  Thank you.
21        Anyone else in the home?
22              PROSPECTIVE JUROR NO. 8:  My girlfriend's mother
23  lives there as well.
24              THE COURT:  And does she work outside of the home?
25              PROSPECTIVE JUROR NO. 8:  Yes.  She's a preschool
```

1    teacher.

2              THE COURT:  All right.  Thank you.

3         Let me ask if there are any additional questions and/or

4    challenge for cause.  The Government first.

5              MS. JAIMEZ:  Your Honor, would the Court mind asking

6    additional questions about the organization as to which

7    Prospective Juror No. 8 belongs?

8              THE COURT:  Well, he says he doesn't belong, but

9    that he supported groups that are opposed to the drug war.

10        Is that right, sir?

11             PROSPECTIVE JUROR NO. 8:  Correct.

12             MS. JAIMEZ:  Your Honor, would the Court mind asking

13   Prospective Juror No. 8 the proposed voir dire question No. 8?

14             THE COURT:  Well, I think I've asked you this in

15   other ways, but again, let me ask you:  Do you feel that any of

16   the drug laws in the country are unconstitutional?

17             PROSPECTIVE JUROR NO. 8:  Yes.

18             THE COURT:  What about the laws that pertain to the

19   charges in this case with regard --

20             PROSPECTIVE JUROR NO. 8:  Okay.  No, I think it's --

21   it's more the people that use them I feel should get

22   rehabilitation.

23             THE COURT:  Yes.  I feel that way, too.

24             PROSPECTIVE JUROR NO. 8:  Yeah, over being jailed

25   and their life being thrown away.

**UNITED STATES DISTRICT COURT**

```
1              THE COURT:  Thank you for that.
2         Any further questions of this juror or any challenge?
3              MS. JAIMEZ:  One moment, Your Honor.
4              THE COURT:  Sure.
5         (Counsel conferred off the record.)
6              MS. JAIMEZ:  Nothing further, Your Honor.
7              THE COURT:  All right.  Mr. Navarro?
8              MR. NAVARRO:  No additional questions, Your Honor.
9    Thank you.
10             THE COURT:  All right.  We are back to the defense.
11             MR. NAVARRO:  Your Honor, we want to thank and
12   excuse Juror No. 9, Sladek, I believe.
13             THE COURT:  Yes.
14        Thank you, ma'am.  If you will go back to the jury
15   assembly room.  Thank you.
16             THE COURTROOM DEPUTY:  Patrick Anthony Thy, T-h-y.
17             THE COURT:  Mr. Thy, have you been able to follow
18   the questions and answers so far, sir?
19             PROSPECTIVE JUROR NO. 9:  Yes.
20             THE COURT:  And based on what you've heard, could
21   you be fair to the Government as well as to the defendant?
22             PROSPECTIVE JUROR NO. 9:  Yes.
23             THE COURT:  Have you ever worked in law enforcement?
24             PROSPECTIVE JUROR NO. 9:  No.
25             THE COURT:  Have you ever studied law?
```

**UNITED STATES DISTRICT COURT**

```
 1                    PROSPECTIVE JUROR NO. 9:  No.
 2                    THE COURT:  Do you have any relatives who have had
 3       any problems with drugs, as far as you know?
 4                    PROSPECTIVE JUROR NO. 9:  Yes.
 5                    THE COURT:  Do you want to tell us about it?
 6                    PROSPECTIVE JUROR NO. 9:  I have an uncle who had a
 7       methamphetamine problem, and had some -- excuse me, did jail
 8       time in Oklahoma for it.
 9                    THE COURT:  And how long ago was that?
10                    PROSPECTIVE JUROR NO. 9:  About 15 years.
11                    THE COURT:  Can you put aside that and decide this
12       case on its own facts and the law given to you to apply to
13       those facts?
14                    PROSPECTIVE JUROR NO. 9:  Yes.
15                    THE COURT:  Have you had prior jury experience?
16                    PROSPECTIVE JUROR NO. 9:  No.
17                    THE COURT:  Have you ever belonged to any kind of an
18       organization that has as its premise the changing of the drug
19       laws of this country?
20                    PROSPECTIVE JUROR NO. 9:  No.
21                    THE COURT:  Have you had prior -- did I ask you if
22       you had prior jury experience?
23                    PROSPECTIVE JUROR NO. 9:  You did.  I do not.
24                    THE COURT:  All right.  And you understand that in a
25       criminal case the defendant doesn't have to put on any evidence
```

or do anything?

PROSPECTIVE JUROR NO. 9: I do.

THE COURT: You accept that?

PROSPECTIVE JUROR NO. 9: Yes.

THE COURT: Where do you live, sir?

PROSPECTIVE JUROR NO. 9: Santa Clarita.

THE COURT: And how long have you been at your presence address?

PROSPECTIVE JUROR NO. 9: About eight months.

THE COURT: Where were you before.

PROSPECTIVE JUROR NO. 9: Same town. I have been in the valley since '73.

THE COURT: And tell us what you do presently.

PROSPECTIVE JUROR NO. 9: I am a helicopter pilot.

THE COURT: For whom.

PROSPECTIVE JUROR NO. 9: Los Angeles Water and Power.

THE COURT: Are you married, sir?

PROSPECTIVE JUROR NO. 9: Divorced.

THE COURT: Do you reside with anyone presently?

PROSPECTIVE JUROR NO. 9: I have two roommates.

THE COURT: And tell us what those roommates do.

PROSPECTIVE JUROR NO. 9: One works in the medical field with disability products, and one is a patent illustrator.

1           THE COURT:  Tell us if they're male or female.

2           PROSPECTIVE JUROR NO. 9:  Male and female.  They're

3   married to each other.

4           THE COURT:  All right.  And do you have any children

5   of your own?

6           PROSPECTIVE JUROR NO. 9:  I have a 15-year-old and a

7   12-year-old.

8           THE COURT:  Are they with the mother?

9           PROSPECTIVE JUROR NO. 9:  Yes.

10          THE COURT:  Thank you.

11       We are asking the Government now if they have any

12   additional questions and/or challenge for cause.

13          MS. JAIMEZ:  No additional questions, no additional

14   challenge for cause.

15          THE COURT:  Thank you.

16       Mr. Navarro?

17          MR. NAVARRO:  No, Your Honor.  Thank you.

18          THE COURT:  And we are still with the defense.

19          MR. NAVARRO:  Your Honor, we would like to thank and

20   excuse Juror No. 3, Ms. Agvanian.

21          THE COURT:  All right.  Thank you, very much,

22   Ms. Agvanian.  Go back to the jury assembly room.  Thank you.

23          THE COURTROOM DEPUTY:  Brenna Moore, M-o-o-r-e.

24          THE COURT:  Ms. Moore, have you been able to follow

25   the questions and answers so far, ma'am?

1                    PROSPECTIVE JUROR NO. 3:  Yes.

2                    THE COURT:  And based on what you've heard, could

3      you be fair to both sides?

4                    PROSPECTIVE JUROR NO. 3:  Yes.

5                    THE COURT:  Have you ever worked in law enforcement?

6                    PROSPECTIVE JUROR NO. 3:  No.

7                    THE COURT:  Do you have any relatives or friends

8      who've had problems with drugs?

9                    PROSPECTIVE JUROR NO. 3:  No.

10                    THE COURT:  Have you ever had an unpleasant

11     experience with anyone in law enforcement?

12                    PROSPECTIVE JUROR NO. 3:  No.

13                    THE COURT:  Have you ever belonged to an

14     organization that has as one of its focal points the changing

15     of the drug laws?

16                    PROSPECTIVE JUROR NO. 3:  No.

17                    THE COURT:  Is there anything at all about the

18     charges you've heard me read to you going to affect your being

19     fair to both sides?

20                    PROSPECTIVE JUROR NO. 3:  No.

21                    THE COURT:  Have you had prior jury experience?

22                    PROSPECTIVE JUROR NO. 3:  No.

23                    THE COURT:  And you understand that in a criminal

24     case there has to be a unanimous verdict in order for there to

25     be a conviction?

```
 1                    PROSPECTIVE JUROR NO. 3:  Yes.
 2                    THE COURT:  Where do you live?
 3                    PROSPECTIVE JUROR NO. 3:  In Culver City.
 4                    THE COURT:  And how long have you been at your
 5     present address?
 6                    PROSPECTIVE JUROR NO. 3:  About seven months.
 7                    THE COURT:  Where were you before?
 8                    PROSPECTIVE JUROR NO. 3:  West Lake Village.
 9                    THE COURT:  For how long?
10                    PROSPECTIVE JUROR NO. 3:  For about five years.
11                    THE COURT:  And how long have you been in the Los
12     Angeles area?
13                    PROSPECTIVE JUROR NO. 3:  Almost my entire life, but
14     I was in Colorado for four years for school.
15                    THE COURT:  I see.
16            With University of Colorado?
17                    PROSPECTIVE JUROR NO. 3:  Yes.
18                    THE COURT:  In Boulder?  It's a beautiful place.
19            Tell us what you do.
20                    PROSPECTIVE JUROR NO. 3:  I'm currently a grad
21     student at the Pepperdine University.  I'm getting my master's
22     in psychology.
23                    THE COURT:  Thank you.
24            And are you married?
25                    PROSPECTIVE JUROR NO. 3:  No.
```

```
 1              THE COURT:  You reside with anyone?
 2              PROSPECTIVE JUROR NO. 3:  No.
 3              THE COURT:  So you're just studying there alone; is
 4    that right?
 5              PROSPECTIVE JUROR NO. 3:  Yes.  And I work at
 6    Pepperdine.  I work as a graduate assistant.
 7              THE COURT:  Thank you.
 8         Let me ask if there are any additional questions and/or
 9    challenge for cause, Government.
10              MS. JAIMEZ:  No questions or challenges for cause.
11              THE COURT:  Thank you.
12         Mr. Navarro?
13              MR. NAVARRO:  No, Your Honor.  Thank you.
14              THE COURT:  We are back to the Government.
15              MS. JAIMEZ:  Your Honor, the Government thanks and
16    excuses Prospective Juror No. 8.
17              THE COURT:  All right.  Thank you very much, Mr.
18    Klingenberger.  Please go back to the jury assembly room, sir.
19    Thank you.
20              THE COURTROOM DEPUTY:  Manuel Sterling,
21    S-t-e-r-l-i-n-g.
22              THE COURT:  Mr. Sterling, have you been able to
23    follow the questions and answers so far, sir?
24              PROSPECTIVE JUROR NO. 8:  Yes, sir.
25              THE COURT:  And based on what you've heard, can you
```

1    be fair to the Government as well as to the defendant?

2              PROSPECTIVE JUROR NO. 8:  Yes, sir.

3              THE COURT:  Have you ever worked in law enforcement?

4              PROSPECTIVE JUROR NO. 8:  Never.

5              THE COURT:  Ever had a problem with law enforcement?

6              PROSPECTIVE JUROR NO. 8:  No.

7              THE COURT:  Ever had any relatives or friends who

8    have had drug problems, to your knowledge?

9              PROSPECTIVE JUROR NO. 8:  You said "relatives"?

10             THE COURT:  Relatives or friends.

11             PROSPECTIVE JUROR NO. 8:  Friends, yes.

12             THE COURT:  And close friends?

13             PROSPECTIVE JUROR NO. 8:  Yeah.

14             THE COURT:  Tell us about it.

15             PROSPECTIVE JUROR NO. 8:  Just people can get lost

16   in addiction, and it happens, and I just try to help any way I

17   can.

18             THE COURT:  Have you ever belonged to any kind of

19   organization that wants to change the drug laws?

20             PROSPECTIVE JUROR NO. 8:  The drug laws?  No.

21             THE COURT:  Do you have any problem yourself with

22   the drug laws in this country?

23             PROSPECTIVE JUROR NO. 8:  Maybe for medicinal

24   marijuana, but that would probably be it.

25             THE COURT:  You mean that you favor it; is that what

1    you're saying?

2              PROSPECTIVE JUROR NO. 8:  No, not that it's my

3    favorite.  It's just I do feel like for people in need, it does

4    benefit them.  And if they need it, they need it.

5              THE COURT:  So you favor the use of?

6              PROSPECTIVE JUROR NO. 8:  What's that?

7              THE COURT:  Oh, you favor the use of medicinal

8    marijuana for medicinal purposes, right?

9              PROSPECTIVE JUROR NO. 8:  If it's needed, I see no

10   harm in it.  People who are terminally ill and it brings them

11   comfort, they're not being violent or anything.

12             THE COURT:  Certainly.

13        Have you ever served on a jury before?

14             PROSPECTIVE JUROR NO. 8:  Never.

15             THE COURT:  And you understand that in a criminal

16   case, the defendant doesn't have to do anything other than be

17   present in court?

18             PROSPECTIVE JUROR NO. 8:  Correct, yes.

19             THE COURT:  Where do you live, sir?

20             PROSPECTIVE JUROR NO. 8:  Downey, California.

21             THE COURT:  And how long have you been at your

22   present address?

23             PROSPECTIVE JUROR NO. 8:  Coming on ten years.

24             THE COURT:  Tell us what you do.

25             PROSPECTIVE JUROR NO. 8:  I'm a college student,

```
 1    played basketball.  I just finished.  And I work with a medical
 2    equipment company.
 3            THE COURT:  Where did you go to college?
 4            PROSPECTIVE JUROR NO. 8:  I am currently at Cypress
 5    College.
 6            THE COURT:  That's a community college?
 7            PROSPECTIVE JUROR NO. 8:  Yes.
 8            THE COURT:  What year are you in?
 9            PROSPECTIVE JUROR NO. 8:  Sophomore year.
10            THE COURT:  Do you have plans to go to a four-year
11    institution afterwards?
12            PROSPECTIVE JUROR NO. 8:  Definitely.
13            THE COURT:  And do something more than just play
14    basketball?
15            PROSPECTIVE JUROR NO. 8:  Yes.
16            THE COURT:  What are your interests in college?
17            PROSPECTIVE JUROR NO. 8:  I want to study biology
18    and become a pediatrician.
19            THE COURT:  Good, very good.
20        Do you reside with anyone presently?
21            PROSPECTIVE JUROR NO. 8:  Yes, my mom and my sister.
22            THE COURT:  Tell us what each of them does.
23            PROSPECTIVE JUROR NO. 8:  My mom is disabled, and my
24    sister is a college student at Cal State Long Beach studying
25    math.
```

```
 1              THE COURT:  And what is she studying?

 2              PROSPECTIVE JUROR NO. 8:  Math.

 3              THE COURT:  And does your mother require help?

 4              PROSPECTIVE JUROR NO. 8:  Yes.

 5              THE COURT:  Is there someone who's there in the home

 6    to help her too?

 7              PROSPECTIVE JUROR NO. 8:  Yes.

 8              THE COURT:  There is a caregiver as well?

 9              PROSPECTIVE JUROR NO. 8:  Yes, sir.  I actually am.

10              THE COURT:  Excuse me?

11              PROSPECTIVE JUROR NO. 8:  I actually am.

12              THE COURT:  Oh, you are?

13              PROSPECTIVE JUROR NO. 8:  Yes, sir.

14              THE COURT:  But when you're in school, who takes

15    care of her?

16              PROSPECTIVE JUROR NO. 8:  Well, she will just --

17    she'll be at home.

18              THE COURT:  All right.  Without anybody personally

19    providing her care; is that right?

20              PROSPECTIVE JUROR NO. 8:  Yes, sir.

21              THE COURT:  All right.  Any additional questions

22    and/or challenge for cause with the Government?

23              MS. JAIMEZ:  One moment, Your Honor.

24              THE COURT:  Surely.

25         (Counsel conferred off the record.)
```

UNITED STATES DISTRICT COURT

```
1              MS. JAIMEZ:  No, Your Honor.

2              THE COURT:  And for Mr. Navarro?

3              MR. NAVARRO:  Your Honor, I would simply like to

4    inquire from Mr. Sterling if this is causing a hardship for him

5    to have his mother alone while he's here.

6              THE COURT:  All right.  Well, let me ask you -- I

7    mean, you go to school, and you're on the basketball team, and

8    that takes some time away.  Is this a special kind of problem

9    for you being here in court as a result of your mother being at

10   home and needing care?

11             PROSPECTIVE JUROR NO. 8:  Well, I really feel like

12   I'm only here because I have to be, to be honest.

13             THE COURT:  That's right.  You're a citizen of the

14   United States, aren't you, sir?

15             PROSPECTIVE JUROR NO. 8:  Yes, sir.

16             THE COURT:  And you have all the privileges and

17   rights of a United States citizen under the Constitution, don't

18   you?

19             PROSPECTIVE JUROR NO. 8:  Yes.

20             THE COURT:  And you have obligations that go along

21   with that.  One of them is serving as a juror.  Another is

22   voting.  There are all kinds of rights as citizens.  So a lot

23   of us don't want to be here, necessarily.

24             PROSPECTIVE JUROR NO. 8:  I completely understand.

25   I just -- I think a lot, and I try to -- I juggle a lot, and I
```

1   try to -- I'm really in a phase of trying to get my life

2   together, and I am so into that, that I can't really focus on

3   anything else.

4           THE COURT:  I see.

5           PROSPECTIVE JUROR NO. 8:  And I work.  I go to

6   school.  And I know a lot of people do, but it is -- it takes

7   up a lot, and I can't really be clear-minded sometimes because

8   I'm so involved in what I am trying to do right now.

9           THE COURT:  All right.  Well, I am asking you to

10  focus here for a while.  Maybe it will clear your head from

11  some of your own personal problems if you look at some of the

12  problems that exist.  And each case brings at least a problem

13  for somebody, and usually for more than one person.  Thank you.

14      Any additional questions or challenge for cause?

15          MR. NAVARRO:  No, Your Honor.  Thank you.

16          THE COURT:  Thank you.

17      We are back to you with the defense.

18          MR. NAVARRO:  Could I have a second, Your Honor?

19          THE COURT:  You may.

20      (Counsel and defendant conferred off the record.)

21          MR. NAVARRO:  Your Honor, we would like to thank and

22  excuse Juror No. 6, Ms. Chang.

23          THE COURT:  Thank you very much, ma'am.  Go back to

24  the jury assembly room, please.

25          THE COURTROOM DEPUTY:  Daisy Sune-Yee Liu, L-i-u.

1          THE COURT:  Ms. Liu, have you been able to hear the

2     questions as well as the answers, ma'am?

3          PROSPECTIVE JUROR NO. 6:  Yes.

4          THE COURT:  And based on what you've heard, can you

5     be fair to both sides here?

6          PROSPECTIVE JUROR NO. 6:  Yes.

7          THE COURT:  Have you ever worked in law enforcement?

8          PROSPECTIVE JUROR NO. 6:  No.

9          THE COURT:  Ever had any problems with law

10    enforcement?

11         PROSPECTIVE JUROR NO. 6:  No.

12         THE COURT:  Do you have any problems with the drug

13    laws, as you understand them, in our country?

14         PROSPECTIVE JUROR NO. 6:  No.

15         THE COURT:  Have you had any prior jury experience?

16         PROSPECTIVE JUROR NO. 6:  Yes.

17         THE COURT:  Tell us about that.

18         PROSPECTIVE JUROR NO. 6:  It was a criminal case

19    with a deadly weapon assault.

20         THE COURT:  And which county?

21         PROSPECTIVE JUROR NO. 6:  In L.A.

22         THE COURT:  Did you reach a verdict in that case?

23         PROSPECTIVE JUROR NO. 6:  We came to 50/50 decision,

24    and the case was postponed to the next year.

25         THE COURT:  Was this a civil case?

```
1              PROSPECTIVE JUROR NO. 6:  It's a criminal case.
2              THE COURT:  And you did what?
3              PROSPECTIVE JUROR NO. 6:  The juror team actually
4    came up with a 50/50 decision, and we couldn't --
5              THE COURT:  You weren't able to reach a verdict?
6              PROSPECTIVE JUROR NO. 6:  Yes.
7              THE COURT:  So the jury was hung?
8              PROSPECTIVE JUROR NO. 6:  Yes.
9              THE COURT:  Sometimes that gets to be traumatic.
10   Can you put aside that experience of being part of a hung jury
11   and be able to deliberate with your fellow jurors in this case
12   fairly for both sides?
13             PROSPECTIVE JUROR NO. 6:  Yes.
14             THE COURT:  Where do you live, ma'am?
15             PROSPECTIVE JUROR NO. 6:  Alhambra.
16             THE COURT:  And how long have you been at your
17   present address?
18             PROSPECTIVE JUROR NO. 6:  About ten years.
19             THE COURT:  Tell us what you do.
20             PROSPECTIVE JUROR NO. 6:  I'm currently working in a
21   pharmaceutical company as a validation technician.
22             THE COURT:  I see.
23        And are you married?
24             PROSPECTIVE JUROR NO. 6:  No.
25             THE COURT:  Do you reside with anyone?
```

UNITED STATES DISTRICT COURT

1          PROSPECTIVE JUROR NO. 6:  Actually with my mom and

2     my sister.

3          THE COURT:  Tell us what they do.

4          PROSPECTIVE JUROR NO. 6:  My mom is a supermarket

5     cashier, and my sister works in Chinese World Journal.

6          THE COURT:  Anyone else in the home?

7          PROSPECTIVE JUROR NO. 6:  No.

8          THE COURT:  Thank you.

9        Any additional questions and/or challenge for cause, first

10    the Government.

11         MS. JAIMEZ:  No, Your Honor.

12         THE COURT:  Mr. Navarro?

13         MR. NAVARRO:  No, Your Honor.  Thank you.

14         THE COURT:  We are still with the defense.

15         MR. NAVARRO:  Can we have a second, Your Honor?

16         THE COURT:  Of course.

17     (Counsel and defendant conferred off the record.)

18         MR. NAVARRO:  Your Honor, we would like to thank and

19    excuse Juror No. 4, Ms. Vose.

20         THE COURT:  Thank you very much, ma'am.  Please go

21    back to the jury assembly room.  Thank you.

22         THE COURTROOM DEPUTY:  Claudia Quinonez,

23    Q-u-i-n-o-n-e-z.

24         THE COURT:  Ms. Quinonez, have you been able to

25    follow the questions and answers so far, ma'am?

**UNITED STATES DISTRICT COURT**

1        PROSPECTIVE JUROR NO. 4:  Yes.

2        THE COURT:  Can you speak into that microphone.

3        PROSPECTIVE JUROR NO. 4:  Yes.

4        THE COURT:  Thank you.

5     And based on what you've heard, could you be fair to the

6  Government as well as to the defendant here?

7        PROSPECTIVE JUROR NO. 4:  Yes.

8        THE COURT:  Have you ever worked in law enforcement?

9        PROSPECTIVE JUROR NO. 4:  No.

10        THE COURT:  Ever studied law?

11        PROSPECTIVE JUROR NO. 4:  No.

12        THE COURT:  Do you have any relatives or close

13  friends who have had problems with drugs, to your knowledge?

14        PROSPECTIVE JUROR NO. 4:  Yes.

15        THE COURT:  Would you tell us about it.

16        PROSPECTIVE JUROR NO. 4:  I've lost two cousins to

17  heroin, and I had a cousin who just served 38 years.

18        THE COURT:  All right.  And as a result of that, do

19  you think that you could be fair to both sides in this case?

20        PROSPECTIVE JUROR NO. 4:  No.

21        THE COURT:  And that is why?

22        PROSPECTIVE JUROR NO. 4:  For my personal reasons,

23  for my cousin's indictment.

24        THE COURT:  All right.  I am going to send you back

25  to the jury assembly room.  There will be another case for you.

```
 1                 THE COURTROOM DEPUTY:  Leila Kay Menzies,

 2    M-e-n-z-i-e-s.

 3                 THE COURT:  Ms. Menzies, have you been able to hear

 4    the questions and answers so far, ma'am?

 5                 PROSPECTIVE JUROR NO. 4:  I have.

 6                 THE COURT:  And based on what you've heard, could

 7    you be fair to both sides?

 8                 PROSPECTIVE JUROR NO. 4:  I could.

 9                 THE COURT:  Have you ever worked in law enforcement?

10                 PROSPECTIVE JUROR NO. 4:  No, but I used to

11    supervise the campus police at our community college.

12                 THE COURT:  Which college was that?

13                 PROSPECTIVE JUROR NO. 4:  Los Angeles Harbor

14    College.

15                 THE COURT:  I see.

16          And how long ago was that?

17                 PROSPECTIVE JUROR NO. 4:  13, 14 years ago.

18                 THE COURT:  Do you think as a result of having done

19    that kind of work, that you might tend to give more credence to

20    a law enforcement officer's testimony than to an ordinary lay

21    witness?

22                 PROSPECTIVE JUROR NO. 4:  No, I do not.

23                 THE COURT:  Do you think as a result of that work

24    that you might give less credence to a law enforcement officer?

25                 PROSPECTIVE JUROR NO. 4:  I think I would be pretty
```

1    even-minded.  I have seen both sides of this.

2              THE COURT:  All right.  Thank you for that.

3         And do you have any problems with the drug laws in the

4    United States?

5              PROSPECTIVE JUROR NO. 4:  I've paid into the

6    nationalization in terms of normalization of marijuana.  I do

7    not see that drug in the same classification as other drugs.

8              THE COURT:  All right.  Other than that, have you

9    ever belonged to any kind of organization that wants to change

10   the drug laws?

11             PROSPECTIVE JUROR NO. 4:  I have not.

12             THE COURT:  Have you had any prior jury experience?

13             PROSPECTIVE JUROR NO. 4:  Yes.  I have served on at

14   least 10, maybe 11 civil, and 2 criminal, 1 drug --

15             THE COURT:  You are a professional juror.

16             PROSPECTIVE JUROR NO. 4:  -- and 1 murder.

17             THE COURT:  Did you reach verdicts in all those

18   cases?

19             PROSPECTIVE JUROR NO. 4:  We did.

20             THE COURT:  And when was the last time you sat as a

21   juror?

22             PROSPECTIVE JUROR NO. 4:  I think about four years

23   ago in Long Beach?

24             THE COURT:  And did you reach a verdict in that

25   case?

```
1              PROSPECTIVE JUROR NO. 4:  Yes, we did.

2              THE COURT:  Criminal or civil?

3              PROSPECTIVE JUROR NO. 4:  That was a criminal.

4              THE COURT:  Can you put aside the enormous amount of

5    experience on other juries and decide this case on its own

6    facts and the law that I give to you to apply to those facts?

7              PROSPECTIVE JUROR NO. 4:  Yes, I could, Your Honor.

8              THE COURT:  All right.  Thank you.

9         Where do you live presently?

10             PROSPECTIVE JUROR NO. 4:  In Long Beach, California.

11             THE COURT:  And how long have you been at your

12   present address?

13             PROSPECTIVE JUROR NO. 4:  Well, I have been at this

14   one 10 years; 27 years in Long Beach.

15             THE COURT:  All right.  And tell us what you do.

16             PROSPECTIVE JUROR NO. 4:  I am a vice president of

17   administrative services for the Los Angeles Community College

18   District.  I work in risk management and health benefits and

19   contracts for the district.

20             THE COURT:  Thank you.

21        And are you married, ma'am?

22             PROSPECTIVE JUROR NO. 4:  I am.

23             THE COURT:  Tell us what your husband does.

24             PROSPECTIVE JUROR NO. 4:  My husband is an

25   electronic recording monitor for L.A. Superior Court.  He is
```

1    going to retire at the end of May, lucky dog.  He has his law

2    degree, but he's never practiced.

3              THE COURT:  I see.

4         And do you have children?

5              PROSPECTIVE JUROR NO. 4:  No.

6              THE COURT:  Is there anyone else in the home?

7              PROSPECTIVE JUROR NO. 4:  Just the fuzzy ones.

8              THE COURT:  Okay.  Well, that's why you have that

9    cheery disposition, I'm sure.

10        Any additional questions and/or challenge for cause for

11   the Government?

12             MS. JAIMEZ:  No, thank you, Your Honor.

13             THE COURT:  Mr. Navarro?

14             MR. NAVARRO:  No, thank you, Your Honor.

15             THE COURT:  We are back to the Government.

16             MS. JAIMEZ:  Your Honor, the government would thank

17   and excuse Prospective Juror No. 11.

18             THE COURT:  Thank you.  Thank you, sir.  If you will

19   go back to the jury assembly room, sir.  Thank you.

20             THE COURTROOM DEPUTY:  Theresa Hickok, H-i-c-k-o-k.

21             THE COURT:  Ms. Hickok, have you been able to follow

22   the questions and answers so far, ma'am?

23             PROSPECTIVE JUROR NO. 11:  Yes, sir.

24             THE COURT:  And based on what you've heard, could

25   you be fair to both sides?

1        PROSPECTIVE JUROR NO. 11:  I think so.

2        THE COURT:  Well, what's troubling you?

3        PROSPECTIVE JUROR NO. 11:  The drug thing.  I have a

4   stepdaughter that gave up her child and would rather be with

5   drugs.  And I have my sister, all her life has been on drugs.

6   I've raised her children for her, and I'm taking care of our

7   mother, and I still have to put up with her.  So -- and I was

8   thinking about it sitting there, and I don't know.  I just feel

9   weird in the stomach about it, but I can give up one week.  So

10  it works out on my schedule.

11       THE COURT:  So is that what's troubling you most,

12  giving up the week?

13       PROSPECTIVE JUROR NO. 11:  No.  My mom is -- also I

14  take care of my mother.  She just got out of the hospital

15  for -- she was in the hospital for six weeks.  She has lung

16  cancer, and now we have to fix her kidney before we can go back

17  to chemo.  But I'm very grateful she's home.

18       THE COURT:  It sounds like you should be at home.

19       PROSPECTIVE JUROR NO. 11:  I would feel more

20  comfortable, but my son says this is my civic duty.

21       THE COURT:  And your son had to tell you that?

22       PROSPECTIVE JUROR NO. 11:  Well, he's in law school.

23  No, I knew it was my civic duty, but anxiety over my mother is

24  a huge thing.

25       THE COURT:  I understand.  I am going to send you

**UNITED STATES DISTRICT COURT**

```
 1    back to the jury assembly room, not to be excused, however.

 2            PROSPECTIVE JUROR NO. 11:  All right.  Thank you.

 3            THE COURTROOM DEPUTY:  Kristen McKenna,

 4    M-c-K-e-n-n-a.

 5            THE COURT:  Ms. McKenna, do you have that

 6    microphone?

 7            PROSPECTIVE JUROR NO. 11:  Yes.

 8            THE COURT:  Have you been able to hear the questions

 9    and answers so far, ma'am?

10            PROSPECTIVE JUROR NO. 11:  Yes.

11            THE COURT:  And based on what you've heard, can you

12    be fair to the Government as well as to this defendant?

13            PROSPECTIVE JUROR NO. 11:  Yes.

14            THE COURT:  Have you ever worked in law enforcement?

15            PROSPECTIVE JUROR NO. 11:  No.

16            THE COURT:  Ever had any problems with drugs in your

17    family or among friends?

18            PROSPECTIVE JUROR NO. 11:  No.

19            THE COURT:  Have you ever belonged to any kind of an

20    organization that is trying to change the drug laws?

21            PROSPECTIVE JUROR NO. 11:  No.

22            THE COURT:  Is there anything at all about the

23    charges you've heard me read to you going to affect your being

24    fair to both sides?

25            PROSPECTIVE JUROR NO. 11:  No.
```

```
 1              THE COURT:  Have you had any prior jury experience?
 2              PROSPECTIVE JUROR NO. 11:  No.
 3              THE COURT:  You understand that a defendant in our
 4   system of justice doesn't have to do anything other than show
 5   up in court?
 6              PROSPECTIVE JUROR NO. 11:  Yeah.
 7              THE COURT:  You accept that?
 8              PROSPECTIVE JUROR NO. 11:  Yeah.
 9              THE COURT:  Where do you live?
10              PROSPECTIVE JUROR NO. 11:  Hancock Park.
11              THE COURT:  And how long have you been at your
12   present address?
13              PROSPECTIVE JUROR NO. 11:  Two years there, four
14   years in Pasadena, but L.A. my whole life.
15              THE COURT:  And tell us what you do.
16              PROSPECTIVE JUROR NO. 11:  I'm a physician assistant
17   at Children's Hospital Los Angeles.
18              THE COURT:  And are you married, ma'am?
19              PROSPECTIVE JUROR NO. 11:  No.
20              THE COURT:  You reside with anyone?
21              PROSPECTIVE JUROR NO. 11:  My parents.
22              THE COURT:  And tell us what they do.
23              PROSPECTIVE JUROR NO. 11:  My dad is a lung surgeon,
24   and my mom is the office manager.
25              THE COURT:  All right.  Anyone else in the home?
```

**UNITED STATES DISTRICT COURT**

1          PROSPECTIVE JUROR NO. 11:  My uncle currently, who's

2   unemployed.

3          THE COURT:  What did he do when he was last

4   employed, to your knowledge?

5          PROSPECTIVE JUROR NO. 11:  Property manager.

6          THE COURT:  Thank you.

7      Let me ask if there are any additional questions and/or

8   challenge for cause, first with the Government.

9      (Counsel conferred off the record.)

10          MS. JAIMEZ:  Your Honor, would the Court mind asking

11   Prospective Juror No. 11 whether or not she is involved in any

12   organizations dealing with the drug laws.

13          THE COURT:  I believe I did ask her.

14      But do you belong to any organizations that are attempting

15   to deal with the drug laws in any way, ma'am?

16          PROSPECTIVE JUROR NO. 11:  No.

17          THE COURT:  Thank you, ma'am.

18      (Counsel conferred off the record.)

19          MS. JAIMEZ:  Your Honor, the Government would

20   request a brief moment to meet and confer with defense counsel,

21   if that's all right.

22          THE COURT:  Go right ahead.

23      Just relax, ladies and gentlemen, for a few minutes.  We

24   are getting near the end, hopefully.

25      (Counsel conferred off the record.)

**UNITED STATES DISTRICT COURT**

```
 1              MS. JAIMEZ:  Thank you, Your Honor.

 2              THE COURT:  All right.  Any challenge for cause?

 3              MS. JAIMEZ:  No, Your Honor.  Thank you.

 4              THE COURT:  All right.  Mr. Navarro, any additional

 5    questions and/or challenge for cause?

 6              MR. NAVARRO:  No, Your Honor.  Thank you.

 7              THE COURT:  All right.  We are back to the defense.

 8              MR. NAVARRO:  Your Honor, we would like to thank and

 9    excuse Juror No. 7, Mr. Lemus.

10              THE COURT:  All right.  Thank you, very much, sir,

11    if you go back to the jury assembly room.

12              THE COURTROOM DEPUTY:  Joy T. Dudley, D-u-d-l-e-y.

13              THE COURT:  Ms. Dudley, have you been able to hear

14    the questions and answers so far, ma'am?

15              PROSPECTIVE JUROR NO. 7:  Yes.

16              THE COURT:  And based on what you've heard, can you

17    be fair to both sides?

18              PROSPECTIVE JUROR NO. 7:  Yes.

19              THE COURT:  Have you ever worked in law enforcement?

20              PROSPECTIVE JUROR NO. 7:  No.

21              THE COURT:  Ever had any problems in your family or

22    among close friends with drugs, as far as you know?

23              PROSPECTIVE JUROR NO. 7:  No.

24              THE COURT:  Is there anything at all about the

25    charges I've read to you going to affect you being fair to both
```

```
 1   sides?

 2            PROSPECTIVE JUROR NO. 7:  No.

 3            THE COURT:  Have you had prior jury experience?

 4            PROSPECTIVE JUROR NO. 7:  Yes.

 5            THE COURT:  Tell us about that.

 6            PROSPECTIVE JUROR NO. 7:  Both of them were

 7   criminal, and --

 8            THE COURT:  Did you reach verdicts?

 9            PROSPECTIVE JUROR NO. 7:  For one of them.  The

10   other one we didn't have to because the person admitted guilt.

11            THE COURT:  All right.  It was a change of plea, I

12   take it.

13       Where was this?

14            PROSPECTIVE JUROR NO. 7:  Compton.

15            THE COURT:  Both cases?

16            PROSPECTIVE JUROR NO. 7:  Yes.

17            THE COURT:  Can you put aside those experiences and

18   decide this case on its own facts.

19            PROSPECTIVE JUROR NO. 7:  Yes.

20            THE COURT:  Where do you live presently, ma'am?

21            PROSPECTIVE JUROR NO. 7:  Carson.

22            THE COURT:  And how long have you been at that

23   address.

24            PROSPECTIVE JUROR NO. 7:  For about two months now.

25            THE COURT:  Where were you before?
```

```
 1              PROSPECTIVE JUROR NO. 7:  Inglewood, California.

 2              THE COURT:  For how long?

 3              PROSPECTIVE JUROR NO. 7:  One year.

 4              THE COURT:  And how long have you been in the Los

 5  Angeles area?

 6              PROSPECTIVE JUROR NO. 7:  All my life.

 7              THE COURT:  All right.  Tell us what you do.

 8              PROSPECTIVE JUROR NO. 7:  I am a customer service

 9  rep for the Department of Water and Power.

10              THE COURT:  All right.  And are you married, ma'am?

11              PROSPECTIVE JUROR NO. 7:  No, I am not.

12              THE COURT:  Do you reside with anyone?

13              PROSPECTIVE JUROR NO. 7:  My parents.

14              THE COURT:  Tell us what they do.

15              PROSPECTIVE JUROR NO. 7:  They are both retired.

16              THE COURT:  From what, if you know?

17              PROSPECTIVE JUROR NO. 7:  My father was an internal

18  auditor.

19              THE COURT:  For whom?

20              PROSPECTIVE JUROR NO. 7:  For Harbor General

21  Hospital, UCLA.  And my mother worked for the State of

22  California, Department of Rehabilitation.

23              THE COURT:  Anyone else in the home?

24              PROSPECTIVE JUROR NO. 7:  My youngest sister and my

25  nephew.
```

```
1              THE COURT:  Tell us what your younger sister does.
2              PROSPECTIVE JUROR NO. 7:  She is a caregiver.  And
3    then my nephew is 11 years old, so he is in school.
4              THE COURT:  Thank you.
5         Let me ask if there are any additional questions and/or
6    challenge for cause.  The Government first.
7              MS. JAIMEZ:  No, thank you, Your Honor.
8              THE COURT:  Thank you.
9         Mr. Navarro?
10             MR. NAVARRO:  No, Your Honor.  Thank you.
11             THE COURT:  All right.  We are still with the
12   defense.
13             MR. NAVARRO:  Yes, Your Honor.  We would like to
14   thank and excuse Juror No. 1, Ms. Boesch.
15             THE COURT:  Thank you very much, Ms. Boesch.  Thank
16   you, ma'am.
17             THE COURTROOM DEPUTY:  Scott Pack, P-a-c-k.
18             THE COURT:  Mr. Pack, have you been able to hear the
19   questions and answers so far, sir?
20             PROSPECTIVE JUROR NO. 1:  Yes, Your Honor.
21             THE COURT:  And based on what you've heard, could
22   you be fair to the Government as well as to the defendant?
23             PROSPECTIVE JUROR NO. 1:  Yes, Your Honor.
24             THE COURT:  Have you ever worked in law enforcement?
25             PROSPECTIVE JUROR NO. 1:  No.
```

1          THE COURT:  Ever had any problems with law

2    enforcement?

3          PROSPECTIVE JUROR NO. 1:  No.

4          THE COURT:  Do you have any family members or close

5    friends who have had drug problems, to your knowledge?

6          PROSPECTIVE JUROR NO. 1:  My mom's ex-husband had a

7    marijuana problem, but nothing in the legal system.

8          THE COURT:  Can you put aside that situation and

9    decide this case on its own facts?

10          PROSPECTIVE JUROR NO. 1:  Yes.

11          THE COURT:  Have you had prior jury experience?

12          PROSPECTIVE JUROR NO. 1:  No.

13          THE COURT:  You understand that in a criminal case,

14    whether it be state court or federal court, a defendant is

15    presumed innocent until proven guilty beyond a reasonable

16    doubt?

17          PROSPECTIVE JUROR NO. 1:  Yes.

18          THE COURT:  And you accept that principle?

19          PROSPECTIVE JUROR NO. 1:  Yes.

20          THE COURT:  Have you ever belonged to any kind of an

21    organization that chooses to change the drug laws?

22          PROSPECTIVE JUROR NO. 1:  No.

23          THE COURT:  Where do you live?

24          PROSPECTIVE JUROR NO. 1:  Santa Paula.

25          THE COURT:  And how long have you been at your

1  present address?

2           PROSPECTIVE JUROR NO. 1:  It's been about ten years.

3           THE COURT:  And tell us what you do.

4           PROSPECTIVE JUROR NO. 1:  I am a manager for a home

5  appliance repair company.

6           THE COURT:  And are you married, sir?

7           PROSPECTIVE JUROR NO. 1:  I am.

8           THE COURT:  Tell us what your wife does.

9           PROSPECTIVE JUROR NO. 1:  She is unemployed, but

10  before that she was an administrator at a private school.

11           THE COURT:  And do you have children?

12           PROSPECTIVE JUROR NO. 1:  Just dogs, so no.

13           THE COURT:  Some people say they're easier than

14  children.  I tend to think so, having had both.

15      We are back to the Government, additional questions and/or

16  challenge for cause?

17           MS. JAIMEZ:  No, thank you, Your Honor.

18           THE COURT:  And, Mr. Navarro?

19           MR. NAVARRO:  No, thank you, Your Honor.

20           THE COURT:  We are with the Government.

21           MS. JAIMEZ:  Your Honor, the Government would like

22  to thank and excuse Prospective Juror No. 12.

23           THE COURT:  All right.  Thank you very much, ma'am.

24           THE COURTROOM DEPUTY:  Christopher Alexander Lopez,

25  L-o-p-e-z.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Sir, would you --

2          THE COURTROOM DEPUTY:  One more.

3          THE COURT:  Scoot over.

4          PROSPECTIVE JUROR NO. 12:  Sorry.

5          THE COURT:  Mr. Lopez, have you been able to hear

6    the questions and answers so far, sir?

7          PROSPECTIVE JUROR NO. 12:  Yes.

8          THE COURT:  And based on what you've heard, can you

9    be fair to both sides here?

10          PROSPECTIVE JUROR NO. 12:  Yes, I can.

11          THE COURT:  Have you ever worked in law enforcement?

12          PROSPECTIVE JUROR NO. 12:  No.

13          THE COURT:  Ever had -- well, you smiled.  Have you

14   ever had any problems with law enforcement?

15          PROSPECTIVE JUROR NO. 12:  No.

16          THE COURT:  Do you have any friends or relatives

17   who've had problems with law enforcement?

18          PROSPECTIVE JUROR NO. 12:  No.

19          THE COURT:  Do you have any friends or relatives who

20   ever had problems with drugs, to your knowledge?

21          PROSPECTIVE JUROR NO. 12:  No.

22          THE COURT:  Have you ever belonged to any kind of an

23   organization that wishes to change the drug laws in the United

24   States?

25          PROSPECTIVE JUROR NO. 12:  No.

1          THE COURT:  Is there anything at all about the

2   charges you've heard me read to you, going to affect your being

3   fair to the defendant as well as to the Government?

4          PROSPECTIVE JUROR NO. 12:  Not at all.

5          THE COURT:  Have you ever had prior jury experience?

6          PROSPECTIVE JUROR NO. 12:  No.

7          THE COURT:  Would you hold it against this defendant

8   if he chose not to take the witness stand, which is his

9   constitutional right?

10          PROSPECTIVE JUROR NO. 12:  No.

11          THE COURT:  Where do you live?

12          PROSPECTIVE JUROR NO. 12:  The Pico Union area.

13          THE COURT:  And how long have you been at your

14   present address?

15          PROSPECTIVE JUROR NO. 12:  19 years.

16          THE COURT:  Tell us what you do.

17          PROSPECTIVE JUROR NO. 12:  I'm a student, and I'm

18   also working part time in North Hollywood at a salad

19   restaurant.

20          THE COURT:  And tell us where you are a student.

21          PROSPECTIVE JUROR NO. 12:  I am a student at a

22   school called Metropolitan High School.

23          THE COURT:  Do you reside with anyone?

24          PROSPECTIVE JUROR NO. 12:  My father.

25          THE COURT:  And tell us what he does.

1           PROSPECTIVE JUROR NO. 12:  My father is a centerless

2   grinder over in Chatsworth.

3           THE COURT:  I'm sorry, he's what?

4           PROSPECTIVE JUROR NO. 12:  His job is designated as

5   centerless grinder in a company called Chatsworth Grinding.

6           THE COURT:  Oh, I see.

7       Anyone else in the home?

8           PROSPECTIVE JUROR NO. 12:  Two uncles and

9   grandmother.

10          THE COURT:  Would you tell us what the uncles do.

11          PROSPECTIVE JUROR NO. 12:  I think one of them works

12  in loading, and I think the other one isn't employed right now.

13          THE COURT:  Do you know what he did last time he was

14  employed?

15          PROSPECTIVE JUROR NO. 12:  He was also in a factory

16  where they load stuff.

17          THE COURT:  I see.

18      And does your grandmother take care of the home pretty

19  much?  I am not saying it.  I am asking what you say.

20          PROSPECTIVE JUROR NO. 12:  Yeah, she pretty much

21  does.

22          THE COURT:  All right.  Any additional questions

23  and/or challenge for cause for the Government?

24          MS. JAIMEZ:  No, thank you, Your Honor.

25          THE COURT:  Mr. Navarro?

**UNITED STATES DISTRICT COURT**

```
 1              MR. NAVARRO:  No, thank you, Your Honor.

 2              THE COURT:  We are back to the defense.

 3              MR. NAVARRO:  Can we have a brief moment,

 4    Your Honor?

 5              THE COURT:  Of course.

 6              MR. NAVARRO:  Thank you.

 7         (Counsel and defendant conferred off the record.)

 8              MR. NAVARRO:  Your Honor, we would like to thank and

 9    excuse Juror No. 8, Mr. Sterling.

10              THE COURT:  All right.  Thank you very much,

11    Mr. Sterling.  You will go back to the jury assembly room and

12    wait until they call you for the next case.

13              THE COURTROOM DEPUTY:  Janice Clayton,

14    C-l-a-y-t-o-n.

15              THE COURT:  Do you have that microphone,

16    Ms. Clayton?

17              PROSPECTIVE JUROR NO. 8:  Yes, uh-huh.

18              THE COURT:  Let me ask you if you've been able to

19    hear all of the questions and answers so far, ma'am.

20              PROSPECTIVE JUROR NO. 8:  Yes, sir.

21              THE COURT:  And based on what you've heard, can you

22    be fair to both sides?

23              PROSPECTIVE JUROR NO. 8:  Yes, sir.

24              THE COURT:  Have you ever worked in law enforcement?

25              PROSPECTIVE JUROR NO. 8:  Never.
```

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Ever had any problems with law
 2    enforcement?
 3              PROSPECTIVE JUROR NO. 8:  Never.
 4              THE COURT:  Is there anything at all about these
 5    charges that I've read to you, going to affect your being able
 6    to be fair to both sides?
 7              PROSPECTIVE JUROR NO. 8:  No.
 8              THE COURT:  Ever belonged to an organization that
 9    wants to change the drug laws?
10              PROSPECTIVE JUROR NO. 8:  No.
11              THE COURT:  Have you had any prior jury experience?
12              PROSPECTIVE JUROR NO. 8:  Yes, I have.
13              THE COURT:  Tell us, please.
14              PROSPECTIVE JUROR NO. 8:  I was on one case that was
15    indecent exposure, and they did find him guilty.  And then in
16    another case, it was a guy that stole some watches.
17              THE COURT:  Did you reach a verdict?
18              PROSPECTIVE JUROR NO. 8:  And they found him -- yes,
19    they found him guilty doing that.
20              THE COURT:  And where was this?
21              PROSPECTIVE JUROR NO. 8:  I'm not sure of the court
22    that's near Temple.
23              THE COURT:  It's the criminal court building?
24              PROSPECTIVE JUROR NO. 8:  Yes.
25              THE COURT:  Just across the street from us?
```

```
 1              PROSPECTIVE JUROR NO. 8:  Oh, yes, yes.
 2              THE COURT:  Can you put aside those prior jury
 3  experiences and decide this case on its own facts and the law
 4  that I give to you to apply to those facts?
 5              PROSPECTIVE JUROR NO. 8:  Yes, sir.
 6              THE COURT:  Thank you.
 7         Where do you live, ma'am?
 8              PROSPECTIVE JUROR NO. 8:  Los Angeles.
 9              THE COURT:  Which part?
10              PROSPECTIVE JUROR NO. 8:  Near the mid Wilshire
11  area.
12              THE COURT:  And how long have you been at your
13  present address?
14              PROSPECTIVE JUROR NO. 8:  Ten years.
15              THE COURT:  And tell us what you do.
16              PROSPECTIVE JUROR NO. 8:  I am in the banking
17  business.
18              THE COURT:  What do you do in the banking business?
19              PROSPECTIVE JUROR NO. 8:  On the phone, phone
20  banking.
21              THE COURT:  Are you married, ma'am?
22              PROSPECTIVE JUROR NO. 8:  No.
23              THE COURT:  Do you reside with anyone?
24              PROSPECTIVE JUROR NO. 8:  No.  No children.
25              THE COURT:  All right.  Thank you.
```

1          And the Government, any additional questions and/or

2     challenge for cause?

3               MS. JAIMEZ:  No, thank you, Your Honor.

4               THE COURT:  Mr. Navarro?

5               MR. NAVARRO:  No, thank you, Your Honor.

6               THE COURT:  We are still with the defense.

7               MR. NAVARRO:  Thank you, Your Honor.

8          (Counsel and defendant conferred off the record.)

9               MR. NAVARRO:  Your Honor, we would like to thank and

10    excuse Juror No. 8, Ms. Clayton.

11              THE COURT:  Thank you very much, Ms. Clayton.  If

12    you will go back to the jury assembly room, ma'am.

13              THE COURTROOM DEPUTY:  Renu Hansen, H-a-n-s-e-n.

14              THE COURT:  Ms. Hansen, have you been able to follow

15    the questions and answers so far, ma'am?

16              PROSPECTIVE JUROR NO. 8:  Yes.

17              THE COURT:  And based on what you've heard, can you

18    be fair to both sides here?

19              PROSPECTIVE JUROR NO. 8:  No.

20              THE COURT:  Why is that?

21              PROSPECTIVE JUROR NO. 8:  I don't think drugs should

22    be illegal.

23              THE COURT:  You don't think any drug should be

24    illegal?

25              PROSPECTIVE JUROR NO. 8:  Yes.

1          THE COURT:  Do you belong to any organization that

2    is trying to change the drug laws?

3          PROSPECTIVE JUROR NO. 8:  No.

4          THE COURT:  Have you ever had anyone in your family

5    having a problem with drugs?

6          PROSPECTIVE JUROR NO. 8:  My brother-in-law.

7          THE COURT:  And what kind of problem did he have?

8          PROSPECTIVE JUROR NO. 8:  He's been on drugs since

9    high school, but I don't know what kind or anything.

10          THE COURT:  Didn't cause him any problems?

11          PROSPECTIVE JUROR NO. 8:  Well, it ruined his

12    relationship with the family, with his family.

13          THE COURT:  But yet you don't think drugs ought to

14    be --

15          PROSPECTIVE JUROR NO. 8:  I don't think putting --

16          THE COURT:  -- unlawful?

17          PROSPECTIVE JUROR NO. 8:  I don't think putting

18    people into prison for drugs is the answer.

19          THE COURT:  You mean for those who use the drugs?

20          PROSPECTIVE JUROR NO. 8:  Right.

21          THE COURT:  Is that the same thing you feel about

22    the people who distribute the drugs --

23          PROSPECTIVE JUROR NO. 8:  Yes.

24          THE COURT:  -- that they should not be either?

25          PROSPECTIVE JUROR NO. 8:  Right.

1          THE COURT:  I don't quite understand that, but can I

2   have you go back to the jury assembly room, and perhaps there

3   can be another case that they can call you on within the next

4   week or so.

5          THE COURTROOM DEPUTY:  Russell Yamabe, Y-a-m-a-b-e.

6          THE COURT:  Mr. Yamabe, have you been able to hear

7   the questions and answers so far, sir?

8          PROSPECTIVE JUROR NO. 8:  Yes, Your Honor.

9          THE COURT:  And based on what you've heard,

10  Mr. Yamabe, can you be fair to both sides here?

11         PROSPECTIVE JUROR NO. 8:  Yes, I can.

12         THE COURT:  Have you ever worked in law enforcement?

13         PROSPECTIVE JUROR NO. 8:  No, I have not.

14         THE COURT:  Have you ever had any problems with law

15  enforcement?

16         PROSPECTIVE JUROR NO. 8:  No.

17         THE COURT:  Do you have any relatives or friends who

18  have had any problems with drugs, to your knowledge?

19         PROSPECTIVE JUROR NO. 8:  No.

20         THE COURT:  Have you ever belonged to any kind of an

21  organization that seeks to change the drug laws?

22         PROSPECTIVE JUROR NO. 8:  No.

23         THE COURT:  Is there anything at all about the

24  charges you've heard me read to you, going to affect your being

25  fair to both sides?

**UNITED STATES DISTRICT COURT**

```
 1                PROSPECTIVE JUROR NO. 8:  No.
 2                THE COURT:  Have you had prior jury experience?
 3                PROSPECTIVE JUROR NO. 8:  Yes, I have.
 4                THE COURT:  Tell us, please.
 5                PROSPECTIVE JUROR NO. 8:  Two criminal cases in the
 6      Malibu courthouse.
 7                THE COURT:  Did you reach verdicts in either one?
 8                PROSPECTIVE JUROR NO. 8:  In both.
 9                THE COURT:  And can you put aside those cases and
10      those facts --
11                PROSPECTIVE JUROR NO. 8:  Yes.
12                THE COURT:  -- and decide this case on its own
13      facts?
14                PROSPECTIVE JUROR NO. 8:  Yes, I can.
15                THE COURT:  Where do you live, sir?
16                PROSPECTIVE JUROR NO. 8:  Agoura Hills.
17                THE COURT:  And how long have you been at your
18      present address?
19                PROSPECTIVE JUROR NO. 8:  23 years.
20                THE COURT:  Tell us what you do.
21                PROSPECTIVE JUROR NO. 8:  I am an accountant.
22                THE COURT:  And are you married, sir?
23                PROSPECTIVE JUROR NO. 8:  No.
24                THE COURT:  And are you -- you have your own
25      practice?
```

**UNITED STATES DISTRICT COURT**

1              PROSPECTIVE JUROR NO. 8:  No.  I work for a private

2      company.

3              THE COURT:  I see.

4         And do you reside with anyone?

5              PROSPECTIVE JUROR NO. 8:  No, I do not.

6              THE COURT:  All right.  Thank you.

7         Let me ask if there are any additional questions and/or

8      challenge for cause.  The Government?

9              MS. JAIMEZ:  No, thank you, Your Honor.

10             THE COURT:  Thank you.

11        Mr. Navarro?

12             MR. NAVARRO:  No, Your Honor.  Thank you.

13             THE COURT:  All right.  We are back to the

14     Government for its last preemptory challenge.

15             MS. JAIMEZ:  One moment, Your Honor.

16        (Counsel conferred off the record.)

17             MS. JAIMEZ:  Your Honor, the Government would accept

18     the panel as currently seated.

19             THE COURT:  Thank you.

20        Mr. Navarro, your last preemptory challenge.

21             MR. NAVARRO:  And, Your Honor, we also accept the

22     panel.

23             THE COURT:  Thank you.

24        Ladies and gentlemen, would you please rise to be sworn.

25             THE COURTROOM DEPUTY:  Please raise your right

```
 1   hands.
 2                   THE JURY WAS SWORN
 3        (The jury responded "I do.")
 4             THE COURT:  Thank you, ladies and gentlemen.
 5        Ladies and gentlemen, in the general courtroom area we are
 6   about to move to the second and equally as important part of
 7   this voir dire, or selection process, and that is the selection
 8   of two alternates.  And the alternates are part of a 14-person
 9   jury, all on equal footing.  Indeed, if one of the first 12
10   members of the jury is excused, then Alternate No. 1 would fill
11   in in the same way if a second juror had to be excused,
12   Alternate Juror No. 2 would fill in.  So whoever sits in those
13   seats has to be just as fair as the other 12 jurymates and be
14   fair to both sides.  So it's very important.
15        So we are going to call two names.  The first person who's
16   called will sit in the second row there in the vacant seat.
17             THE COURTROOM DEPUTY:  Mari Gevorkyan,
18   G-e-v-o-r-k-y-a-n.
19        Humberto Moreno, M-o-r-e-n-o.
20             THE COURT:  Let's start with Alternate No. 1.  Do
21   you have that microphone there?
22             PROSPECTIVE ALTERNATE JUROR NO. 1:  Yes.
23             THE COURT:  Have you been able to follow the
24   questions and answers so far?
25             PROSPECTIVE ALTERNATE JUROR NO. 1:  Yes.
```

```
1              THE COURT:  And based on what you've heard, can you
2    be fair to both sides?
3              PROSPECTIVE ALTERNATE JUROR NO. 1:  Yes.
4              THE COURT:  Have you ever worked in law enforcement?
5              PROSPECTIVE ALTERNATE JUROR NO. 1:  No.
6              THE COURT:  Ever had any problems with law
7    enforcement?
8              PROSPECTIVE ALTERNATE JUROR NO. 1:  No.
9              THE COURT:  Do you have any relatives or close
10   friends who have had drug problems, to your knowledge?
11             PROSPECTIVE ALTERNATE JUROR NO. 1:  No.
12             THE COURT:  Is there anything at all about the
13   charges that I've read to you going to affect your being fair
14   to both sides?
15             PROSPECTIVE ALTERNATE JUROR NO. 1:  Yes.
16             THE COURT:  Tell us.  You understand they are
17   charges and nothing else?
18             PROSPECTIVE ALTERNATE JUROR NO. 1:  I don't know.
19             THE COURT:  But just hearing the charges is going to
20   affect your being fair?
21             PROSPECTIVE ALTERNATE JUROR NO. 1:  Yes.
22             THE COURT:  How?
23             PROSPECTIVE ALTERNATE JUROR NO. 1:  Well, hearing
24   the judgment, how it works.
25             THE COURT:  You understand that the reason we have
```

```
1   trials is to determine if the charges are proper or not, and

2   the only way you do that is by presenting the facts and then

3   giving you the law to apply to those facts and then deciding?

4   But until 12 members of this jury decide that the Government

5   has proven its case, then the defendant is innocent.  Do you

6   understand that?

7              PROSPECTIVE ALTERNATE JUROR NO. 1:  No.

8              THE COURT:  How long have you been in the United

9   States, ma'am?

10             PROSPECTIVE ALTERNATE JUROR NO. 1:  34 years.

11             THE COURT:  And you don't know anything about our

12  jury system?

13             PROSPECTIVE ALTERNATE JUROR NO. 1:  No.

14             THE COURT:  Tell us what you do.

15             PROSPECTIVE ALTERNATE JUROR NO. 1:  Dental

16  technician.

17             THE COURT:  And where do you do this?

18             PROSPECTIVE ALTERNATE JUROR NO. 1:  In a laboratory.

19             THE COURT:  Where?

20             PROSPECTIVE ALTERNATE JUROR NO. 1:  In North

21  Hollywood.

22             THE COURT:  And people speak English there?

23             PROSPECTIVE ALTERNATE JUROR NO. 1:  Yes.

24             THE COURT:  And you understand English?

25             PROSPECTIVE ALTERNATE JUROR NO. 1:  Well, I
```

1    understand the basic one, whatever it's involving my job.

2              THE COURT:  But you don't understand anything about

3    the court system; is that right?

4              PROSPECTIVE ALTERNATE JUROR NO. 1:  No.

5              THE COURT:  Well, you go back to the jury assembly

6    room, and maybe in a week or two you will learn something about

7    the jury system.

8              PROSPECTIVE ALTERNATE JUROR NO. 1:  Okay.

9              THE COURT:  Mr. Moreno, will you move into that

10   first seat, please.

11             THE COURTROOM DEPUTY:  David Rhoads, R-h-o-a-d-s.

12             THE COURT:  Mr. Moreno, you have the microphone?

13             PROSPECTIVE ALTERNATE JUROR NO. 1:  Yes.

14             THE COURT:  Have you been able to follow the

15   questions and answers so far, sir?

16             PROSPECTIVE ALTERNATE JUROR NO. 1:  Yes.

17             THE COURT:  And based on what you've heard, can you

18   be fair to the Government as well as to the defendant here?

19             PROSPECTIVE ALTERNATE JUROR NO. 1:  Yes.

20             THE COURT:  Have you ever had any problems with law

21   enforcement?

22             PROSPECTIVE ALTERNATE JUROR NO. 1:  No.

23             THE COURT:  Have you ever worked in law enforcement?

24             PROSPECTIVE ALTERNATE JUROR NO. 1:  No.

25             THE COURT:  Do you have any relatives or close

```
 1    friends who have had drug problems, to your knowledge?
 2              PROSPECTIVE ALTERNATE JUROR NO. 1:  No.
 3              THE COURT:  Is there anything at all about these
 4    charges that I've read to you going to affect your being fair
 5    to both sides?
 6              PROSPECTIVE ALTERNATE JUROR NO. 1:  No.
 7              THE COURT:  Have you had any prior jury experience?
 8              PROSPECTIVE ALTERNATE JUROR NO. 1:  No.
 9              THE COURT:  You understand that in a criminal case,
10    a defendant doesn't have to put on any case in defense, but
11    just show up in court?
12              PROSPECTIVE ALTERNATE JUROR NO. 1:  Yes.
13              THE COURT:  Do you accept that?
14              PROSPECTIVE ALTERNATE JUROR NO. 1:  Yes.
15              THE COURT:  Have you ever belonged to any kind of
16    organization that wants to change the drug laws in this
17    country?
18              PROSPECTIVE ALTERNATE JUROR NO. 1:  No.
19              THE COURT:  Where do you live, sir?
20              PROSPECTIVE ALTERNATE JUROR NO. 1:  In Los Angeles.
21              THE COURT:  What part of the city?
22              PROSPECTIVE ALTERNATE JUROR NO. 1:  City of Watts.
23              THE COURT:  And how long have you been at your
24    present address?
25              PROSPECTIVE ALTERNATE JUROR NO. 1:  Five years.
```

```
 1              THE COURT:  Where were you before that?
 2              PROSPECTIVE ALTERNATE JUROR NO. 1:  Fontana.
 3              THE COURT:  Fontana?
 4              PROSPECTIVE ALTERNATE JUROR NO. 1:  Yes.
 5              THE COURT:  All right.  And how long have you been
 6   in Southern California altogether?
 7              PROSPECTIVE ALTERNATE JUROR NO. 1:  25 years.
 8              THE COURT:  And tell us what you do, sir.
 9              PROSPECTIVE ALTERNATE JUROR NO. 1:  I do shipping
10   and receiving.  I work for a glass company.
11              THE COURT:  I see.
12         And are you married, sir?
13              PROSPECTIVE ALTERNATE JUROR NO. 1:  Yes.
14              THE COURT:  Tell us what your wife does.
15              PROSPECTIVE ALTERNATE JUROR NO. 1:  She does
16   caregiving.
17              THE COURT:  And do you have children?
18              PROSPECTIVE ALTERNATE JUROR NO. 1:  Yes.
19              THE COURT:  Tell us.
20              PROSPECTIVE ALTERNATE JUROR NO. 1:  I have three
21   children:  Three boys, their ages are 11, 8 and 6.
22              THE COURT:  Must be exciting.
23         Anyone else in the home?
24              PROSPECTIVE ALTERNATE JUROR NO. 1:  My wife.
25              THE COURT:  All right.  Well, I assumed that she's
```

UNITED STATES DISTRICT COURT

```
 1    there with the boys and you.
 2              PROSPECTIVE ALTERNATE JUROR NO. 1:  Yes.
 3              THE COURT:  But nobody else?
 4              PROSPECTIVE ALTERNATE JUROR NO. 1:  Nobody else.
 5              THE COURT:  Thank you.
 6         And, Mr. Rhoads --
 7         Would you give that microphone to Mr. Rhoads, please.
 8         Have you been able to follow the questions and answers so
 9    far, sir?
10              PROSPECTIVE ALTERNATE JUROR NO. 2:  Yes.
11              THE COURT:  And based on what you've heard, can you
12    be fair to both sides here?
13              PROSPECTIVE ALTERNATE JUROR NO. 2:  Yes.
14              THE COURT:  Have you ever worked in law enforcement?
15              PROSPECTIVE ALTERNATE JUROR NO. 2:  No.
16              THE COURT:  Ever had any problems with law
17    enforcement?
18              PROSPECTIVE ALTERNATE JUROR NO. 2:  No.
19              THE COURT:  Anything about these charges going to
20    affect your being able to be fair to the defendant as well as
21    to the Government?
22              PROSPECTIVE ALTERNATE JUROR NO. 2:  No.
23              THE COURT:  Have you ever belonged to any kind of an
24    organization that wishes to change the drug laws?
25              PROSPECTIVE ALTERNATE JUROR NO. 2:  No.
```

1          THE COURT:  Have you had any prior jury experience?

2          PROSPECTIVE ALTERNATE JUROR NO. 2:  Yes.

3          THE COURT:  Tell us, please.

4          PROSPECTIVE ALTERNATE JUROR NO. 2:  Criminal case in

5    Santa Maria.  We did come to a verdict.

6          THE COURT:  And can you put aside the facts of that

7    case and decide this case on its own facts?

8          PROSPECTIVE ALTERNATE JUROR NO. 2:  Yes.

9          THE COURT:  Thank you.

10       Let me ask if there are any additional questions of either

11   Alternate No. 1 or Alternate No. 2 from the Government.

12         MS. JAIMEZ:  No, Your Honor.

13         THE COURT:  And from the defense?

14         MR. NAVARRO:  No, Your Honor.  Thank you.

15         THE COURT:  And the Government may exercise its

16   preemptory challenge.

17         MS. JAIMEZ:  One brief moment, Your Honor.

18         THE COURT:  Surely.

19       (Counsel conferred off the record.)

20         MS. JAIMEZ:  Your Honor, the Government would accept

21   the panel as seated.

22         THE COURT:  Thank you.

23       And the defense?

24         MR. NAVARRO:  We would also accept the panel,

25   Your Honor.

```
1              THE COURT:  Thank you.
2        Would you both please rise to be sworn.
3              THE COURTROOM DEPUTY:  Will you please raise your
4    right hand.
5                   THE JURY ALTERNATES WERE SWORN
6              ALTERNATE JUROR NO. 2:  I do.
7              ALTERNATE JUROR NO. 1:  I do.
8              THE COURT:  Thank you.  Please be seated.
9         Ladies and gentlemen in the general courtroom area, if I
10   were you, I would never play or pick whatever they do with this
11   lottery, because if you can't be picked from this small number,
12   think of your chances with the lottery.  No, but seriously
13   though, I want to thank you on behalf of the lawyers here and
14   case agent and the defendant.  Thank you for your service
15   because, you know, it is citizens such as yourselves that give
16   us the finest jury system in the world in the federal court.
17   And I have been a state court judge before some 36 years or so
18   and this federal bench, and I tell you there is no other system
19   quite like it, and it's because of citizens such as yourselves
20   that are willing to serve.  Thank you very much.  And if you
21   will go back to the jury assembly room now.
22        Ladies and gentlemen, I know it's getting late, ladies and
23   gentlemen of the jury, but I want to take just a few minutes,
24   and I don't think I've heard any stomach grumbles, peristalsis
25   or reverse peristalsis.  Our physician's assistant probably
```

1    knows all about that sort of thing, but in a few minutes you

2    will be going to lunch.  What I want to emphasize to all 14 of

3    you is that there's nothing by way of the facts of this case so

4    far during the jury voir dire.  That we have yet to get to that

5    point.  And when you come back from lunch, the first order of

6    business will be what are called opening statements.  Those are

7    not facts either.  It's not evidence.

8         I often liken the opening statements to someone who's

9    trying to tell you where he or she is going on a map or

10   something of that nature.  It's important, and I'm sure you

11   will listen very carefully, but there's nothing by way of

12   evidence that comes from the mouths of the lawyers with one

13   exception, and that is when they stipulate to something and the

14   Court indicates that it will accept that stipulation.  It's

15   merely an agreement.

16        And if the Court says it will accept it, then you're free

17   to accept it or not accept it because we have two sets of

18   juries -- judges here, excuse me.  You are the judges of the

19   facts, and I am the judge of the law.  Each of you has taken an

20   oath to accept the law as given by the Court whether you agree

21   with it or not.

22        I am not going to attempt to step on your toes and try to

23   tell you what the facts are because that's your job as judges.

24   My job is to give you the law to apply to those facts, which

25   only you will have found.  Now, I've told you before that

1    you're not to talk about this matter among yourselves or with

2    anyone.  Most of you reside with someone.  When you get home,

3    all you can say is that you're on a jury.  You shouldn't even

4    say whether it's a criminal jury or civil jury.

5         You're not to use any of these various technological

6    gadgets, which most I am unfamiliar with, but I know they exist

7    because my grandkids tell me they do and I see them using them,

8    texting or doing whatever, and looking at all kinds of screens

9    and going places to research this, that and the other, you

10   can't do any of that.  And if you do happen inadvertently to

11   hear something about this case, don't talk to any one of your

12   fellow jurors about it, but let one of our staff or me know.

13        It's very important that you be fair.  You have taken an

14   oath to be fair to the Government and to this defendant.  You

15   have juror badges.  Make sure you wear them at all times.  Let

16   people know that you are, indeed, jurors, and they should not

17   be talking to you beyond a "Good morning," a "Good afternoon."

18        And even with the individuals involved in this case, all

19   of whom have been introduced to you, it's all right to say

20   "Good morning" or "Good afternoon" if you happen to see one of

21   them out in the hall or outside, but don't talk about the

22   demise of the Clippers or what's happened, whether the Lakers

23   are going to get a good draft choice this evening or any of

24   those kinds of things, if SC is going to have a decent football

25   team for a change, and we know that UCLA is going to try.

1    I mean, I have opinions about all of these things, and I

2    will be glad to talk to you about any of them, the Dodgers and

3    whether you will ever see them on television again, and whether

4    the Angels can get it together like they usually do at the end

5    of the season rather than at the beginning.  Don't talk to

6    anyone else about these.  Someone might see you innocently

7    talking about something like that and think you are talking

8    about the case.  So it's very important that not only that you

9    are fair, but there is always the appearance of fairness as

10   well.

11       After we've had the opening statements when you come back,

12   then the Government will call its first witness, and that's

13   when the evidence actually comes in from the mouths of the

14   witnesses.  After the Government has rested its case-in-chief,

15   the defense may or may not put on a case.  As you well know by

16   now, the defense doesn't have to do anything.  The defendant

17   has shown up in court, he has no other obligation under our

18   system of justice.  It's all up to the Government, the

19   prosecution, to prove its case beyond a reasonable doubt to

20   people who are fair to both sides.

21       If the defense does put on a case, then the Government has

22   a right to put on what's called a rebuttal case, has a right to

23   do so, but there's no obligation to do so.  Once both sides

24   have rested completely, then we have closing argument.  And

25   like the opening statements, again, they're not evidence.  And

unlike the opening statements where the lawyers are telling you
where they think the evidence is going to take you, during the
closing arguments they are going to argue to you where they
think the evidence has taken you, but only you will decide
that.

And after the arguments -- and of course I should say to
you that since the government alone bears the burden of proof,
they get two bites of the apple, as it were, doing these final
arguments.  They open the arguments, and then you will hear
from Mr. Navarro on behalf of the defendant, and then the
Government has a final or closing argument or rebuttal
argument.  And after both sides are completely rested, I will
give you further instructions on the law that you must follow
and apply it to the facts which only you will have found.

Now, Ms. Skipper, our court clerk, is going to show you
the jury room.  That's where you will be most of the time.
There will be some times when we are in here taking care of
matters of law.  There are a few old magazines and other things
in there, and you can play games and do other things.  Don't
think that's what we are doing out here when we are not with
you.

There's tea in there and coffee.  I don't drink either one
of them, so I can't tell you how it gets done in there, but
there is some kind of a machine.  There's also a refrigerator.
If you don't like the soft drinks that are in the refrigerator,

1    you are free to bring them from home.  Just make sure they are

2    soft.  If you want to bring a sandwich or something else, do

3    so.

4         When you come into the jury box, make sure that you stay

5    in the same seats that you are in now because you are a juror

6    by number on the record.  We must keep the record straight.

7    Now, I think we lost our schoolteacher, but there's some of you

8    who probably remember what it was like coming back from recess,

9    and I was going to say grammar school, but I don't think

10   anyone's been to grammar school since I did because they don't

11   seem to teach grammar anymore.

12        So if you have been in elementary school, you know after

13   recess you line up, and so you can practice in there lining up

14   and getting in the right order so you don't fall all over each

15   other.  And actually, we have a little contest trying to figure

16   out which jury is going to do it best, and you've got a hard,

17   hard battle there because a couple juries only took a day.  If

18   you take longer than that, then you lose the competition.

19        Don't bring anything into the jury box that you don't

20   need.  At the same time, if you have something of value, don't

21   leave that in the jury room because we have a lot of

22   contractors who come through the building.  We can't vouch for

23   all of them.  So if you have something that's valuable, just

24   bring it in and put it under your seat.  But if there are books

25   and magazines, you can leave those in the jury room, please.  I

1    think that's about all now.

2        Ms. Skipper, anything else that we need to tell the

3    jurors?

4            THE COURTROOM DEPUTY:  No.

5            THE COURT:  Well, yes, the time.  Why don't we --

6    let's see.  It's 1:00 now.  Ask that you come back at 2:00.

7    Are any of you going to have problems if you are asked to stay

8    until 5:00 or 5:30 today?

9        I see no hands having been raised.

10       And tomorrow, let me ask if any of you would have problems

11   being here by 9:00, transportation problems or anything of that

12   nature?  If not, we will start at 9:00 tomorrow morning, and we

13   will go to 5:00 or 5:30 today.  I try not to leave a witness on

14   the stand, but just try to finish up with a witness, so that's

15   why I say 5:00 or 5:30.  If it looks as though it's going to be

16   a long-winded witness, then I try to tell the lawyers to cut it

17   off after a time.  And if they don't, I will, but we don't want

18   to leave someone overnight and have to come back tomorrow.  So

19   we will either close around 5:00 or sometime between 5:00 and

20   5:30.

21       You've probably been told that L.A. can be a mean place,

22   but that's true of any large city.  Sadly, there are a lot of

23   homeless around.  It's sad for them.  It's sad for us that we

24   live in the wealthiest nation in the world and have individuals

25   who cannot find homes for themselves or find treatment for

1    themselves.

2         As some of you may remember, there was a former governor,

3    later president, who came up with what they called

4    community-based treatment, and ever since that, we have had

5    large homeless groups.  And since the wars, we've had even more

6    homeless veterans and others, entire families that are out

7    there.

8         I come in very early in the morning, and I see these tents

9    and other things just a block from the courthouse.  Most of

10   these people will not bother you at all, so don't worry about

11   that.  And we will make sure that you're not here when it's

12   dark.  You will be long home.

13        There are a lot of things for people who have not been

14   downtown recently, including the new music center that you

15   ought to see.  It's lovely.  The new -- it's not new any

16   longer, but the cathedral, which I still think belongs in

17   New Mexico and not here, but it's really beautiful inside, more

18   so than outside, all within walking distance.  Little Tokyo,

19   Chinatown is just a few blocks away, and Olvera Street where

20   the city began, all of this within blocks.

21        The Japanese American National Museum, within walking

22   distance.  The Museum of Contemporary Art, the new Broad Museum

23   is not open yet, but it will be soon, but there are a lot of

24   features, and there are a lot of places to eat and all.  There

25   is even a five-star restaurant that Ms. Skipper likes.  It's

1    called Federal Cafeteria.  It's in the Roybal building.  Give

2    it a try, too.  And there's this mall that's right across from

3    us, too, and there are a few fast food places down there, too.

4    So we will see you at 2:00.

5         Everyone please rise for the jury.

6         (Out of the presence of the jury.)

7              THE COURT:  Please be seated.  We are outside the

8    presence of the jury.

9         Are there any matters that counsel wish to take up?  Well,

10   let me ask you how much time you're requesting for your opening

11   statement.

12             MS. JAIMEZ:  Your Honor, ten minutes, ten minutes,

13   please.

14             THE COURT:  Sounds good.

15        And, Mr. Navarro?

16             MR. NAVARRO:  It will be like two minutes,

17   Your Honor.

18             THE COURT:  Sounds even better.  All right.  We will

19   see you at 2:00.

20        (Recess taken from 1:08 P.M. to 2:07 P.M.)

21        (Out of the presence of the jury.)

22             THE COURTROOM DEPUTY:  Please remain seated and come

23   to order.  This court is once again in session.

24             THE COURT:  We are outside the presence of the jury.

25   It's just come to my attention that -- always seem to happen

```
1    after the jury's been sworn, that one of the jurors, No. 11, I
2    think it is -- what is her name?  The physician's assistant
3    Ms. McKenna, Kristen McKenna has heard from the hospital, and
4    evidently where they normally have four physician assistants at
5    any one time, they are down to one because of emergencies that
6    have occurred.
7         And she's quite willing to come back, and she understands
8    if she can't be released, but I just wonder if you want to have
9    someone who's feeling pressure and all serving on the jury.  So
10   I thought I would raise it with counsel and then tell her what
11   we are going to do.
12            MS. JAIMEZ:  Your Honor, the Government has no
13   problem if Juror 11 needs to go to work and the Court wants to
14   replace her with one of the alternates.
15            THE COURT:  Mr. Navarro?
16            MR. NAVARRO:  Your Honor, that's fine with me as
17   well.  I think we will have one alternate left, and that should
18   be enough.
19            THE COURT:  Right.  All right.  Why don't we have
20   her come in, Ms. Skipper.
21        (Pause in proceedings.)
22            THE COURT:  Right over here, Ms. McKenna.  Right
23   here is fine.
24            JUROR NO. 11:  Okay.
25            THE COURT:  I understand that there is a problem
```

**UNITED STATES DISTRICT COURT**

1    with the hospital and they want you -- well, I have talked with

2    the attorneys on both sides, and they very graciously have

3    indicated to me that if you really need to be there, they would

4    agree with my excusing you.  So I'm going to excuse you, and I

5    understand that you had indicated that if you would have heard

6    of this before being sworn in, you would have just asked --

7              JUROR NO. 11:  Yeah.

8              THE COURT:  -- to have your service just moved back

9    perhaps some weeks and all.  If you go up to the jury assembly

10   room and let them know that you have been excused from this,

11   but that you are willing to serve, I would appreciate it.

12             JUROR NO. 11:  Yeah, absolutely.

13             THE COURT:  I thank you for your service.  We really

14   appreciate that.  We understand.

15             JUROR NO. 11:  Thank you.

16             THE COURT:  You're quite welcome.

17             THE COURTROOM DEPUTY:  I will bring in the jurors

18   now.

19             THE COURT:  Yes.  I take it that counsel have no

20   matters to bring up?

21             MS. JAIMEZ:  Nothing from the Government,

22   Your Honor.

23             THE COURT:  Thank you.

24        (Pause in proceedings.)

25             THE COURTROOM DEPUTY:  Please rise.

```
1              (In the presence of the jury.)

2                   THE COURT:  Please be seated.

3         And good afternoon, ladies and gentlemen.  Ladies and

4    gentlemen, as you can see, one of your number has been excused.

5    There was an emergency at the hospital where she works, and the

6    attorneys on both sides have graciously agreed that she would

7    be excused.  So I have done that.

8         And that means, then, that, Mr. Moreno, you are now Juror

9    No. 11.  So would you move over to that.

10        And, Mr. Rhoads, would you move over to the seat there as

11   Alternate No. 1.

12        Has anything about this matter come to your attention

13   since we were last here?  If so, please raise your hand.

14        I see no hands having been raised.

15        I told you, ladies and gentlemen, the first order of

16   business this afternoon would be the opening statements, and we

17   will hear now from the Government.

18        Ms. Jaimez?

19             MS. JAIMEZ:  May it please the Court?

20             THE COURT:  Yes.

21             MS. JAIMEZ:  Over the course of one week, four

22   recorded phone calls and six text messages, the defendant,

23   Ismael Gutierrez Vilavazo, also known as Mikey, brokered the

24   sale of methamphetamine to a paid FBI informant.  That sale

25   took place in September 2013 in a McDonald's parking lot, when
```

1  the defendant's nephew delivered two bags of methamphetamine to

2  the informant.

3      That sale was the direct result of the defendant's

4  middleman efforts.  And consequently, it is the defendant who

5  is charged with one count of conspiracy to distribute

6  methamphetamine, one count of aiding and abetting in the

7  distribution of methamphetamine, and six counts of the use of a

8  telephone in connection with a drug-related felony.

9      Now, during this trial you're going to hear several

10  recorded calls and see several text messages between the

11  defendant, Mikey, and the informant.  You will see during the

12  course of the evidence that while the defendant didn't

13  personally deliver the drugs to the informant, the meeting was

14  brokered by the defendant, and the price of the drugs was

15  influenced by the defendant because the defendant was in

16  business with his nephew.

17      Now, you will also hear during the course of this trial an

18  audio recording from that McDonald's methamphetamine deal.  You

19  will hear during that recording the defendant's nephew referred

20  repeatedly to the business he does with the defendant, Mikey.

21  You will hear the defendant's nephew explain that the defendant

22  was in charge of dealing in larger quantities, while the

23  defendant's nephew was in charge of dealing smaller quantities,

24  smaller quantities like those pictured here, the two bags of

25  methamphetamine delivered to the FBI informant in that

1    McDonald's parking lot.

2         Now, during that recording you will hear the defendant's

3    nephew say things like, quote, "This one," referring to the

4    drugs, "This one is from the same company."  Quote, "Mike does

5    not sell small ones.  I'm the one in charge of selling it like

6    this."  "All of us are one.  We are all one hand or one finger

7    of one hand.  "Mike and I are the same."  "It's just that Mike,

8    Mike doesn't like to move small amounts."

9         You'll also hear during the recording of that meeting that

10   the defendant's nephew lowered the price for these drugs

11   because the informant spoke with the defendant Mikey.  Now, in

12   addition to hearing the recording from the McDonald's

13   methamphetamine deal, you will also hear from the informant

14   himself.  You will hear from him that, in fact, the defendant

15   Mikey brokered the deal when he purchased these drugs.  You

16   will hear that the informant, while he has no criminal history,

17   no arrests, no charges, he did at the time of this deal have

18   ties to the criminal world, which Mikey, the defendant,

19   navigated.

20        And the evidence will show that those very ties are what

21   made him valuable to the FBI and what enabled him to purchase

22   these two bags of methamphetamine for supposed resale.  You

23   will also hear when the informant takes the stand that he knew

24   Mikey from years before this deal.  You will hear from the

25   informant when he takes the stand that he heard the defendant

UNITED STATES DISTRICT COURT

1    talk about drugs in the past.  He heard the defendant argue

2    about drugs in the past.

3        He will also tell you about a meeting he had with the

4    defendant one week prior to the McDonald's methamphetamine

5    deal.  He will explain to you that during that meeting with the

6    defendant, the deal was put into motion.  The defendant told

7    the informant at that meeting that the defendant had two pounds

8    of methamphetamine, but the two pounds weren't currently in his

9    possession or weren't in the possession of him at the time

10   because he felt like he was being watched by the police.

11       He indicated that another person, another individual, was

12   holding his drugs, and that the defendant would put the

13   informant in contact with the individual holding defendant's

14   drugs.  And, in fact, that's what occurred when the defendant's

15   nephew delivered these two bags of methamphetamine to the

16   informant.

17       Now, in addition to hearing from the informant and hearing

18   the recording from the methamphetamine deal, you will also hear

19   the recorded calls between the defendant and the informant

20   leading up to the McDonald's methamphetamine deal.  You will

21   hear that while the defendant spoke in coded, careful language,

22   he was careful to reassure the informant that it was safe to

23   deal with the defendant's nephew, who the informant had never

24   met.

25       You'll hear the defendant say things like, "It's the same

1    thing.  He's my nephew" or, "They're my people.  That's the

2    thing."  In addition to hearing the calls that led up to the

3    McDonald's methamphetamine deal, you will also hear one call

4    that took place a week after the McDonald's methamphetamine

5    deal between the informant and the defendant.

6         During that call you will hear that the defendant

7    attempted to purchase additional drugs, a higher quantity, this

8    time half a pound, and you will hear the defendant respond

9    immediately to that request, quote, "Well, good, good.  I'm

10   going to give you warranty and everything."

11        Now, all of these recorded calls, ladies and gentlemen,

12   you will note were made to the defendant on his cell phone

13   number ending in -3398.  Now, during this trial you will hear

14   there is no subscriber information or no name associated with

15   that number for the -3398 number.  However, you will see

16   evidence tying the defendant to the -3398 number.

17        For example, you will hear from an arresting officer who

18   arrested the defendant back in 2014 and who will testify that

19   the defendant personally gave that 3398 number as both his

20   personal cell phone and as his work phone.  In addition, you

21   will also hear from the FBI from this case, the agent that was

22   in charge of monitoring the informant, who was in charge of

23   monitoring that McDonald's methamphetamine deal.

24        He will corroborate the informant's testimony, and he will

25   also summarize documentary evidence, documentary evidence, such

1  as phone records that show the constant contact between the

2  defendant, the defendant's nephew and the informant leading up

3  to the McDonald's methamphetamine deal.

4       And at the conclusion of this trial, ladies and gentlemen,

5  after you have seen all of the exhibits and heard all of the

6  testimony, the United States would ask that you return a

7  verdict consistent with the evidence, guilty.

8            THE COURT:  Thank you, Ms. Jaimez.

9       Now, ladies and gentlemen, on behalf of the defendant we

10 will hear from Mr. Navarro.

11           MR. NAVARRO:  Thank you, Your Honor.

12      Good afternoon, everybody.

13      Right after lunch, so hopefully I'm still awake,

14 Your Honor.

15      I want to talk to you just briefly about some of the

16 things that Judge Hatter talked to you about when he came in

17 and when you took your oath.  Judge Hatter talked about this

18 concept of presumption of evidence, and he talked about it a

19 number of times.

20           THE COURT:  Remember, it's not argument.  You are

21 just going to tell us what the evidence is going to show.

22           MR. NAVARRO:  Thank you, Your Honor.

23      I bring this up because the trial is about to begin.  As

24 the evidence is presented by the Government in this case, as

25 Judge Hatter told you, the Government will have the burden of

1    proof to present the evidence in this case.  Keep in mind -- I

2    want you to keep that in mind as you look at the text messages

3    that are played before you, as you read the transcripts of the

4    undercover conversations, as you hear from all of the

5    government witnesses, keep an open mind as to the evidence.

6         Now, at the end of the case, after the Government has

7    presented its case, I am going to come back here, and I'm going

8    to argue to you what I believe the evidence shows you, not only

9    by the questions asked by the Government, but the questions

10   asked by me as defense counsel and by your own commonsense and

11   your own experience, your reading of the texts.  I am going to

12   argue to you who sent what text, who initiated which call,

13   pretty basic stuff.  At the end of the case, when I come up

14   here and actually get to argue my case before you, I'm going to

15   be arguing to you to find my client not guilty of these

16   charges.

17        Thank you, Your Honor.

18             THE COURT:  Thank you.

19        The Government may call its first witness.

20             MS. JAIMEZ:  Yes, Your Honor.  The Government calls

21   Officer McGraw.

22             THE COURT:  Thank you.

23        Officer, would you come right up on the witness stand to

24   be sworn, please.

25             THE WITNESS:  Yes, Your Honor.

**UNITED STATES DISTRICT COURT**

1          THE COURTROOM DEPUTY:  Please raise your right hand.

2          **JONATHAN McGRAW, PLAINTIFF'S WITNESS, WAS SWORN**

3          THE WITNESS:  Yes, I do.

4          THE COURTROOM DEPUTY:  Please have a seat.

5     State and spell your name for the record.

6          THE WITNESS:  My name is Jonathan McGraw;

7     J-o-n-a-t-h-a-n, M-c-g-r-a-w.

8          THE COURT:  Do you have a middle name?

9          THE WITNESS:  Yes, sir.

10         THE COURT:  Would you --

11         THE WITNESS:  Scott, S-c-o-t-t, middle name.

12         THE COURT:  Go ahead, please, Ms. Jaimez.

13                    **DIRECT EXAMINATION**

14    BY MS. JAIMEZ:

15    Q    Good afternoon, Mr. McGraw.

16         How are you currently employed?

17    A    I am an accident investigator in the Collierville Police

18    Department, in Collierville, Tennessee.

19    Q    And how long have you been an accident investigator?

20    A    Since 2014.

21    Q    And what did you do before becoming an accident

22    investigator?

23    A    I was a control officer assigned to the midnight shift,

24    from 2011 to 2014.

25    Q    Now, turning your attention to the date of January 13th,

1    2014, do you remember the events of that day?

2    A    Yes, ma'am, I do.

3    Q    What were you doing in the morning on that date?

4    A    I was conducting traffic enforcement in the area of

5    Highway 72 and Shelby Drive.

6    Q    What, if anything, happened at approximately 1:30 in the

7    morning that day?

8    A    I observed a vehicle I later identified as a white Toyota

9    Corolla traveling west on Highway 72 east of Shelby Drive at

10   what appeared to be a high rate of speed, in the 40-miles-an-

11   hour speed limit.  I activated my moving radar in my vehicle

12   and obtained a reading of 65 miles an hour in a 40 miles an

13   hour, and I then conducted a traffic stop and spoke with the

14   driver who presented himself as Ismael Gutierrez Vilavazo.

15   Q    Do you see the person you stopped that night in the

16   courtroom today?

17   A    Yes, ma'am, I do.

18   Q    Can you please point to him and describe for the record

19   what he is wearing.

20   A    Yes, ma'am.  It's the gentleman in the white shirt.

21              THE COURT:  Indicating, for the record, the

22   defendant in this matter.

23   BY MS. JAIMEZ:

24   Q    Now, what happened during your traffic stop of the

25   defendant, Officer McGraw?

**UNITED STATES DISTRICT COURT**

```
 1   A     I conducted a routine query of the existence or status of

 2   Mr. Vilavazo's California ID and learned that his driver's

 3   license from California had been suspended for failure to

 4   appear.

 5   Q     And what did you do after finding out his license had been

 6   suspended?

 7   A     I then placed Mr. Vilavazo under arrest for driving on a

 8   suspended license and speeding, transported him to jail in

 9   Collierville, Tennessee.

10   Q     And what happened after you got to the jail?

11   A     We conducted the booking process.

12   Q     And are there any forms in particular that you fill out

13   during that process?

14   A     Yes, ma'am.  It would be the incident report.

15   Q     And who typically provides the information needed for that

16   incident report?

17   A     The arrestee does.

18   Q     Now, turning your attention to the exhibit binder before

19   you.  Please take a moment to turn to what's been previously

20   identified as Exhibit 708.

21              THE COURT:  What was that exhibit number?

22              MS. JAIMEZ:  708, Your Honor.

23              THE COURT:  All right.

24              THE WITNESS:  Okay.

25   BY MS. JAIMEZ:
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     Officer McGraw, do you recognize this exhibit?

 2   A     Yes, I do.

 3   Q     And what is it?

 4   A     It's the Collierville incident report -- Collierville

 5   Police Department incident report that I filled out.

 6   Q     And how do you know that?

 7   A     It has my name on it.

 8   Q     And is it a fair and accurate depiction of the accident

 9   report from the night of the arrest?

10   A     Yes.

11         MS. JAIMEZ:  Your Honor, the Government moves

12   Exhibit 708 into evidence.

13         THE COURT:  I take it there is no objection.  It

14   will come in.

15         MR. NAVARRO:  No objection.

16      (Exhibit 708 received.)

17         MS. JAIMEZ:  Permission to publish, Your Honor.

18         THE COURT:  You may.

19   BY MS. JAIMEZ:

20   Q    Now, turning your attention to page 5 of Exhibit 708,

21   please take a moment to turn there.

22      What information is provided in this first section of the

23   form marked "Person Information"?

24   A    It would be the arrestee's first and last names, social

25   security number, date of birth, age, height and weight,
```

```
 1  address, phone number, driver's license, things of that nature.
 2  Q    And whose name was provided here?
 3  A    Ismael Gutierrez Vilavazo.
 4  Q    And who provided you with this information?
 5  A    Mr. Vilavazo did.
 6  Q    What phone number is listed in this section?
 7  A    He provided a phone number of area code (818) 263-3398.
 8  Q    Now, turning your attention to the following section, the
 9  Employer Information section, do you see that part of the form?
10  A    Yes, ma'am, I do.
11  Q    And what information is provided in the first part of the
12  Employer Information section?
13  A    It has the employer's name, address, city and state, phone
14  number, things of that nature.
15  Q    And what is the noted employment?
16  A    He advised Gutierrez Trades and that he was the owner.
17  Q    Does he provide a phone number?
18  A    Yes, ma'am.  He provided a phone number of (818) 263-3398.
19  Q    And is that the same phone number previously given?
20  A    Yes, ma'am, that's correct.
21            MR. JAIMEZ:  No further questions, Your Honor.
22            THE COURT:  Cross-examination, Mr. Navarro?
23            MR. NAVARRO:  Briefly, Your Honor.  Thank you.
24                      CROSS-EXAMINATION
25  BY MR. NAVARRO:
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     Now, Officer McGraw, what happened to the vehicle?

 2   A     The vehicle was released to a passenger inside.

 3   Q     So there was someone else with Mr. Vilavazo inside the

 4   vehicle?

 5   A     That's correct.

 6   Q     And was any contraband found in the vehicle?

 7   A     No, sir, there was not.

 8              MR. NAVARRO:  No further questions, Your Honor.

 9   Thank you.

10              THE COURT:  All right.  Anything further of this

11   witness?

12              MS. JAIMEZ:  No redirect, Your Honor.  Thank you.

13              THE COURT:  Thank you very much.

14              THE WITNESS:  Thank you, Your Honor.

15              THE COURT:  You're excused.

16        You may call your next witness.

17              MR. AZAT:  Your Honor, the United States calls

18   Special Agent Michael Alker.

19              THE COURT:  Very well.

20        Come right up on the witness stand, Agent.

21              THE WITNESS:  Yes, sir.

22              THE COURTROOM DEPUTY:  Please raise your right hand.

23         **MICHAEL ALKER, PLAINTIFF'S WITNESS, WAS SWORN**

24              THE WITNESS:  I do.

25              THE COURTROOM DEPUTY:  Please have a seat.
```

**UNITED STATES DISTRICT COURT**

```
 1          State and spell your name for the record.
 2              THE WITNESS:  My name is Michael Edward Alker;
 3   M-i-c-h-a-e-l, E-d-w-a-r-d, A-l-k-e-r.
 4              THE COURT:  Go ahead, please, Mr. Azat.
 5                      DIRECT EXAMINATION
 6   BY MR. AZAT:
 7   Q     Good afternoon, Agent Alker.
 8   A     Good afternoon.
 9   Q     Where are you currently employed?
10   A     Federal Bureau of Investigation, Los Angeles field
11   division.
12   Q     And what is your current position with the FBI?
13   A     I am a special agent.
14   Q     How long have you been a special agent?
15   A     I was hired by the FBI in August 2008.
16   Q     Have you received training in illegal narcotics
17   investigations with the FBI?
18   A     Yes, sir.
19   Q     What training have you received in illegal narcotics
20   investigations?
21   A     During the FBI academy I received general training with
22   regards to conducting narcotics trafficking investigations, as
23   well as the investigations of transnational criminal
24   organizations, such as drug cartels.  Also, while assigned to
25   my current duties, I received on-the-job training with respect
```

```
 1    to conducting narcotics investigations, identifying different
 2    types of narcotics and the different methodologies used by
 3    narcotics traffickers.
 4    Q    And in your present assignment, do you investigate illegal
 5    narcotics?
 6    A    Yes, sir.
 7    Q    What is a confidential informant?
 8    A    A confidential informant is a person who provides
 9    information to law enforcement and at times acts at the
10    direction of law enforcement.
11    Q    In your current assignment do you work with confidential
12    informants?
13    A    Yes, sir, I do.
14    Q    How is it that confidential informants have access to
15    information about illegal narcotics transactions?
16    A    It is oftentimes through their own personal experiences,
17    albeit who they are associated with, friends, things like that.
18    Q    Did you work with a confidential informant while
19    investigating this case?
20    A    Yes, sir.
21    Q    And what is that confidential informant's name?
22    A    Yader Gutierrez.
23    Q    When you first met Yader Gutierrez, is it your
24    understanding he may have information about drug trafficking?
25    A    Yes, sir.
```

**UNITED STATES DISTRICT COURT**

```
1   Q    Was it your understanding that Yader Gutierrez may have
2   information about the defendant being involved in drug
3   trafficking?
4   A    Yes, sir.
5   Q    At some point did Yader Gutierrez agree to cooperate with
6   law enforcement?
7   A    Yes, sir.
8   Q    Did he agree to purchase narcotics from the defendant?
9   A    Yes, sir.
10  Q    During the investigation of this case, did you communicate
11  with Yader Gutierrez on the telephone?
12  A    Yes, sir, I did.
13  Q    What was the telephone number you used to reach Yader
14  Gutierrez?
15  A    It was (818) 602-1716.
16  Q    From September to October 2013, did you contact Yader
17  Gutierrez on any other number?
18  A    No, sir.
19  Q    What does Yader Gutierrez's cell phone look like?
20  A    This was a black smart phone.  It was a black smart phone.
21  Q    During the investigation of this case, were you present
22  when Yader Gutierrez made telephone calls with the cellular
23  phone you just described?
24  A    Yes, sir.
25  Q    Were these calls recorded?
```

**UNITED STATES DISTRICT COURT**

1   A   Yes, sir.

2   Q   Have you listened to audio recordings of these calls?

3   A   Yes, sir.

4   Q   Could you understand what was being said?

5   A   No, sir, I could not.

6   Q   Why not?

7   A   The conversations took place in Spanish.

8   Q   Do you speak Spanish, Agent Alker?

9   A   No, sir.

10  Q   Was the quality of the recordings that you listened to the

11  same?

12  A   No, sir.

13  Q   Why not?

14  A   At times where the recording was taking place, there was a

15  high level of background noise.  And additionally, the

16  technical equipment did not always work as well as it should

17  have.

18  Q   During this investigation did you observe text messages

19  displayed on Yader Gutierrez's cell phone?

20  A   Yes, I did.

21  Q   Did you take photographs of those cell phone messages?

22  A   Yes, sir.

23  Q   I would like you now to take a moment to please direct

24  your attention in the exhibit binder before you, the smaller

25  one below the larger one, and take a look at what's been marked

```
 1   as Government Exhibits 101 through 110 and 112 to 113.
 2        Your Honor, may I step to counsel table for one moment,
 3   please?
 4             THE COURT:  Of course.
 5             THE WITNESS:  Okay, sir.
 6   BY MR. AZAT:
 7   Q    Have you had a chance to look at those exhibits?
 8   A    Yes, sir.
 9   Q    Do you recognize those exhibits?
10   A    Yes, sir, I do.
11   Q    What are they?
12   A    They are copies of test messages taken from Yader
13   Gutierrez's cellular phone, and they are Xeroxed copies of CDs
14   consisting of recorded calls and a meet between Yader Gutierrez
15   and Jorge Huerta, as well as Yader Gutierrez and the defendant,
16   between September 19th and October 7th, 2013.
17   Q    Let's first address the photographs of the text messages.
18   Are those true and accurate photographs of the text messages
19   that you took photographs of?
20   A    Yes, sir.
21             THE COURT:  What exhibit numbers?
22             MR. AZAT:  Sorry, Your Honor.  Would be Exhibit 101,
23   104, 105, 106.  That would be all the text messages,
24   Your Honor.
25             THE COURT:  Thank you.
```

**UNITED STATES DISTRICT COURT**

BY MR. AZAT:

1

2  Q    The remaining exhibits, do those remaining exhibits -- are

3  those photographs of CDs -- do you recognize those CDs?

4  A    Yes, sir, I do.

5  Q    How do you recognize those CDs?

6  A    My initials are on those CDs to indicate I reviewed them.

7  Q    Are those true and accurate -- do those CDs contain true

8  and accurate recordings of the calls you referenced earlier?

9  A    Yes, sir.

10         MR. AZAT:  Your Honor, at this time the United

11 States would offer -- excuse me, Your Honor.  At this time,

12 Your Honor, the Government would offer into evidence and read a

13 stipulation, which is marked as Government Exhibit 915, that

14 has been entered into between the United States and Defendant

15 concerning Exhibits 101 through 114, but more importantly, the

16 transcripts that have been translated of those recordings and

17 text messages, Your Honor.

18         THE COURT:  Mr. Navarro, is that the stipulation

19 that you have agreed to on behalf of your client?

20         MR. NAVARRO:  Yes, Your Honor.

21         THE COURT:  Thank you.  They will come into

22 evidence.

23      (Exhibits 101 through 114 and 905 received.)

24         MR. AZAT:  With the Court's permission, Your Honor,

25 may I read the pertinent part of that stipulation?

1          THE COURT:  Of course.

2          MR. AZAT:  Thank you.

3      Stipulation is titled "Parties' Stipulation Regarding

4  Methamphetamine, Scale and Transcripts of Spanish Language

5  Texts and Audio Recordings."  Beginning on page 1:

6      "Plaintiff, United States of America, by and through its

7  counsel of record, Assistant United States Attorneys Michael O.

8  Azat and Kimberly D. Jaimez, and Defendant Ismael Gutierrez

9  Vilavazo, hereafter Defendant, individually and by and through

10  counsel, Angel Navarro, hereby stipulate to the facts and agree

11  to their admissibility at trial:

12      "No. 1. Methamphetamine is a Schedule II controlled

13  substance.

14      "No. 2. On September 26, 2013, law enforcement officers

15  seized 55.9 grams of a mixture containing methamphetamine,

16  which is 87 percent pure, namely, 48.6 grams of actual

17  methamphetamine that is in a bag marked Exhibit 201.  Exhibit

18  201-A is a true and correct copy of a photograph of Exhibit

19  201.  Exhibit 201 and 201-A are admissible into evidence."

20      Now, reading paragraph 3 -- excuse me, Your Honor, reading

21  paragraph 4:

22      "Exhibits 101 through 114 are audio recordings, video

23  recordings and text messages that were recorded at the time and

24  date and over the telephones and at the places indicated on the

25  first page of the transcripts that corresponds to each

1    recording.  The transcripts contain an accurate transcription

2    and/or translation of each of the aforementioned recordings and

3    are the exhibits marked with the letter 'A' following the

4    exhibit number of the corresponding recording, namely, Exhibits

5    101-A through 104-A.  Exhibits 101-A through 114-A are

6    admissible into evidence.  This stipulation is admissible at

7    trial for all purposes."

8         Your Honor, at this time the United States requests to

9    move Exhibits 101-A through 110-A and Exhibits 112-A through

10   113-A into evidence.

11              THE COURT:  They will all come in.

12        (Exhibits 101-A through 110-A, 112-A and 113-A received.)

13              THE COURTROOM DEPUTY:  Counsel, can you repeat that,

14   the exhibit numbers again?

15              MR. AZAT:  Sure, it's 101-A through 110-A.

16              THE COURTROOM DEPUTY:  Thank you.

17              MR. AZAT:  And then 112-A through 113-A.

18        Next, Your Honor, the United States would like to

19   introduce the following exhibit, which are business records and

20   admissible under Federal Rule of Evidence 90211, as each is

21   accompanied in the exhibits with its custodian of business

22   record's declaration.

23              THE COURT:  You may proceed.

24              MR. AZAT:  Those exhibits are numbered as follows:

25   First are the exhibits.  They are exhibit numbers 401, 402,

1   403, 404, 511, 805, 803, 704, 801 and 806.

2       I will now read the custodian of record's declarations,

3   Your Honor.

4           THE COURT:  Go ahead.

5           MR. AZAT:  Those are in the same order as the

6   previous exhibits I just listed.  Exhibits 401-A; 402-A; 403-A;

7   404-A; 511-A; 805-A; 804, which is the custodian of record's

8   declaration for Exhibit 803; 704-A; 802; and 806-A.

9       And lastly, Your Honor, the United States would like to

10  submit the following exhibits into evidence as they are

11  admissible under Federal Rules of Evidence 9024 as they are

12  certified true and correct copies of public records.

13          THE COURT:  Go ahead.

14          MR. AZAT:  Those are Exhibits 705, 706, 707, 901,

15  912, and lastly, 914.

16          THE COURT:  Very well.

17      (Exhibits 401, 401-A, 402, 402-A, 403, 403-A, 404, 404-A,

18  511, 511-A, 704, 704-A, 705, 706, 707, 801, 802, 803, 804, 805,

19  805-A, 806, 806-A, 901, 912 and 914 received.)

20          MR. AZAT:  And, Your Honor, if the Court would

21  permit, for all of these now admitted exhibits, as I proceed

22  with the direct examination of Special Agent Alker, with the

23  Court's permission, may the Government publish these admitted

24  exhibits?

25          THE COURT:  You may do so.

```
 1              MR. AZAT:   Thank you, Your Honor.
 2   Q     Thank you for your patience, Special Agent Alker.
 3   A     No problem.
 4   Q     For the record, what is a toll record?
 5   A     A toll record is basically a call log of ingoing and
 6   outgoing telephone numbers between two telephone numbers where
 7   it lists the time, the date, the direction and the end result
 8   of the call.
 9   Q     What can you learn from a toll record?
10   A     You can learn from a toll record the time and date a call
11   took place, as well as the telephone number that a number was
12   calling or texting or receiving a call or text from.
13   Q     Can you use toll records to determine the phone number
14   that someone texted?
15   A     Yes, sir, at times you can.
16   Q     Where do you get toll records from?
17   A     The cell phone providers.
18   Q     Would a toll record tell someone the content of a call or
19   text?
20   A     No, sir.
21   Q     Would you describe a toll record as a log?
22   A     Yes, sir.
23   Q     In investigating narcotics crimes, have you received
24   training on how to examine toll records?
25   A     Yes, sir, I have.
```

```
 1   Q     Have you received training on how to read toll records?
 2   A     Yes, sir.
 3   Q     And in investigating this case, did you obtain any toll
 4   records?
 5   A     Yes, sir, I did.
 6   Q     What telephone numbers did you obtain toll records for?
 7   A     I obtained toll records for several different numbers, but
 8   some of the more important telephone numbers were (818)
 9   602-1716, the telephone number for Yader Gutierrez, the
10   confidential source; (818) 263-3398, the defendant's cell
11   phone; (818) 471-2618, which is Jorge Huerta's cell phone; as
12   well as (818) 720-7725, which is another telephone number for
13   Jorge Huerta.
14   Q     Did you obtain any historical cell site data for cell
15   phones?
16   A     Yes, sir, I did.
17   Q     What is historical cell site data?
18   A     Historical cell site data is data which shows which cell
19   phone tower a phone is in contact when it's either making or
20   receiving a call or text or it's connecting to the Internet.
21   Q     And what does that information tell you?
22   A     It can help you provide an approximate location of the
23   phone.
24   Q     In investigating narcotics crimes with the FBI, have you
25   received training on how to examine historical cell site data?
```

```
 1    A     Yes, sir, I have.
 2    Q     In investigating this case, did you obtain historical cell
 3    data for defendant's cell phone?
 4    A     Yes, sir, I did.
 5    Q     I would like to now direct your attention to the morning
 6    of September 19th, 2013.  Where were you that morning?
 7    A     I was at Mission Hills station, Los Angeles Police
 8    Department, meeting with Yader Gutierrez, confidential human
 9    source.
10    Q     And did you see Yader Gutierrez make a phone call that
11    morning?
12    A     Yes, sir, I did.
13    Q     And did he make that call on the same phone that you
14    earlier described as belonging to him?
15    A     Yes, sir.
16    Q     Did you hear that conversation?
17    A     There was no conversation, sir.
18    Q     Why not?
19    A     The defendant didn't answer the phone.
20    Q     Did he try calling again?
21    A     Yes, sir.  We tried calling again approximately five
22    minutes later.
23    Q     What happened next?
24    A     There was still no answer.
25    Q     When was the next time you saw Yader Gutierrez?
```

1   A     I saw him the next day, on September 20th, 2013.

2   Q     And when you saw him on September 20th, 2013, did Yader

3   Gutierrez show you anything?

4   A     Yes, sir.  He showed me his cell phone, which contained

5   text messages between himself and the defendant, as well as a

6   picture of a vehicle that he had taken.

7   Q     And were the text messages he showed you on the same phone

8   you saw him use to try to call the defendant earlier, the

9   previous day?

10  A     Yes, sir.

11  Q     I would like you now to take a look at Government Exhibit

12  101-A, which has been previously admitted, that I would like to

13  publish, please.

14            THE COURT:  Go right ahead.

15  BY MR. AZAT:

16  Q     Special Agent Alker, this has been previously admitted.

17  Who are these texts between?

18  A     These text messages are between Defendant and Yader

19  Gutierrez.

20  Q     How do you know?

21  A     I observed Yader Gutierrez's cell phone and saw that under

22  "Maky," he stored telephone number (818) 263-3398, and I also

23  corroborated by observing or looking at toll records for (818)

24  263-3398, as well as (818) 602-1716, Yader Gutierrez's phone.

25  Q     Did Yader Gutierrez ask the defendant anything on these

1    texts?

2    A    Yes, sir.

3    Q    Where is that?

4    A    He was asking earlier if he was busy, and then he mentions

5    that he needs some of what he told him about last time at 11:58

6    A.M.

7    Q    I would like you to take a look now at Government Exhibits

8    405 to 413.  Please take your time.

9    A    Okay, sir.

10   Q    What are these exhibits?

11   A    These are excerpts of toll records from the defendant's

12   phone, from Yader Gutierrez's cell phone and from Jorge

13   Huerta's cell phone.

14   Q    Did you cause these charts to be created from the toll

15   records you obtained in this case?

16   A    Yes, sir, I did.

17            MR. AZAT:  Your Honor, the United States would like

18   to move into evidence Exhibits 405 to 413.

19            THE COURT:  Barring no objection, they will come in.

20       (Exhibits 405 through 413 received.)

21            MR. AZAT:  And with the Court's permission,

22   Your Honor, the United States would like to publish these as I

23   continue my examination.

24            THE COURT:  Please go ahead.

25            MR. AZAT:  Please publish 405.

1   Q      Please take a look at Exhibit 405, Special Agent Alker.

2   A      Sir.

3   Q      The toll records for -- whose phone were these toll

4   records from?

5   A      These were derived from Yader Gutierrez's cellular

6   telephone.

7   Q      And if we could please just highlight the top row first.

8   That's fine.

9          There are -- can you get the whole row, please.

10         Three, four, five, six -- about seven columns.  Can you

11  explain what those columns mean?

12  A      Yes, sir.  The MSISDN is the telephone number of which the

13  toll records that you're looking at.  The date is the date that

14  the call or text message took place.  The destination, if it is

15  an outgoing telephone call, it's going to list an area of where

16  that phone is calling to.  If it's an incoming call, it will

17  show as incoming.  And if he is using a phone to visit a Web

18  address, there will be an IP address.

19         The time is the time that the call or text message took

20  place.  And then the phone number, if it is an outgoing call,

21  that will be the phone number that dialed.  And if it's an

22  incoming telephone call, that will be the number that called

23  (818) 602-1716.  And then you have the call type, "D," in this

24  chart refers to a text message for call type.  And then number

25  of minutes for the actual telephonic contact is the far column

1    to the right.

2    Q    Can you move that box down just a little bit, please, so

3    this chart references calls between who?

4    A    Between Yader Gutierrez, the confidential source, and the

5    defendant.

6    Q    Is this excerpt on this chart we are looking at exactly or

7    nearly exactly as it would look -- a toll record would look in

8    a toll record when it's received from the phone company?

9    A    Yes, very similar.

10   Q    Do toll records from different phone companies look very

11   similar?

12   A    No, sir.

13   Q    These first two calls which are highlighted in green, are

14   those telephone calls?

15   A    Yes, sir.  Those were two telephone calls from Yader

16   Gutierrez to the defendant.

17   Q    Are these the two calls you saw Yader Gutierrez make when

18   he was trying to get ahold of defendant on September 19th?

19   A    Yes, sir.

20   Q    And I would like you now --

21        If we could get rid of the blow-up.  And can we highlight

22   this group of text messages in the middle, please.

23        Thank you very much.

24        What are we looking at now?

25   A    This is a series of incoming and outgoing text messages

1    between the confidential source and the defendant on September

2    19th, 2013.

3    Q     And are the times on these text messages the same as the

4    text messages that you saw on Yader Gutierrez's phone?

5    A     Yes, sir, they are.

6    Q     So what does that tell you?

7    A     That tells me that the text messages that Yader Gutierrez

8    showed me on his smart phone were, in fact, in communication

9    with the defendant based upon a review of these toll records.

10   Q     Did Yader Gutierrez show you anything else on his phone on

11   September 20th?

12   A     Yes, sir.  He showed me a photograph of an Audi.

13   Q     Can you please take a look at government Exhibit 910.

14   A     Sir.

15   Q     Do you recognize that exhibit?

16   A     Yes, sir, I do.

17   Q     What is that?

18   A     That is the picture of a silverish Audi that Yader

19   Gutierrez showed me on September 20th, 2013, when I met with

20   him.

21   Q     Did you take a photo of that picture on Yader Gutierrez's

22   phone?

23   A     Yes, sir, I did.

24   Q     Is this a true and accurate copy of the photo that you

25   took?

```
 1   A     Yes, sir, it is.
 2             MR. AZAT:  Your Honor, the United States would
 3   submit Government Exhibit 910 into evidence.
 4             THE COURT:  It will come in.
 5        (Exhibit 910 received.)
 6             MR. AZAT:  And with the Court's permission, I would
 7   like to publish that to the jury.
 8             THE COURT:  Yes, you may.
 9   BY MR. AZAT:
10   Q     Do you recognize the car in that photo?
11   A     Yes, sir, I do.
12   Q     How do you recognize this car?
13   A     I have seen this vehicle on surveillance.
14   Q     Did you ever see anyone driving this car?
15   A     Yes, sir.  I have seen the defendant driving this car.
16   Q     Where did you see the defendant driving this car?
17   A     I saw him at 11461 Oxnard Street, North Hollywood,
18   California.
19   Q     Do you know who lives at 11461 Oxnard Street?
20   A     Yes, sir, the defendant does.
21   Q     I would like you now to please take a look at what's been
22   previously admitted as Government Exhibit 901.
23        If you could please publish that for the jury?
24        What is Government Exhibit -- oh, sorry.  Are you there?
25   A     Yes, sir.
```

```
1    Q     What is Government Exhibit 901?

2    A     This is a certified California Department of Motor

3    Vehicles record for the driver's license information for the

4    defendant, Ismael Gutierrez Vilavazo.

5    Q     Is this the individual you saw driving that Audi?

6    A     Yes, sir.

7    Q     Do you recognize that individual in court today?

8    A     Yes, sir, I do.

9    Q     Can you please point him out?

10   A     He's sitting at defense table wearing a white shirt.

11             THE COURT:  Indicating, for the record, the

12   defendant in this matter.

13   BY MR. AZAT:

14   Q     If we could please turn to page 3 of this record.

15         What is the address listed on the defendant's DMV records?

16   A     It is 11461 Oxnard Street, North Hollywood, California.

17   Q     If we could please take a look at page 5 of this exhibit.

18         There's some handwriting on this exhibit, if we could

19   please --

20   A     Yes, sir.  There's a driver's license number, and then

21   below that it's "Gutierrez Vilavazo," and below that for first

22   name it's "Ismael."  Underneath that is an address of 11461

23   Oxnard Street, North Hollywood, California.

24   Q     And when did you see the defendant driving the Audi at

25   that Oxnard Street address?
```

**UNITED STATES DISTRICT COURT**

1    A    I saw him on two occasions, at least, October 4th and

2    October 25th.

3    Q    Of which year?

4    A    2013.

5    Q    Thank you.

6         I would like to now direct your attention to September

7    25th, 2013.

8         Did you review toll records for Yader Gutierrez's phone

9    for that day?

10   A    Yes, sir, I did.

11   Q    Did you review toll records for the defendant's phone for

12   that day?

13   A    Yes, sir.

14   Q    I would like you to please look at what was previously

15   admitted as Government Exhibit 406.

16   A    Yes, sir.

17        MR. AZAT:  Go ahead and publish that.

18   Q    What are we looking at here?

19   A    This is an excerpt from the toll records for Yader

20   Gutierrez, the confidential source.

21   Q    And what does -- what do these toll records tell us?

22   A    These toll records show two telephone calls between the

23   confidential source, Yader Gutierrez, and the defendant on

24   September 25th, 2013.

25   Q    When you reviewed the toll records for the defendant's

```
 1   phone and for Yader Gutierrez's phone on that day, did those
 2   toll records have any number in common?
 3   A    Yes, sir.  There was a telephone number (818) 471-2618.
 4   Q    Did that number appear on both of those toll records?
 5   A    Yes, sir.
 6   Q    Can a phone company tell you who pays for a cell phone?
 7   A    It is possible, yes, sir.
 8   Q    How would you find out that information?
 9   A    I would request subscriber information from the cell phone
10   service provider.
11   Q    Did you obtain subscriber information for that number that
12   these two toll records -- excuse me -- the defendant's phone
13   and Yader Gutierrez's phone had in common?
14   A    Yes, sir, I did.
15   Q    If you could please take a look, Government Exhibit 805.
16   Government's Exhibit 805 has been previously entered into
17   evidence.
18        And if we could please publish that for the jury.
19        Do you recognize this document?
20   A    Yes, sir, I do.
21   Q    What is this document?
22   A    This is subscriber information provided by Metro PCS for
23   telephone number (818) 471-2618.
24   Q    Who is that number subscribed to?
25   A    Subscribed to a Jorge Huerta.
```

1   Q     Did you ever ask the phone company for subscriber

2   information for defendant's phone?

3   A     Yes, sir, I did.

4   Q     What happened?

5   A     It was provided service through a subsidiary, and Verizon

6   Wireless did not have any subscriber information available.

7   Q     I would like you now to take a look at what's been

8   previously introduced as Government Exhibit 407.

9         Thank you for publishing that.

10        What are we looking at here?

11  A     This is an excerpt of toll records from the defendant's

12  -3398 phone on September 25th, 2013.

13  Q     And what's the first call we see on there up at the top?

14  A     There's an outgoing telephone call from Yader Gutierrez to

15  the defendant at approximately 3:22 P.M.

16  Q     If we could highlight that row, please.

17        Why is it that looking at that pop-out box -- I see right

18  here -- why does it say 15:22?

19  A     Because it's military time, which is a 24-hour clock.

20  Q     So in civilian time that's what time?

21  A     It's 3:22.  Anything after 12 you just subtract 12.  So 13

22  would be 1:00.  14 would be 2:00 and so forth.

23  Q     What are these three calls that we see highlighted in

24  green?

25  A     There's an outgoing telephone call at 3:22 to defendant,

1    and there's also an additional one that did not connect at

2    3:24.  And at 3:54 there is a third outgoing telephone call

3    from defendant -- I'm sorry from Yader Gutierrez, the

4    confidential source, to the defendant.

5    Q    So after these two calls that connected between the

6    defendant and the confidential source, Yader Gutierrez, what's

7    this call highlighted in orange down at the bottom of the

8    chart?

9    A    That is a telephone call between defendant's -3398 and

10   Jorge Huerta's (818) 471-2618 telephone number.

11   Q    Did the defendant call Jorge Huerta, or did Jorge Huerta

12   call him?

13   A    No, Jorge Huerta called the defendant, Vilavazo.

14   Q    If you could please take a look at what's been marked as

15   Government Exhibit 104-A that was previously admitted.

16   A    Okay, sir.

17   Q    What is Government Exhibit 104-A?

18   A    This is a transcription of text messages between the

19   confidential source, Yader Gutierrez, and Jorge Huerta, who is

20   labeled as "el contacto," or the contact.

21   Q    Are these texts before or after the call to Jorge Huerta?

22   A    They are after.

23   Q    How do you know these texts are between Jorge Huerta and

24   Yader Gutierrez?

25   A    Because I examined toll records for Yader Gutierrez and

1    Jorge Huerta, and I corroborated the times.

2    Q    And in this text message exchange, which one is Jorge

3    Huerta, and which one is Yader Gutierrez?

4    A    Jorge Huerta is the one that's listed as the contact, and

5    the text messages in white are the confidential source, Yader

6    Gutierrez.

7    Q    Does Mr. Gutierrez ask Mr. Huerta anything in these text

8    messages?

9    A    Yes, sir.  He -- Yader Gutierrez was wondering how much it

10   was going to cost for it.

11   Q    Did they discuss quantity?

12   A    Yes, sir.  The confidential source mentions that he is

13   going to want an ounce and a half.

14   Q    Does Jorge Huerta quote the confidential source a price?

15   A    Yes, sir.  He indicates a price of $600 per ounce of

16   methamphetamine.

17   Q    If you could please turn your attention to what's been

18   previously admitted as Government Exhibit 408.

19   A    Yes, sir.

20   Q    Whose phone are these tolls from?

21   A    These are derived from Yader Gutierrez's toll records, the

22   confidential source, on September 25th, 2013.

23   Q    And what does this exhibit show us?

24   A    This shows telephonic contact between Yader Gutierrez and

25   Jorge Huerta, who at the time was using (818) 471-2618.

1    Q     Do the text messages on these toll records match up with

2    the text messages that we just saw?

3    A     Yes, sir.  All the items highlighted in yellow with the

4    "D" next to them are text messages, and those correspond.

5    Q     What does that tell us?

6    A     That tells us that the pictures of the text messages that

7    Yader Gutierrez showed me on the cell phone were, in fact,

8    between himself and Jorge Huerta, the user of -2618.

9    Q     If we could please turn next to what's been previously

10   admitted as Government Exhibit 407.

11         If we could go ahead and publish.

12         Thank you very much.

13         What does Exhibit 409 show?

14   A     This is an excerpt from the toll records of Jorge Huerta's

15   toll records, and it shows a contact between Jorge Huerta and

16   the defendant.  And then immediately thereafter, Jorge Huerta

17   makes an outgoing telephone call to Yader Gutierrez, the

18   confidential source.

19              MR. AZAT:  If we could please highlight all three of

20   those calls in one window.

21         Thank you.

22   Q     Here we see what looks to be military time again.  So

23   which call is at the top of these rows in orange?

24   A     There is an outgoing telephone call from Jorge Huerta to

25   the defendant at approximately 4:58 P.M.

```
 1   Q      How long does that phone call last?

 2   A      It lasts a minute and 59 seconds.

 3   Q      What time is the next call on here?

 4   A      The next call is at 5:00 and 53 seconds, and it's a call

 5   to -- from Jorge Huerta to Yader Gutierrez.

 6   Q      What does that timing tell us?

 7   A      That timing tells us that immediately after speaking with

 8   Defendant Vilavazo, Jorge Huerta called Yader Gutierrez.

 9   Q      And what about this second call we see highlighted in

10   green?

11   A      That's a second attempt by Jorge Huerta to contact the

12   confidential source.  It was not answered.

13   Q      What time was that call?

14   A      That was at 5:16 P.M.

15   Q      I would like to now direct your attention to the next day,

16   September 26, 2013.

17          Did you review toll records for Yader Gutierrez's phone

18   for that day?

19   A      Yes, sir, I did.

20   Q      I would like you to please take a look at what was

21   previously admitted, United States Exhibit 410.

22          If we could please publish that.

23          Thank you.

24   A      Okay, sir.

25   Q      What is the first call we see on here?
```

**UNITED STATES DISTRICT COURT**

```
 1   A    It is an outgoing telephone call from Yader Gutierrez, as
 2   these are his toll records, to Defendant Vilavazo, at 4:52 P.M.
 3            MR. AZAT:  If you could please move the box down a
 4   little bit, please.
 5        Thank you very much.
 6   Q    What is this exhibit depicting?
 7   A    It shows attempts by Yader Gutierrez to contact the
 8   Defendant Vilavazo on September 26, 2013, and eventually the
 9   two made contact at approximately 6:08 P.M., listed as 18:08 on
10   these toll records.
11   Q    What happens after that first call at 4:52?
12   A    Yader Gutierrez sent a text message to Defendant Vilavazo.
13   Q    What time was that text message?
14   A    It was at 4:54 P.M.
15   Q    What happened after the text message at 4:54?
16   A    Yader Gutierrez again attempted to call the defendant,
17   Vilavazo.
18   Q    Did you instruct Yader Gutierrez to make these calls?
19   A    Yes, sir.
20   Q    Did Mr. Gutierrez show you anything on September 26th?
21   A    Yes, sir.  He showed me his black smart phone.
22   Q    Was there anything on that smart phone?
23   A    Yes, sir.  There were text messages that he sent to the
24   defendant as well as to Jorge Huerta.
25   Q    Before we move on, I would just like you to tell me how
```

1  many different times did Yader Gutierrez try to call the

2  defendant on September 26 and was unable to get ahold of him?

3  A    With respect to calls, there was three calls before he

4  finally was able to get in contact with him at 6:08.

5  Q    Let's take a look at what's been previously admitted as

6  United States Exhibit 105-A.

7  A    Okay.  Sir.

8  Q    What is this exhibit?

9  A    This is a translation or transcription of text messages

10 which took place between Yader Gutierrez and the defendant on

11 September 26, 2013.

12 Q    What was going on in these text messages?

13 A    Yader Gutierrez was attempting to contact Defendant

14 Vilavazo, so the first text message at 4:54 P.M.

15 Q    And what time is the second text message?

16 A    5:54 P.M.

17 Q    Did you see Yader Gutierrez attempt to call Jorge Huerta

18 on September 26?

19 A    Yes, sir, I did.

20 Q    How do you know he was trying to call Jorge Huerta?

21 A    Because I was there with him when he attempted to make

22 these telephone calls, and I listened to the message that

23 played on the phone.

24 Q    Did you hear him have a conversation?

25 A    No, sir.  The number appears to have been disconnected.

1    Q    I would like to direct your attention to what's been

2    previously admitted as United States Exhibit 411.

3    A    Okay.  Sir.

4    Q    There's two calls up at the top.  What are these two

5    calls?

6    A    It's a telephone call at 4:52 and 5:00, from Yader

7    Gutierrez to the defendant.

8    Q    Are these the same two calls you saw him try to make?

9    A    Yes, sir.

10   Q    What's the next call right here?

11   A    That's another call at 5:17 P.M., from Yader Gutierrez to

12   the defendant.

13   Q    Did Yader Gutierrez eventually get ahold of the defendant

14   on September 26?

15   A    Yes, sir.  At approximately 6:08 P.M., the defendant

16   contacted Yader Gutierrez at (818) 602-1716.

17   Q    And there is another call that's highlighted in gray after

18   the call at -- well, excuse me.

19        If we could go back, push that screen back a little bit.

20        Why are these calls here denoted in Pacific Standard Time?

21   A    That is a box to indicate the time that the telephone

22   calls took place on Pacific Standard Time with respect to

23   Verizon toll records and toll records in general.  The time

24   zone of the call is for an outgoing telephone call is reflected

25   as the time zone with which the phone is currently located in

**UNITED STATES DISTRICT COURT**

1  when it makes the telephone call.  So at the time where there

2  is a Pacific Standard Time box, there is an outgoing telephone

3  call, you can see that for the 18:08 call, it shows 19:08, and

4  that's because the phone was actually located in the Mountain

5  Standard Time.

6  Q    Whose phone was located in Mountain Standard Time?

7  A    Yader Gutierrez -- excuse me, Defendant Vilavazo's phone

8  was located in Mountain Standard Time.

9  Q    After Yader Gutierrez got ahold of the defendant at 6:08

10  P.M., what happened next?

11  A    Defendant attempted to contact Jorge Huerta at (818)

12  471-2618.

13  Q    What color is that call depicted in?

14  A    It's in gray.

15  Q    After the call in gray, there appears to be one, two,

16  three, four, five, six, seven calls depicted in green?

17  A    Yes, sir.

18  Q    Who were those calls between?

19  A    Those calls were from the defendant to telephone number

20  (818) 915-7044.

21  Q    Is that the number that the defendant called -- did the

22  defendant call anybody else in between attempting to call Jorge

23  Huerta before calling -7044?

24  A    No.

25  Q    Do you know who that telephone number belongs to?

**UNITED STATES DISTRICT COURT**

1    A    I know who it's subscribed to, yes, sir.

2    Q    I would like you to take a look at what's been previously

3    admitted as United States Exhibit 803.

4    A    Yes, sir.

5    Q    Who's that phone subscribed to?

6    A    It's subscribed to a Rosalva Gutierrez.

7    Q    What is, according to this record, Rosalva Gutierrez's

8    address?

9    A    It is 11461 Oxnard Street, North Hollywood, California.

10   Q    Do you recognize that address?

11   A    Yes, sir, I do.

12   Q    Is that the same address that's on the defendant's DMV

13   records?

14   A    Yes, sir, it is.

15   Q    I would like you next to take a look at what's been marked

16   as United States Exhibit 705.  It's also been previously

17   admitted into evidence.

18        What is Exhibit 705?

19   A    This is a certified California Department of Motor

20   Vehicles driver's license information for a Rosalba Gutierrez.

21   Q    And what's the address on this record?

22   A    11461 Oxnard Street, North Hollywood, California.

23   Q    Next I want to take a look at what's been previously

24   admitted as Exhibit 912.

25   A    Yes, sir.

```
 1   Q    This is the wrong version.
 2        I apologize, Your Honor.  That is not Exhibit 912.
 3            THE COURT:  All right.
 4            MR. AZAT:  I will go ahead and get that up for you
 5   sir, if I could.
 6   Q    Hopefully the version you have up in front of you,
 7   Special Agent Alker, is not redacted.
 8   A    No, sir, it's not.
 9            MR. AZAT:  I appreciate the jury's patience and the
10   Court's patience.
11   Q    Do you know what this exhibit is?
12   A    Yes, sir, I do.  It's a certified certificate of marriage
13   for the County of Los Angeles.
14   Q    Who is the groom?
15   A    The groom is Jorge Huerta.
16   Q    Who did Jorge Huerta marry?
17   A    He married Jenny Ruiz.
18   Q    And who is -- what is the full birth name of the bride,
19   according to this document?
20   A    The bride is Jenny Gutierrez.
21   Q    The full -- excuse me.  The birth name -- the mother of
22   the bride, I'm sorry?
23   A    Rosalva Gutierrez.
24   Q    What does that make Rosalva Gutierrez to Jorge Huerta?
25   A    His mother-in-law.
```

**UNITED STATES DISTRICT COURT**

1    Q    I would like to go back to Exhibit 411, if we can, please.

2         What time was the last call made between defendant and

3    Rosalva Gutierrez?

4    A    6:55 P.M.

5    Q    Pacific Standard Time?

6    A    Yes, sir, Pacific Standard.

7    Q    Next, if we could please take a look at Exhibit 412.

8    A    Yes, sir.

9    Q    What is this exhibit?

10   A    This is an excerpt from the toll records for Yader

11   Gutierrez's phone.

12   Q    Who is the text to that that's highlighted in yellow?

13   A    That was a text message from Yader Gutierrez to Jorge

14   Huerta's old cellular telephone number (818) 471-2618.

15   Q    When you say "old cellular phone," do you mean the number

16   that was disconnected?

17   A    Yes, sir.

18   Q    And what time is the first call in between here on this

19   exhibit?

20   A    There is an incoming call at 6:59 P.M., from (818)

21   720-7725 to the confidential source.

22   Q    Is that call before or after the last call on this day

23   between Defendant and Jorge Huerta's mother-in-law?

24   A    After.

25   Q    Who did you say called who in this exhibit?

**UNITED STATES DISTRICT COURT**

```
 1   A     (818) 720-7725 called the confidential source.

 2   Q     Did you obtain -- do you know who the number ending in

 3   -7725 belongs to?

 4   A     I know who the billing information is for.

 5               MR. AZAT:  We can clear out of that, please.

 6   Q     I wanted to put this exhibit up because I think the

 7   previous exhibit didn't identify the correct number.

 8         The correct number that these calls were between was what

 9   number again, Special Agent Alker?

10   A     It's between Yader Gutierrez's phone and (818) 720-7725.

11   Q     Thank you.

12         So you said you did obtain subscriber information for

13   -7725?

14   A     Yes, sir, I did.

15   Q     Would you please take a look at Exhibit 806, been

16   previously admitted, and take a look at page 2 of that exhibit.

17         What is this exhibit?

18   A     This is the account information for (818) 720-7725

19   provided by Sprint.

20   Q     And according to this account information for -7725, who

21   is the billing address to on this phone?

22   A     It's to Jenny Ruiz.

23   Q     What is Jenny Ruiz's relation to Jorge Huerta?

24   A     She's his wife.

25   Q     I would like you next to please take a look at Exhibit
```

1    704, which has been previously admitted.

2        What is this document?

3    A    This is a Trulincs report.

4    Q    What is a Trulincs report, Special Agent Alker?

5    A    Well, the Trulincs system is part of the Bureau of Prisons

6    telecommunications system, and this screen shot here shows the

7    name, telephone number, e-mail address and relationship with

8    respect to certain people that the defendant is able to be in

9    contact with while he is housed with the Bureau of Prisons.

10   Q    Does the defendant provide this information to the Bureau

11   of Prisons?

12   A    Yes, sir.

13   Q    Does that number (818) 915-7044 show up?

14   A    Yes, sir, it does.

15   Q    And this is the number the defendant called how many times

16   after trying to get ahold of Jorge Huerta?

17   A    Seven times, sir.

18   Q    And who is that number associated with on this document?

19   A    It says Maria Vilavazo, and defendant listed Maria

20   Vilavazo as a parent.

21   Q    I would like you to please next take a look at what's been

22   marked as United States Exhibit 706, which has been previously

23   introduced.

24       What is Exhibit 706, Agent Alker?

25   A    This is a certified California Department of Motor

```
 1    Vehicles senior citizen ID information for Maria de Los Angeles
 2    Vilavazo.
 3    Q    And what is Mrs. Vilavazo's address according to this
 4    document?
 5    A    11461 Oxnard Street, North Hollywood, California.
 6    Q    Is that also the address of Rosalva Gutierrez, who is
 7    Jorge Huerta's mother-in-law?
 8    A    Yes, sir, it is.
 9    Q    I would like you next please take a look at United States
10    Exhibit 414, which has not been introduced yet.
11         What is Exhibit 414?
12    A    This is a call frequency report showing the number of
13    times that the defendant called two separate telephone numbers
14    between July 1st, 2013 and October 7th, 2013.
15    Q    Did you create this exhibit?
16    A    Yes, sir, I did.
17    Q    Did you create it from toll records that you obtained in
18    this case?
19    A    Yes, sir.
20         MR. AZAT:  Your Honor, the United States would
21    request to admit Exhibit 414 into evidence.
22         THE COURT:  If there be no objection, it will come
23    in.
24         (Exhibit 414 received.)
25         MR. AZAT:  With the Court's permission, I would like
```

**UNITED STATES DISTRICT COURT**

```
 1   to publish, please, Your Honor.
 2              THE COURT:  Go right ahead.
 3   BY MR. AZAT:
 4   Q    Here's that -7044 number that we have been talking about.
 5   How many times between July 1st and October 7th did the
 6   defendant call that -7044 number?
 7   A    45 times.
 8   Q    And how about this number, who did the defendant call 234
 9   times?
10   A    He called (310) 529-0607.
11   Q    Do you know who that number belongs to?
12   A    I know who it's subscribed to, yes, sir.
13   Q    I would like to take a look back at Exhibit 704 that we
14   were just discussing that's already been admitted.
15        Is that -0607 number that the defendant called over 230
16   times listed on this record?
17   A    Yes, sir, it is.  It's listed as Suzy Alvarez, and it's
18   listed as a spouse, with the corresponding e-mail address of
19   azucenamada@yahoo.com.
20   Q    Do you have any doubt that -3398 is Defendant's phone?
21   A    No, sir.
22   Q    We just talked a lot about toll records that were
23   associated with calls made on September 25th and September
24   26th.  What else happened on September 26?
25   A    The confidential source, Yader Gutierrez, obtained
```

1   approximately two ounces of methamphetamine from Jorge Huerta.

2   Q     Direct your attention to that evening, September 26, at

3   approximately 7:30 P.M.  What were you doing at that time?

4   A     I was meeting with Yader Gutierrez in preparation for a

5   controlled narcotics purchase.

6   Q     And were you preparing for that purchase?

7   A     I was searching Yader Gutierrez's person as well as his

8   vehicle to see if there were any additional narcotics or monies

9   present.  And I gave Yader Gutierrez $1100 in order to make a

10  controlled narcotics purchase.

11  Q     When did Yader Gutierrez leave your sight?

12  A     Shortly after 7:30.

13  Q     When did he return to your sight?

14  A     At approximately 45 minutes later.

15  Q     What happened when he returned 45 minutes later?

16  A     He had two -- he had a clear plastic baggie of -- that

17  contained a white crystalline substance, consistent with the

18  presence of methamphetamine.

19          THE COURT:  Who is "he"?

20          THE WITNESS:  Yader Gutierrez, sir.

21  BY MR. AZAT:

22  Q     Did you obtain an audio recording from Yader Gutierrez

23  when he returned with the methamphetamine?

24  A     Yes, sir, I did.

25  Q     Was there a meeting captured on that auto recording?

UNITED STATES DISTRICT COURT

```
 1   A      Yes, sir, there was.

 2   Q      Did you understand what they were saying in that meeting?

 3   A      No, sir.

 4   Q      And why is that?

 5   A      The conversation was taking place in Spanish.

 6          THE COURT:  Let's take an afternoon recess at this

 7   time.  Let's take 15 minutes, ladies and gentlemen.

 8       Everyone, please rise for the jury.

 9       And you may step down, Agent.

10          THE WITNESS:  Thank you.

11       (Out of the presence of the jury.)

12          THE COURT:  We are outside the presence of the jury.

13       Are there any matters that counsel wish to raise.

14          MS. JAIMEZ:  Not from the Government, Your Honor.

15          MR. NAVARRO:  No, Your Honor.

16          THE COURT:  All right.  We will take 15 minutes.

17       (Recess taken from 3:39 P.M. to 4:08 P.M.)

18       (Out of the presence of the jury.)

19          THE COURTROOM DEPUTY:  Please remain seated and come

20   to order.  This court is once again in session.

21          THE COURT:  We are once more outside the presence of

22   the jury.

23       Are there any matters that any counsel wish to take up?

24          MS. JAIMEZ:  Not from the Government, Your Honor.

25          MR. NAVARRO:  No, Your Honor.
```

**UNITED STATES DISTRICT COURT**

```
 1            THE COURT:  Okay.  We will bring the jury in.
 2            THE COURTROOM DEPUTY:  The witness will be back on
 3  the stand.
 4       Please rise.
 5       (In the presence of the jury.)
 6            THE COURT:  Please be seated, ladies and gentlemen.
 7  You almost got it in the right order that time.  By tomorrow
 8  you'll be perfect.
 9       Agent Alker, will you repeat your full name for the
10  record, and spell your last name, please.
11            THE WITNESS:  Yes, sir.  It's Michael Edward Alker,
12  the last name A-l-k-e-r.
13            THE COURT:  And you understand you are still under
14  oath in this matter?
15            THE WITNESS:  Yes, sir.
16            THE COURT:  You may proceed.
17            MR. AZAT:  Thank you, Your Honor.
18  Q    Agent Alker, before the break we were talking about how on
19  the evening of September 26, Yader Gutierrez returned from a
20  controlled narcotics purchase with methamphetamine, and he also
21  returned with an audio recording.
22       And at this time, Your Honor, if I may, I just want to
23  ensure that the audio recording, which the translation of which
24  is 101-A, was, in fact, admitted when we previously read into
25  the stipulation regarding those translations.
```

```
 1              THE COURT:  Ms. Skipper, did you show it to me?
 2        I think I did.
 3              THE COURTROOM DEPUTY:  Yes.
 4              THE COURT:  Yes.
 5              MR. AZAT:  Thank you, Your Honor.
 6        In addition to that, before the break we talked a little
 7   bit about Exhibit 201, which is the physical evidence in this
 8   case, the methamphetamine.  I want to ensure that that, as well
 9   as Exhibit 201-A, has also been admitted into evidence,
10   Your Honor, pursuant to the stipulation.
11              THE COURT:  I don't show it yet.  The photograph
12   or --
13              MR. AZAT:  The photograph and the physical evidence.
14              THE COURT:  Both being offered?
15              MR. AZAT:  Yes, Your Honor.
16              THE COURT:  All right.  There being no opposition,
17   it will come in.  It will come in.
18        (Exhibit 201-A received.)
19              THE COURT:  Tell us which exhibit this is.
20              MR. AZAT:  I'm sorry, Your Honor.  This is Exhibit
21   201-A.
22   Q    Special Agent Alker, do you recognize Exhibit 201-A?
23   A    Yes.
24   Q    What is this exhibit?
25   A    That is a photograph I took of two clear plastic baggies
```

1    containing a white crystalline substance consistent with

2    methamphetamine that Yader Gutierrez returned from a controlled

3    narcotics purchase from -- on September 26, 2013.

4    Q    And when Yader Gutierrez left, there were other agents

5    there that evening; is that correct?

6    A    Yes, sir.  He was under constant surveillance from the

7    time he left until the time he came back.

8              THE COURT:  Don't ask your witness is something

9    correct.  It indicates that you're leading.

10              MR. AZAT:  Thank you, Your Honor.  I will refrain

11    from doing so.

12              THE COURT:  Uh-huh.

13              MR. AZAT:  And also, Your Honor, I want to ensure

14    that the stipulation itself was, Exhibit 915, admitted into

15    evidence.

16              THE COURT:  Yes, it has been.

17              MR. AZAT:  Thank you, Your Honor.

18    Q    Special Agent Alker, if you could look at what's been

19    previously admitted, Exhibit 914.

20         With the Court's permission, I would like to publish.

21              THE COURT:  Go right ahead.

22              THE WITNESS:  Yes, sir.

23    BY MR. AZAT:

24    Q    Do you recognize the man in this photograph?

25    A    Yes, sir, I do.

**UNITED STATES DISTRICT COURT**

1    Q    Who is he?

2    A    That is Jorge Huerta.

3    Q    Defendant's nephew?

4    A    The defendant's nephew, yes, sir.

5    Q    Where have you seen him before?

6    A    I have seen him driving a white Chrysler 300.  That was

7    the same type of vehicle observed during the controlled

8    narcotics purchase on September 26, 2013.

9    Q    Who is that white Chrysler registered to?

10   A    It's registered to a Samuel Lopez.

11   Q    I would like you to take a look at what's been previously

12   admitted, 902.  It's in the larger exhibit binder.  Sorry about

13   that.

14   A    Yes, sir.

15   Q    What is Exhibit 902?

16   A    This is certified DMV information for the vehicle

17   registration for a white Chrysler 300.

18   Q    Is that the vehicle you saw defendant's nephew driving,

19   Jorge Huerta?

20   A    Yes, sir, it is.

21        MR. AZAT:  Your Honor, the United States would like

22   to offer Exhibit 902 into evidence under Federal Rule of

23   Evidence 9024 as a certified public record.

24        THE COURT:  If there being no opposition, it will

25   come in.

```
 1          (Exhibit 902 received.)
 2               MR. AZAT:  May I publish, Your Honor?
 3               THE COURT:  Go right ahead.
 4               MR. AZAT:  Thank you, Your Honor.
 5   Q    Who does it say this car is registered to, you said?
 6   A    Samuel Lopez, the bottom vehicle.
 7   Q    Are you aware of other vehicles registered to the
 8   defendant's nephew?
 9   A    Yes, sir.  There is a Ford Explorer bearing California
10   license plate 6ESB079, and that vehicle was actually
11   co-registered in the name of both Sam Lopez, as well as Jorge
12   Huerta.
13   Q    Is that why we see it here?  Is this the vehicle you are
14   talking about?
15   A    Yes, sir.
16   Q    Is that the license plate number for the vehicle?
17   A    Yes, sir, it is.
18   Q    Flip over to Exhibit 919, please, page 2.
19        What is Exhibit 919?
20   A    This is certified vehicle registration information for a
21   Ford Explorer, bearing California license plate 6ESB709, in the
22   name of Sam Lopez or Jorge Huerta.
23               MR. AZAT:  Your Honor, the United States would ask
24   to admit Exhibit 919 into evidence under Federal Rule of
25   Evidence 9024.
```

1          THE COURT:  It will come in.

2      (Exhibit 919 received.)

3          MR. AZAT:  Permission to publish.

4          THE COURT:  Go right ahead.

5  BY MR. AZAT:

6  Q     Who is this vehicle registered to?

7  A     Samuel Lopez or Jorge Huerta.

8  Q     Have you seen this Ford 2002 -- looks like a sport utility

9  vehicle -- before?

10  A     Yes, sir, I have.

11  Q     Where have you seen it?

12  A     I saw it at 11461 Oxnard Street, North Hollywood,

13  California.

14  Q     After Yader Gutierrez returned with the methamphetamine on

15  September 26th, was he shown a photograph?

16  A     Yes, sir, he was.

17  Q     Who was he shown a photograph of?

18  A     He was shown a photograph of a Samuel Lopez.

19  Q     Who showed him that photograph?

20  A     I was present when it took place.  The L.A.P.D. officer

21  that showed it to him, I don't recall exactly who it was.

22  Q     Did you see that photograph?

23  A     Yes, sir, I did.

24  Q     Do you know if Sam Lopez looks to be about the same age as

25  Jorge Huerta?

1   A      Yes, sir, he does.

2   Q      Are they both Hispanic?

3   A      Yes, sir.

4   Q      Did Mr. Gutierrez -- did Yader Gutierrez incorrectly

5   identify that as a photograph of Jorge Huerta?

6   A      Yes, sir, he did.

7   Q      How long was Yader Gutierrez out of your sight before he

8   came back?

9   A      Approximately 45 minutes.

10  Q      Why was Yader Gutierrez shown a photograph of Sam Lopez

11  instead of Jorge Huerta?

12  A      Because the vehicle that Jorge Huerta was driving was

13  registered to a Sam Lopez.

14  Q      I would like you to take a look at Exhibit 304.

15        It is not an exhibit I will publish to the jury at this

16  time.  It will be admitted later, Your Honor.

17        But I would just ask Special Agent Alker, if you can tell

18  me if this is the car you saw defendant's nephew, Jorge Huerta,

19  driving in the photograph?

20  A      That is the same make and model of the vehicle.

21  Q      What kind of car is that?

22  A      White Chrysler 300M.

23              THE COURT:  We are not going to go into it.

24              MR. AZAT:  No.

25              THE COURT:  You are not offering it?

1          MR. AZAT:  That will be all, Your Honor.

2    Q    I would like to now direct your attention to October 7th,

3    2013.  Did you meet with Yader Gutierrez that day?

4    A    Yes, sir, I did.

5    Q    Did you observe Yader Gutierrez make any calls on October

6    7th?

7    A    Yes, sir.

8    Q    Do you know who he called?

9    A    Yes, sir.  He called the defendant.

10   Q    Did you review toll records for those calls?

11   A    Yes, sir, I did.

12   Q    I would like you to quickly take a look at what's been

13   previously admitted as Exhibit 413.

14        Go ahead and publish?

15        What does Exhibit 413 represent?

16   A    This is an excerpt of toll records from the defendant's

17   cellular telephone for October 7th, 2013.

18   Q    And do these -- are these two calls depicted on this toll

19   record excerpt, the calls that you saw Yader Gutierrez make on

20   October 7th?

21   A    Yes, sir.  He made one call and received a call.

22          MR. AZAT:  No further questions, Your Honor.

23          THE COURT:  Cross-examination, Mr. Navarro?

24          MR. NAVARRO:  Yes, Your Honor.

25        Can I have just one second?

```
 1              THE COURT:  Of course.  Take your time.
 2              MR. NAVARRO:  Thank you, Your Honor.
 3              THE COURT:  Surely.
 4         (Pause in proceedings.)
 5                      CROSS-EXAMINATION
 6    BY MR. NAVARRO:
 7    Q    Good afternoon, sir.
 8    A    Good afternoon, sir.
 9    Q    You testified that Yader Gutierrez became a confidential
10    informant for the FBI, would have been -- was it September of
11    2013?
12    A    Yes, sir.
13    Q    Now, prior to him becoming a confidential informant for
14    the FBI, there was a process that goes with the FBI, correct?
15    A    Yes, sir.
16    Q    It's called a vetting process?
17    A    A validation process.
18    Q    And what typically does a validation process involve?
19    A    It involves running the person's criminal history to see
20    if they have any prior criminal convictions.  It also involves
21    speaking with them and attempting to see how truthful they are
22    based upon the information that they provide.  Other steps can
23    be taken as well.
24    Q    And were you the agent in charge -- were you the handler
25    of Mr. Gutierrez, of Yader Gutierrez?
```

**UNITED STATES DISTRICT COURT**

1    A      Yes, sir.

2    Q      Now, you've testified that you don't speak Spanish, and he

3    doesn't speak English, correct?

4    A      He speaks a little bit of English.

5    Q      So did you communicate with him through other officers or

6    through an interpreter?

7    A      Through other officers who spoke Spanish.

8    Q      And were these L.A.P.D. officers or FBI agents?

9    A      I met with him with both L.A.P.D. and FBI agents.

10   Q      So would it be a correct statement that every time you met

11   with Yader Gutierrez you needed an interpreter?

12          THE COURT:  No.  Just a minute.  Don't make a

13   statement correct or otherwise.  Just ask a question.

14   BY MR. NAVARRO:

15   Q      When you were meeting with Mr. Yader Gutierrez as you were

16   doing the vetting process, did you meet with him alone, or were

17   there always somebody else present?

18   A      There was somebody else present.

19   Q      And that was because he spoke Spanish and you spoke

20   English, correct?

21   A      Correct.

22   Q      And you testified on your direct -- excuse me.  Let me

23   strike that.

24          You were present when Mr. Yader Gutierrez made the phone

25   calls beginning on September of 2013, correct?

1    A    Yes, sir.

2    Q    And you were not present when he made the initial set of

3    texts on September 19th of 2013, correct, "he" being Yader

4    Gutierrez?

5    A    Could you be more specific?

6    Q    I believe that you were shown Exhibit 101-A, which had a

7    number of texts between Yader Gutierrez and Ismael Gutierrez.

8    I believe that's 101-A.  Do you have that in front of you?  I

9    don't know which of the two notebooks it's in.  Sorry.

10   A    Yes.

11   Q    Now, Exhibit 101-A which has been previously admitted,

12   that's a translation of Spanish language text, correct?

13   A    Yes, sir.

14            MR. NAVARRO:  And if I may show it to the jury,

15   Your Honor.

16            THE COURT:  Of course.

17   BY MR. NAVARRO:

18   Q    Beginning at the top, Mr. Yader Gutierrez says, "What's

19   up, Maky?  It's me.  Are you busy?  Call me."  Correct?

20   A    Yes, sir.

21   Q    And that text was sent on September 19th of 2013, at 10:01

22   A.M., correct?

23   A    Yes, sir.

24   Q    Now, you were not present when that text was sent,

25   correct?

1   A    This specific text, I can't recall if I was still there or

2   I had departed already.

3   Q    I believe you had testified that you left, and he showed

4   you a text from the following day, correct?

5   A    He did show me a text the following day.  This specific

6   text message, I am not sure if I was still with him when he

7   made it.

8   Q    Now, did the informant show you other texts before

9   September 19th of 2013, that he had sent to Mr. Ismael

10  Gutierrez?

11  A    No, he didn't.

12  Q    And the following text here, this is from Maky.  It says

13  "I call you, and you never answer."  That's what it says,

14  correct?

15  A    Yes, sir.

16  Q    That was about two hours later, correct?

17  A    Yes, sir.

18  Q    And then Yader Gutierrez sends him a second text which

19  says, "You don't even answer.  Hey, I need some of what I told

20  you about last time."  That's what the text says, correct?

21  A    Yes, sir.

22  Q    That was 11:58 A.M., one minute after Ismael Gutierrez

23  sent a text to Yader Gutierrez, correct?

24  A    Yes, sir.

25  Q    And then Ismael Gutierrez responds, "I was sleeping.  I am

1    just getting up."

2    A     Yes, sir.

3    Q     Did he say anything about -- did he answer the question?

4    That's my question.  Did he answer that question that was

5    asked, "I need some of what you told me about last time"?

6    A     No, sir, he did not answer the question.

7    Q     And then Yader Gutierrez sends a text at 11:59 that says

8    "I don't have work, and I want to see if I can do something."

9    That was the text that he sent, correct?

10   A     Yes, sir.  My translation says "I want to see if there is

11   something."

12   Q     Pardon me?

13   A     The binder I have in front of me says "I want to see if

14   there is something."

15         MR. NAVARRO:  I believe, Your Honor, he may have the

16   wrong exhibit.

17         THE COURT:  What's the exhibit number again?

18         MR. NAVARRO:  There was some wording, Your Honor,

19   that had to be changed.  Your Honor, I am going to enlist some

20   help from the Government to fix this one here.

21         (Pause in proceedings.)

22   BY MR. NAVARRO:

23   Q     Do you see that screen in front of you?

24   A     Yes, sir.

25   Q     At the text on the bottom of the page that was sent by

```
 1    Yader Gutierrez, it says "I don't have work, and I want to see
 2    if I can do something," correct?
 3    A    Yes, sir.
 4    Q    That's the one that's been admitted for the trial in this
 5    case.  Okay?
 6    A    Yes, sir.
 7    Q    Now, there were additional texts sent that same day, and I
 8    believe those have been previously admitted as well.  And the
 9    first text, and I believe it's still part of 101-A, from Maky,
10    it says "I'll call you in an hour.  Where are you?"  Do you see
11    that one?
12    A    Yes, sir, I do.
13    Q    And then the informant says here, "At home doing nothing,"
14    correct?
15    A    Yes, sir.
16    Q    And then Maky says again, "I will call you later.  I am
17    just waking up."
18    A    Yes, sir.
19    Q    Then there's one final text on that day, and that one says
20    "Okay."  Then that came from the informant, correct?
21    A    Yes, sir.
22    Q    Now, the bottom two texts were not sent that day, correct?
23    A    They were sent that day.
24    Q    They were sent that day?
25    A    I believe so, sir.
```

1    Q     Well, we will get back to those.

2          Now, on September 25th, which was six days later, the

3    informant called Ismael Gutierrez, correct?

4    A     Yes, sir.

5    Q     And when he made this phone call, was he at the Mission

6    station?

7    A     I don't remember exactly where we were.  I believe it was

8    at the Mission station, or we were in a parking lot nearby.

9    Q     And who was present when he made that call?

10   A     I was present, and there was some additional people that

11   were present.  I believe Detective Efrain Gutierrez was there

12   as well.

13   Q     And this was a recorded call that was made at your

14   direction, correct?

15   A     Yes, sir.

16   Q     Now, prior to making the phone call, was Mr. Yader

17   Gutierrez prepped as to what to inquire about, what to ask

18   about?

19   A     Yes, sir.

20   Q     And what was he told?

21   A     We were talking about basically finding out about the

22   narcotics contact.

23   Q     He was told to call Ismael Gutierrez to inquire about a

24   drug deal?

25   A     Yes.

1    Q    And he was told to try to elicit information which would

2    later be used in a criminal case dealing with Mr. Ismael

3    Gutierrez, correct?

4    A    Repeat the question.

5    Q    Sure.  When Yader Gutierrez makes the call on September

6    25th of 2013, at about 3:22 P.M., under your direction --

7    A    Yes, sir.

8    Q    -- he is calling Ismael Gutierrez, correct?

9    A    Yes, sir.

10   Q    And the nature of this call, there is an investigation

11   going on into a possible narcotics transaction, correct?

12   A    Yes, sir.

13   Q    And Yader Gutierrez is being instructed to try to obtain

14   information from Mr. Ismael Gutierrez on a possible drug deal,

15   correct?

16   A    We were actually trying to set up the drug deal with the

17   defendant.

18   Q    Right.

19        So the point is Yader Gutierrez will call Ismael

20   Gutierrez, and you are going to try to set up a drug deal with

21   him, correct?

22   A    Yes, sir.

23   Q    And you obviously reviewed the translation of that

24   recording, correct?

25   A    Yes, sir, I have.

1          MR. NAVARRO:  If I could have just one second,

2   Your Honor.

3          THE COURT:  Of course.  Take your time.

4   BY MR. NAVARRO:

5   Q    And during that conversation, Ismael Gutierrez tells the

6   informant that he had forgotten about it, correct?

7   A    I believe so, sir.

8   Q    And then that same day, September 25th, at about 3:53

9   P.M., at your direction the informant made a second call to

10  Ismael Gutierrez, correct?

11  A    Yes, sir.

12  Q    And again, this was a follow-up phone call to try to get a

13  drug deal in order, correct?

14  A    Yes, sir.

15  Q    Now, on the same day, September 25th, of 2013, after the

16  two phone calls to Mr. Ismael Gutierrez, the informant began

17  texting with Mr. Huerta, correct?

18  A    Yes, sir.  He received a telephone call, and then he began

19  texting.

20  Q    I believe it's Exhibit 104.

21         If I can have just one second, Your Honor.

22         THE COURT:  Of course.

23         MR. NAVARRO:  It's already been admitted.  It's

24  104-A.

25  Q    Do you have that in front of you?

UNITED STATES DISTRICT COURT

1  A     One moment, sir.

2  Q     Uh-huh.

3  A     Yes, sir.

4           MR. NAVARRO:  Now, if I may publish, Your Honor.

5           THE COURT:  Go ahead.

6  BY MR. NAVARRO:

7  Q     The very top text is from the contact.  That's Mr. Huerta,

8  correct?

9  A     Yes, sir.

10  Q     And it says "I'll be there like in ten minutes"?

11  A     Yes, sir.

12  Q     And then after that, the informant, in essence, asks him,

13  "I am going to want an ounce and a half."  Do you see that?

14  A     Yes, sir, I do.

15  Q     Now, were you present when he sent those texts?

16  A     No, sir.

17  Q     And the answer that he gets from the contact is "Okay.

18  Around what time?"  Correct?

19  A     That's the time he said he will get back.

20  Q     Okay.  And the very last text on that page from the

21  contact says, "I sell them for 600," correct?

22  A     Yes, sir.

23  Q     It doesn't say "We sell them for 600," correct?  It says

24  "I sell them for 600," correct?

25  A     Correct.

1    Q     And then on the second page, all we have is this one

2    additional text at the bottom, right?  That says "Okay,"

3    correct?

4    A     Yes, sir.

5    Q     The texts above are all incorporated in the prior page,

6    correct?

7    A     Yes, sir.

8    Q     Now, there was a document which was previously admitted.

9    I think it's Exhibit 405, if you can get that.  It's one of the

10   charts you prepared.

11   A     Yes, sir.

12            MR. NAVARRO:  Now, this has been previously

13   admitted, Your Honor.

14            THE COURT:  Yes.

15            MR. NAVARRO:  I am going to publish it.

16            THE COURT:  Go right ahead.

17   BY MR. NAVARRO:

18   Q     The top two items that are shaded in green, those are the

19   previously referenced phone calls made from Yader Gutierrez to

20   Ismael Gutierrez, correct?

21   A     Yes, sir.

22   Q     And the other 11 items in yellow are the exchanges and the

23   text messages back and forth, correct?

24   A     Yes, sir.

25   Q     And the bottom one, the bottom one in the green, that's an

```
 1   incoming call?

 2   A    Yes, sir.

 3   Q    Do you know if that call went through, can you tell?

 4   A    I can't tell.

 5   Q    And this is all from September 19th, correct?

 6   A    Yes, sir.

 7   Q    Now, we next have Exhibit 406, if you can get that one.

 8   A    Okay, sir.

 9   Q    Now, this is the two phone calls that we talked about

10   previously that were made on September 25th between the

11   informant and Ismael Gutierrez, correct?

12   A    Yes, sir.

13   Q    Now, these were phone calls that were made by the

14   informant, correct?

15   A    Yes, sir.

16   Q    And we can tell because they don't say "incoming," right?

17   They just say "Van Nuys" on them?

18   A    Yes, sir.

19   Q    And these were phone calls that were recorded, correct?

20   A    Yes, sir.

21   Q    Now, the next item that I am going to show you is 407, and

22   I believe these are --

23        Let me know when you have that.

24   A    I have it, sir.

25   Q    These are from September 25th, and these are phone calls
```

1  between Ismael Gutierrez and the informant, shaded in green,

2  correct?  There's three of those, correct?

3  A    Yes, sir.

4  Q    And who made those calls?

5  A    Yader Gutierrez made those telephone calls.

6  Q    So those were three phone calls that were made by the

7  informant to Ismael Gutierrez, correct?  Or am I wrong?

8  A    No, you're --

9  Q    I get confused with the Gutierrezes.  I'm sorry.

10  A    Yes, sir.  The calling party on all three is the

11  confidential source calling the defendant.  However, the call

12  at 15:24 never went through.

13  Q    So there was one that was just a dropped call?

14  A    Yes, sir.

15  Q    Two actual phone calls?

16  A    Yes, sir.

17  Q    Three altogether?

18  A    Yes, sir.

19  Q    And then there was a call made between Ismael Gutierrez

20  and Mr. Huerta, correct?

21  A    Yes, sir.

22  Q    Now, you testified that Mr. Huerta is Ismael Gutierrez's

23  nephew, correct?

24  A    Yes, sir.

25  Q    Is that true?  Do you know if that's true?

1    A    Based upon the statements made by the defendant.

2    Q    Now, who is Mr. Huerta married to, if you know?

3    A    Huerta is married to Jenny Ruiz.

4    Q    Do you know what the relationship is between Jenny Ruiz

5    and Ismael Gutierrez?

6    A    Jenny Ruiz's mother is Rosalva Gutierrez, who is the

7    defendant's sister.

8    Q    So Jenny Ruiz is the niece to Ismael Gutierrez, correct?

9    A    I believe so, yes.

10   Q    So Mr. Huerta is the husband to Jenny Ruiz, correct?

11   A    Yes.

12   Q    So there's no blood relation between, from what we know

13   about, Mr. Huerta and Ismael Gutierrez, correct?

14   A    Not that I'm aware of, sir.

15   Q    He is just referred to as a nephew, but he isn't a nephew,

16   per se?

17   A    Not that I'm aware of, sir.

18   Q    Now, the next document I have prepared is, I think,

19   Exhibit 408, if you can get that.

20   A    Yes, sir.

21        MR. NAVARRO:  If I can publish this, Your Honor.  It

22   was previously admitted.

23        THE COURT:  Go ahead.

24   BY MR. NAVARRO:

25   Q    There was a phone call between the informant and

**UNITED STATES DISTRICT COURT**

Case 2:14-cr-00209-TJH   Document 172   Filed 11/17/15   Page 221 of 240   Page ID #:1584

```
 1   Mr. Huerta, correct?

 2   A     Yes, sir.

 3   Q     And that's a call that was made by Mr. Huerta, correct?

 4   A     Yes, sir.

 5   Q     And then we have six texts between the informant and

 6   Mr. Huerta, correct?

 7   A     Yes, sir.

 8   Q     And those were all September 25th, correct?

 9   A     Yes, sir.

10   Q     The day before the drug deal?

11   A     Yes, sir.

12   Q     Now, there was a document which was previously admitted.

13   I think it's 704, if you can get that.

14   A     Yes, sir.

15   Q     Now, this is a document that's obtained from the Bureau of

16   Prisons, correct?

17   A     Yes, sir.

18   Q     And this document tells you the numbers that a particular

19   inmate may be calling, correct?

20   A     Yes, sir, as well as their e-mail addresses.

21   Q     Because when you're in custody, you just can't call

22   anybody when you are in BOP custody.  You know this?

23   A     Yes, sir.

24   Q     When you are in BOP custody, you have to give phone

25   numbers.  They have to be approved.  And you have to give
```

**UNITED STATES DISTRICT COURT**

```
 1   e-mail addresses.  They have to be approved, correct?

 2   A    Yes, sir.

 3   Q    And this little chart that you have here, which if I may

 4   publish, basically lists a number of people that Ismael

 5   Gutierrez can contact, correct?

 6   A    At the time that this picture was taken, those are the

 7   people that he could contact.

 8   Q    And this was taken January of this year, correct?

 9   A    It's when the screen shot was made, yes.

10   Q    Which is January 20th of this year?

11   A    That's actually -- I believe that's when this document was

12   printed.

13   Q    Now, the first person listed is Suzy Alvarez, correct?

14   A    Yes, sir.

15   Q    And the relationship is spouse, correct?

16   A    Yes, sir.

17   Q    And there is a Nancy Barios who is listed as a friend as

18   well, correct?

19   A    Yes, sir.

20   Q    And there is a Gene G-u-t, which is a child, correct?

21   A    Yes, sir.

22   Q    And we have a second spouse, a Nancy G-u-t as well,

23   correct?

24   A    Yes, sir.

25   Q    And then it has my name, correct?
```

```
 1    A     Yes, sir.

 2    Q     And then it has Esmerelda Navarro.  Do you know who she

 3    is?

 4    A     No, sir, I don't.

 5    Q     And there is a Terry Weirick.  Do you know who he is?

 6    A     No, sir.

 7    Q     And what about the woman at the bottom, Maria Vilavazo, do

 8    you know who that is?

 9    A     The defendant's mother.

10    Q     And that's his mom, correct?

11              THE COURT:  Is that right?

12              THE WITNESS:  I believe so, sir.

13    BY MR. NAVARRO:

14    Q     Now I am going to show you Exhibit 411, which I think it's

15    been prepared and admitted, if we can get that.

16    A     Yes, sir.

17    Q     Now, on this chart, there is phone calls that are

18    highlighted in blue, correct?

19    A     Yes, sir.

20    Q     And these are calls made between the informant and Ismael

21    Gutierrez, correct?

22    A     Yes, sir.

23    Q     These are on September 26th of 2013, correct?

24    A     Yes, sir.

25    Q     And there is one phone call between Mr. Ismael Gutierrez
```

1    and Mr. Huerta, correct?

2    A    Yes, sir.

3    Q    And how long did that phone call last, if you can tell?

4    A    Looks like -- the -2618 number, just to specify?

5    Q    Yes, sir.

6    A    It looks like it had a duration of 18 seconds.

7    Q    So it wasn't much of a phone call, correct?

8    A    No, sir.

9    Q    Then we have a number of phone calls, seven phone calls to

10   Mr. Gutierrez's mother's home, correct?

11   A    Yes, sir.

12   Q    And that's the (818) number that finishes with -7044,

13   correct?

14   A    Yes, sir.

15   Q    Now, from the chart are you able to tell where

16   Mr. Gutierrez, Ismael Gutierrez, is calling from, where he is

17   at?

18   A    Yes, sir.  You can see the network element name off to the

19   left, and it basically indicates which network elements that

20   the phone is in contact with.

21   Q    And that reflects Albuquerque, correct?

22   A    Yes, sir.

23   Q    In New Mexico, correct?

24   A    I assume so, sir.

25            THE COURT:  Don't assume, but I will take judicial

```
 1    notice that Albuquerque is in New Mexico.
 2              MR. NAVARRO:   Thank you, Your Honor.
 3    Q    Now, are you able to tell this jury who Mr. Ismael
 4    Gutierrez is talking to when he's calling his mother's home?
 5    A    No, sir, I'm not.
 6    Q    Now, have you been to that house before?
 7    A    I have not been inside of it, but I have been around it,
 8    sir.
 9    Q    Do you know who lives in that home?
10    A    I know of people that live in that home.
11    Q    Do you know who lives in the home, anyone in particular?
12    A    The defendant lives in that home.
13    Q    Anyone else?
14    A    I have seen vehicles registered to Rosalva Gutierrez at
15    that home as well.
16    Q    That would be Mr. Ismael Gutierrez's sister; is that
17    correct?
18    A    I believe it is his sister.
19    Q    And does his mother, Maria, also live at home?
20    A    According to her California DMV information she does.
21    Q    Does Jenny Ruiz live at that address that you know of?
22    A    Not that I am aware of.
23    Q    What about Mr. Moreno, does he live at that address?
24    A    Mr. Moreno or Mr. --
25    Q    Mr. Huerta.  I apologize.
```

1    A    No, he does not live at that address, to my knowledge.

2    Q    You testified that at some point you saw a vehicle

3    registered to Mr. Huerta at Mr. Ismael Gutierrez's home,

4    correct?

5    A    Yes, sir.

6    Q    But you don't know why the vehicle was there?

7    A    No, sir, I don't.

8    Q    But we do know that he is married to -- "he" being

9    Mr. Huerta, is married to Mr. Ismael Gutierrez's niece; is that

10   correct?

11   A    Yes, sir.

12   Q    Now, we also know that Jenny Ruiz's mother lives at that

13   home, correct?

14   A    Jenny Ruiz's mother?

15   Q    Rosalva Gutierrez.

16   A    I am not exactly sure where she lives.  Are you talking

17   about the Oxnard Street address?

18   Q    Yes, that's correct.

19   A    I know that's listed on her California DMV information,

20   and I have seen vehicles registered there in her name.

21   Q    Very well.

22        Now, I am going to place before you Exhibit 414, which was

23   previously admitted.

24        Do you have this?

25   A    Yes, sir.

**UNITED STATES DISTRICT COURT**

```
1    Q    Now, when you did the analysis -- you prepared this
2    document, correct?
3    A    Yes, sir.
4    Q    Were there other -- were there other phone numbers that
5    were frequently called, or were these the top two phone numbers
6    that were called, if you know?
7    A    I don't know if they were the top two telephone numbers.
8    I was looking at these specific numbers.
9    Q    So you were targeting the telephone number associated with
10   Ismael Gutierrez's girlfriend, correct, one of the numbers?
11   A    I wasn't -- I was looking to see how many times he had
12   called it.
13   Q    That was his girlfriend's phone number, correct?
14   A    It's listed as the spouse in his BOP information.
15   Q    And what is her name again?
16   A    Suzy -- Suzanna Alvarez.  It's Suzy Alvarez, I believe.
17   Q    Now, were you able to determine at any point whether
18   Ismael Gutierrez and Suzy Alvarez are married?
19   A    No, sir.
20   Q    Did you make any efforts to find that out?
21   A    Yes, sir, I did.
22   Q    What did you do?
23   A    I looked at the BOP information.
24   Q    Did you do any searches in the L.A. County register?
25   A    I did not do the L.A. County register, no, sir.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    Now, there was another -- there was a number that was
 2   called 45 times.  That would be his mother's home, correct?
 3   A    That is the telephone number which is registered in the
 4   name of Rosalva Gutierrez, with the address of 11461 Oxnard
 5   Street.
 6   Q    That telephone number is registered to Rosalva Gutierrez?
 7   A    Yes, sir.
 8   Q    At the address on Oxnard Street, right?
 9   A    Yes, sir.
10   Q    And Rosalva Gutierrez, her DMV license is registered to
11   that address as well, correct?
12   A    Yes, sir.
13   Q    And also vehicles are registered to her at that address,
14   correct?
15   A    Yes, sir.
16   Q    Are there any -- are there any other addresses associated
17   with Rosalva Gutierrez, aside from the Oxnard Street address,
18   that you're aware of?
19   A    I don't know, sir.
20   Q    Now, the narcotics that you were shown the photograph,
21   Exhibit 201-A, do you have that photograph in front of you?
22   A    Yes, sir.
23        MR. NAVARRO:  Now, if I may publish this, Your
24   Honor.  It's been previously admitted.
25        THE COURT:  Go ahead.
```

```
 1   BY MR. NAVARRO:

 2   Q     Is that your hand holding the narcotics?

 3   A     I believe it is my hand.

 4   Q     Now, were these narcotics ever fingerprinted?

 5   A     Yes, they were.

 6   Q     And were you able to obtain or lift any fingerprints

 7   associated with Ismael Gutierrez?

 8   A     No, sir, I was not.

 9   Q     Now, on the date these narcotics were purchased from

10   Mr. Huerta, you provided $1100 to the informant, correct?

11   A     Yes, sir.

12   Q     You did not give him $900; you gave him 1100, correct?

13   A     Yes, sir.

14   Q     Now, you were also in charge of -- as a handler for the

15   informant, you're in charge of making payments to him, correct?

16   A     Yes, sir.

17   Q     And the FBI paid the informant over $7,000 during this

18   investigation; is that correct?

19   A     Yes, sir.

20   Q     Now, do you know what the informant claimed to do as a

21   living before he came to you as an informant?

22   A     He advised me that he was working as a mechanic.

23   Q     As an auto mechanic?

24   A     Yeah, auto mechanic, yes, sir.

25   Q     And were you able to -- did you verify that?
```

```
 1   A    I was able to verify that through other sources.

 2   Q    And you testified that the informant identified the wrong

 3   person in a photograph within minutes of the drug deal,

 4   correct?

 5   A    Yes, sir.

 6   Q    He identified a person by the name of Samuel Lopez?

 7   A    Yes, sir.

 8             MR. NAVARRO:  I have no additional questions,

 9   Your Honor.

10             THE COURT:  Very well.

11        Redirect?

12             MR. AZAT:  Yes, Your Honor.

13             THE COURT:  Very well.

14             MR. AZAT:  One moment, Your Honor.

15             THE COURT:  Very well.

16        (Counsel conferred off the record.)

17                       REDIRECT EXAMINATION

18   BY MR. AZAT:

19   Q    Special Agent Alker, when you first met the informant in

20   this case, did he tell you about Defendant being involved in

21   drug dealing?

22   A    Yes, sir.

23   Q    So he knew the defendant?

24   A    Yes, sir.

25   Q    Did he ever mention Jorge Huerta?
```

1    A    No, sir.

2    Q    Did you have any reason to believe that Yader Gutierrez,

3    the informant, knew or had ever met Jorge Huerta?

4    A    No, sir.

5    Q    Did you review toll records specifically looking for calls

6    from the informant to Jorge Huerta?

7    A    I did.

8    Q    Before the exhibit we saw, which was Exhibit 411 -- no,

9    excuse me, Exhibit 407.  Before September 25th, did you ever

10   see any phone contact between Yader Gutierrez, the informant,

11   and defendant's nephew, Jorge Huerta?

12   A    No, sir.

13   Q    Did you conclude that defendant gave Yader Gutierrez --

14   excuse me, Yader Gutierrez Jorge Huerta's phone number?

15   A    I concluded that defendant gave Jorge Huerta the source's

16   telephone number.

17   Q    Was that before or after Yader Gutierrez texted and called

18   the defendant Yader -- excuse me, the defendant in this case?

19   A    After.

20   Q    I would like you to take a look back at 101-A.

21        Defense counsel was asking you some questions about that

22   exhibit.  Do you see where it says on this exhibit -- where

23   Yader Gutierrez texted defendant, "I need some of what I told

24   you about last time"?

25   A    Yes, sir.

1    Q    Can you show me where the defendant texted back, "I don't
2    know what you're talking about"?
3    A    No, sir, I can't.
4    Q    Can you show me where the defendant texted back, "I am not
5    a drug dealer"?
6    A    No, sir, I can't.
7    Q    I would like you to take a look at Exhibit 104-A.
8         Defense counsel was asking you some questions about this
9    exhibit.  These are translations of texts between the
10   defendant's nephew and the informant.  When they talk about
11   price, and they talk about an ounce and a half, is this before
12   or after you concluded that Defendant gave -- had Jorge Huerta
13   get in contact with Yader Gutierrez?
14   A    After.
15   Q    How long have you been investigating narcotics for?
16   A    Since approximately May of 2013.
17   Q    Do people typically tell, that are selling narcotics to
18   people, in text messages that they sell something on behalf of
19   somebody else or use names?
20   A    They generally don't use names.
21   Q    In your experience, if somebody was selling drugs at the
22   direction of somebody else, is that a fact they put in a text
23   message?
24   A    Not in my experience, sir.
25   Q    Now, defense counsel also asked you a few questions about

```
 1   some familial relationships in this case.  How is Jenny Ruiz
 2   related to the defendant?
 3   A     Jenny Ruiz is the niece of the defendant.
 4   Q     What does that make Jorge Huerta to the defendant?
 5   A     Nephew-in-law.
 6   Q     Now, also on Exhibit 411, defense counsel asked you
 7   another question.  He asked you how long the call was between
 8   the defendant and his nephew.
 9         I will put this up here for the jury.
10         I believe your testimony was it was a matter of seconds.
11   A     Yes, sir.
12   Q     And then defense counsel said they didn't talk about much
13   of anything at all.  How come they didn't talk about much of
14   anything at all during this call here?
15   A     Because that number had already been disconnected.
16   Q     And after the number was disconnected, who was the
17   defendant trying to call?
18   A     He's trying to call (818) 915-7044.
19   Q     And who does that number subscribe to, again?
20   A     It subscribed to Rosalva Gutierrez, the defendant's
21   sister.
22   Q     And how is Rosalva Gutierrez related to Jorge Huerta?
23   A     It is his mother-in-law, Jorge Huerta's mother-in-law.
24   Q     Defense counsel also asked -- excuse me -- about Exhibit
25   201 -- excuse me, 201-A.  And he asked you if there were any
```

**UNITED STATES DISTRICT COURT**

```
 1    fingerprints for the defendant on that exhibit.  And your

 2    answer was "no," right?

 3    A    Yes, sir.

 4    Q    Was the defendant there during this drug transaction on

 5    September 26?

 6    A    No, sir.

 7    Q    Why not?

 8    A    Jorge Huerta was there, sir.  He was the one that

 9    delivered the drugs.

10    Q    Defense counsel also asked you if you looked into the

11    confidential source before you signed him up as a confidential

12    source; is that right?

13    A    Yes, sir.

14    Q    How many times has the confidential source been arrested

15    for drug dealing?

16    A    Never, sir.

17    Q    In your experience, is it often risky for a confidential

18    source to cooperate with the Federal Bureau of Investigation in

19    investigating drug trafficking crimes?

20    A    It can be, sir.

21              MR. AZAT:  One moment, please, Your Honor.

22              THE COURT:  Surely.

23         (Counsel conferred off the record.)

24              MR. AZAT:  Nothing else, Your Honor.  Thank you.

25              THE COURT:  Thank you.
```

**UNITED STATES DISTRICT COURT**

1     Any further questions?

2          MR. NAVARRO:  Can I have a second, Your Honor?

3          THE COURT:  You may.

4     (Counsel and defendant conferred off the record.)

5          THE COURT:  All right.  Recross?

6          MR. NAVARRO:  Thank you, Your Honor.

7                    **RECROSS-EXAMINATION**

8   BY MR. NAVARRO:

9   Q    You testified on redirect that you've worked drug cases

10  since May of 2013, correct?

11  A    Yes, sir.  I believe that's when I moved to the squad.

12  Q    Prior to this investigation, how many other narcotics

13  cases had you worked on between May and September 2013?

14  A    Can you be more specific?

15  Q    Yeah, between May of 2013 --

16  A    Can you be more specific as to what working on -- what you

17  consider working on one is?  I served warrants in several

18  different narcotics investigations.

19  Q    So you served warrants on several FBI investigations.

20  Prior to May of 2013 -- I'm sorry.  Prior to September 2013,

21  but after May of 2013, how many FBI drug cases were you the

22  case agent on?

23  A    After May of 2013?

24  Q    Yeah.

25  A    I have been the case agent or a co-case agent on, I would

1    say, five.

2    Q    So between May and September you were the case agent on

3    five different FBI narcotics cases?

4    A    Oh, no, I thought you were talking about until now, sir.

5    Q    No, no, I am asking before this case.

6    A    Oh, yes, sir, this is the first one I have been a case

7    agent on.

8    Q    So this was your first -- this was the first time you were

9    a case agent, as an FBI agent, handling a confidential

10   informant, correct?

11   A    No, sir.  It's the first time with a narcotics

12   investigation, not the first time I have done an FBI

13   investigation.

14   Q    I apologize.

15        This was the first time in a narcotics setting that you

16   were the case agent handling an informant, correct?

17   A    Yes, sir.

18   Q    Now, you were asked a question about whether or not the

19   confidential informant had any prior drug dealing arrests.

20   A    Yes, sir.

21   Q    Now, in terms of vetting the informant, did you polygraph

22   him?

23   A    No, sir.

24   Q    Did you -- were you able to figure out if he had used

25   drugs before?

1    A    He eventually told us that he has used them one time

2    before.

3    Q    Just one time?

4    A    To my recollection, I remember him mentioning one specific

5    time.

6              MR. AZAT:  Objection, Your Honor.  Hearsay.

7              THE COURT:  It's overruled.

8         You may continue.

9    BY MR. NAVARRO:

10   Q    And what type of narcotics did he eventually tell you he

11   used?

12   A    Cocaine.

13   Q    When you say "eventually," this means he initially was

14   dishonest with you about his drug use?

15   A    No.  It just means I remember the one time he advised us

16   it was later on when we were preparing for trial.

17   Q    So it was after this whole investigation was done, it was

18   then that you asked him for the first time if he had used

19   drugs?

20   A    No, sir.  We asked him again if he had used them.

21   Q    So the first time you asked him, he did not tell you -- he

22   lied to you?

23   A    No.  He hadn't -- the drug usage came after this

24   investigation already occurred.

25   Q    So after this investigation was done, he used drugs

1    somewhere along the line?

2    A    Yes, sir.

3    Q    And you still used him as an informant in this case?

4    A    He was already an informant in this case, sir.

5    Q    And you were also asked that -- you also testified that he

6    had no prior drug dealing arrests, correct?

7    A    Yes, sir.

8    Q    Now, were you able to ascertain whether, before he became

9    an informant, he had been a drug courier for anybody?

10   A    I did not have any information that he was a drug courier.

11   Q    Did you take any efforts, any investigative efforts, to

12   figure out if, in fact, he had been one?

13   A    I spoke with other sources.

14   Q    So based on your conversations with other sources to

15   determine that he had no -- that he was going to be a clean

16   informant, correct?

17   A    Based upon my conversations with them, with other law

18   enforcement officers, by looking at his criminal history and by

19   also interviewing the confidential source himself and the

20   different steps taken to vet some of the things that he told

21   us, that's how we came to that determination.

22            MR. NAVARRO:  No other questions, Your Honor.

23            THE COURT:  Anything further of this witness?

24            MR. AZAT:  Nothing further, Your Honor.  Thank you.

25            THE COURT:  Thank you, Agent.  You may step down.

**UNITED STATES DISTRICT COURT**

1          THE WITNESS:  Yes, sir.

2          THE COURT:  Ladies and gentlemen, I want to remind

3    you once again of the admonition not to discuss the matter

4    among yourselves or with anyone.  Please don't attempt to

5    investigate it through any kind of technological device or

6    anything else.  Just put it aside.  And we will see you at 9:00

7    tomorrow morning.

8        Everyone, please rise for the jury.

9        Go right outside, ladies and gentleman.  Have a good

10   evening.

11       (Out of the presence of the jury.)

12          THE COURT:  We are outside the presence of the jury.

13       Are there any matters that counsel wish to raise outside

14   the presence of the jury?

15          MS. JAIMEZ:  Nothing, Your Honor.  Thank you.

16          MR. NAVARRO:  Nothing, Your Honor.

17          THE COURT:  All right.  We will see you tomorrow at

18   9:00 in the morning.

19              (Proceedings concluded at 5:09 P.M.)

20                      ---oOo---

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6              I, CAROL JEAN ZURBORG, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  November 17, 2015

17

18

19                    /s/ CAROL JEAN ZURBORG

20   _____
                    CAROL JEAN ZURBORG, CSR NO. 7921, CCRR
21                     Federal Official Court Reporter

22

23

24

25

**UNITED STATES DISTRICT COURT**