1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE TERRY J. HATTER, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,        )
                                     )
6                Plaintiff,          )
                                     )
7        vs.                         )    Case No. CR-14-0209-TJH
                                     )         Volume II
8   ISMAEL GUTIERREZ VILAVAZO,       )      (Pages 241 - 409)
                                     )
9                Defendant.          )
    ─────────────────────────────── )

10

11

12         REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                         TRIAL DAY 2
13             WEDNESDAY, MAY 20, 2015
                         9:24 A.M.
14             LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22  ────────────────────────────────────────────────

23        CAROL JEAN ZURBORG, CSR NO. 7921, CCRR
            FEDERAL OFFICIAL COURT REPORTER
24         312 NORTH SPRING STREET, ROOM 414
            LOS ANGELES, CALIFORNIA  90012
25                 (213) 894-3539

              UNITED STATES DISTRICT COURT

1                    **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4         EILEEN DECKER
          United States Attorney
5         BY:  KIMBERLY D. JAIMEZ
               MICHAEL AZAT
6              STEPHANIE CHRISTENSEN
               Assistant United States Attorneys
7         United States Courthouse
          312 North Spring Street
8         Los Angeles, California  90012

9     **FOR THE DEFENDANT:**

10        ANGEL J. NAVARRO
          Attorney at Law
11        714 West Olympic Boulevard, Suite 450
          Los Angeles, California  90015

12    **ALSO PRESENT:**

13        MICHAEL ALKER, Federal Bureau of Investigation

14    **SPANISH-LANGUAGE INTERPRETER:**

15        MONICA DESIDERIO

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                          **INDEX OF WITNESSES**

2

3    <u>PLAINTIFF'S WITNESSES</u>                              PAGE

4    GUTIERREZ, Yader

5        Direct Examination by Ms. Jaimez              249

6        Cross-Examination by Mr. Navarro             295

7        Redirect Examination by Ms. Jaimez           321

8
     JOHNSON, Douglas
9
         Direct Examination by Mr. Azat              324
10

11   STEBBINS, Jeremy

12       Direct Examination by Ms. Jaimez              330

13       Cross-Examination by Mr. Navarro             335

14
     SAUL, M. Scott
15
         Direct Examination by Ms. Jaimez              338
16
         Cross-Examination by Mr. Navarro             353
17

18   HANSEN, Sean

19       Direct Examination by Mr. Azat              356

20
     SADER, Michael
21
         Direct Examination by Mr. Azat              369
22
         Cross-Examination by Mr. Navarro             390
23
         Redirect Examination by Mr. Azat            395
24

25


                     **UNITED STATES DISTRICT COURT**

```
1              INDEX OF EXHIBITS

2                                    FOR         FOR
                              IDENTIFICATION  EVIDENCE
3    NUMBER  DESCRIPTION            PG.         PG.

4    920  -  Stipulation                       251

5    916  -  Map                               332

6    309  -  Apple iPhone                      346

7    301  -  Copy of Device Information taken  349
             from forensic examination
8
     302  -  Copy of an iMessage exchange taken 349
9            from forensic examination

10   303  -  Copy of the Web History taken     349
             from forensic examination
11
     304  -  Photograph taken from forensic    349
12           examination

13   305  -  Photograph taken from forensic    349
             examination
14
     306  -  Photograph taken from forensic    349
15           examination

16   307  -  Photograph taken from forensic    349
             examination
17
     308  -  Photograph taken from forensic    349
18           examination

19   504  -  Map of historical cell site       364
             information for (818) 263-3398 on
20           9/19/13

21   505  -  Map of historical cell site       364
             information for (818) 263-3398 on
22           9/25/13

23   506  -  Map of historical cell site       364
             information for (818) 263-3398 on
24           9/26/13

25
```

**UNITED STATES DISTRICT COURT**

```
 1                        INDEX OF EXHIBITS

 2                                      FOR            FOR
                                IDENTIFICATION     EVIDENCE
 3      NUMBER  DESCRIPTION            PG.            PG.

 4      507  -  Map of historical cell site          364
                information for (818) 263-3398 on
 5              10/4/13

 6      508  -  Map of historical cell site          364
                information for (818) 263-3398 on
 7              10/7/13

 8      509  -  Map of historical cell site          364
                information for (818) 263-3398 on
 9              10/25/13

10      510  -  Map of historical cell site          364
                information for (818) 263-3398 on
11              1/13/14

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, MAY 20, 2015

 2                              9:24 A.M.

 3                              --oOo--

 4              (Out of the presence of the jury.)

 5              THE COURTROOM DEPUTY:  Please remain seated and come

 6    to order.  This court is once again in session.

 7              THE COURT:  Good morning.  We are outside the

 8    presence of the jury.

 9         We were waiting for one of the jurors who evidently had a

10    slight automobile accident on her way in from Ventura, but

11    they're all here now, and we are ready to proceed.

12         Ms. Skipper has told me she's put some notebooks on the

13    jury chairs.  And actually, I wasn't even going to suggest to

14    the members of the jury that they could take notes, but I

15    suppose if some want to, we will let them go ahead and do it.

16    It's just this matter should be moving quite along, and

17    hopefully there won't be much in the way of note-taking.

18         Anything from any counsel before we bring members of the

19    jury in?

20              MS. JAIMEZ:  Nothing from the Government,

21    Your Honor.

22              THE COURT:  All right.  Thank you.

23              MR. NAVARRO:  No, Your Honor.

24              THE COURT:  Thanks.

25         And I will admonish those who wish to take notes about the
```

```
 1   problem -- we'll see.
 2        Does the Government have its next witness available?
 3             MS. JAIMEZ:  Yes, Your Honor.  The Government's next
 4   witness is waiting in the waiting room.
 5             THE COURT:  All right.
 6             THE COURTROOM DEPUTY:  Please rise.
 7        (In the presence of the jury.)
 8             THE COURT:  Please be seated, and good morning,
 9   ladies and gentlemen.  I see you practiced last night.  You are
10   in the right order.
11        You notice that there are some notebooks there on your
12   chairs.  You're free to take notes, if you wish to.  But I have
13   to admonish you, those notes must be left here.  And also, one
14   of the problems that often arises is that one's busy taking
15   notes and looking down at what he or she is writing instead of
16   looking at the witnesses, and since you are the judges of the
17   facts and you have to judge the reliability of each witness, or
18   lack thereof, it could be a simple nod of the head or some
19   nuance that you would miss that would indicate to you whether
20   you really believe that witness or not, and if you're busy
21   taking notes, you could miss that.  So keep that in mind if you
22   want to take notes.
23        And if you do take notes during the time of deliberation,
24   you can use those notes to help with your recollection or the
25   recollection of your fellow jurors, but they would then have to
```

```
 1    remain with the Court afterwards and all.  So keep that in
 2    mind.
 3         I must ask you, though, has anything in this matter come
 4    to your attention since last night?  If so, please raise your
 5    hand.
 6         I see no hands having been raised.
 7         We are going to continue with the Government's case, and
 8    the Government may call its next witness.
 9              MS. JAIMEZ:  Yes, Your Honor.  The Government calls
10    Mr. Yader Gutierrez.
11              THE COURT:  Thank you.
12         (Pause in proceedings.)
13              THE COURT:  Sir, come straight ahead.  Come right up
14    here on the witness stand to be sworn, please.
15         No, right up on the witness stand.
16              THE COURTROOM DEPUTY:  Please raise your right hand.
17              THE COURT:  Remain standing.
18          YADER GUTIERREZ, PLAINTIFF'S WITNESS, WAS SWORN
19              THE WITNESS:  I do.
20              THE COURTROOM DEPUTY:  Please have a seat.
21         State your name for the record.
22              THE WITNESS:  Yader Gutierrez.
23              THE COURT:  Spell the last name for the record,
24    please.
25              THE WITNESS:  Y-a-d-e-r; Gutierrez, G-u-t-i-e,
```

```
 1   double r-e-z.
 2            THE COURT:  Do you have any other names?
 3            THE WITNESS:  No, just that one.
 4            THE COURT:  Thank you.
 5        You may proceed.
 6            MS. JAIMEZ:  Your Honor, before proceeding, I would
 7   like to note for the record that the witness is using a
 8   Spanish-language interpreter.
 9            THE COURT:  Yes, the record will so indicate, and
10   the jurors see that.
11            MS. JAIMEZ:  Thank you, Your Honor.
12                        DIRECT EXAMINATION
13   BY MS. JAIMEZ:
14   Q    Good morning, Mr. Yader Gutierrez.
15   A    Good morning.
16   Q    How are you currently employed?
17   A    I am an electrical mechanic.
18   Q    And how long have you been an electrical mechanic?
19   A    Five years.
20   Q    And how old are you, Mr. Gutierrez?
21   A    26.
22   Q    Have you ever worked with the FBI?
23            THE COURT:  Well, before we get into that, in what
24   city do you reside presently?
25            MS. JAIMEZ:  Your Honor, I'm sorry.  Before the
```

```
1    witness answers that question, he's been relocated due to
2    security concerns.
3              THE COURT:  Very well.  Go ahead.
4              MS. JAIMEZ:  Thank you, Your Honor.
5    Q    Now, returning to the question, Mr. Gutierrez, have you
6    ever worked with the FBI?
7    A    Yes.
8    Q    And what did you do for the FBI?
9    A    Record the calls that I had with Mikey.
10             MS. JAIMEZ:  At this time, Your Honor, the
11   Government would like to read a stipulation between the
12   parties --
13             THE COURT:  Go right ahead.
14             MS. JAIMEZ:  -- previously marked as Exhibit 920.
15             THE COURT:  Thank you.
16             MS. JAIMEZ:  "Parties' Stipulation Regarding
17   Defendant's Aliases Mike and Mikey."  "Plaintiff, United States
18   of America, and Defendant, Ismael Gutierrez Vilavazo,
19   defendant, individually and by and through counsel hereby
20   stipulate as to the following facts:  At all times relevant to
21   this case, Defendant was also known to others as Mike and
22   Mikey."
23        Your Honor, the Government would like to move Exhibit 920
24   into evidence.
25             THE COURT:  Is that the stipulation that you have
```

```
 1    agreed to on behalf of your client, Mr. Navarro?
 2              MR. NAVARRO:  Yes, Your Honor.
 3              THE COURT:  All right.  It will come in.
 4         (Exhibit 920 received.)
 5              MS. JAIMEZ:  Thank you, Your Honor.
 6    Q    Now, Mr. Gutierrez, did you know Mikey personally at the
 7    time you began working as an informant?
 8    A    Yes.
 9    Q    And how did you know Mikey?
10    A    Through a friend.
11    Q    How often would you see Mikey?
12    A    Often.
13    Q    And how long had you known Mikey before you began working
14    as an informant?
15    A    Approximately two or three years.
16    Q    And while working with the FBI, what were your duties?
17    A    Record the calls between Mikey and I, try to buy drugs
18    from him, and inform the FBI of everything that was happening.
19    Q    And were you ever allowed to call Mikey on your own
20    without the FBI present?
21    A    No.
22    Q    Well, were there exceptions to that rule, though?
23    A    Yes.
24    Q    And what were those exceptions?
25    A    If he called me when the FBI was not there, after the call
```

UNITED STATES DISTRICT COURT

```
 1    I was supposed to report everything to the FBI.
 2    Q    And how would you typically contact Mikey?
 3    A    Through calls or text messages.
 4    Q    And how did you get the number for Mikey?
 5    A    Through a friend.
 6    Q    What did you do with that number once you got it?
 7    A    I saved it in my contacts.
 8    Q    Your contacts where?
 9    A    In my telephone.
10    Q    Under what name did you save the number?
11    A    Maky.
12    Q    And how did you write that?
13    A    M-a-k-y.
14    Q    And is the individual you know as Mikey or Maky in the
15    courtroom today?
16    A    Yes.
17    Q    Can you please point to that individual and describe for
18    the record what he's wearing.
19    A    Yes.  He's wearing black clothes.
20              THE COURT:  And where is he sitting?
21              THE WITNESS:  Over there.
22              THE COURT:  Next to someone?
23              THE WITNESS:  Yes, his attorney.
24              THE COURT:  All right.  Indicating, for the record,
25    the defendant in this matter.
```

```
 1    BY MS. JAIMEZ:
 2    Q     Now, Mr. Yader Gutierrez, do you remember the events of
 3    September 19th, 2013?
 4    A     Yes.
 5    Q     And what were you doing in the morning of September 19th?
 6    A     The FBI was with me trying to call Mikey.
 7    Q     And were you able to get in touch with Mikey?
 8    A     No.
 9    Q     What did you do when you couldn't get in touch with him?
10    A     We sent him a text message.
11    Q     Now, turning to the exhibit binder before you to the
12    previously admitted Exhibit 101.  Please take a moment to turn
13    there.
14          And let's publish this for the jury.
15          And, Your Honor, permission to publish the translation of
16    Exhibit 101, previously admitted Exhibit 101-A?
17                THE COURT:  Of course.  Go ahead.
18    BY MS. JAIMEZ:
19    Q     Mr. Yader Gutierrez, do you recognize Exhibit 101?
20    A     Yes.
21    Q     And what is it?
22    A     Those are the messages that I sent to Mikey.
23    Q     And when did you send these messages?
24    A     On the 19th.
25    Q     And what color are the messages sent by you?
```

```
 1   A     White.
 2   Q     And what color are the messages sent by the defendant?
 3   A     Blue.
 4   Q     Now, what were you talking about initially here in the
 5   first text messages?
 6   A     That if he was busy, to call me.
 7   Q     And what did you say in the text message you sent at 11:58
 8   A.M.?
 9   A     "You don't even answer.  Hey, I need some of what I told
10   you about last time."
11   Q     And what were you talking about here?  What had you talked
12   about last time?
13   A     About drugs.
14   Q     And how did the defendant respond to this text message?
15   A     "I was asleep.  I'm getting up now."
16   Q     And when did he respond to that text that you had
17   previously sent?
18   A     A minute later.
19   Q     And did you respond to his text message here?
20   A     Yes.  "I do not have work, and I want to see if there's
21   something."
22   Q     What did you mean by "I want to see if I can do
23   something"?
24   A     If he would give me work regarding drugs.
25   Q     And how did the defendant respond to the text message,
```

```
 1    looking at the next page now?

 2    A    "I'll call you in an hour.  Where are you?"

 3    Q    And did he call you as promised?

 4    A    Yes.

 5    Q    And approximately what time that day did he try to call

 6    you?

 7    A    3:22.

 8    Q    And were you able to initially pick up his calls?  Did you

 9    catch his calls?

10    A    No.  The call was lost at that time.

11    Q    And then what happened?  Did the defendant try to get in

12    touch with you in any other way?

13    A    Yes.  He sent me a text message.

14    Q    And what were the text messages he sent you?

15    A    "Where are you?"  "I am calling you and you don't answer."

16    Q    What did you do, Mr. Yader Gutierrez, after receiving

17    these text messages?

18    A    I made a couple of calls to him.

19    Q    Were you able to get in touch with him?

20    A    No.

21    Q    Well, then what happened?

22    A    Then he called me.

23    Q    Do you remember what time?

24    A    3:45.

25    Q    And at 3:45 on September 19th, were you alone, or were you
```

1    with the FBI?

2    A    I was alone.

3    Q    And did you record that 3:45 call that you received from

4    the defendant?

5    A    No.  I couldn't.

6    Q    Why not?

7    A    Because only the FBI can do that.  I cannot do the

8    recordings.

9    Q    So what did you and the defendant talk about on that 3:45

10   P.M. call?

11   A    That he had a job for me as a mechanic.

12   Q    And what did you think about that request?

13   A    I thought it was an excuse to talk about drugs later.

14   Q    What happened after the 3:45 call?

15   A    He asked me if we could meet in front of my house.

16   Q    And did you, in fact, meet with the defendant?

17   A    Yes.

18   Q    And then what happened?

19   A    Then we went to his house to fix a tow truck.

20   Q    You went to the defendant's house?

21   A    To the house of the cousin of the defendant.

22   Q    And what happened at the defendant's cousin's house?

23   A    We repaired the tow truck.  I changed some shock

24   absorbers.

25   Q    And during that time did you discuss anything with the

**UNITED STATES DISTRICT COURT**

1  defendant?

2  A     Yes.

3  Q     What did you talk about?

4  A     We talked about drugs.

5  Q     What did you talk about specifically with respect to

6  drugs?

7  A     I asked him if he had work for me regarding drugs.

8  Q     And what did he say?

9  A     He said that "yes," he did have drugs, but at that moment,

10 he didn't have them readily available, at hand.

11 Q     Did he explain why he didn't have them readily available?

12 A     Yes.  He told me that he felt a little bit like the police

13 were investigating him.

14 Q     Did he mention anything about the quantity of drugs he

15 had?

16 A     Yes, approximately two pounds of methamphetamine.

17 Q     Now, during that meeting did you discuss pricing at all?

18 A     We possibly did.

19 Q     Do you remember what you might have discussed with respect

20 to price?

21 A     Yes, that for ounce of crystal methamphetamine, 450.

22 Q     Did you discuss anything else about payment, such as

23 payment on credit versus payment in cash?

24 A     Yes.  I asked him if he could give it to me on credit or

25 if I had to pay cash.

1  Q     And do you remember what the defendant said?

2  A     Yes.  He said he was going to get me in touch with one of

3  his contacts or workers.

4  Q     Now, was that meeting recorded that you had with the

5  defendant?

6  A     No.

7  Q     Why not?

8  A     Because the FBI was not with me.

9  Q     Did you report that meeting?

10          THE INTERPRETER:  Counsel, would you repeat that

11 question for the interpreter.

12 BY MS. JAIMEZ:

13 Q     Did you report that meeting to the FBI?

14          THE INTERPRETER:  Thank you.

15          THE WITNESS:  Yes.

16 BY MS. JAIMEZ:

17 Q     Did you communicate again with the defendant after that

18 September 19th meeting?

19 A     Yes.

20 Q     And how did you communicate with the defendant after that

21 meeting?

22 A     Through a call.

23 Q     And were any of those calls recorded?

24 A     Yes.

25 Q     How many times, approximately, did you record calls with

1    the defendant between September and October of 2013?

2    A     Seven or six times.

3    Q     And who recorded those calls?

4    A     The FBI did.

5    Q     Now, prior to your testimony today, did you review those

6    recordings?

7    A     Yes.

8    Q     And how did you review them?

9    A     I listened to the recordings.

10   Q     And did they accurately reflect your calls with the

11   defendant?

12   A     Yes.

13   Q     Did you mark the disk in any way so that you would be able

14   to recognize them during your testimony today?

15   A     Yes.

16   Q     How did you mark them?

17   A     I put my initials on them.

18   Q     Now, looking again at the exhibit binder before you,

19   please take a moment to turn to Exhibits 102, 103, 107 and 108.

20         What are these disks -- or what are these exhibits, excuse

21   me?

22   A     It's a Xerox copy of the disks of the recordings that the

23   FBI made with me regarding Mikey.

24   Q     How do you know that?

25   A     Because my initials are there.

1    Q     And at the time you reviewed those recordings, did you

2    recognize the voices on those recordings?

3    A     Yes.

4    Q     And whose voices are they?

5    A     Mikey's and mine.

6    Q     How were you able to recognize the defendant's voice?

7    A     Because I know him.

8    Q     And how many times did you hear the defendant speak before

9    making those recordings?

10   A     Many times.

11   Q     And when speaking on those recordings, did you ever refer

12   to the defendant by name?

13   A     Yes.

14   Q     And what name did you use?

15   A     Mikey.

16   Q     Now, when did you speak with the defendant again after

17   that September 19th meeting?

18   A     On the 25th.

19   Q     And how did you contact him?

20   A     Through a call.

21   Q     Do you remember what time that first call was that you

22   made on the 25th?

23   A     3:25, something around there.

24   Q     And was that call recorded?

25   A     Yes.

1           MS. JAIMEZ:  Your Honor, permission to publish

2    102-A, the translation of the call between the witness and the

3    defendant.

4           THE COURT:  Yes.  Go right ahead.

5       (Recording played in open court.)

6    BY MS. JAIMEZ:

7    Q    Now, Mr. Yader Gutierrez, can you summarize the purpose of

8    this call?

9    A    Yes, to remind him that his contact or worker had not

10   called me.

11   Q    And how did the defendant respond when you reminded him of

12   that?

13   A    Oh, he told me that he had forgotten but that he was going

14   to call him.

15   Q    Now, during the conversation defendant says he wants you

16   to pay all of it.  How did you interpret that?

17   A    Yes, that he's not going to give me any credit on the

18   drugs, that I have to pay them all at once.

19   Q    Now, during the call you also asked whether you would be

20   dealing with the defendant or his contacts.  Why did you ask

21   that?

22   A    Because I know that the drugs are his, and I also know

23   that that is very dangerous.

24   Q    Why did you believe working with the defendant's contact

25   would be dangerous?

1    A      Because I did not know him.

2    Q      And were you ever able to overcome that concern or that

3    worry?

4    A      Yes.  He told me that it was one of his people.

5    Q      How did you understand the comment that it was one of his

6    people?

7    A      That it's a worker of his.

8    Q      Now, when the defendant said, "I am not doing that.  I am

9    just passing it on to him," how did you understand that

10   comment?

11   A      Well, yes, at that moment he wasn't the one selling the

12   drugs, but he's giving the drugs to his worker so that they

13   could sell them.

14   Q      Did you think the defendant had retired from the drug

15   trade?

16   A      No.

17   Q      And why did you think that?

18   A      Because he told me that he had the drugs -- well, that the

19   drugs were his, but he's giving it to his worker.

20   Q      And what did you believe the defendant's involvement would

21   be with the transaction going forward?

22   A      Could you repeat the question, please?

23   Q      What did you believe the defendant's involvement would be,

24   if any, with the transaction going forward?

25   A      To get me in touch with his worker.

```
 1   Q    Now, Mr. Yader Gutierrez, did you have any other calls

 2   with the defendant on September 25th?

 3   A    Yes.

 4   Q    At approximately what time?

 5   A    3:50.

 6   Q    And was that call also recorded?

 7   A    Yes.

 8             MS. JAIMEZ:  Your Honor, permission to publish

 9   Exhibit 103-A, the call between the defendant and witness.

10             THE COURT:  Go right ahead.

11             MS. JAIMEZ:  Thank you.

12        (Recording played in open court.)

13   BY MS. JAIMEZ:

14   Q    What was the purpose of this call?

15   A    To see if he had gotten in touch with his worker.

16   Q    And how had he responded?

17   A    That "yes," that he was working.

18   Q    And at the time of making this call, how were you feeling

19   about the idea of working with the defendant's contact?

20   A    I was feeling more at ease.

21   Q    Did the defendant say anything to put you more or less at

22   ease?

23   A    Yes.

24   Q    What did he say?

25   A    That it was his nephew.
```

1    Q    And why was that important to you?

2    A    Because I know that it's a relative of his.

3    Q    And why would that be relevant?

4    A    Because it's not like meeting a new person.

5    Q    Now, did the defendant's nephew ever contact you as the

6    defendant promised?

7    A    Yes.

8    Q    How did he contact you?

9    A    He called me.

10   Q    When did he call you?

11   A    That same day, on the 25th.

12   Q    And was that call recorded?

13   A    No.

14   Q    Why not?

15   A    The FBI was not with me.

16   Q    Now, at the time you spoke with the defendant's nephew,

17   had you ever spoken to him before that?

18   A    No.

19   Q    And what did you and the defendant's nephew talk about on

20   that first call?

21   A    He asked me if I was interested in buying product from

22   him.

23   Q    And how did you interpret the term "product"?

24   A    Drugs.

25   Q    Did he say anything else?

```
1   A    He told me that if I wanted to buy the drugs, that he
2   could show them to me.
3   Q    During the call do you recall whether or not he mentioned
4   if he was related to the defendant?
5   A    Yes.  He told me that he was a relative of his, of
6   Mikey's.
7   Q    And did the defendant's nephew mention how he got your
8   number?
9   A    Yes, through Mikey.
10  Q    Now, during that call, did the defendant's nephew ask you
11  to do anything?
12  A    Yes.  He told me that he wanted to see me, that he wanted
13  to agree upon a place so that he could show me his drugs.
14  Q    And how did you respond?
15  A    I said "yes" to him at that moment, but later I sent him a
16  text message.
17  Q    And what did you say in the text message?
18  A    I told him that I had to go to Los Angeles to get some
19  money.
20  Q    And why did you send that message?
21  A    Because I had to report to the FBI.
22  Q    Were you trying to delay the meeting in some way?
23  A    Yes.
24  Q    Now, at the time of that call with the defendant's nephew,
25  what phone were you using?
```

1    A     During that -- excuse me?

2    Q     During that first call with the defendant's nephew, what

3    phone were you using?  Were you using a cell phone?

4    A     Yes.  It was my telephone, a cell phone.

5    Q     And during that call were you able to capture the number

6    of the defendant's nephew on your phone?

7    A     Yes.

8    Q     And what did you do with the phone number?

9    A     I saved it in my contacts.

10   Q     And how did you save it in your contacts?

11   A     I assigned the name "the contact."

12   Q     Why did you assign it the name "the contact" as opposed to

13   an actual name?

14   A     Because he never gave me his name and because he was

15   Mikey's contact.

16   Q     And did you report that phone call to the FBI?

17   A     Yes.

18   Q     After that first call did you have any additional contact

19   with defendant's nephew that day?

20   A     Yes.  We exchanged text messages.

21   Q     Now, turning your attention to the exhibit binder again,

22   please turn to what's been previously admitted as Exhibit 104.

23         Do you recognize this item?

24   A     Yes.

25   Q     And what is it?

1  A    Those are the messages that I sent to the contact, to

2  Mikey's nephew.

3          MS. JAIMEZ:  Your Honor, permission to publish

4  Exhibit 104-A the translation of the text messages.

5          THE COURT:  Certainly.

6          MS. JAIMEZ:  Thank you, Your Honor.

7  Q    Now, in Exhibit 104, who was the contact speaking here?

8  A    Mikey's nephew.

9  Q    And what color are the messages sent by Mikey's nephew?

10 A    Blue.

11 Q    What did the defendant's nephew text you at 5:16 P.M.?

12 A    "I'll be there like in 10 minutes."

13 Q    And what is he talking about here?

14 A    Of the last call between us where he wanted to show me his

15 drugs.

16 Q    And how did you respond to his text message?

17 A    That I had to go to Los Angeles to get some money.

18 Q    Would you read the text message you sent at 5:19?

19 A    Yes.  "Hey, if you want I'll call you.  I have to go to

20 Los Angeles to get some money.  I'm going to want an ounce and

21 a half.  I will call you when I arrive."

22 Q    Just to be clear, why did you say you had to go to Los

23 Angeles?

24 A    Because I had to delay seeing him.  I had to report to the

25 FBI.

```
 1   Q    Now, during this text message exchange, did you and the
 2   defendant's nephew talk about pricing at all?
 3   A    Yes.
 4   Q    And what was said?
 5   A    That each ounce of methamphetamine, that he could give it
 6   to me for $600.
 7   Q    Can you read the text message sent by the contact at 5:21?
 8   A    "Well, I leave it at 600, but when we" -- "when we see
 9   each other, we will talk about it."
10   Q    And how did you interpret this message?
11   A    Yes, that each ounce of methamphetamine, he was going to
12   give it to me for $600.
13   Q    Did you have any opinion about that price?
14   A    Yes.  It was very expensive.
15   Q    Why did you think that the price was too expensive?
16   A    Because I had talked to Mikey about it, and it was less;
17   it was 450.
18   Q    And when had you spoken with Mikey about it?
19   A    On the 19th.
20   Q    Did you ultimately meet with the defendant's nephew on
21   September 25th?
22   A    No.
23   Q    And why not?
24   A    Because I had to report to the FBI and get ready for the
25   purchase.
```

**UNITED STATES DISTRICT COURT**

```
 1    Q     Now, turning your attention to the events of the following
 2    day, September 26, 2013.  Do you recall making any calls that
 3    day?
 4    A     Yes.
 5    Q     And who did you call that day?
 6    A     Mikey.
 7    Q     And what happened when you called Mikey?
 8    A     He did not answer.
 9    Q     What happened next?
10    A     We sent him a text message.
11    Q     Now, turning your attention to the exhibit binder before
12    you, what has previously been marked Exhibit 105.  Take a
13    moment and turn there.
14          Do you recognize this exhibit?
15    A     Yes.
16    Q     And what is it?
17    A     Those are the messages that I sent Mikey.
18               MS. JAIMEZ:  Your Honor, permission to publish
19    Exhibit 105-A, the translation.
20               THE COURT:  Certainly.
21    BY MS. JAIMEZ:
22    Q     Now, when were the last two text messages sent?
23    A     On the 26th of September.
24    Q     And can you read that first message that you sent on the
25    26th of September to the defendant.
```

**UNITED STATES DISTRICT COURT**

```
 1   A     "Hey Maky, I already spoke to your nephew.  Please call
 2   me.  I want to tell you something."
 3   Q     And when had you spoken with the nephew?  What time were
 4   you referring to?
 5   A     On the 25th.
 6   Q     And what did you want to tell Mikey in this message?
 7   A     That his nephew was giving me the drugs at a very
 8   expensive price.
 9   Q     Did the defendant respond to that text?
10   A     No.
11   Q     What did you do after that?
12   A     We called the contact, or Mikey's nephew.
13   Q     And did he answer your call?
14   A     We realized that his phone was disconnected.
15   Q     What did you do after realizing his phone was
16   disconnected?
17   A     We sent him a text message.
18   Q     Who did you send the message to?
19   A     The message went to the contact, or Mikey's nephew.
20   Q     Now, turning your attention to the exhibit binder again,
21   what's been marked as Exhibit 106.
22         Do you recognize that item?
23   A     Yes.
24   Q     And what is that?
25   A     It's the message that I sent to the contact.
```

1    Q    And when did you send that message?

2    A    On the 26th.

3              MS. JAIMEZ:  Your Honor, permission to publish the

4    translation of Exhibit 106.

5              THE COURT:  Go right ahead.

6              MS. JAIMEZ:  Thank you, Your Honor.

7    Q    And what time on the 26th did you send that text message?

8    A    5:10.

9    Q    And can you read the message you sent at 5:10?

10   A    Yes.  "Hey, when can we meet?  I already have the money."

11   Q    Did the defendant's nephew respond to that message?

12   A    No.

13   Q    What did you do after that?

14   A    We called Mikey once again.

15   Q    And was that successful?

16   A    No.

17   Q    Did you do anything else to try to get in touch with

18   anyone?

19   A    Yes.  We sent Mikey another text message.

20   Q    Now, turning back to Exhibit 105.  What time did you send

21   that next text message?

22   A    5:54.

23   Q    And what did you say in that message?

24   A    "Hey Maky, you never called me."

25   Q    Why were you trying to get in touch with the defendant at

**UNITED STATES DISTRICT COURT**

```
 1    this time?
 2    A    Because Mikey was the only person who knew his contact, or
 3    his nephew.
 4    Q    Why did you think that Mikey would be able to help you?
 5    A    Because it's Mikey's worker.
 6    Q    Did anyone respond to your text messages or efforts to
 7    communicate?
 8    A    Yes.
 9    Q    Who?
10    A    Mikey did.
11    Q    And approximately what time did Mikey call you?
12    A    6:10, 6:15, something around there.
13    Q    And was that call recorded?
14    A    Yes.
15    Q    And why were you able to record that call?
16    A    Because the FBI was with me.
17             MS. JAIMEZ:  Your Honor, permission to publish the
18    call with the translations at Exhibit 107-A.
19             THE COURT:  Go right ahead.
20             MS. JAIMEZ:  Thank you, Your Honor.
21        (Recording played in open court.)
22    BY MS. JAIMEZ:
23    Q    Who's speaking in this call?
24    A    Mikey and I.
25    Q    Were you actually able to hear the defendant when you took
```

1    the call?

2    A    Yes.

3    Q    Do you have any idea why some of the recording is

4    inaudible?

5    A    Yes, because we were in a place that was very noisy and

6    because there was a lot of interference.

7    Q    Can you summarize the purpose of this call?

8    A    Yes.  I told Mikey that I was trying to find his nephew.

9    Q    How did the defendant respond when you asked him whether

10   or not the defendant's nephew's phone was cut off?

11   A    That he did not know, that he hadn't been in touch with

12   him.

13   Q    Did he say anything about trying to get in touch with the

14   defendant's nephew?

15   A    Yes.  He told me that he was going to try to call him so

16   that he would get in touch with me.

17   Q    Now, during the call you said that you were working with

18   other people.

19   A    Yes.

20   Q    Who were you referring to?

21   A    To the FBI.

22   Q    And how did the defendant respond to that comment, that

23   you were working with other people?

24   A    He told me that if I wanted to buy drugs for him -- well,

25   he didn't refer specifically to drugs.  He said that if I

1   wanted to buy something from him, that I should go all by

2   myself, that he didn't want anybody else there.

3   Q    Now, during the call you say, "We already have enough for

4   two."  What did you mean by that statement?

5   A    Yes, that I had enough of -- well, that I had enough to

6   buy two ounces from him of methamphetamine.

7   Q    And what was the defendant's reaction to that statement?

8   A    "Okay.  That's fine."

9   Q    You also say during the call that your buddy trusts you

10  and that you're waiting.

11  A    Yes.

12  Q    How did the defendant respond to that statement?

13  A    He said the same thing, that I shouldn't take anybody, and

14  that if we wanted to do a deal, that he wanted to do it with me

15  and with nobody else.

16  Q    Do you recall whether or not the defendant said he would

17  tell his nephew anything?

18  A    Yes.  He said that as soon as he got in touch with him, he

19  would tell him that I was looking for him in order to do the

20  purchase.

21  Q    Did you speak with the defendant again that day, on

22  September 26th?

23  A    Yes.

24  Q    At approximately what time?

25  A    Approximately almost 5:00.

**UNITED STATES DISTRICT COURT**

```
 1   Q     Are you having difficulty remembering the times from that
 2   day?
 3   A     A little bit.
 4   Q     Would looking at an exhibit perhaps help refresh your
 5   recollection?
 6   A     Yes.
 7   Q     Can you please take a moment to turn to Exhibit 108.
 8         Please take a moment to review it, review the writing.
 9         Does that help assist you in remembering the timing of
10   that day?
11   A     Yes.
12   Q     Do you remember what time that second call took place?
13   A     Yes.
14   Q     Approximately what time?
15   A     6:43.
16   Q     And was that call recorded?
17   A     Yes.
18         MS. JAIMEZ:  Your Honor, permission to publish the
19   call translation between the defendant and the witness.
20         THE COURT:  Go right ahead.
21    (Recording played in open court.)
22   BY MS. JAIMEZ:
23   Q     Now, who's speaking on this call?
24   A     Mikey and I.
25   Q     And were you able to hear the defendant at the time of the
```

1  actual call?

2  A    Yes.

3  Q    And why did you make this call?

4  A    To see if he could -- if he might have found his nephew.

5  Q    And how did the defendant respond when you said, "Tell him

6  to bring it down a bit.  We had agreed it was less"?

7  A    Yes, he told me that he was going to tell him to bring

8  down the price of the drugs.

9  Q    And how did the defendant respond when you said, "Tell him

10  so that I can make some profit too"?

11  A    "Okay.  I'll tell him."

12  Q    And finally, how did the defendant respond when you said,

13  "Tell him to call me then"?

14  A    "Okay.  I'll tell him to call you."

15  Q    And who was he going to have call you?

16  A    His nephew.

17  Q    Did you ever hear back from the defendant's nephew that

18  day?

19  A    Yes.

20  Q    How long after your last call with the defendant?

21  A    20, 25 minutes.

22  Q    And about what time was it when you heard from the

23  defendant's nephew?

24  A    7:10, something around there.

25  Q    And did the defendant's nephew call you from the same

1    phone number?

2    A    From another number.

3    Q    How did you know that it was the defendant's nephew?

4    A    I could recognize his voice.

5    Q    And was that call recorded?

6    A    Yes.

7    Q    And why was that?

8    A    Because the FBI was there with me.

9    Q    Now, please take a brief moment to look at Exhibits 109,

10   110 and 111.

11        What are these exhibits?

12   A    They are Xerox copies of disks that contain the recordings

13   of my calls to Mikey and back by the FBI.

14   Q    Your calls with whom?

15   A    I beg your pardon.  The calls between Mikey's nephew and

16   I.

17   Q    And do these calls accurately reflect -- or do these

18   exhibits accurately reflect these calls?

19   A    Yes.

20   Q    Now, turning your attention to that 7:00 P.M. call we just

21   discussed, that call was recorded?

22   A    Yes.

23        MS. JAIMEZ:  Permission to publish, Your Honor, that

24   call between the defendant and the witness at Exhibit 109-A.

25        THE COURT:  Go right ahead.

```
1          (Recording played in open court.)
2    BY MS. JAIMEZ:
3    Q    Were you able to hear the defendant's nephew at the time
4    the call was made?
5    A    Yes.
6    Q    Can you please summarize the purpose of this 7:00 P.M.
7    call.
8    A    Yes.  The purpose was to find him in order to conduct the
9    purchase.
10   Q    And how did the defendant's nephew explain his
11   disconnected phone?
12   A    He told me that that same day they were disconnecting
13   it -- well, that his telephone plan was over that day.
14   Q    And how did the defendant's nephew respond when you said
15   you had arranged it for less with Mike?
16   A    He asked me the price.  He said, "How much is Mike giving
17   it to you for?"
18        And I said, "450."
19        And then he said, "Well, if you talked to him about it, I
20   can leave it at about that price, 450."
21   Q    And how did the defendant's nephew respond when you said,
22   quote, "What's the lowest you can give it to me?"
23   A    He said, "Around 450."
24   Q    Next, you say, "Do you have two ready or not?"  What did
25   you mean by that?
```

**UNITED STATES DISTRICT COURT**

1    A    Two ounces.

2    Q    And what did the defendant's nephew say?

3    A    Yes, that they were ready.

4    Q    And how did the two of you end the call?

5    A    He told me that he was going to call me back to see where

6    we could agree to get together.

7    Q    And did you have another call?

8    A    Yes.

9    Q    Was that also recorded?

10   A    Yes.

11            MS. JAIMEZ:  Your Honor, permission to publish

12   between the defendant's nephew and the witness at Exhibit

13   110-A.

14            THE COURT:  Go right ahead.

15       (Recording played in open court.)

16   BY MS. JAIMEZ:

17   Q    Now, what happened during this call?

18   A    We were talking about where we were going to meet to buy

19   the drugs.

20   Q    And what did you decide?

21   A    We decided to see each other in North Hollywood, at the

22   McDonald's parking.

23   Q    And did the defendant's nephew mention the type of car he

24   would be in or the color of car?

25   A    Yes, a white car.

```
 1  Q     Now, before actually meeting with the defendant's nephew,
 2  did you do anything to prepare?
 3  A     Yes.  They put a video recorder on my shirt.  They gave me
 4  money to buy the drugs.
 5  Q     And before actually meeting with defendant's nephew, did
 6  you have any additional calls?
 7  A     Yes.
 8  Q     With who?
 9  A     With Mikey's nephew.
10  Q     And was that call also recorded?
11  A     Yes.
12          MS. JAIMEZ:  Your Honor, permission to publish
13  Exhibit 111-A.
14          THE COURT:  Go right ahead.
15      (Recording played in open court.)
16  BY MS. JAIMEZ:
17  Q     Where were you during this call?
18  A     I had already arrived at the place we agreed upon.
19  Q     Where was that?
20  A     At the parking lot of McDonald's in North Hollywood.
21  Q     And were you with anyone when you took that call?
22  A     At that moment I was in my car by myself, but the FBI was
23  in the surrounding area.
24  Q     Now, were there any other recorded calls between you and
25  the defendant's nephew before the meeting?
```

```
 1   A     Yes.
 2              MS. JAIMEZ:  Permission to publish, Your Honor.
 3              THE COURT:  Go right ahead.
 4              MS. JAIMEZ:  Still Exhibit 111.
 5              THE COURT:  Yes.
 6        (Recording played in open court.)
 7   BY MS. JAIMEZ:
 8   Q     And did you see the white Chrysler mentioned in this call?
 9   A     Yes.
10   Q     What happened after you spotted the white Chrysler?
11   A     I parked beside him, and I got into his car.
12   Q     And was the meeting that you then had with the defendant's
13   nephew recorded?
14   A     Yes.
15              MS. JAIMEZ:  Your Honor, permission to publish the
16   remainder of Exhibit 111-A.
17              THE COURT:  Go right ahead.
18        (Recording played in open court.)
19   BY MS. JAIMEZ:
20   Q     Now, did you purchase any drugs during the meeting just
21   played?
22   A     Yes.
23   Q     And what did you purchase?
24   A     Methamphetamine.
25   Q     Now, turning to the exhibit binder before you, please take
```

1    a moment, to what's been previously marked as Exhibit 201-A,

2    previously marked and admitted.

3         Your Honor, permission to publish Exhibit 201-A.

4              THE COURT:  Okay.  Go right ahead.

5    BY MS. JAIMEZ:

6    Q    Now, do you recognize Exhibit 201-A?

7    A    Yes.

8    Q    And what is it?

9    A    They're the drugs that I bought from Moreno, Mikey's

10   nephew.

11   Q    And how do you know that?

12   A    Because those are the drugs that I bought from him, and

13   when I turned them over to the FBI, they took that picture in

14   front of me.

15   Q    And what, if anything, did the defendant's nephew call

16   these drugs?

17   A    Pink Champagne.

18   Q    What quantity is pictured here in 201-A?

19   A    Two ounces.

20   Q    And how much did the defendant's nephew charge for these

21   two ounces?

22   A    950.

23   Q    And was this amount more or less than what he originally

24   quoted you?

25   A    Less.

```
 1   Q     Did he explain why he reduced the price?
 2   A     Yes, because he said that if I had talked to Mikey, then
 3   there was no problem, that he was going to reduce the price to
 4   what I had talked about to Mike.
 5   Q     Now, during that meeting did the defendant's nephew tell
 6   you what you should call him?
 7   A     Yes, "Moreno."
 8   Q     Now, during the meeting you asked Moreno or defendant's
 9   nephew whether he was working with Mike or whether the work was
10   his own.  Why did you ask that question?
11   A     To get more information from him.
12   Q     And how did you interpret the statement that the product
13   was from the same company?
14   A     Yes, that they're the same ones, that it's the same drugs
15   from Mikey.
16   Q     And how did you understand the nephew's statement that,
17   quote, Mike doesn't sell small ones?
18   A     That Mike only moves pounds or half pounds.
19   Q     And how did you understand his statement that they were
20   all one hand or one finger of one hand?
21   A     Yes, that they are an organization, that Mike has somebody
22   above him who gives him the drugs, and Mike has his workers to
23   distribute those drugs.
24   Q     Now, also during this meeting you asked Moreno if he's met
25   Catracho or Nestor.
```

1    A     Yes.

2    Q     And who were you referring to here?

3    A     To a friend that I had.

4    Q     You said at that time that you had such a struggle and

5    people were returning drugs in connection with a past event.

6    A     Yes.

7    Q     What were you referring to here?

8    A     I found out that he had a lot of problems because the

9    drugs that he sold were very cut up so they were being returned

10   to him.

11   Q     The drugs that who sold?

12   A     Nestor.

13   Q     Why were you adding information about Nestor to this

14   meeting?

15   A     So that he would trust me more and give me more

16   information.

17   Q     Now, during this meeting did Moreno, or defendant's

18   nephew, give you any tips or advice on how to communicate?

19   A     Yes.  He told me that he didn't use the telephone too

20   much.  He told me that I should send him a text message so that

21   he would call me, and that he changes telephones every month.

22   Q     Did he mention any code language that he used?

23   A     Yes.  He asked me that if I wanted one peso or half a

24   peso.

25   Q     And what would "peso" refer to?

```
 1   A      One peso is one ounce.
 2   Q      Now, how did you interpret the final statement, "Mike and
 3   I are the same.  Mike doesn't like to move small amounts"?
 4   A      Yes, if they're the same, that they belong to the same
 5   group of drug sellers.
 6   Q      Now, after that sale were you ever asked to identify the
 7   defendant's nephew?
 8   A      Yes.
 9   Q      And were you able to do so?
10   A      No.
11   Q      Why not?
12   A      Because the time of the purchase was the first time I ever
13   saw him.  It was dark, and he was wearing a cap.
14   Q      And how long was that meeting that you had with him?
15   A      Eight to ten minutes.
16   Q      So how many times had you seen the defendant's nephew
17   before you were asked to identify him?
18   A      One time, just the time when I bought the drugs from him.
19   Q      And did you, in fact, ID somebody else as the defendant's
20   nephew?
21   A      Yes.
22   Q      And why was that?
23   A      Because the two looked alike.  They have the same skin
24   color and everything.
25   Q      Now, in contrast, how many times have you seen the
```

1   defendant in person?

2   A    Many times.

3   Q    How many times have you heard the defendant speak?

4   A    Many times.

5   Q    How many times had you heard the defendant speak before

6   becoming an informant?

7   A    Many times.

8   Q    Could you be mistaken about the defendant's voice on the

9   audio recordings?

10   A    No.  I'm sure it's him.

11   Q    Now, in your work as an informant, did you ever try to

12   purchase additional drugs through the defendant?

13   A    Yes.

14   Q    And how did you attempt to make another purchase?

15   A    Through a call.

16   Q    And when did you make such call?

17   A    October 7.

18   Q    Was that call also recorded?

19   A    Yes.

20         MS. JAIMEZ:  Your Honor, permission to publish the

21   call on October 7th, Exhibit 112-A.

22         THE COURT:  I think we should wait.  We are going to

23   take a midmorning recess at this time.  We will take it up

24   right after that.

25         Everyone please rise for the jury.

```
 1          (Out of the presence of the jury.)

 2              THE COURT:  You may step down, Mr. Gutierrez.

 3  Return in about 10 or 15 minutes.

 4          Please be seated.  We are outside the presence of the

 5  jury.  Are there any matters that counsel wish to raise at this

 6  time?

 7              MR. NAVARRO:  No, Your Honor.

 8              THE COURT:  All right.

 9              MS. JAIMEZ:  Nothing from the Government,

10  Your Honor.  Thank you.

11              THE COURT:  All right.  We will take about 10, 15

12  minutes.

13              THE COURTROOM DEPUTY:  Court is in recess.

14          (Recess taken from 10:53 A.M. to 11:11 A.M.)

15          (Out of the presence of the jury.)

16              THE COURTROOM DEPUTY:  Please remain seated and come

17  to order.  This court is once again in session.

18              THE COURT:  We are again outside the presence of the

19  jury, and I understand that there is a matter to be taken up.

20              MS. JAIMEZ:  Yes, Your Honor, one housekeeping

21  matter.  We would ask the Court to give an instruction to the

22  jury that the English translations are what would be admitted

23  into evidence and not any of the Spanish recordings or the

24  Spanish testimony by the witness.  We've provided some proposed

25  language to the Court already, and we have previously shown it
```

1    to defense counsel, who has no objection.

2              THE COURT:  Well, to me, this is the kind of

3    instruction that's normally given.  It isn't necessarily given

4    at the time, but no real problem.  Let me just take a look --

5              MS. JAIMEZ:  Thank you, Your Honor.

6              THE COURT:  -- at what we have in O'Malley, and then

7    I will decide which one to give.  But I take it you wish it to

8    be given at this time.

9              MS. JAIMEZ:  Yeah, prior to resuming direct

10   testimony, just so that it is clear for the jurors, Your Honor.

11             THE COURT:  All right.

12        Let me just check the O'Malley instruction.

13             MS. JAIMEZ:  Thank you, Your Honor.

14        (Pause in proceedings.)

15             THE COURTROOM DEPUTY:  Please remain seated and come

16   to order.

17             THE COURT:  We are still outside the presence of the

18   jury.  I wanted to check on various of the instructions.  And

19   while I have no problem with the Ninth Circuit model 2.8 and

20   2.9 as you've modified it, the O'Malley, it's actually

21   different in that usually the transcripts under that

22   suggested -- the number I think was 14.09 of O'Malley.  The

23   actual recordings are the evidence, and the transcripts are

24   just provided for the convenience of the jurors.

25        But since both sides agree to the Ninth Circuit criminal

1  model we will do that.  But at the time of actually

2  instructing, I'm also going to consider giving O'Malley's

3  101.50, the official translation, which reads:  "Language other

4  than English is being used or has been used during this trial

5  with some witnesses, one or more witnesses.  You are to

6  consider only that evidence provided through the official court

7  interpreter.  Although some of you may know the language used,

8  it is important that all jurors consider the same evidence.

9  Therefore, you must base your decision on the evidence

10 presented in the English interpretation and disregard any

11 different meaning of the nonEnglish words," but we can consider

12 that later.  I will go ahead and make use of the Ninth Circuit

13 criminal model 2.8 and 2.9 modified.

14            MS. JAIMEZ:  Thank you, Your Honor.

15            THE COURT:  Let's bring the jurors back in.

16        (Pause in proceedings.)

17            THE COURT:  I think it might be best I just give

18 this once they have completed the testimony of this witness.

19            MS. JAIMEZ:  Your Honor, the Government has no

20 objection.  We just wanted to clarify for the jurors that the

21 translation was, in fact, evidence.

22            THE COURT:  Yes.

23        (Pause in proceedings.)

24            THE COURTROOM DEPUTY:  Please rise.

25        (In the presence of the jury.)

1           THE COURT:  Please be seated, ladies and gentlemen.

2    We are going to continue now with the Government's case.

3        Mr. Gutierrez, would you please repeat your name for the

4    record.

5           THE WITNESS:  Yes, Yader Gutierrez.

6           THE COURT:  And you understand you are still under

7    oath in this matter?

8           THE WITNESS:  Yes.

9           THE COURT:  Go ahead, Ms. Jaimez.

10           MS. JAIMEZ:  Your Honor, the Government seeks

11   permission to publish the October 7th, 2013 call between the

12   witness and the defendant, Exhibit 112-A.

13           THE COURT:  Go right ahead.

14       (Recording played in open court.)

15   BY MS. JAIMEZ:

16   Q    Now, Mr. Gutierrez, what was the purpose of this call?

17   A    To try to buy more drugs from him.

18   Q    Now, you said during the call that you wanted half a pound

19   this time.  Why did you want half a pound as opposed to a few

20   ounces?

21   A    To have more evidence.

22   Q    And what did you mean when you said you wanted it to be,

23   quote, good like the one they gave you?

24   A    Yes, that the drugs shouldn't be cut.

25   Q    And how did you interpret the defendant's statement that,

```
 1  quote, he would give you warranty and everything?
 2  A    Yes, that all of the drugs that I would buy from him would
 3  not be cut, but that they would be fine.
 4  Q    Now, changing subjects here, Mr. Gutierrez, did you
 5  receive any benefits in exchange for your work as an informant?
 6  A    Yes.
 7  Q    And what were those benefits?
 8  A    Money, they're helping me with my immigration situation,
 9  and they helped me to travel from one place to the other to
10  come here for this case.
11  Q    And how much have you received altogether for your help
12  with respect to this case?
13  A    $9,000.
14  Q    Over what period of time?
15  A    A year and a half, almost two.
16  Q    And how have you used that money?
17  A    I use it for my family, for my mother, to pay for the car
18  that I had.
19  Q    Did you use the money to relocate anywhere?
20  A    Yes.
21  Q    And why did you need to relocate?
22  A    Because in this case, I am not safe here.
23  Q    And why don't you feel safe?
24  A    Because being a witness, something could happen to me.
25  Q    Now, you mentioned travel benefits.  Can you describe
```

**UNITED STATES DISTRICT COURT**

```
 1   those a little bit more?
 2   A    Yes.  They pay for airline travel.  They pay for the hotel
 3   and for food.
 4   Q    And with respect to what event, sir?  When was that done?
 5   A    Last year.
 6   Q    And were those benefits only for assisting with your
 7   testimony?
 8   A    Yes.
 9   Q    Now, you also mentioned some immigration benefits.  Can
10   you describe those a little bit more?
11   A    Yes.  It's a temporary visa to be in this country.
12   Q    Are you receiving permanent residency of some sort?
13   A    No.
14   Q    Now, in addition to the benefits, are there also
15   disadvantages to assisting the FBI?
16   A    Yes.
17   Q    And what are those?
18   A    Because of all the traveling, I lost my job.  I fear for
19   the life of my son or my family and mine.
20   Q    And why were you traveling so much?
21   A    Because every time I came here to Los Angeles, they
22   postponed the case.
23   Q    Now, changing subjects again, Mr. Gutierrez, have you ever
24   used drugs?
25   A    Yes.
```

```
 1   Q     And when was that?

 2   A     In January.

 3   Q     Do you continue to use drugs?

 4   A     No.

 5   Q     And did you report that instance to the FBI?

 6   A     Yes.

 7   Q     Now, turning to your prior relationship with the

 8   defendant, did you ever hear the defendant talk about drugs

 9   prior to the September sale?

10   A     Yes.

11   Q     And what did you hear him talk about?

12   A     He was arguing with my friend about some drugs that had

13   been lost.

14   Q     And what was the discussion about specifically?

15   A     That my friend had some drugs in his car, and that the

16   drugs had been lost, and that he had to pay for them.

17   Q     And was this the only instance where you witnessed such

18   arguments?

19   A     No.

20   Q     Have you ever personally seen the defendant sell drugs?

21             THE INTERPRETER:  Interpreter needs to clarify,

22   please, Your Honor.

23             THE COURT:  Yes.

24             THE INTERPRETER:  Thank you, Your Honor.

25             THE WITNESS:  I have seen him give orders to another
```

```
 1    person so that person will deliver drugs to somebody else.
 2    BY MS. JAIMEZ:
 3    Q    Now, you previously testified that you had used drugs
 4    before.  You mentioned in January.  Are you certain that was
 5    January, or are you a little -- or could it have been a
 6    different date?
 7              MR. NAVARRO:  Your Honor, objection; asked and
 8    answered.
 9              THE COURT:  Sustained.
10    BY MS. JAIMEZ:
11    Q    Finally, Mr. Gutierrez, with respect to the McDonald's
12    deal, how were you able to get in touch with the defendant's
13    nephew?
14    A    How I could -- could you please repeat that question?
15    Q    Who put you in touch with the defendant's nephew?
16    A    Mikey.
17    Q    And would you have met the defendant's nephew had it not
18    been for the defendant?
19    A    No.
20              MS. JAIMEZ:  No further questions.  Thank you.
21              THE COURT:  Cross-examination, Mr. Navarro?
22              MR. NAVARRO:  Thank you, Your Honor.
23         Can I have just a minute, Your Honor?
24         (Pause in proceedings.)
25              MR. NAVARRO:  Thank you, Your Honor.
```

```
1              THE COURT:  Surely.
2                    CROSS-EXAMINATION
3   BY MR. NAVARRO:
4   Q    Good morning, sir.
5   A    Good morning.
6   Q    Your birth name is Yader Gutierrez, correct?
7   A    Exactly.
8   Q    But you're known by some nicknames, correct?
9   A    Yes.
10  Q    What are those nicknames?
11  A    Nica.
12  Q    N-i-c-a?
13  A    Yes.
14  Q    And also Bicho?
15  A    Sometimes they call me Bicho.
16  Q    And these are nicknames you have acquired over your life,
17  correct?
18              THE INTERPRETER:  Interpreter needs to clarify,
19  Your Honor.
20              THE COURT:  Yes.
21              THE WITNESS:  Yes.
22  BY MR. NAVARRO:
23  Q    Now, you're 26 years old.  When did you first come to this
24  country?
25  A    The first time, like in 2007 or something like that.
```

**UNITED STATES DISTRICT COURT**

1   Q    So you would have been about 18 years old?

2   A    19.

3   Q    And you came to this country -- where are you from

4   originally?

5   A    Nicaragua.

6   Q    So you came from Nicaragua to this country.  Did you come

7   as a tourist with a visa?

8   A    No.

9            MS. JAIMEZ:  Objection, Your Honor; relevance.

10           THE COURT:  It's overruled.

11       You may continue.

12  BY MR. NAVARRO:

13  Q    How did you come into this country?

14           THE INTERPRETER:  I'm sorry, Counsel.

15  BY MR. NAVARRO:

16  Q    How did you come into this country?

17           THE INTERPRETER:  Thank you.

18           THE WITNESS:  By land through coyotes.

19           MS. JAIMEZ:  Objection, Your Honor; beyond the scope

20  of direct.

21           THE COURT:  It's overruled.

22  BY MR. NAVARRO:

23  Q    When you first came at age 19, you came illegally?

24  A    Yes.

25  Q    And from that moment did you remain in this country, or

1   did you go back to your home country?

2   A    Here in this country.

3   Q    So you have been here since age 19?

4   A    Yes.

5   Q    And you are an auto mechanic by trade, correct?

6   A    Yes.

7   Q    Now, you testified on direct that you knew Ismael

8   Gutierrez before you became an informant for the FBI, correct?

9   A    Yes.

10   Q    How long did you know him?

11   A    Approximately two to three years.

12   Q    And during those two to three years, what was the nature

13   of your relationship with Ismael Gutierrez?

14   A    We were -- we would just greet each other like, "Hey,

15   what's happening?" just like it through my friend.

16   Q    And which friend are we talking about?

17   A    Nestor.

18   Q    So you knew Ismael Gutierrez through your friend Nestor?

19   A    Exactly.

20   Q    And Nestor and you were friends?

21   A    Yes.

22   Q    Now, during the time you knew Nestor, isn't it true that

23   you would deliver narcotics for Nestor?

24   A    No.

25   Q    So it's your testimony today that you never delivered any

1    narcotics whatsoever on behalf of your friend Nestor?

2    A      No.

3    Q      You testified just a few minutes ago that being an

4    informant is dangerous.

5    A      Exactly.

6    Q      And you've relocated?

7    A      Exactly.

8    Q      Now, when you relocated, was that because of a specific

9    threat to your life?

10   A      No.

11   Q      So no one's come knocking at your door looking for your

12   children, correct?

13   A      No, but I found out that many things happened.

14   Q      I am talking about you.  With respect to you, did anyone

15   ever threaten you as a result of your cooperation in this case?

16   A      No.

17   Q      And as a result of your cooperation, I believe you

18   testified you've received over 9,000 -- about $9,000?

19   A      Yes.

20   Q      Now, you didn't get those $9,000 all at once, correct?

21   A      No.

22   Q      You got a thousand dollars in October of 2013, correct?

23   A      Yes.

24   Q      And you also got $1600 in January of the following year,

25   2014, correct?

```
 1   A     Yes.

 2   Q     And you also received $200 in April of last year, correct?

 3   A     Yes.

 4   Q     And you also got a thousand dollars in July of last year,

 5   correct?

 6   A     Yes.

 7   Q     And you also got $1500 in August of last year, correct?

 8   A     Yes.

 9   Q     Let me ask you about the $1,000 you got in the year 2013.

10   Did you report those to the IRS?

11   A     No.

12   Q     And the money that you received in 2014, which is about

13   $4300, did you report that to the IRS for the year 2014?

14   A     No.

15   Q     And you also received money this year, correct?

16   A     Yes.

17   Q     Now, in addition to the money that you've received, you've

18   also received a temporary visa, correct?

19   A     Yes.

20   Q     Now, you're hoping to stay in this country, correct?

21   A     Possibly.

22   Q     You want to go back to Nicaragua?

23   A     No.

24   Q     So you want to stay in this country?

25   A     Yes, exactly.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    And you're hoping that the FBI will help you stay in this
 2   country since you're an informant, correct?
 3   A    I hope to resolve -- well, to help the FBI to resolve this
 4   case.
 5   Q    Let me ask the question again.  I don't think you
 6   understood my question.  I can't ask you in Spanish.  I want
 7   to, but I can't.
 8              THE COURT:  Just ask it again, please.
 9              MR. NAVARRO:  Thank you, Your Honor.
10   Q    You are hoping that the FBI could help you with your
11   immigration situation, correct?
12   A    Yes.
13   Q    Now, in addition to the immigration benefits and the money
14   you've received, you also elicited the help of the FBI when you
15   got pulled over by the police in Oklahoma, correct?
16   A    Yes.
17   Q    You were stopped for speeding in June of last year, and
18   you called the FBI, correct?
19   A    Yes.
20   Q    And the FBI took care of the ticket for you, correct?
21   A    Yes.
22   Q    And then -- you got a parking ticket after that, last year
23   sometime, and you called the FBI to help you with that parking
24   ticket, correct?
25   A    Yes.
```

```
1   Q    Did they help you with that?

2   A    I think so.

3   Q    Now, after that, you had troubles making your car

4   payments.  Remember that?

5   A    Yes.

6   Q    And Agent Alker called your finance company on your

7   behalf, correct?

8   A    Yes.

9   Q    He called them two times, correct?

10  A    Exactly.

11  Q    And as a result of that, your vehicle was not repossessed,

12  correct?

13  A    Yes.

14  Q    Now, when you first became an informant for the FBI, you

15  met with other agents aside from Agent Alker, correct?

16  A    Yes.

17  Q    There was at least one officer who spoke your language,

18  correct?

19  A    Yes.

20  Q    And that officer or agent will translate from Spanish into

21  English what was being explained to you, correct?

22  A    Yes.

23  Q    They would explain to you the ground rules of becoming an

24  informant, correct?

25  A    Yes.
```

```
1   Q     They went over what you could and could not do as an

2   informant, correct?

3   A     Yes.

4   Q     Do you recall what those rules were?

5   A     Yes.

6   Q     What were they?

7   A     Not to use drugs, do not carry a weapon in my car, do not

8   try to buy drugs from another person without the FBI being

9   there present, many things like that.  I hardly remember, but

10  yes, those are some.

11  Q     Now, did they -- were you required to sign any kind of a

12  contract and sign it?

13  A     Yes.

14  Q     And did you sign that contract?

15  A     Yes.

16  Q     And you broke your promise, correct?

17  A     Why?

18  Q     You used drugs.

19  A     One time.

20  Q     And you were told you could not use drugs, correct?

21  A     Exactly.

22  Q     In January of this year, correct?

23  A     Yes.

24  Q     You used cocaine?

25  A     Exactly.
```

```
1   Q    Now, after you used the cocaine, you didn't call the FBI

2   and tell them that you used cocaine, correct?

3   A    I let the FBI know, but it was not at that moment.

4   Q    You informed them when you were questioned about preparing

5   for this trial, correct?

6   A    Exactly.

7   Q    So you did not call the FBI from wherever you were living

8   at to inform them that you had broken your promise and your

9   agreement, correct?

10  A    Yes.

11  Q    Now, in preparation for this trial, you spoke to the FBI

12  and the prosecutors a number of times, correct?

13  A    Yes.

14  Q    How many times were you flown here from wherever you were

15  coming from?

16  A    Three times.

17  Q    And each of those times you stayed at a hotel, correct?

18  A    Of course.

19  Q    And the FBI or the Government paid for your meals and your

20  hotel, correct?

21  A    Yes.

22  Q    And your airfare, correct?

23  A    Yes.

24  Q    And every time you met, you were preparing for this trial,

25  correct?
```

**UNITED STATES DISTRICT COURT**

1    A    Yes.

2    Q    And during one of those meetings, you discussed a

3    situation where you, yourself, were involved in criminal

4    activity?

5    A    What?  Can you repeat the question, please?

6    Q    Yes.  Do you recall meeting with the prosecutors and the

7    agents and telling them that you were involved in a situation

8    where there were four people in the car, and an individual by

9    the name of Jorge was threatened?

10   A    I was there, but, I mean, it was them that were

11   threatened.

12   Q    And you were in the car, correct?

13   A    Yes.

14   Q    And your friend Nestor was there, correct?

15   A    Of course.

16   Q    And a couple of other individuals were present as well,

17   correct?

18   A    Yes.

19   Q    And one of these individuals had a weapon, correct?

20   A    Yes.

21   Q    And the weapon was not loaded, correct?

22   A    Exactly.

23   Q    Because you checked it, correct?

24   A    I did not check it.  My friend checked it.

25   Q    Your friend Nestor checked it, and the weapon was clean?

```
 1                THE COURT:  You must answer out loud.

 2                THE WITNESS:  Oh, okay.

 3   BY MR. NAVARRO:

 4   Q     The weapon was not loaded?

 5   A     It was not loaded.

 6   Q     And your friend Nestor gave the gun to another individual,

 7   correct?

 8   A     Yes.

 9   Q     And the four of you went up to Jorge to take a truck,

10   correct?

11   A     Yes.  We went because Nestor wanted to talk to him.

12   Q     And Jorge ran, correct?

13   A     I do not know what his name is, if it's Jorge or -- I

14   don't know.

15   Q     Isn't that the name you gave -- when you met with the

16   Government, isn't that the name you gave for this individual,

17   Jorge?

18   A     But Juan -- I don't know.  They always use several names.

19   Q     This individual, Juan, Jorge, whatever it is, he took off,

20   correct?

21   A     Yes, he ran off.

22   Q     Now, do you know if he knew that the weapon was unloaded?

23                THE INTERPRETER:  Interpreter needs to clarify.

24                THE WITNESS:  Nobody showed the weapon to him.

25   BY MR. NAVARRO:
```

**UNITED STATES DISTRICT COURT**

1   Q    And were you ever prosecuted for that incident?

2   A    No.

3   Q    You were never arrested, correct?

4   A    No.

5   Q    Now, you testified early this morning that you had a

6   meeting with Ismael Gutierrez, that you met with him in person

7   a number of times on March 19th -- I'm sorry, September 19th, I

8   apologize, 2013.  Do you remember that?

9   A    Yes, I remember.

10  Q    Now, where was this meeting at?

11  A    In his cousin's house.

12  Q    What's his cousin's name?

13  A    I do not remember what his name is.

14  Q    So you met up -- so it's your testimony you met up with

15  Ismael Gutierrez at his cousin's house?

16  A    Exactly.

17  Q    And it was at this meeting that you testified that Ismael

18  Gutierrez told you that he had two pounds of methamphetamine or

19  access to two pounds of methamphetamine, correct?

20  A    Yes.

21  Q    And this meeting was not recorded, correct?

22  A    It was not recorded.

23  Q    Now, before you went to the cousin's house, did you call

24  the FBI to tell them you were going over to the house?

25  A    No.

1    Q    And hadn't you been told that you were to contact him only

2    through them?

3    A    Yes.

4    Q    But you decided to go on your own?

5    A    No, because there were also exceptions.

6    Q    Well, one of the exceptions was if he called, you could

7    call him back, correct?

8    A    Yes.

9    Q    And this was more than that exception, correct?  This

10   actually required to meet in person?

11   A    Yes.

12   Q    Now, before the investigation in this case, had you done

13   any mechanical work for Ismael Gutierrez?

14   A    No.

15   Q    You had never worked on a vehicle for him?

16   A    No.

17   Q    And you testified as well today it was during this meeting

18   you had at Ismael Gutierrez's cousin's house that you discussed

19   a $450-per-ounce price, correct?

20   A    Yes.

21   Q    Now, you also testified that there were other instances

22   when you heard Ismael Gutierrez discuss narcotics.

23   A    Yes.

24   Q    You testified about an incident with your friend.  I

25   assume Nestor, correct?

```
 1   A      Yes.

 2   Q      And during this incident you testified that you overheard

 3   them arguing about narcotics, correct?

 4   A      Yes.

 5   Q      You testified that you overheard a disagreement about

 6   stolen narcotics, correct?

 7   A      Yes.

 8   Q      And you testified that there were some narcotics that had

 9   been stolen from a vehicle?

10   A      Yes.

11   Q      And this was Nestor's vehicle?

12   A      Yes.

13   Q      And you testified that because of that, Ismael Gutierrez

14   was upset with Nestor, correct?

15   A      Yes.

16   Q      Now, you also testified about another incident where you

17   heard Ismael Gutierrez order another person to deliver drugs to

18   a third party.

19   A      Yes.

20   Q      Who was this person that you testified you heard Ismael

21   Gutierrez order to deliver drugs?

22   A      Nestor.

23   Q      So you're testifying that Ismael Gutierrez told Nestor to

24   deliver some drugs to a third party?

25   A      To give them to that person.
```

**UNITED STATES DISTRICT COURT**

```
1   Q    And this was in your presence?

2   A    Yes.

3   Q    Where did this take place at?

4   A    In a mechanic's shop.

5   Q    Is that a mechanic's shop that you worked at?

6   A    Yes.

7   Q    And were you working there that day?

8   A    Yes.

9   Q    And if you know, what was Ismael Gutierrez doing there?

10  A    He met there with a person that I worked with.

11  Q    Your boss?

12  A    No, a co-worker.

13  Q    Another auto mechanic?

14  A    Yes.

15  Q    And it was at that mechanic's shop that this conversation

16  took place?

17  A    Yes.

18  Q    Now, you also told the authorities that there were other

19  incidents where you overheard Mr. Ismael Gutierrez talk about

20  narcotics or argue about narcotics with your friend Nestor,

21  correct?

22  A    Yes.

23  Q    You told them that there was an incident where you were

24  all hunting.  Do you remember that?

25            MS. JAIMEZ:  Objection, Your Honor; beyond the scope
```

```
 1    of direct.
 2              THE COURT:  It's overruled.
 3         You may proceed.
 4              THE WITNESS:  Yes.
 5    BY MR. NAVARRO:
 6    Q    You went on a hunting trip with Ismael Gutierrez and your
 7    friend Nestor, correct?
 8    A    Yes.
 9    Q    And you went hunting near Lancaster, correct?
10    A    Yes.
11    Q    And you went in a white convertible, correct?
12    A    Yes.
13    Q    What time of the year was this, if you remember?
14    A    I don't remember the years too well, really.
15    Q    Was it in the springtime, summertime, fall?
16    A    It was in summer.
17    Q    So in the summer you went on this hunting trip.  And what
18    types of firearms did you guys take on this hunting trip?
19    A    A .38 that was there in the house that we arrived.
20    Q    .38 caliber revolver?
21    A    Yes.
22    Q    Any other weapons?
23    A    R-15.
24    Q    AR-15 rifle?
25    A    Yes.
```

```
 1   Q    Did you guys do any actual hunting on that trip?

 2   A    Yes.

 3   Q    What did you hunt?

 4        THE INTERPRETER:  Interpreter needs a moment,

 5   please, Your Honor.

 6        THE COURT:  Certainly.

 7        THE INTERPRETER:  Thank you.

 8        THE WITNESS:  Deer.

 9   BY MR. NAVARRO:

10   Q    So you killed some deer?

11   A    Yes.  They killed them.

12   Q    How many did they kill?

13   A    One.

14   Q    And did they bring the deer back home?

15   A    They took them to their houses.

16   Q    And during this hunting trip, according to what you told

17   the police, Ismael Gutierrez was very upset because he wanted

18   to get back to Los Angeles to deal with a customer, correct?

19   A    Yes.

20   Q    Now, on September 26 of 2013, you purchased drugs from an

21   individual that you learned was named Moreno, correct?

22   A    That is correct.

23   Q    Now, this is an individual that's been referenced as

24   Ismael Gutierrez's nephew, correct?

25   A    Yes.
```

```
 1   Q     Now, do you know if, in fact, he is his blood relative as
 2   a nephew?
 3   A     No.
 4   Q     And when you showed up to the McDonald's parking lot to
 5   meet with the individual known as Moreno, you had been given a
 6   recording device, correct?
 7   A     Yes.
 8   Q     Now, the recording device, did it record audio and video
 9   or just audio?
10   A     It would record, and it would film.
11   Q     And during the meeting you had with Moreno, the meeting
12   was recorded on audio, correct?
13   A     Yes.
14   Q     I believe you were shown earlier -- you were played a copy
15   of the audio.
16           THE COURT:  Counsel, wait until you get back to the
17   lectern, please.
18           MR. NAVARRO:  Sorry, Your Honor.  I am just trying
19   to find it here.
20           THE COURT:  That's okay.  Take your time.
21   BY MR. NAVARRO:
22   Q     Prior to meeting with Moreno on September 26 of 2013, you
23   had several phone calls with him, correct?
24   A     Yes.
25   Q     And you eventually met up at the McDonald's parking lot,
```

**UNITED STATES DISTRICT COURT**

```
 1  correct?

 2  A     Yes.

 3  Q     And you shook hands, correct, when you got in his car?

 4  A     Yes.

 5  Q     And he said his name was Moreno, correct?

 6  A     He told me that he was Moreno.

 7  Q     And he told you that the product he was delivering to you

 8  was Pink Champagne, correct?

 9  A     Yes.

10  Q     And he told you that it was from the same company as

11  Mikey, correct?

12  A     Yes.

13  Q     And he told you that he was in charge of selling items

14  like this, correct?

15  A     Yes.

16  Q     And you indicated to him that Mikey sold larger amounts,

17  correct?

18  A     Yes.

19  Q     And he, Moreno, told you that he, himself, Moreno, also

20  sold large quantities, correct?

21  A     Yes.

22  Q     And that's when you mentioned your friend Nestor, correct?

23  A     Yes.

24  Q     You were trying to get Moreno's confidence, correct?

25  A     Yes.
```

```
 1  Q    Now, did you know at that point whether Moreno and Nestor
 2  knew each other?
 3  A    No.
 4  Q    But you did tell Moreno during that meeting that "We were
 5  having some problems" -- "We were struggling," I'm sorry?
 6  A    Yes.
 7  Q    And when you said "we," you were talking about yourself
 8  and Nestor, correct?
 9  A    Yes.
10  Q    You told him -- you implied to him that Nestor and you
11  were struggling with selling narcotics that Nestor had,
12  correct?
13  A    I said that in order to obtain more information from him.
14  Q    You said that in a way to make it seem as if you were a
15  drug dealer, correct?
16  A    Yes.
17  Q    And you were name-dropping, correct?
18  A    Of course.
19  Q    Did that cause you any concern that Moreno would contact
20  Ismael Gutierrez or other individuals to corroborate what you
21  were saying?
22  A    I possibly thought about it, but Mike knows that Nestor is
23  my friend, and then they think that I was probably selling
24  drugs with Nestor.
25  Q    Who's "they"?
```

**UNITED STATES DISTRICT COURT**

```
1    A    Mike and all his friends.

2    Q    So as far as you were concerned, Mike and his friends

3    thought you were a drug dealer because you had a friend named

4    Nestor who was a drug dealer?

5    A    Yes.

6    Q    And during this same meeting that you had with Moreno, you

7    discussed buying narcotics in the future from him, correct?

8    A    Yes.

9    Q    You talked about cocaine, correct?

10   A    Yes.

11   Q    You talked about methamphetamine, correct?

12   A    Yes.

13   Q    And you talked about specific prices?

14   A    Yes.

15   Q    Discussed how much it would be for an ounce, $1200 or

16   something to that effect, correct?

17   A    Yes.

18   Q    And you decided to -- he give you his cell phone number,

19   and you added him to your contact list, correct?

20   A    Yes.

21   Q    And Moreno never told you at that meeting that for any

22   future dealings you had with him you had to go through Ismael

23   Gutierrez?

24           THE INTERPRETER:  I'm sorry, Counsel, "you had to go

25   through" --
```

**UNITED STATES DISTRICT COURT**

```
 1              MR. NAVARRO:  Ismael Gutierrez.

 2              THE INTERPRETER:  Thank you.

 3              THE WITNESS:  He told me that they were all one and

 4    the same.

 5    BY MR. NAVARRO:

 6    Q    He said that "We're all part of one hand," correct?

 7    A    No -- well, he said that, but he also said that if I

 8    wanted to buy, that the drugs were all the same whether they

 9    were from Mike or they were his.

10    Q    Did he ever tell you that he got his drugs from Mike?

11    A    He just told me that he got my number from Mikey.

12    Q    Let me ask you again.  Prior to September 26th, you had

13    never met Moreno, correct?

14    A    Exactly.

15    Q    And you misidentified him, correct?

16    A    Yes.

17    Q    Two times, correct?

18    A    Yes.

19    Q    And during the time that you spoke with Moreno, whether it

20    was in texts, telephone or in person, he never told you that he

21    got his drugs from Mike, correct?

22    A    Yes.

23    Q    He did tell you that?

24    A    No, no, he did not tell me.

25    Q    That is not in any text, correct?
```

```
 1   A    Yes.

 2   Q    Not in any phone call?

 3   A    He told me that it was from the same company.

 4   Q    And you've interpreted that to mean that somehow it comes

 5   from Ismael Gutierrez, correct?

 6   A    Yes.

 7   Q    Now, you also had conversations with Ismael Gutierrez on

 8   October 7th of 2013.  Remember those conversations?

 9   A    Yes.

10   Q    You called him twice on October 7th of 2013, correct?

11   A    Yes.

12   Q    And both of those calls were done at the direction of the

13   FBI, correct?

14   A    Yes.

15   Q    Now, at this point you had already purchased drugs from

16   Moreno, correct?

17   A    Yes.

18   Q    And you had Moreno's cell number, correct?

19   A    Yes.

20   Q    He was known as the contact on your cell phone?

21   A    Yes.

22   Q    And Moreno and you had discussed the possibility of him

23   selling you narcotics in the future, correct?

24   A    Yes.

25   Q    He had told you call it one peso, two pesos, whatever it
```

1    may be?

2    A     Yes.

3    Q     He had given you codes to use when texting him, correct?

4    A     Yes.

5    Q     And he told you he preferred to sell in small amounts?

6    A     Yes.

7    Q     Because he could make more money that way, correct?

8    A     Yes, that is correct.

9    Q     He even told you where he hung out?

10   A     Yes.

11   Q     He told you he sold drugs near a Jack-in-the-Box, correct?

12   A     Yes.

13   Q     And he told you he can get you large amounts as well,

14   correct?

15   A     Yes.

16   Q     And yet, on October 7th you called Ismael Gutierrez?

17   A     Yes.

18   Q     Because you were instructed to try to get a larger amount

19   of narcotics, and this time get it directly from Ismael

20   Gutierrez, correct?

21   A     Yes.

22   Q     And you called him two times?

23   A     Yes.

24   Q     The first time you tried to get him to incriminate

25   himself, correct?

```
 1   A     Yes.

 2   Q     Tried to get him to give you a price, correct?

 3   A     Yes.

 4   Q     And he never gave you a price, correct?

 5   A     No.

 6   Q     Then you talked to him a second time on October 7th,

 7   correct?

 8              MS. JAIMEZ:  Objection; assumes facts not in

 9   evidence, Your Honor.

10              THE COURT:  It's overruled.

11        You may continue.

12              MR. NAVARRO:  Can I have a second, Your Honor, to

13   confer with Government counsel?

14              THE COURT:  You may.

15        (Counsel conferred off the record.)

16   BY MR. NAVARRO:

17   Q     And during the second call you had with Ismael Gutierrez,

18   you guys talked about auto repairs, correct?

19   A     Yes.

20   Q     He was complaining to you about a vehicle that was making

21   funny noises, correct?

22   A     Yes.  He was talking to me about a vehicle.

23   Q     And he discussed with you having you look at the vehicle

24   when he got back, correct?

25   A     Yes.
```

UNITED STATES DISTRICT COURT

1          MR. NAVARRO:  Can I have a second, Your Honor, to

2    confer with my client?

3          THE COURT:  You may.

4          MR. NAVARRO:  Thank you.

5      (Counsel and defendant conferred off the record.)

6          MR. NAVARRO:  Your Honor, I don't have any

7    additional questions.  Thank you.

8          THE COURT:  Thank you.

9      We are going to take a luncheon recess at this time.

10   Everyone please rise for the jury.

11     Go right out, ladies and gentlemen.  I ask that you come

12   back at 1:45.

13       You may step down, Mr. Gutierrez.  Return at 1:45.

14       (Out of the presence of the jury.)

15          THE COURT:  Please be seated.

16     We are outside the presence of the jury.  Are there any

17   matters that any counsel wish to take up at this time.

18          MS. JAIMEZ:  Nothing from the Government,

19   Your Honor.

20          THE COURT:  All right.

21          MR. NAVARRO:  No, Your Honor, not yet.

22          THE COURT:  Very well, 1:45.

23          THE COURTROOM DEPUTY:  The Court is in recess.

24       (Recess taken from 12:23 P.M. to 1:52 P.M.)

25       (Out of the presence of the jury.)

**UNITED STATES DISTRICT COURT**

1          THE COURTROOM DEPUTY:  Please remain seated and come

2   to order.  This court is once again in session.

3          THE COURT:  Good afternoon.  We are still outside

4   the presence of the jury.  I understand that the problem

5   involving the next few witnesses has been taken care of, and

6   they are letting people in.  Nobody's been shot at the federal

7   building, and the drama continues.  If there's nothing, we will

8   bring members of the jury in.

9          MS. JAIMEZ:  Nothing from the Government,

10  Your Honor.

11      (In the presence of the jury.)

12          THE COURT:  Please be seated.

13      And good afternoon, ladies and gentlemen.  You've heard

14  about the drama over at Main Street, always something, but

15  usually the something is nothing, and it's probably going to

16  resolve here, but we are going to continue.

17      And, Mr. Gutierrez, would you once again repeat your name

18  for the record.

19          THE WITNESS:  Yes, Yader Gutierrez.

20          THE COURT:  And you understand that you are still

21  under oath in this matter?

22          THE WITNESS:  Yes.

23          THE COURT:  All right.  You may commence your

24  redirect examination, Ms. Jaimez.

25                    **REDIRECT EXAMINATION**

```
 1   BY MS. JAIMEZ:

 2   Q     Now, before lunch, Mr. Gutierrez, you heard defense

 3   counsel ask you about the McDonald's methamphetamine deal.  Do

 4   you remember that?

 5   A     Yes.

 6   Q     And you testified that Moreno had told you that the drugs

 7   sold were from the same company?

 8   A     Yes.

 9   Q     What was your understanding of the defendant's involvement

10   with that company?

11   A     To sell drugs to me through his nephew, through Moreno.

12                MS. JAIMEZ:  Thank you.

13          No further questions, Your Honor.

14                THE COURT:  Anything further of this witness?

15                MR. NAVARRO:  No, Your Honor.

16                THE COURT:  Mr. Gutierrez, would you explain how it

17   is that you became the confidential source, an informant, for

18   the FBI?

19                THE WITNESS:  How it was that -- could you please

20   repeat the question?

21                THE COURT:  Yes.  How was it that you became an

22   informant for the Federal Bureau of Investigation?

23                THE WITNESS:  After the death of my friend, they

24   were the ones who called me.

25                THE COURT:  The FBI?
```

```
1              THE WITNESS:  From L.A.P.D., Detective Gutierrez.
2              THE COURT:  And they put you in touch with the FBI?
3              THE WITNESS:  Yes, that is correct.
4              THE COURT:  Any questions from either of the
5    Government or Mr. Navarro based on the Court's question and
6    answer from this defendant?
7              MS. JAIMEZ:  Nothing from the Government,
8    Your Honor.  Thank you.
9              THE COURT:  Mr. Navarro?
10             MR. NAVARRO:  No, Your Honor.  Thank you.
11             THE COURT:  Mr. Gutierrez, you're excused.  Thank
12   you.
13        The Government may call its next witness.
14             MR. AZAT:  United States calls Los Angeles police
15   officer Doug Johnson.
16             THE COURT:  Thank you.
17        (Pause in proceedings.)
18             MR. AZAT:  It's my understanding, Your Honor, the
19   witness was using the restroom, so it will just be a moment.
20             THE COURT:  Very well.
21        Just be at ease, ladies and gentlemen.
22        (Pause in proceedings.)
23             THE COURT:  Would you come forward, please.  Just
24   leave the bottle there.  Come right up on the witness stand and
25   be sworn, please.  On the witness stand.
```

```
 1                   THE WITNESS:  Yes, sir.

 2                   THE COURTROOM DEPUTY:  Please raise your right-hand.

 3          DOUGLAS JOHNSON, PLAINTIFF'S WITNESS, WAS SWORN

 4                   THE WITNESS:  Yes, ma'am, I do.

 5                   THE COURTROOM DEPUTY:  Please have a seat.

 6            State and spell your name for the record.

 7                   THE WITNESS:  Good afternoon.  I'm Douglas,

 8      D-o-u-g-l-a-s, Johnson, J-o-h-n-s-o-n.

 9                   THE COURT:  Do you have a middle name?

10                   THE WITNESS:  I do, sir.  It's Mark, M-a-r-k.

11                   THE COURT:  Thank you.

12            You may proceed.

13                   MR. AZAT:  Thank you, Your Honor.

14                          DIRECT EXAMINATION

15      BY MR. AZAT:

16      Q    Good afternoon, Officer Johnson.

17      A    Good afternoon, sir.

18      Q    Where are you employed?

19      A    I am employed by the Los Angeles Police Department where I

20      work at the Topanga division investigating robberies.

21      Q    What is your current rank with the L.A.P.D.?

22      A    I am a detective.

23      Q    How long have you been a police officer with the L.A.P.D.?

24      A    Since September of 2005.

25      Q    And what duties does your position there entail?
```

1   A    My current position centers on the investigation of

2   robberies that occur within the Topanga division.

3   Q    Direct your attention to September 26, 2013.  Do you

4   remember where you were that day?

5   A    Yes, sir, I do.

6   Q    Where were you?

7   A    I was assisting the FBI in a federal task force with an

8   undercover operation to buy narcotics in North Hollywood.

9   Q    What time of the day was that?

10  A    It was the evening hours.  I think we got there sometime

11  around 6:30, and we stayed there until a little bit after 9:00.

12  Q    Do you remember -- did you witness a transaction or

13  something occur that evening?

14  A    Yes, sir, I did.

15  Q    What did you see happen?

16  A    We were at a McDonald's parking lot where we were told to

17  expect a transaction for methamphetamine to occur between a

18  gentleman who we knew to be an informant and another gentleman

19  that we didn't know specifically that was supposed to show up

20  in the parking lot, and they were supposed to meet, exchange

21  narcotics and then both go their separate ways.

22  Q    And what was your assignment during that event?

23  A    My assignment that day was specifically to get as close as

24  I could to the parking lot, in a position where I could see the

25  whole transaction go down, and then to watch the transaction

1    from start to finish.

2    Q    Can you explain to the jury, please, what it is you saw

3    happen.

4    A    Absolutely.  My partner and I parked our car and sat with

5    eyes on the parking lot just a little bit before 8:00, and then

6    we were told to expect the informant to show up right around

7    8:00 specifically.  Right around 8:00 we saw the informant

8    drive up in his car and park, and then we saw him get out of

9    his car.  And he went over and he spoke with a gentleman that

10   was standing outside of a white Chrysler 300.

11        They spoke briefly, and then they both got into the car,

12   the front seats, and they sat.  And they sat inside the car for

13   the better part of 10 minutes.  And then after they got out,

14   the informant walked back to his car and drove away.  And about

15   the same time, the other gentleman in the Chrysler drove away.

16   Q    Approximately how far away from the gentleman in the white

17   Chrysler were you?

18   A    You know, I went out there yesterday to get a more concise

19   measurement, but if I had to estimate, it was between 25 and

20   30, 35 yards.  It was very close.

21   Q    Was it dark out?

22   A    It was definitely dark out, but the parking lot of the

23   McDonald's was uniquely situated under four very bright high-

24   pressure sodium lights, very bright lights.

25   Q    Did you get a good look at the person who was driving the

1    white Chrysler?

2    A    Yes, sir.

3    Q    I would like to show you an exhibit that's been previously

4    admitted.  If you can please flip over to the exhibit binder

5    that you have in front of you.  It's the white exhibit binder

6    that's -- it is marked as -- previously admitted as Government

7    Exhibit 914.

8    A    If you would just give me a moment.

9         I am looking at the Exhibit 914.

10   Q    Do you recognize the man in Exhibit 914?

11   A    Yes, sir, I do.  That's the gentleman that was driving the

12   white Chrysler.

13        MR. AZAT:  Your Honor, with the Court's permission,

14   may I please publish Exhibit 914?

15        THE COURT:  Yes.  Go right ahead.

16   BY MR. AZAT:

17   Q    What did you see after the two gentlemen met in the

18   parking lot of McDonald's?  What did they do?

19   A    They spoke briefly outside.  The white Chrysler was

20   actually backed into the parking spot, so they stood near the

21   left side of the car.  They exchanged, it looked like, a

22   regular greeting between two people that casually knew each

23   other.  They talked for a couple seconds.  And then this

24   gentleman here, the gentleman in the picture, got into the

25   driver's side of the car, and our informant got in the right

1    front seat of the car almost immediately after they had their

2    greeting.

3    Q    Did you see them get out of the car?

4    A    Yeah.  They were in the car for the better part of ten

5    minutes, eight or nine minutes, as I recall, but no, they sat

6    in the car.  And then after eight or nine minutes, they got

7    out, and then the informant went back to his car.

8              MR. AZAT:  One moment, please, Your Honor.

9              THE COURT:  Surely.

10             MR. AZAT:  No further questions, Your Honor.  Thank

11   you.

12             THE COURT:  Any cross-examination, Mr. Navarro?

13             MR. NAVARRO:  No questions, Your Honor.

14             THE COURT:  Thank you, very much, Detective.  You're

15   excused.

16             THE WITNESS:  Thank you, Your Honor.

17             THE COURT:  Before we call our next witness, I want

18   to give several other instructions to the members of the jury.

19        Now, ladies and gentlemen, you know that a language other

20   than English has been used during this trial, and that may be

21   true with yet another witness other than Mr. Gutierrez.  You

22   are to consider only the evidence which has been provided

23   through the official court interpreters.

24        Although some of you may know the language used, Spanish

25   in this particular case, it's important that all of you jurors

1    consider the same evidence.  Therefore, you must base your

2    decision on the evidence presented in the English

3    interpretation and disregard any different meaning of the

4    nonEnglish words, even if you understand some Spanish

5    yourselves.

6         And also, you've heard and may hear further recordings in

7    the Spanish language.  Transcripts of these recordings have

8    been admitted into evidence, and these transcripts are the

9    official English-language translation of the recordings.  And

10   you have also heard and will probably hear testimony with

11   regard to the Spanish language through an official court

12   interpreter.

13        And although some of you may know the Spanish language, it

14   is important that all jurors consider the same evidence.

15   Therefore, you must accept the English translation which is

16   contained in the transcripts and have been received into

17   evidence already even if you would translate it differently.

18        The Government may call its next witness.

19             MS. JAIMEZ:  Your Honor, the Government calls

20   Special Agent Jeremy Stebbins.

21             THE COURT:  Thank you.

22        (Pause in proceedings.)

23             THE COURT:  Would you come straight ahead.  Come

24   right up to the witness stand to be sworn, please.  Right up on

25   the witness stand.

1          THE COURTROOM DEPUTY:  Please raise your right hand.

2          **JEREMY STEBBINS, PLAINTIFF'S WITNESS, WAS SWORN**

3          THE WITNESS:  I do.

4          THE COURTROOM DEPUTY:  Please have a seat.

5     State and spell your name for the record.

6          THE WITNESS:  My name is Jeremy Stebbins,

7     S-t-e-b-b-i-n-s.

8          THE COURT:  And do you have a middle name?

9          THE WITNESS:  Yes, I do.  It's Michael.

10          THE COURT:  And spell that for us, please.

11          THE WITNESS:  M-i-c-h-a-e-l.

12          THE COURT:  Thank you.

13     Go ahead, please, Ms. Jaimez.

14                    **DIRECT EXAMINATION**

15     BY MS. JAIMEZ:

16     Q     Good afternoon, Agent Stebbins.

17     A     Good afternoon, ma'am.

18     Q     Where are you currently employed?

19     A     I work for the Federal Bureau of Investigation.

20     Q     And what is your position there?

21     A     I am a special agent.

22     Q     And how long have you been a special agent?

23     A     Approximately ten and a half years.

24     Q     And what are your duties as a special agent?

25     A     I investigate federal and state crimes utilizing several

1    different investigative tools.

2    Q    Such as --

3             THE COURT:  Where do you office?

4             THE WITNESS:  My office is downtown, working on

5    narcotics investigations with the DEA.

6             THE COURT:  Downtown Los Angeles?

7             THE WITNESS:  Yes, it is, Your Honor.

8             THE COURT:  Go ahead, please.

9    BY MS. JAIMEZ:

10   Q    You were discussing your duties as a special agent.

11   A    Yes, ma'am.

12   Q    Do those duties also include surveillance?

13   A    Yes, ma'am.

14   Q    You remember the events of October 25th, 2013?

15   A    Yes, I do.

16   Q    And where were you at approximately 1:30 P.M.?

17   A    I was conducting surveillance of Ismael Vilavazo on 11461

18   Oxnard Street in North Hollywood, California.

19   Q    And why were you conducting surveillance at this Oxnard

20   address?

21   A    Defendant Vilavazo was the subject of an ongoing

22   investigation.

23   Q    Do you see the subject of your ongoing investigation in

24   the courtroom today?

25   A    Yes, I do.

```
 1   Q    Could you please point to the person and note for the
 2   record what he is wearing.
 3   A    It's the gentleman sitting at defense table wearing a
 4   black shirt.
 5            THE COURT:  Indicating, for the record, the
 6   defendant in this matter.
 7   BY MS. JAIMEZ:
 8   Q    Now, directing your attention, Agent Stebbins to the
 9   exhibit binder before you.  Please take a moment to turn to
10   what's been previously marked as 916.
11   A    Yes, ma'am, I have it.
12   Q    Do you recognize this exhibit?
13   A    Yes, I do.
14   Q    What is it?
15   A    It's a map of the San Fernando Valley area.
16   Q    And how do you know that?
17   A    I have conducted surveillance in the San Fernando Valley
18   many times.
19            MS. JAIMEZ:  Government moves Exhibit 916 into
20   evidence, Your Honor.
21            THE COURT:  It will come in.
22       (Exhibit 916 received.)
23            MS. JAIMEZ:  Permission to publish, Your Honor.
24            THE COURT:  Go right ahead.
25   BY MS. JAIMEZ:
```

**UNITED STATES DISTRICT COURT**

1    Q    Now, looking at the map in Exhibit 916, where were you

2    conducting surveillance on October 25th, 2013?

3    A    At the little pointer marked "A."

4    Q    Now, directing your attention to previously admitted

5    Exhibit 910.  Can you please take a moment to turn there.

6         Permission to publish Exhibit 910, Your Honor.

7              THE COURT:  Yes.  Certainly.

8    BY MS. JAIMEZ:

9    Q    What is Exhibit 910?

10   A    It's the Audi station wagon.

11   Q    And how do you know?

12   A    I have seen this on surveillance on October 25th.

13   Q    And where did you see this Audi on October 25th?

14   A    It was parked in the parking area at 11461 Oxnard Street.

15   Q    And did you see anything after you initially observed the

16   Audi parked at the Oxnard address?

17   A    Yes.

18   Q    What did you observe?

19   A    I observed a defendant access the Audi several times to

20   the trunk area and then also the driver's area of the car.

21   Q    And did the defendant ever enter the car?

22   A    Yes, he did.

23   Q    What happened after the defendant entered the Audi?

24   A    The second time he entered the car, he drove out of the

25   parking area at 11461 Oxnard Street.

1    Q    What did you do after the defendant left?

2    A    I radioed to my team that he was coming out.  My team

3    continued to follow him.  I waited a few minutes, and then I

4    followed.

5    Q    And what route did you take when you followed him?

6    A    We went westbound on Oxnard Street, and then he entered

7    the 170 Freeway northbound.  Then he exited Roscoe Boulevard

8    and went westbound on Roscoe Boulevard.

9    Q    Now, can you turn back to the previously admitted Exhibit

10   916 --

11   A    Yes, ma'am.

12   Q    -- and indicate there the route that was taken on that map

13   with your finger.

14        And then turning to the next page of that same exhibit,

15   the following page of the same exhibit.

16        And then how did it continue?

17   A    (Indicating.)

18   Q    And what happened at approximately 2:00 P.M. that day?

19   A    He exited the freeway westbound on Roscoe, then he made a

20   quick northbound turn on Truesdale Street, then he stopped on

21   the side of the road at Truesdale Street.

22   Q    And where approximately was that on Exhibit 916?

23   A    It's at the pointer marked "B."

24   Q    And approximately how long was he at the Truesdale spot?

25   A    I would say several minutes.

```
1    Q    Now, directing your attention to the narcotics sale that
2    took place on September 26, 2013, are you familiar with that
3    sale?
4    A    Yes, ma'am.
5    Q    And how are you familiar with that sale?
6    A    I've spoken to the other investigating agents on this
7    case, and then I have also viewed the video.
8    Q    And based on your review of that video, what was the
9    quality of that video?
10   A    The other individual selling the drugs could not be
11   observed within the video.
12   Q    And why was that?
13   A    The camera did not face towards the subject.
14   Q    Were there any other problems with the video?
15   A    It was dark outside and very difficult for the camera to
16   focus on anything specifically.
17             MS. JAIMEZ:  Thank you.  No further questions,
18   Agent Stebbins.
19             THE COURT:  Any cross-examination, Mr. Navarro?
20             MR. NAVARRO:  Just briefly, Your Honor.
21             THE COURT:  Go ahead.
22                     CROSS-EXAMINATION
23   BY MR. NAVARRO:
24   Q    Good afternoon, sir.
25   A    Good afternoon, sir.
```

1    Q    So you followed Mr. Ismael Gutierrez on the 170 north?

2    A    Yes, sir.

3    Q    And then he exited Roscoe?

4    A    Yes, sir.

5    Q    He went westbound on Roscoe?

6    A    Yes, sir.

7    Q    And he parked on -- near the intersection of Roscoe and

8    Truesdale?

9    A    Just north of that intersection, yes, sir.

10   Q    Did you see him with anybody when he stopped the vehicle

11   or anything else?  Did you notice anything unusual?

12   A    He was parked in an area where there wasn't a house.  He

13   was just parked there on the side of the street.

14   Q    Did you see him on the phone?

15   A    I could not see whether he was on the phone.

16   Q    How far behind him were you?

17   A    I was at the -- an adjacent street, probably 50 yards

18   away.

19   Q    What street were you on?

20   A    Spartan.

21   Q    So you were on -- I guess near the corner of Spartan and

22   Roscoe?

23   A    Yes, sir.

24   Q    And that street runs perpendicular to Truesdale, right?

25   A    Yes, sir.

337

```
 1   Q     And how far down were you parked on Spartan?  Were you as
 2   far as Wrigley?
 3   A     No, sir.
 4   Q     Middle of the block?
 5   A     I would say I was closer to Roscoe, maybe 20 to 30 yards
 6   from Roscoe.
 7               MR. NAVARRO:  No other questions, Your Honor.  Thank
 8   you.
 9               THE COURT:  All right.  Anything further of this
10   witness?
11               MS. JAIMEZ:  No, thank you, Your Honor.
12               THE COURT:  Thank you very much, Agent.  You're
13   excused.
14               THE WITNESS:  Thank you.
15               THE COURT:  You may call your next witness.
16               MS. JAIMEZ:  Your Honor, the Government calls Scott
17   Saul.
18               THE COURT:  Thank you.
19               MS. JAIMEZ:  Your Honor, may Assistant United States
20   Attorney Stephanie Christensen be excused for just a minute?
21               THE COURT:  Oh, yes, certainly.
22               MS. JAIMEZ:  Thank you, Your Honor.
23          (Pause in proceedings.)
24               THE COURT:  Please come right up on the witness
25   stand to be sworn, sir.
```

**UNITED STATES DISTRICT COURT**

```
 1            THE COURTROOM DEPUTY:  Please raise your right hand.
 2       M. SCOTT SAUL, PLAINTIFF'S WITNESS, WAS SWORN
 3            THE WITNESS:  I do.
 4            THE COURTROOM DEPUTY:  Please have a seat.
 5        State and spell your name for the record.
 6            THE WITNESS:  My name is M. Scott Saul, M. Scott,
 7   S-c-o-t-t; Saul, S-a-u-l.
 8            THE COURT:  Does the "M." stand for something?
 9            THE WITNESS:  It stands for Michael, but I have
10   never gone by that.
11            THE COURT:  All right.  But that is your complete
12   name?
13            THE WITNESS:  Yes, sir.
14            THE COURT:  Go ahead, please.
15                    DIRECT EXAMINATION
16   BY MS. JAIMEZ:
17   Q    Good afternoon, Mr. Saul.
18   A    Good afternoon.
19   Q    Where are you currently employed?
20   A    I'm currently employed by the FBI.
21   Q    And what is your position with the FBI?
22   A    I am an IT specialist forensic examiner.
23   Q    How long have you been an IT specialist forensic examiner?
24   A    I have with the FBI for about four years.
25   Q    What does a forensic examiner do?
```

**UNITED STATES DISTRICT COURT**

```
 1   A    I do digital forensic exams.  I take digital evidence

 2   related to criminal investigations, and I extract the data and

 3   generally provide it to a case agent in a readable format so

 4   they can further their investigation.

 5             THE COURT:  And where do you office?

 6             THE WITNESS:  My office is in -- well, I have two

 7   offices:  The main office is the FBI building on Wilshire

 8   Boulevard, but I work in an offsite building most of the time.

 9             THE COURT:  In Los Angeles?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  Go ahead, please.

12   BY MS. JAIMEZ:

13   Q    And what experience do you have in computer forensic

14   examinations?

15   A    I started doing computer forensics when I was a police

16   officer back in 2009.  I was a task force officer assigned to a

17   computer forensics lab for the FBI.  I started in 2009

18   training, retired from the police department and then hired on

19   with the FBI in 2011.

20             THE COURT:  Which police department?

21             THE WITNESS:  The Albuquerque Police Department.

22   BY MS. JAIMEZ:

23   Q    And approximately how many pieces of digital evidence have

24   you examined in your career?

25   A    Probably just under a thousand.  I estimate about 900.
```

1    Q     And what specific training do you have in computer

2    forensic examinations?

3    A     When I started, I started with the FBI's CART, Computer

4    Analysis Response Team.  Training consisted of taking classes,

5    generally three days of forensic software, forensic practices.

6    I went out to the FBI academy, took classes out in Stafford,

7    Virginia.  I went through various training courses throughout

8    the country basically for computer forensics, cell phone/GPS

9    forensics, biosystems, computer software hardware classes.

10   Q     And have you received any certifications in computer

11   forensic examination?

12   A     Yes, I have.

13   Q     And can you describe those?

14   A     I have certifications from -- for computer hardware,

15   software, network security, network configuration, and then

16   computer forensics I have -- I'm a certified forensic analyst,

17   certified forensic examiner through the FBI and also through

18   private organizations.  I also have software certifications

19   from various vendors that do forensics, forensics software.

20   Q     And, Mr. Saul, how many computer -- or certified computer

21   forensic examiners are currently employed by the FBI in this

22   area?

23   A     I want to say between 300 and 400.

24   Q     And do you belong to any professional organizations

25   relating to forensic examinations?

**UNITED STATES DISTRICT COURT**

1    A     Yes, I do.

2    Q     And what are those?

3    A     I belong to the American Society of Digital Forensics and

4    eDiscovery, the High Tech Investigation Association and the

5    Consortium of Digital Forensic Examiners -- or Digital Forensic

6    Specialists.

7    Q     And, Mr. Saul, what is your educational background?

8    A     I have a bachelor of science degree from Wayland Baptist

9    University.

10             MS. JAIMEZ:  Your Honor, at this point the United

11   States would ask the Court to find Mr. Saul as an expert in the

12   field of computer forensic examinations and allow the United

13   States to elicit testimony in the form of expert opinion.

14             THE COURT:  Mr. Navarro, do you care to voir dire?

15             MR. NAVARRO:  No, Your Honor.  I accept.

16             THE COURT:  All right.  You may proceed, and the

17   jury, in the final analysis, will consider the expert witness.

18             MS. JAIMEZ:  Thank you, Your Honor.

19   Q     Now, Mr. Saul, what is the process for conducting a

20   forensic examination of a cellular phone?

21   A     When I receive a cellular phone examination, I

22   basically -- once I ensure they have legal authority to do the

23   examination, I take the item out of evidence.  I -- in this

24   case in a cell phone, I would isolate it from a network.

25             We use what's called a Faraday box, which basically blocks

1    all the signals to outgoing communication or incoming

2    communication.  I place it in there and keep it so it doesn't

3    connect to the network in case somebody had sent a signal to

4    the phone to wipe it or destroy data or alter the data, and I

5    don't want to alter the data.  So it keeps it from connecting

6    to the networks and receiving new information.

7        Once I do that, I put it into airplane mode, which does

8    the same thing.  In this case I took it to a forensic device

9    that I have.  It's called a Cellebrite universal forensic

10   extraction device, also known as a UFED.  In this case I used

11   that device.  I connected to that device.  There's different

12   options on what I can extract from the device, and I tried to

13   get everything or as most as much data as I can.  So I do a

14   file system extraction, which extracts the entire file system

15   from the phone.  I do that.

16       I make a file that contains all that data, and then I use

17   software, in this case made by the same company, the Cellebrite

18   company, physical analyzer.  I run it through that software,

19   and it takes all of the data, parses it out and puts it into

20   special containers such as the phonebook, the text messages,

21   the multi-media messages, photographs.  It separates everything

22   for me into those file systems, into those files.  I create a

23   report with all that information, and I provide it to the

24   examiner -- or I'm sorry, to the investigator.

25   Q    Now, Mr. Saul, are there other comparable programs the FBI

1    could use to extract such information beyond Cellebrite?

2    A    There are several.  There's XRY, another company.  Micro

3    Systemation makes XRY software.  There's also Cisteen

4    Secure-View.  And then there's others that I don't have access

5    to, but I have access to those.

6    Q    And why is Cellebrite used by the FBI?

7    A    Cellebrite is the main tool because it supports more

8    devices than most of the other software.

9    Q    Now, does making a forensic copy of a smart phone alter

10   the data on the original phone at all?

11   A    No, it does not, although just turning on the phone is

12   going to alter the system data, but not the user data.

13   Q    And can you describe the difference?

14   A    There's two partitions on a phone, two separate areas.

15   There's a system partition which has the operating system that

16   runs the phone.  It has all the configuration files.  And then

17   there's the user partition which has all the user data.

18   Q    Now, how do you preserve a copy of the phone once you've

19   extracted it?

20   A    It creates -- I do a file extraction in this case, which

21   creates a file.  And then I use -- there's a mathematical

22   algorithm software that does -- it's called a hash file.  So it

23   takes that known set of data and creates a unique identifier

24   for that set of data.  And then once I'm done with the exam,

25   once I load it all into the software, I compare that value

1   again and make sure that the data hasn't changed.

2   Q    So what is the significance of obtaining the hash value?

3   A    It's a 64-bit alphanumeric numbers and letters.  It's

4   unique to that set of data, and you can -- any trained examiner

5   can replicate that, run it through the same algorithm.  And if

6   the data hasn't changed, we will get the exact same output.

7   Q    Now, do you do anything else to make sure that your copy

8   is the same as the original?

9   A    Are you talking about -- can you --

10  Q    Do you do anything else besides checking the hash value?

11  Do you also do any type of spot-check?

12  A    Once I'm done, I take the phone and I spot-check it.  I

13  scroll through it and look at different files that I find in

14  the report and make sure that they're on the phone.

15  Q    And after you have an image copy of the phone, what is

16  done with the original phone?

17  A    The original phone is placed back in evidence.

18  Q    Now, were you assigned to perform any task for this case?

19  A    Yes, I was.

20  Q    What were you assigned to do?

21  A    I was assigned to do a forensic examination of an iPhone

22  5, and special agent Michael Alker had requested it, and I was

23  assigned to do the examination.

24  Q    And when was that?

25  A    On July 2nd, 2014.

1    Q    Now, showing you what has been previously marked as --

2         Or actually, Your Honor, can -- may I approach to show the

3    witness what's been previously marked as Exhibit 309?  May I

4    approach?

5              THE COURT:  You may since the clerk's not here.

6         The witness has Exhibit 309.

7              THE COURTROOM DEPUTY:  309.

8              THE COURT:  For identification.

9    BY MS. JAIMEZ:

10   Q    Mr. Saul, do you recognize what's been previously marked

11   as Exhibit 309?

12   A    Yes, I do.

13   Q    And what is it?

14   A    It appears to be the same cell phone I did an examination

15   of.

16   Q    And how are you able to recognize it, or how do you know

17   that?

18   A    The case looks the same.  The packaging has my initials

19   and date.  And if I could take the case off real quick, it will

20   have my initials, date, and other information that I wrote on

21   the phone.

22             MS. JAIMEZ:  Your Honor, the Government seeks to

23   move 309 into evidence.

24             THE COURT:  There being no opposition, it will come

25   in.

**UNITED STATES DISTRICT COURT**

```
 1          (Exhibit 309 received.)

 2              MS. JAIMEZ:  Your Honor, permission to publish?

 3              THE COURT:  Go right ahead.

 4   BY MS. JAIMEZ:

 5   Q    Now, did you conduct a forensic examination of Exhibit

 6   309?  If you could hold it up.

 7   A    Yes, I did.

 8   Q    And what steps did you take to preserve the evidence on

 9   Exhibit 309?

10   A    I basically took the phone, took it out of the packaging,

11   which it was secured and sealed.  I put it in the Faraday box.

12   I powered it on.  I put it into airplane mode to isolate it

13   from a network, then I took it to my work station area.  I put

14   it -- attached it to the Cellebrite forensic device that I

15   previously mentioned.

16       I selected -- I followed the onscreen instructions, used

17   the cables and then extracted all the data using a process of

18   extraction.  And I used a forensically wiped-clean thumb drive,

19   put all the data directly to that device.  And once it

20   successfully extracted that data, I took it to my forensic work

21   station.  I took that file.  I extracted all the files out of

22   that with the physical analyzer software.  I compared the hash

23   value, made sure that it was identical and had not changed.

24   Then I create a report.

25              THE COURT:  Was the phone fully charged when you did
```

**UNITED STATES DISTRICT COURT**

```
 1   that?
 2                THE WITNESS:  I do not believe it was fully charged,
 3   no.
 4                THE COURT:  Did you check the battery?
 5                THE WITNESS:  I would have seen it when I turned it
 6   on, and I took photographs of it.
 7                THE COURT:  Would you have been able to do what
 8   tasks you performed if it had not been charged.
 9                THE WITNESS:  It depends on the amount of charge,
10   but once I connected that device to the forensic device, it
11   will actually charge it.
12                THE COURT:  Thank you.
13        Go ahead.
14   BY MS. JAIMEZ:
15   Q    So with this process, Mr. Saul, did you make an image copy
16   of the phone?
17   A    Yes, I did, of the file system.
18   Q    And did you verify that that image file system was an
19   accurate copy?
20   A    Yes, I did.
21   Q    And after confirming it was an accurate copy, then what
22   did you do?
23   A    Then I used the software to extract all of the data from
24   that file.
25   Q    And what was done with the original phone when you were
```

1    done making the copy?

2    A    I sealed it back up in the envelope, put my seal and

3    initials and date on it and placed it back into evidence.

4    Q    Now, please take a moment to look at the exhibit binder

5    before you.

6    A    Okay.

7    Q    And please flip to what's been previously marked as

8    Exhibits 301 through 308.

9         Now, do you recognize these exhibits?

10   A    I'm not done, but so far, yes.

11        Okay.

12   Q    Thank you.

13        And what are these exhibits?

14   A    These are screen shots that were cut by

15   Special Agent Alker from the report that I provided him with,

16   and he pasted them into a document, and these are pages from

17   that document.  So they're screen shots from the report that I

18   created.

19   Q    And how do you know that?

20   A    I sat with him when he was creating this, going through

21   the files, and I recall them.

22        MS. JAIMEZ:  Your Honor, the Government seeks to

23   move Exhibits 301 through 308 into evidence.

24        THE COURT:  I take it there is no opposition.  They

25   will come in.

```
1              (Exhibits 301 to 308 received.)
2                   MS. JAIMEZ:  Permission to publish, Your Honor.
3                   THE COURT:  Go right ahead.
4                   MS. JAIMEZ:  Thank you.
5    Q    Now, please take a look at Exhibit 302.
6         Do you see where it says "From" in Exhibit 302?
7    A    Yes, I do.
8    Q    And what is the phone number noted in this box?
9    A    It's area code (818) 720-7725.
10   Q    And what is the significance of this number?
11   A    This is the phone number of the phone I examined, of this
12   phone.
13                  MS. JAIMEZ:  Blow that up.
14        Thank you.
15   Q    And why is the word "Moreno" noted here in this box?
16   A    "Moreno" is in here because the user of the phone had
17   entered this phone number and this name, Moreno, as the contact
18   information into the phonebook.
19   Q    So to be clear, Moreno -- is Moreno associated with this
20   phone number?
21   A    In the phonebook on this phone, this phone number is
22   assigned to the name Moreno, yes.
23   Q    And did you see the name or term "Moreno" used anywhere
24   else on this phone in your examination?
25   A    Yes, I did.
```

```
1    Q      Where?

2    A      When the user set up the phone, when you get an iPhone and

3    you first set it up, you connect it, and you have to create an

4    Apple ID, which is an e-mail address that's assigned to that

5    phone.  And one of the Apple IDs assigned to this phone -- if I

6    can look through real quick.

7    Q      If you wouldn't mind turning to, I believe, Exhibit 301.

8    A      Yes.  The Apple ID is lmoreno6@icloud.com, and iCloud is

9    just an e-mail address associated with Apple products.

10   Q      Now, turning your attention to Government Exhibit 303.

11   Please take a moment to turn there.

12   A      Okay.

13   Q      And what is Exhibit 303?

14   A      It's three separate parts of the Web history that I

15   extracted from the phone.

16   Q      And what is El Blog Del Narco?

17   A      Blog Del Narco would be -- my understanding would be that

18   it would be a blog involving markets, which somebody publishes

19   a journal, an online journal, a blog, regarding narcotics.

20   Q      And why is this narcotics blog Web page noted here?

21   A      The user of the phone had gone to -- well, there's a few

22   different ones.  Had gone to websites with the website address

23   www.elblogdelnarco.info.  The other one is www.blogdelnarco.com

24   and the user had gone to these websites.

25   Q      And just on this Web page alone -- or, rather, on this
```

1    Exhibit 303 alone, how many times did the user attempt to

2    access narcotics-related websites?

3    A    Under the "Visit" column there are nine separate visits to

4    three different website addresses and a Google search for

5    www.narcomundo.blog.

6    Q    And this is over what period?

7    A    From the period of March 22nd, 2014 through April 1st,

8    2014.

9    Q    All right.  Now, turning your attention to Exhibit 304.

10   Please take a moment to turn there.

11   A    Okay.

12   Q    And what is this exhibit?

13   A    It appears to be a photograph of a white Chrysler 300.

14   Q    Just based on your everyday experience, you're able to

15   tell the make and model or estimate the make and model of the

16   car?

17   A    I was a police officer for over 20 years, and I used to be

18   good at identifying cars.

19   Q    And what is the significance of the date and time noted on

20   the side of the photograph?

21   A    The date of October 15, 2013, at 6:29 P.M.?

22   Q    That's correct.

23   A    Would be the date that this photograph appeared on the

24   phone, was first either taken or synced to this phone.

25   Q    And are you able to tell whether or not this phone took

1    this picture?

2    A     Based on this, no, but I do remember sitting down with

3    Special Agent Alker when he was looking through this, and based

4    on the file path of where the file was located, the extension

5    of the file itself and the metadata that was stored there taken

6    from an iPhone 5, I am confident it was taken with that camera,

7    with that phone.

8    Q     Now, turning your attention to Exhibits 305 through 308.

9    Can you take a moment to just review those one more time.

10   A     Okay.

11   Q     I will briefly publish those one by one.

12   A     Okay.

13   Q     Now, were these the only photos that you saw on Exhibit

14   309 in the iPhone?

15   A     No.  There were many more.

16   Q     Did you see any particular individual repeatedly -- excuse

17   me.

18         Do you see any particular individual repeatedly in your

19   review of the phone's photographs?

20   A     The individual that you have on the phone in the left, the

21   adult, I noticed several times in different photos on the

22   phone.

23              MS. JAIMEZ:  Thank you, Mr. Saul.  No further

24   questions.

25              THE COURT:  Cross-examination, Mr. Navarro?

1          MR. NAVARRO:  Just very briefly, Your Honor.

2          THE COURT:  Very well.

3                       **CROSS-EXAMINATION**

4    BY MR. NAVARRO:

5    Q    Good afternoon, sir.

6    A    Good afternoon.

7    Q    I believe you were shown Exhibit 305.  Do you have that in

8    front of you?

9    A    Yes, sir.

10   Q    Can you tell what that is a photograph of?

11   A    It appears to be two males at a video game with the guns

12   that are associated with the game.  I am assuming it's a

13   shooting game.

14         MR. NAVARRO:  If I may publish it, Your Honor.

15         THE COURT:  Yes.  Go right ahead.

16         MR. NAVARRO:  Sorry, Your Honor.

17         THE COURT:  It's all right.  They didn't teach that

18   when I was in law school.

19         MR. NAVARRO:  Not when I was in law school either.

20   Q    This is a photograph of two young men, it looks like, by a

21   video game?

22   A    Yes, sir.

23   Q    Like it's some kind of arcade?

24   A    It appears to be some type of video game, yes.

25   Q    Now, you also are able to extract the Web history of the

1   cell phone you examined, correct?

2   A    Yes, sir.

3   Q    And it appears that the user of the cell phone, I think

4   it's Exhibit 304 -- 303, I apologize, 303, he was looking at

5   some car speakers on Craig's List, correct?

6   A    Correct.

7   Q    And then he was looking at a blog of narcos.  He visited

8   that place four times?

9   A    I don't know he.  I would say the user of the phone.  I

10  don't know who that was, but correct.

11  Q    Can you tell how long the visits were?

12  A    No, I cannot.

13  Q    And the user of the phone and Web item number 121 visited

14  another narco-trafficking website in Spanish, correct?

15  A    Correct.

16  Q    Then he visited some news bulletin of narco drug dealing

17  or something on item number 122, correct?

18  A    It says "Noticias," which I believe is "news."

19  Q    I'm sorry.

20  A    And narcotics blogs, yes.

21  Q    Then he did some kind of Google search for "narco mundo,"

22  correct?

23  A    Correct.

24  Q    Then he went back to El Blog Del Narco in item 124,

25  correct?

1   A     Correct.

2   Q     And I believe you testified that the user was someone

3   known as Moreno, correct?

4   A     The phone was registered to an e-mail address of someone

5   named Moreno, but I don't know who did this.

6   Q     So someone used this phone to look up those websites,

7   correct?

8   A     Correct.

9   Q     At some point.  Could have been Moreno; it could have been

10  somebody else?

11  A     Correct.

12              MR. NAVARRO:  No other questions, Your Honor.

13              THE COURT:  Anything further of this witness?

14              MS. JAIMEZ:  No, thank you, Your Honor.

15              THE COURT:  Thank you very much.  You may be

16  excused.

17       You may call your next witness.

18              MR. AZAT:  Your Honor, the United States calls Los

19  Angeles Police Department detective Sean Hansen.

20              THE COURT:  Thank you.

21       (Pause in proceedings.)

22              THE COURT:  Officer, come straight ahead.  Come

23  right up on the witness stand to be sworn, please.

24              THE COURTROOM DEPUTY:  Please raise your right hand.

25              **SEAN HANSEN, PLAINTIFF'S WITNESS, WAS SWORN**

```
 1              THE WITNESS:  I do.
 2              THE COURTROOM DEPUTY:  Please have a seat.
 3         State and spell your name for the record.
 4              THE WITNESS:  First name is Sean, S-e-a-n; last name
 5    is Hansen, H-a-n-s-e-n.
 6              THE COURT:  And do you have a middle name, Officer?
 7              THE WITNESS:  James.
 8              THE COURT:  Thank you.
 9         Go ahead, please.
10              MR. AZAT:  Thank you, Your Honor.
11                      DIRECT EXAMINATION
12    BY MR. AZAT:
13    Q    Good afternoon, Detective Hansen.
14    A    Good afternoon.
15    Q    Where are you currently employed?
16    A    I am currently employed with the Los Angeles Police
17    Department and assigned to a federal task force called CAST,
18    the Cellular Analysis Survey Team of the FBI.
19    Q    How long have you been employed by the Los Angeles Police
20    Department?
21    A    Approximately 18 years.
22    Q    What's your rank with the Los Angeles Police Department?
23    A    I am a detective supervisor.
24    Q    What is historical cell site analysis?
25    A    Historical cell site analysis is taking a set of phone
```

1    records and plotting the cell sites and the cell site sectors

2    that were used by a phone over a given period of time.

3    Q    Is that what you do as a member of the Cellular Analysis

4    Survey Team, the CAST team?

5    A    Yes, that's part of what we do.

6    Q    Have you received specialized training in the field of

7    historical call detail analysis or historical cell site

8    analysis?

9    A    Yes, I have.

10   Q    Can you please describe that training to the jury.

11   A    Sure.  I have actually used cell phone records themselves

12   in homicide investigations since about 2007.  I then began my

13   formal training with the FBI in 2009.  The initial training was

14   three classes each, approximately 30 hours, of how to take cell

15   phone records themselves and go out into the field, into a

16   city, and locate that phone itself.

17        Then when I was accepted into the task force in 2011, my

18   initial training was 248 hours of cellular communications;

19   radiofrequency theory, radiofrequency is how a phone talks to a

20   tower and how a tower talks to a phone; as well as receiving

21   instruction from each one of the cell phone companies

22   themselves, such as T-Mobile, Metro PCS, Verizon, Sprint PCS

23   and AT&T.

24   Q    What is radiofrequency?

25   A    Radiofrequency basically is just how a phone talks to a

1    tower and how a tower talks to the phone.  It's what carries

2    the voice communications when you are actually on a phone call.

3    Q    And what is GSM or UMTS?

4    A    They're just different types of technologies that cell

5    phone companies use so you can have your cell phone calls, your

6    data transmissions, things of that nature.

7    Q    Did you receive any other specific training to become a

8    member of that CAST team?

9    A    Specific --

10   Q    Is there ongoing training to maintain?

11   A    There is ongoing training and certification each year.  In

12   fact, the most recent was just a few weeks ago in Miami.

13   Q    Have you received any instruction from engineers of

14   cellular phone companies?

15   A    Yes.  Over the years when we do our certification, we have

16   cell phone reps, as well as engineers, from each of the

17   providers come to our training to give us further instruction.

18   Q    Which cell phone companies have you received training

19   from?

20   A    Sprint PCS, Metro PCS, T-Mobile, Verizon, AT&T, U.S.

21   Cellular.  That's approximately all.

22   Q    How many members are there in CAST?

23   A    32 nationwide.

24   Q    32 nationwide?

25   A    Yes.

```
 1   Q     How long does it take to become a member of that team?

 2   A     At the present time it takes approximately two years.

     That includes the formal training, as well as the practical

 4   experience, of using cell phone records in child abductions and

 5   kidnappings and other fugitive investigations.

 6   Q     Have you taught other law enforcement officers in this

 7   field of expertise?

 8   A     Yes.  Part of our duties is to teach training nationwide

 9   for local law enforcement, as well as for federal agents.

10   Q     How many times have you conducted an analysis of cell

11   phone records, such as we are about to see in your testimony

12   today?

13   A     To date, approximately 400 times.

14   Q     Have you testified as an expert in the area of historical

15   cell phone record analysis in state or federal court?

16   A     Yes, both.

17   Q     Approximately how many times?

18   A     Approximately 21 times.  The most recent was actually last

19   week in Inglewood court in a homicide trial.

20         MR. AZAT:  Your Honor, given the witness'

21   qualifications, the United States asks permission to elicit

22   expert testimony from the witness in the field of historical

23   cell site analysis.

24         THE COURT:  Do you care to voir dire, Mr. Navarro?

25         MR. NAVARRO:  No, Your Honor.
```

1          THE COURT:  All right.  You may proceed.  The jury,

2     of course, will be the final determiner whether or not he is an

3     expert witness.  Go ahead.

4          MR. AZAT:  Thank you, Your Honor.

5     Q    Detective Hansen, can you please explain to the jury

6     briefly how a cell phone works with a cell tower so that we are

7     allowed to makes calls using our cell phone?

8     A    Sure.  As we are sitting here in this courtroom, our

9     phones of course are supposed to be off, but if they were on,

10    they are scanning the environment for the strongest, cleanest

11    signal from a cell phone tower, and actually a sector of that

12    cell phone tower.  So what happens is that when you are ready

13    to make your call, you place your call on your phone, request

14    sources from that tower, and the tower says, "Okay.  I have

15    resources for you," then you are able to have your call.  All

16    of this happens in a very, very short period of time.

17         Conversely, if you're receiving a call, what happens is is

18    that the network knows an area where you are, and the network

19    sends out a paging signal to your phone, and your phone answers

20    up and says, "Hey, I'm here."  And then that same tower that

21    the phone sees as the strongest, cleanest signal will then

22    receive the phone call for you, and then you will have your

23    call.

24    Q    What are cell tower sectors?

25    A    Most cell towers are sectorized, meaning they are divided

1    into sectors.  Some can have three, six, nine sectors.  Some

2    can be omnidirectional, meaning energy from that tower is

3    radiating out at 360 degrees.  Most of the towers we are

4    looking at today are three-sector towers.

5         All that allows us to do is for the network to increase

6    the capacity of the users.  Cell phone companies are in the

7    business of making money.  The more users they have, the better

8    service they provide, the longer the people will stay with

9    their network.

10   Q    Would it be correct to say that the goal of having

11   these --

12             THE COURT:  No.

13             MR. AZAT:  Excuse me, Your Honor.

14   Q    Does each sector have its own coverage and range?

15   A    Yes.  Each sector of the tower faces in a different

16   direction.  Each sector has its own actual individual range for

17   how far the RF energy reaches.

18   Q    What's the purpose of this analysis?

19   A    Purpose of the analysis today?

20   Q    Of the historical cell site analysis, what kind of

21   information would you glean from it?

22   A    What we use it for basically is to identify the side of a

23   tower a person used, to look at the other towers in the area,

24   and then to identify basically a coverage area of where that

25   person may have been when they made or received a phone call.

1    Q    How many hours did you spend on the analysis of the

2    historical cell site data in this case?

3    A    Approximately 40 hours.

4    Q    And were you provided cell phone records specifically for

5    this case?

6    A    Yes, I was.

7    Q    Were you asked to review cell phone records for a number

8    associated with the defendant?

9    A    Yes.

10   Q    Were you able to use those records to determine general

11   locations for phone calls at the times they were made?

12   A    Yes.

13   Q    I would like you to take a look, please, at Exhibit 511,

14   if you would, please.

15   A    Okay.

16   Q    It was previously admitted.

17        Do you recognize that exhibit?

18   A    I do.

19   Q    And what is it?

20   A    It's a photocopy of a disk with my initials, "SH," written

21   on it.

22   Q    Why did you initial the disk?

23   A    It is a disk of cell phone records that were used in this

24   case.

25   Q    Did you analyze the records on that disk?

1    A    Yes.

2    Q    I would like you to please next take a look at Exhibit

3    401, which has been previously admitted into evidence.

4         What is Exhibit 401?

5    A    I apologize, I misspoke before.  This is the disk of the

6    records.  The previous exhibit was the disk of the cell tower

7    lists, which act as a key to interpret the records.

8    Q    Thank you.

9         I would like to publish Exhibit 401, if that's okay?

10             THE COURT:  Go right ahead.

11             MR. AZAT:  Could you please blow up the number on

12   that disk.

13   Q    Is that your initial on that disk?

14   A    Yes, it is.

15   Q    Did you review records contained on this disk?

16   A    Yes.

17   Q    Is that the telephone number of the records you reviewed?

18   A    Yes, it is.

19   Q    Did you create -- or did you review and ensure the

20   accuracy of summaries of the data that you reviewed?

21   A    Yes, I did.

22   Q    Were those summaries in the form of maps?

23   A    Yes.

24   Q    If you could please take a look at what's been marked as

25   United States Exhibit 504 to 510.

1    A    Okay.

2    Q    What are these exhibits?

3    A    These were the maps that we're speaking.

4    Q    And do these maps accurately summarize the historical cell

5    site and phone records that you reviewed --

6    A    Yes.

7    Q    -- for the defendant's phone in this case?

8    A    Yes, they do.

9         MR. AZAT:  Your Honor, with the court's permission,

10   the United States would request that Exhibits 504 to 510 be

11   admitted into evidence.

12        THE COURT:  They will come in.

13        (Exhibits 504 through 510 received.)

14        MR. AZAT:  And, Your Honor, with the Court's

15   permission, I would like to publish these so I can continue

16   with my examination.

17        THE COURT:  Yes.  Go right ahead.

18        MR. AZAT:  Thank you, Your Honor.

19   Q    Take a look at United States Exhibit 504.

20        What is the chart on the top of this exhibit?

21   A    That is a screen shot of the actual call records

22   themselves from Verizon.

23   Q    Is a similar chart summarizing call data contained on each

24   of the exhibits?

25   A    Yes.

```
 1  Q     And are the calls that are summarized on this map
 2  reflected in that chart?
 3  A     They are, yes.
 4  Q     What are the blue -- this looks like a blue triangle
 5  emitting from the -- excuse me.  What is the blue triangle?
 6  A     Actually, all of the blue triangles on the chart represent
 7  Verizon towers.  The only one that has a blue shaded area with
 8  two lines branches off of it is going to be the tower that was
 9  utilized by the phone for these calls.
10  Q     And what do the two -- what is this supposed to represent,
11  the two lines branching off of it?
12  A     This is a visual representation of the sector that was
13  used by the phone for the calls.  It's oriented at 350 degrees.
14  And what we are looking at is what would be one sector of a
15  three-sector tower.  And if you look at the arc, the arc is
16  representative of 120 degrees.
17  Q     So if we could please look at the entire exhibit again.
18        How many calls are summarized on this chart?
19  A     It's going to be five calls from 9:42 A.M. to 11:57 A.M.
20  Q     Were you able to come to a conclusion as to the
21  approximate location of the defendant's phone during those
22  calls?
23  A     Yes.
24  Q     And what is it?
25  A     During that time period for those calls, the phone itself
```

**UNITED STATES DISTRICT COURT**

1    was in the vicinity of 11461 Oxnard Street, North Hollywood,

2    California.

3            MR. AZAT:  I would also just like to briefly state

4    for the record, those calls took place on September 19th, 2013,

5    between 9:42 A.M. to 11:57 A.M.

6            THE COURT:  The record will so reflect.

7    BY MR. AZAT:

8    Q    Actually, I would please like to look at what's been

9    previously admitted as United States Exhibit 505, if you would,

10   also in the binder in front of you.

11   A    Okay.

12           MR. AZAT:  Would you please publish that exhibit.

13   Oh, it's up?  Great.

14       What does this exhibit show?

15   A    We're seeing a series of calls where the phone was using

16   cell sites in the state of Alabama.

17   Q    What day -- what's the date on these calls?

18   A    September 25th, 2013.

19   Q    What's the approximate times?

20   A    3:24 P.M. to 3:54 P.M., and that is in Pacific time.

21   Q    Did you come to any conclusion based on the analysis of

22   this data?

23   A    Yes.  For the call at 3:24 P.M., the phone used a cell

24   site in the area of Chilton, Alabama, and for the call at 3:54

25   P.M., the phone traveled north, approximate distance of 36.9

1    miles, and used a cell site in the city of Alabaster, Alabama.

2    Q    Next I would like to please have you take a look at what's

3    been previously admitted as United States Exhibit 507.

4         What does Exhibit 507 show?

5    A    We are looking at calls on October 4th, 2013, 8:11 A.M. --

6    I'm sorry.  It's going to be two calls:  8:11 A.M. and 8:39

7    A.M.  In this time the phone is in the Valley area of Los

8    Angeles.  We have a call at 8:11 A.M.  The phone uses a tower

9    at Hatteras and Tujunga, which was the tower from the previous

10   slide where the phone was in the area of 11461 Oxnard Street.

11        The phone then travels a distance of approximately 10.4

12   miles and uses a tower right by the 118 and the 210 Freeway for

13   service at 8:39 A.M.

14   Q    Next I would like to take a look at United States Exhibit

15   508, which was also previously admitted.

16        What does this exhibit show?

17   A    These calls are from October 7th, 2013, at 5:24 P.M. and

18   5:55 P.M.  We are going to be in the state of Oklahoma.  The

19   handset used a tower in Oklahoma City at 5:24 P.M., and then

20   traveled a distance of approximately 28.8 miles and used a

21   tower that's going to be in Calumet at 5:55 P.M.

22   Q    Moving right along to Exhibit 509, which has been

23   previously admitted.  What does Exhibit 509 show?

24   A    We are looking at calls from October 25th, 2013, from 2:05

25   P.M. to 2:10 P.M.  And we have a series of calls at 2:05 P.M.,

```
 1   2:09 P.M. and 2:10 P.M., using a tower at Woodman Avenue and

 2   Community Street.  That's in the lower left-hand portion of the

 3   screen.

 4        The direction of the panel of that tower faces towards the

 5   area of Truesdale Street.  During that time period, the handset

 6   also used the tower located on Branford Street, which is going

 7   to be on the top portion of the slide near the 5 Freeway for

 8   service at 2:07 P.M.

 9   Q    And finally, if we could please take a look at what's been

10   previously admitted as United States Exhibit 510.

11        What does Government Exhibit 510 show you?

12   A    We are looking at calls from January 13, 2014, two calls,

13   12:17 A.M. and 1:57 A.M.  The phone is using cell sites in the

14   area of Collierville, Tennessee.  And we just have two calls:

15   12:17 A.M. and 1:57 A.M.  And then on the lower portion of the

16   screen is an area identified where an individual was arrested.

17             MR. AZAT:  One moment, please, Your Honor.

18             THE COURT:  Surely.

19        (Counsel conferred off the record.)

20             MR. AZAT:  No further questions, Your Honor.  Thank

21   you very much.

22             THE COURT:  Cross-examination, Mr. Navarro?

23             MR. NAVARRO:  I have no questions of this witness,

24   Your Honor.

25             THE COURT:  Thank you very much, sir.  You are
```

```
 1   excused.
 2              THE WITNESS:  Thank you, Your Honor.
 3              THE COURT:  Does the Government have any further
 4   witnesses?
 5              MR. AZAT:  United States would call Drug Enforcement
 6   Agency Special Agent and Group Supervisor Michael Sader.
 7              THE COURT:  Very well.
 8         (Pause in proceedings.)
 9              THE COURT:  Agent, would you come straight up to the
10   witness stand to be sworn, please.
11              THE COURTROOM DEPUTY:  Please raise your right hand.
12         MICHAEL SADER, PLAINTIFF'S WITNESS, WAS SWORN
13              THE WITNESS:  Yes, I do.
14              THE COURTROOM DEPUTY:  Please have a seat.
15         State and spell your name for the record.
16              THE WITNESS:  First name is Michael, last name is
17   Sader, S-a-d-e-r.
18              THE COURT:  And do you have a middle name?
19              THE WITNESS:  Richard.
20              THE COURT:  Go ahead, please, Mr. Azat.
21                   DIRECT EXAMINATION
22   BY MR. AZAT:
23   Q    Good afternoon, Group Supervisor Sader.
24   A    Good afternoon.
25   Q    How are you presently employed?
```

**UNITED STATES DISTRICT COURT**

1    A     Presently assigned as a group supervisor at the Los

2    Angeles field division.

3    Q     With what agency?

4    A     Oh, I'm sorry.  With the Drug Enforcement Administration

5    in Los Angeles.

6    Q     How long have you been with the DEA?

7    A     Approximately 22 years.

8    Q     Can you please briefly describe to the jury the training

9    you underwent to become a special agent.

10   A     I was hired and had to attend a 17-week drug enforcement

11   academy in Quantico, Virginia.  Since that time I have attended

12   numerous training sessions with regards to drugs, drug

13   recognition, transportation, sales, numerous other classes

14   pertaining to cartel structure and organized crime.

15   Q     What about the training to become a group supervisor?

16   A     I also attended a three-week group supervisor institute

17   school in Quantico, Virginia in 2002.

18   Q     And what do you supervise as a group supervisor?

19   A     I'm currently assigned as a strike force supervisor.

20   There's approximately 30 people assigned to my group from 10

21   different agencies, consisting of both state, federal and local

22   law enforcement.  The main mission of the strike force is to

23   disrupt and dismantle drug cartels within the Los Angeles area,

24   as well as in Mexico and elsewhere around the world

25   internationally.

1  Q     Where were you assigned prior to your assignment in Los

2  Angeles?

3  A     Prior to Los Angeles, I was assigned as a group supervisor

4  and a senior agent in the Riverside district office.

5  Q     And before that?

6  A     Prior to that I was -- initially started out in a HIDTA

7  group -- HIDTA stands for high-intensity drug trafficking

8  area -- here in Los Angeles.  I was assigned to a clandestine

9  enforcement team.  The primary mission of that group was to

10 disrupt and dismantle PCP and methamphetamine labs and any of

11 the organizations that manufactured those drugs.

12       From the HIDTA group in Los Angeles, I was assigned to

13 Riverside in the general enforcement group, again, to disrupt

14 and dismantle drug cartels within the Riverside area of

15 responsibility.  And then from Riverside I was assigned to New

16 Mexico and Albuquerque.

17       I was assigned to a -- I was promoted as a supervisor in

18 Albuquerque, and I was in charge of a methamphetamine drug

19 enforcement task force where, again, the mission was to disrupt

20 and dismantle groups responsible for manufacturing

21 methamphetamine in New Mexico.

22 Q     Have you received specific training in the investigation

23 of illegal narcotics trends?

24 A     I have.

25 Q     Can you just briefly describe that training.

1    A    That training, again, was instituted in the 17-week

2    academy, and since that time I've taken annual courses to

3    maintain my certification in clandestine labs and

4    investigations concerning drug cartels.

5    Q    Have you ever been a member of any associations related to

6    narcotics?

7    A    I was also a member of the California Narcotic Officers

8    locally here in California, and through those -- through a

9    membership with that organization, I was able to take several

10   additional courses:  Interviewing techniques, organized crime,

11   trends in trafficking concerning narcotics transportation and

12   distribution.

13   Q    And in your current assignment do you currently supervise

14   DEA agents that investigate illegal narcotics cases?

15   A    Yes.

16   Q    What types of drugs are involved in those cases?

17   A    The three primary drugs that I am responsible for consist

18   of methamphetamine, cocaine and heroin.

19   Q    Over the course of your career with the DEA, approximately

20   how many cases have you investigated involving illegal

21   narcotics?

22   A    Thousands of cases.

23            MR. AZAT:  Your Honor, given the witness'

24   qualifications, the United States requests permission to elicit

25   expert testimony from the witness in narcotics trafficking.

1          THE COURT:  Do you care to voir dire, Mr. Navarro?

2          MR. NAVARRO:  No, Your Honor.

3          THE COURT:  You may proceed.  And the jury will be

4    the final determiner of whether or not the witness is offering

5    expert testimony.

6          MR. AZAT:  Thank you, Your Honor.

7    Q    What types of tools do special agents with the DEA, or

8    special agents in general, in your experience use to

9    investigate illegal narcotics?

10   A    The tools we use would be confidential sources, undercover

11   agents, wiretaps.  We do a lot of electronic surveillance,

12   which consists of pinging telephones.  We utilize pole cameras,

13   which allow us to have surveillance through a camera while not

14   having it physically be present at a specific location.

15   Q    Have you personally used those tools?

16   A    Yes, I have.

17          THE COURT:  Just a minute.  Let me ask you about

18   this camera on a pole.

19          THE WITNESS:  Yes, sir.

20          THE COURT:  You have used that since the Ninth

21   Circuit ruled --

22          THE WITNESS:  Yes, sir.  We get court orders for

23   both telephone pings and cameras.  We are required to get court

24   orders to install those cameras to be able to utilize them.

25          THE COURT:  As they are directed towards an

**UNITED STATES DISTRICT COURT**

1    individual's home?

2              THE WITNESS:  Usually it's a public -- we direct the

3    cameras towards a public entrance, whether it's a parking lot

4    or a street.  We are not able to look inside homes or garages

5    or any private property.  The cameras are specifically designed

6    for us to be able to utilize the public areas where people come

7    and go from.

8              THE COURT:  Thank you.

9         Go ahead.

10             MR. AZAT:  Thank you, Your Honor.

11   Q    Have you personally listened to recorded conversations

12   that took place during the sale of illegal narcotics during

13   your investigations?

14   A    Yes, sir.

15   Q    Approximately how many times?

16   A    Thousands of times.

17   Q    What about conversations that took place in other

18   languages?

19   A    We have monitors, so if we have a wiretap that's in a

20   foreign language, primarily Spanish, we have certified monitors

21   who transcribe and translate telephone calls.  Although I have

22   been present for intercepted phone calls in a foreign language,

23   the monitor is transcribing the call as it comes over the phone

24   line.

25   Q    Are illegal narcotics sold, in your experience, in large

1    quantities?

2    A    Not necessarily, no.

3    Q    Are they sold sometimes as well in small quantities?

4    A    Yes, sir.

5    Q    What is a wholesaler?

6    A    A wholesaler's a drug trafficker who distributes usually

7    large amounts of traffic -- or large amounts of narcotics.  A

8    wholesaler will sell quantities consisting of multi kilos or

9    multi pounds of any given drug.

10   Q    And what is a retailer?

11   A    A retailer is somebody who will take the wholesale amount

12   and break it down into street quantities.  Usually what we

13   consider a retailer would be somebody who distributes narcotics

14   at a gram, an ounce levels.

15            MR. AZAT:  Your Honor, I apologize, but I would

16   request going further with this examination, that the witness

17   examine some of the transcripts that have been previously

18   admitted into evidence.

19            THE COURT:  Certainly.

20            MR. AZAT:  May I approach with the -- I am handing

21   the clerk a transcript binder with transcripts admitted.

22            THE COURT:  Thank you.

23   BY MR. AZAT:

24   Q    If you could start by flipping over to previously admitted

25   United States Exhibit 102-A.  It should be tabbed in that

1    binder in front of you.

2    A     Yes, sir.

3          THE COURT:  I believe he has it.

4    BY MR. AZAT:

5    Q     Do you see where it says "It's just that he says he wants

6    you to pay him everything, man"?

7    A     Yes, sir.

8    Q     Do you see that?

9    A     Yes, sir.

10   Q     In your experience are narcotics transactions ever done on

11   consignment?

12   A     Yes, they are.

13   Q     What about first-time transactions?

14   A     Typically it's not done that way, but depending on the

15   trafficker and the customer on first time -- on a first-time

16   basis, sometimes drugs are sold on consignment.

17   Q     Is trust important in narcotics investigations?

18   A     Yes.

19   Q     If a deal goes bad, what kind of recourse does a purchaser

20   have with a drug dealer?

21   A     The recourse would be primarily the money, and then if

22   money is not enough for recourse, then violent acts tend to

23   follow any kind of a recourse from a deal that went wrong.

24   Q     If somebody in the drug world stiffs another person in the

25   drug world, they wouldn't be able to -- excuse me.

1       If somebody doesn't know somebody in the drug world, in

2   your experience, would that individual be more cautious about

3   selling something on consignment?

4   A     Absolutely.

5   Q     Turning to page 2.

6       Do you see where it says from the defendant -- excuse me,

7   above Mr. Yader Gutierrez says, "But you, you know, I know you.

8   I don't know him."

9       The defendant says, "No, but that's why.  But they are my

10  people.

11      The defendant -- Mr. Yader Gutierrez says, "They're your

12  people?"

13  A     Yes, sir.

14  Q     Why would someone brokering an illegal narcotics

15  transaction refer to someone as their people?

16  A     Usually a drug dealer will refer to his -- when they're

17  stating "his people," he is referring to the group that he

18  works with, the people that he's obtaining the drugs from to

19  distribute.

20  Q     Is it important, then, for somebody who's brokering a deal

21  to assure customers?

22  A     Yes.  Again, trust and rapport are needed to complete a

23  drug transaction, and without either one, usually it won't

24  occur.

25  Q     If you would please flip now to admitted United States

1   Exhibit 103-A.

2       Taking a look at that exhibit, at the page with Bates

3   number -- numbered 4 and Bates number 2363.  Do you see that

4   page?

5   A    Yes, sir.

6   Q    Do you see where Mr. Yader Gutierrez says, "Are you going

7   to be there because I don't know him, and well -- well, the

8   thing is to do the deal with you, you know, and with him too at

9   the same time."

10      To which defendant responds, "It's -- it's the same thing.

11  He's my nephew."

12      What's the importance of the defendant referring to the

13  delivery man as his nephew?

14  A    Oftentimes --

15          THE COURT:  Just a minute, please.

16          MR. NAVARRO:  Your Honor, I'm going to object to

17  this line of questioning, having the agent --

18          THE COURT:  Sustained.

19  BY MR. AZAT:

20  Q    Well, in your experience would somebody in the

21  drug-dealing business only work with other individuals that

22  that individual trusts?

23  A    Yes.

24  Q    So in your experience would people in the drug-dealing

25  business work with others in their family?

1   A    Yes, very often.  It's common.

2   Q    Why is that?

3   A    Again, rapport and trust is very important in the buying

4   and selling narcotics.  Oftentimes, especially at the retail

5   level, narcotics distributors will work with family members to

6   ensure there's a relationship between the people who are

7   selling the drugs and the people who are buying the drugs.

8   Q    So would one drug dealer referring to a delivery man as

9   his nephew be this vouching?

10  A    Yes.

11  Q    Turning now to what's been marked as United States Exhibit

12  111-A.  It's been previously admitted.  Would you please flip

13  to that in the binder.

14       If you could please turn to page 3, which is marked with

15  Bates number 2387.

16  A    Yes, sir.

17  Q    You see where Moreno says -- or excuse me, where Mr. Yader

18  Gutierrez says, "It's good, right?"

19       In response to which Moreno, Jorge Huerta, says, "Yes,

20  it's good work.  They call it Pink Champagne.  That's how they

21  call it.  It's the most expensive one."

22       Do drug traffickers use coded language to refer to drugs

23  during transactions?

24  A    Always.

25  Q    Do you see where Mr. Yader Gutierrez goes on to say, "Are

UNITED STATES DISTRICT COURT

1    you working with Mike, or is -- is it your work?"

2        What does the reference to "work" mean?

3    A    "Work" is another coded reference word for drugs.

4            MR. NAVARRO:  Your Honor, I object, again, to this

5    witness testifying as to the contents of conversations,

6    Your Honor.  I understand he is an expert, but --

7            THE COURT:  It's sustained.

8    BY MR. AZAT:

9    Q    In your experience in investigating illegal narcotics

10   crimes, how many wires have you listened to?

11   A    Thousands.

12   Q    And have you heard illegal narcotics referred to as

13   "work"?

14   A    Oftentimes, yes.

15   Q    After that, Moreno says, "It's this one.  It's from the

16   same company.  It's just that --"

17       Have you ever heard, in your experience investigating

18   illegal narcotics crimes, a reference to a company or the same

19   company when referencing illegal narcotics?

20   A    Yes.

21   Q    What is that a reference to?

22   A    "Company," again, is a reference to the drug seller who is

23   distributing the narcotics.

24   Q    What does it mean when a drug is from the same company?

25   A    It means it's from the same drug distribution group.

1    There are several drug cells and drug distribution groups

2    within a specific area.  So when they are talking about the

3    same company, they are referring it's coming from the same

4    group of people that is selling that particular product, that

5    particular drug.

6    Q    Moving on, Mr. Yader Gutierrez says, "Yeah, because if

7    not, I will buy only from you instead if it's like that

8    because --"

9         To which Moreno responds, "Mike already -- it's because

10   Mike doesn't sell small -- small ones."

11        Now, earlier we described -- you described the difference

12   between a wholesaler and a retailer.  Which type of narcotics

13   seller would have more contact with individuals, a wholesaler

14   or retailer?

15   A    Retailer would have more contact with individuals.

16   Q    Which typically would have more risk of being detected by

17   law enforcement, a wholesaler or retailer?

18   A    Because the retailer has more contact with more people,

19   the risk is higher for the retailer to be contacted by law

20   enforcement.

21   Q    And the retailer sells -- excuse me, the wholesaler sells

22   small ones or large ones?

23   A    Wholesaler sells large quantities of drugs.

24   Q    Bottom of the page, Moreno says to Mr. Yader Gutierrez,

25   "You can send me a message.  Oh, can you call me?"

**UNITED STATES DISTRICT COURT**

1        To which Mr. Yader Gutierrez responds, "And the other one?

2   You cut it off then?"

3        Earlier we heard Mr. Yader Gutierrez and

4   Special Agent Alker testify that Jorge Huerta changed phones.

5   In your experience investigating illegal narcotics trafficking,

6   would an individual involved in the drug trade cut off their

7   phones or change phones regularly?

8   A    Yes, sir.  It's very, very common.

9   Q    Why is that?

10  A    It's a way they believe to inhibit law enforcement from

11  detecting their illegal drug transactions via the phones.

12  Q    Going on to page 4, Moreno says to Mr. Yader Gutierrez,

13  "So we don't use the phone -- the phone that much."  Mr. Yader

14  Gutierrez then says, "Should I make arrangements with you

15  instead?"

16       And then Moreno responds, "Yeah, you are going to make

17  arrangements with me, but --"

18       To which Yader Gutierrez says, "How much is it?"

19       Moreno then says, "Those?  I am going to give them to you

20  for 950 for both of them."

21       Now, in this case it's undisputed that 48.6 grams of pure

22  methamphetamine was sold during a transaction on September

23  26th, 2013, during this recorded conversation.  Is that, in

24  your experience investigating illegal narcotics, the

25  approximate price on the street of two ounces of

1  methamphetamine, 950?

2  A    For that time period, yes, sir.

3  Q    When Moreno says, "Because they're selling worse work for

4  550," what does that reference to "work" mean in that context?

5  A    "Work" is, again, another coded word for drugs.  And when

6  he's saying "worse work," he is talking about drugs with a

7  lesser purity.  Oftentimes drugs with a low purity level are

8  sold for smaller amounts of money.

9  Q    What's it mean when a drug is cut, methamphetamine

10 specifically?

11 A    When a drug is cut, that means that there's a substance

12 added to the drug to bulk it up.  Oftentimes with

13 methamphetamine there's several different substances used to

14 double the product.  So retailers, in order to make more money,

15 will take quantities of methamphetamine or cocaine, even

16 heroin, and add bulk adulterants to it in order to increase the

17 yield of that particular drug.

18 Q    And in your training and experience investigating illegal

19 narcotics crimes, are ounce denominations typical in the sale

20 of methamphetamine?

21 A    Yes, sir.

22 Q    What about pound denominations?

23 A    That's very common as well, but again, that's not very

24 common with retail dealers.

25 Q    Would a pound denomination be a wholesale transaction?

```
 1   A    It could be.  A pound denomination or anything over that
 2   is on the border between a retailer and wholesaler, but it's
 3   very common for retailers to sell pound quantities.  But very
 4   often, again, the pound quantities are multiple ounces of --
 5   with a specific drug, in this case methamphetamine, that bulk
 6   adulterant was added to it to make it -- to make it more than
 7   it really is, to make it, say, from 8 ounces to 16 ounces.
 8   Q    Would a drug dealer make more money selling one pound in
 9   one transaction of methamphetamine or breaking that pound of
10   methamphetamine into smaller ounces and selling those ounces
11   separately?
12   A    Breaking the drug into smaller amounts and selling --
13   making more sales at a smaller amount would yield more money.
14   Q    Turning now to page 5 of the same exhibit, Moreno makes a
15   reference to Window as the name for something.  Do you see that
16   on page 5?
17   A    Yes, sir.
18   Q    In your training and experience, what type of drug is
19   referred to as Window or Windows?
20   A    Usually cocaine is referred to as Windows.
21   Q    Have you ever heard of methamphetamine referred to by
22   that?
23   A    Methamphetamine, again, depending on the person who's
24   selling the drugs, will use various coded words for drugs.
25   Methamphetamine is referred to as Windows because pure
```

1  methamphetamine has a clarity to it, a crystal-like substance

2  to it where it's referred to as Windows because you can see

3  through it.  It's transparent.

4  Q    Do you see this one where Moreno says, "This one is

5  original.  This one is not -- not -- not cut or anything."  If

6  Moreno was discussing narcotics, to say something is original

7  or not cut, would that mean it's better quality or worse

8  quality?

9  A    It means it's better quality, higher purity.

10 Q    Turning now to page 6.  Here at the top of the page Moreno

11 says, "The work is good when it's clear and shinny" {sic}.

12 "Look, and all of -- I don't -- I don't -- don't cut it or

13 anything."

14      Why would someone reference methamphetamine as clear and

15 shiny?

16 A    Because in the process of manufacturing methamphetamine,

17 if it's done correctly, again, you will have a crystal-like

18 substance that's shiny, clear and transparent.  It's just

19 another way of describing what the drug is.

20 Q    Moving on, we see another reference to Moreno, "Because

21 it's just that the phone was due today because I change the

22 phone almost every month."

23      In your training and experience, when a drug dealer

24 reminds an individual that he changes a phone, is that common?

25 A    Yes, sir.

**UNITED STATES DISTRICT COURT**

1  Q    "Hey a text -- a text -- hey, can you call me?  And I will

2  call you from another cellular and then..."

3       What is the significance of a narcotics dealer asking

4  someone to send them a text and then calling them back from

5  another cell phone?

6  A    Again, drug traffickers commonly use this technique to

7  avoid detection from law enforcement.  They believe that using

8  multiple phones in a variety of ways, whether it's texting or

9  actually using the phone to call somebody, is a way to inhibit

10 anyone from detecting what they're doing regarding drug

11 transactions.

12 Q    Over here, "What should I put you down as?" Yader

13 Gutierrez asks Mr. Huerta.

14      Huerta responds, "Moreno."

15      Mr. Yader Gutierrez says, "Okay, Moreno."

16      In your experience is it common for narcotics traffickers

17 to identify themselves by names other than their true names?

18 A    Yes, sir.

19 Q    Why is that?

20 A    Again, it's avoidance technique.  So if somebody was to be

21 arrested, that particular person who was arrested wouldn't have

22 specific information about the person that sold them the drugs,

23 and it would inhibit law enforcement from tracking down that

24 person that sold the drugs to whoever was arrested.

25 Q    Turning now to page 7, Mr. Yader Gutierrez and Jorge

1    Huerta start discussing a reference to "Soda."  Yader Gutierrez

2    says, "Do you have uh --"

3         Moreno responds, "Soda?"

4         Yader Gutierrez, "Soda."

5         Moreno, "Yeah, that too."

6         Have you ever heard of illegal narcotics referred to as

7    "Soda"?

8    A    Yes, sir.

9    Q    What type?

10   A    Cocaine.

11   Q    When Moreno says -- excuse me, where Yader Gutierrez says,

12   "Now, you have a connection."

13        Moreno, "The one that works with me -- the one that works

14   with me.  All of us are one."

15        Yader Gutierrez, "Yeah, yeah, I know.  I know.

16        "We are all one hand," Moreno says.

17        "No, no, of course."

18        "One finger of the hand."

19        In your training and experience in illegal narcotics, have

20   you ever heard the reference "one hand," or "We are all one

21   finger of the same hand"?

22   A    Yes.

23   Q    What does that reference mean to you?

24   A    That reference basically refers to a group of individuals

25   that are collectively together to sell drugs.  One hand, one

1    finger refers to that specific group of people that work united

2    together to sell drugs, the same organization.

3    Q    Then on page 7, Moreno comes right out with -- Jorge

4    Huerta comes out with it and says, "The ounce of -- of coke."

5         Yader Gutierrez says, "um-hmm."

6         Jorge Huerta, "Says they are selling it for 1200, but it's

7    good."

8         In your training and experience in approximately September

9    2013, would $1200 for an ounce of cocaine be the approximate

10   street value?

11   A    Yes, it would be.  For a higher purity level of cocaine,

12   that would be the correct amount.

13   Q    On page 8, the bottom of the page, Yader Gutierrez says,

14   "You know, if the work is yours, just let me know, you know, so

15   I can work with you."

16        Jorge Huerta responds, "No, yeah, yeah, no, no, no.  Right

17   now it's -- it's not that I'm -- Mike and I are the same."

18        "Yeah, yeah I know," Yader Gutierrez says.

19        Jorge Huerta says, "It's just that Mike doesn't -- doesn't

20   like to be moving either."

21        Yader Gutierrez responds, "Move, yeah, yeah, I know that

22   Mike always moves pounds and all that."

23        In your training and experience, an individual who moves

24   pounds, would that individual also be involved in personally

25   doing street-level sales?

```
 1   A     Typically not, no.
 2   Q     On page 9, on the top of the page, Moreno says, "Yeah so I
 3   am in charge.  I am the one in charge of here of --"
 4         Yader Gutierrez says, "Of -- of the small ones.  I mean,
 5   one ounce, half an ounce."
 6         "No, no, I don't, I don't.  I also move the big stuff,
 7   but --"
 8         Yader Gutierrez, "Yeah."
 9         Jorge Huerta says, "For me, it's better like this."
10         Again, you testified earlier that you make more money
11   selling a pound in ounces or selling it as a whole pound?
12   A     You make more money selling a pound as ounces than selling
13   the whole pound.
14   Q     Coming close to the end here, at page 10, the middle of
15   the page, Yader Gutierrez says, "Hey look, maybe you can --
16   maybe you can get me, uh, Coke."
17         Jorge Huerta, "Yeah."
18         Then if you go to page 10 -- excuse me, page 11, Yader
19   Gutierrez says, "I only want a hundred."
20         Jorge Huerta, "A hundred dollars?"
21         Yeah, a hundred from when I come and buy from you, the
22   other crystal."
23         "Uh-huh."
24         "I want a hundred."
25         How much cocaine can an individual buy for a hundred
```

**UNITED STATES DISTRICT COURT**

1    dollars in 2013, roughly?

2    A    Gram amounts of cocaine.

3    Q    Is a gram amount of cocaine a lot?  Is it smaller or more

4    than an ounce?

5    A    It's much smaller.  You can consider a gram to be almost

6    equated to a sugar packet would be equivalent to a gram.

7    Q    Is cocaine ever sold in an eighth of an ounce?

8    A    It is.

9            MR. AZAT:  One moment, please, Your Honor.

10           THE COURT:  Surely.

11       (Counsel conferred off the record.)

12           MR. AZAT:  No further questions.  Thank you,

13   Your Honor.

14           THE COURT:  Cross-examination, Mr. Navarro?

15           MR. NAVARRO:  Yes, Your Honor, thank you.

16                     **CROSS-EXAMINATION**

17   BY MR. NAVARRO:

18   Q    Good afternoon, sir.

19   A    Good afternoon, sir.

20   Q    Now, you have been with the DEA now for 22 years, correct?

21   A    Yes, sir.

22   Q    Would it be correct to say that you are not involved in

23   the day-to-day operations of investigating cases, rather you

24   are supervising a number of people?

25   A    That's inaccurate, too.

1   Q     What do you -- what's your typical day?  What do you do in

2   an average day?

3   A     I daily sit down with my investigators and my case agents,

4   and we strategize cases on a daily basis.  I probably oversee

5   ten active investigations daily.  Those investigations -- all

6   ten of them, are in an active status, so each day something

7   else is going on with each of those cases.  So as I supervise,

8   I also help my case agents to make decisions with regards to

9   the direction of the investigation.

10  Q     And are you involved in -- what I meant, are you involved

11  in the day-to-day operations of being on the street, talking to

12  informants, making sure they have the money, making sure they

13  have the wire, that kind of stuff?

14  A     Yes, sir.

15  Q     Now you've worked with informants for 22 years?

16  A     Yes, sir.

17  Q     You know with regard to informants there's protocol that

18  goes along with it, right?

19  A     Yes, sir.

20  Q     Before someone can become an informant for the DEA?

21              MR. AZAT:  Objection, Your Honor; beyond the scope

22  of the direct.

23              THE COURT:  It does appear to be.  Sustained.

24  BY MR. NAVARRO:

25  Q     Now, in your 22 years of using informants -- you testified

```
 1   on direct that some of the tools used by the DEA include
 2   confidential sources, correct?
 3   A     Yes, sir.
 4   Q     That's informants, correct?
 5   A     Yes, sir.
 6   Q     Now, when it comes to informants, if an informant uses
 7   drugs, is that something that's encouraged by the DEA, if that
 8   person's an informant?
 9            MR. AZAT:  Your Honor, objection; same objection.
10            THE COURT:  I will allow some amount of latitude so
11   we can get over this.  Overruled.
12       Go ahead.
13            THE WITNESS:  Could you rephrase that question?
14   BY MR. NAVARRO:
15   Q     Sure.  When you use a confidential source, an informant,
16   if that informant is using drugs, is this something that's
17   approved of or encouraged by the DEA?
18   A     Like actually ingesting the drugs?
19   Q     Yeah, getting high.
20   A     That is -- yeah, that's not approved.
21   Q     And is that a grounds for termination for an informant?
22   A     Yes, sir.
23   Q     Now, you also testified that you use undercover agents,
24   correct?
25   A     Yes, sir.
```

1    Q      And you use wiretaps?

2    A      Yes, sir.

3    Q      And you use electronic surveillance, like pole cameras?

4    A      Correct.

5    Q      You're investigating multi-nation drug-dealing, correct?

6    You're investigating drug dealers from Mexico and further

7    south, correct?

8    A      Yes, sir.

9    Q      And you are also investigating drug trafficking north of

10   the border in this country, correct?

11   A      Yes, sir.

12   Q      What are called DTOs, correct?

13   A      Correct.

14   Q      And when you're investigating an organization or a person

15   in this country, you see patterns, correct?

16   A      I don't use the word "patterns."  I see trends.  I see

17   trends in trafficking is the terminology that we use.

18   Q      And this trends in trafficking that you see, for example,

19   you will notice that people like to change their phones

20   constantly, correct?

21   A      Yes, sir.

22   Q      They want to hide from you, correct?

23   A      Correct.

24   Q      They don't trust a lot of people, correct?

25   A      Correct.

```
 1   Q     They rely on their friends and their acquaintances,
 2   correct?
 3   A     Who?
 4   Q     The drug traffickers, the people you are investigating.
 5   A     They do.
 6   Q     And that makes it difficult to infiltrate a drug-
 7   trafficking organization, correct?
 8   A     Yes, sir.
 9   Q     So you have to use those tools, like wiretaps and
10   informants and undercovers, correct?
11   A     That's a part of it, yes, sir.
12   Q     And when people are wholesalers of narcotics, they will
13   have stash houses, correct?
14   A     At times they will, yes, sir.
15   Q     And the stash houses will be homes that are typically
16   vacant, correct?
17   A     That's not always the case, no, sir.
18   Q     And are these homes -- say there's a drug trafficker, does
19   he have a house in his name that he uses to stash drugs?
20   A     I have had drug traffickers that have had homes in their
21   names that they use as stash houses, yes, sir.
22   Q     But many times the drug traffickers will have homes in
23   other people's names, correct?
24   A     If they use a house, yes, sir.
25   Q     And the reason is obvious; they don't want to be located
```

1    by law enforcement, correct?

2    A    Correct.

3    Q    You talked about rapport and trust are very important to

4    drug traffickers, correct?

5    A    Yes, sir.

6    Q    And you testified that for two ounces at the time, in

7    2013, $950 was a good price?

8    A    For?

9    Q    For methamphetamine.

10   A    Yes, sir.

11   Q    It wasn't a discounted price; it was an average price?

12   A    Average price depending on the purity.

13   Q    You were asked a question about the term "Soda."  Remember

14   that?

15   A    Yes, sir.

16   Q    That refers to coke, correct?

17   A    Yes, sir.

18   Q    That's cocaine?

19   A    Yes, sir.

20            MR. NAVARRO:  I have no other questions, Your Honor.

21            THE COURT:  Anything further of this witness?

22            MR. AZAT:  Just briefly, Your Honor, couple

23   questions.

24            THE COURT:  Go ahead.

25                      **REDIRECT EXAMINATION**

1    BY MR. AZAT:

2    Q    Supervisor Sader, in your experience, when a retailer has

3    never met somebody before, is it uncommon for them to try to

4    charge them as much as possible?

5    A    No.  It's very common to try to make as much money as

6    possible.

7    Q    And in your experience working with confidential

8    informants, do individuals who have neither done drugs before

9    or never associated with drug dealers or been around drug

10   trafficking in their lives, make good informants?

11   A    No, sir.

12   Q    Why is that?

13   A    Because they are naive to the ways of drug transactions.

14   They don't know the language.  They don't know prices.  They

15   don't know how to conduct themselves.  They don't know how to

16   negotiate.

17              MR. AZAT:  Thank you.  No further questions.

18              THE COURT:  Anything further of this witness?

19              MR. NAVARRO:  No, Your Honor.

20              THE COURT:  Thank you very much, Agent.  You're

21   excused.

22              THE WITNESS:  Thank you, sir.

23              THE COURT:  Does the Government have anything

24   further?

25              MS. JAIMEZ:  No, Your Honor, but before we rest, we

```
 1    would request a brief recess.
 2              THE COURT:  All right.
 3         Everyone please rise for the jury.
 4         (Out of the presence of the jury.)
 5              THE COURT:  Please be seated.
 6         We are outside the presence of the jury.
 7         Ms. Jaimez, you have something?
 8         (Counsel conferred off the record.)
 9              MS. JAIMEZ:  Yes, Your Honor.  The Government
10    requested the recess to make sure all of the exhibits have been
11    moved into evidence and also to confer with defense counsel
12    about any further witnesses that the defense counsel may be
13    bringing.
14              THE COURT:  All right.  We will take --
15              MR. NAVARRO:  And, Your Honor, just so you know --
16              THE COURT:  Yeah.
17              MR. NAVARRO:  -- I think I told you yesterday
18    morning before we started, I have one or two witnesses.  I have
19    one witness I am going to call.  I indicated to Your Honor that
20    witness has childcare issues.  He is a single father, picks up
21    his kid at 2:00.  He is not available in the afternoon.  He
22    will be available tomorrow morning at 9:00 A.M.  He could be
23    here at 9:00 A.M.  That's the only witness we have, Your Honor.
24              THE COURT:  I see.  Well, I take it the Government
25    rests subject to going over the exhibits and other items you
```

1    need to.

2              MS. JAIMEZ:  Yes, Your Honor.  And we would also

3    request, Your Honor, that the defense provide a proffer of the

4    expected testimony of the witness that would be coming

5    tomorrow.

6              THE COURT:  Yes, absolutely.

7              MR. NAVARRO:  I can do that now, Your Honor.

8              THE COURT:  Very well.

9              MR. NAVARRO:  Your Honor, during the course of my

10   investigation on this case, I was provided a number of reports

11   dealing with a confidential informant, and one of those

12   reports -- there were several times, and it was referenced in

13   at least I think two Government filings, that the informant

14   indicated that he went on a hunting trip with my client and an

15   individual named Nestor, his friend.

16             THE COURT:  Yeah.

17             MR. NAVARRO:  And I have a witness, Your Honor, who

18   actually is the person who went on the hunting trips with my

19   client and with Nestor, and we have photographic evidence from

20   the trip, Your Honor.  And the testimony would be that this

21   individual by the name of Oscar Rodriguez, who has no known

22   criminal record -- and I can provide a date of birth as well --

23   went hunting with my client and with Nestor Hernandez, I

24   believe, four times, and these trips were all during the month

25   of October because that's the only time you can go hunting.

1   And these trips were nowhere near the mountains of Lancaster.

2   They are near Gorman, California, which are the opposite end of

3   the mountains.

4       This individual will testify it was his firearm that was

5   taken.  He will identify the photographs.  He will identify

6   himself in the photographs.  He will identify my client in the

7   photograph.  He will identify Nestor Hernandez in the

8   photograph as well.  We believe this is an impeachment witness,

9   impeachment testimony, Your Honor, of the confidential

10  informant.

11      We believe he has lied under oath about going on a hunting

12  trip, that this makes no sense to us.  It's difficult to

13  impeach witnesses, Your Honor, when we are talking about having

14  meetings with my client that are not recorded.  But when the

15  person starts telling stories that we can verify are false, we

16  think the jury has a right to know.

17      And obviously I have been aware of this for a long

18  period -- for a period of time, but I had to wait until he

19  testified.  And until I asked him those questions, I wanted to

20  make sure if, in fact -- he said that they went in the summer

21  in a white convertible.  It would make no sense in the summer

22  to go hunting.  It is not hunting season.

23      This person has been a hunter for over 20 years.  His

24  father was a hunter as well.  I interviewed him three times

25  just to make sure.  I do not want to make a mockery of this,

1    Your Honor.  I do believe this person has valuable information.

2    It's limiting information.  It's really impeachment testimony

3    with regard to the confidential informant.

4        I have some photographs.  I showed him a photograph of the

5    informant. He identified the informant in the photograph.  And

6    then I showed him some photographs of the hunting trips, and he

7    identified the hunting trips as being present.  He even

8    recalled how the trips went and everything, Your Honor.  That

9    will be his testimony, Your Honor.

10            THE COURT:  Okay.  Mr. Gutierrez was not with him on

11   any of those trips that he went on?

12            MR. NAVARRO:  My client was not the informant.

13            THE COURT:  Excuse me?

14            MR. NAVARRO:  My client was with Mr. Rodriguez on

15   the trips.  Now, the informant claimed that he went on a

16   hunting trip.

17            THE COURT:  Right.

18            MR. NAVARRO:  And this individual will say that

19   there were hunting trips, but it was Mr. Rodriguez, it was my

20   client, and it was the friend of the informant was also

21   present.  And we have photographs that would show the

22   informant, would show my client, you know, with the catch.

23   They have a dead deer.  They went hunting, and what we believe

24   happened, Your Honor, the informant heard about the hunting

25   trip somewhere and he made up a story about it just to further

```
 1   incriminate my client.
 2            THE COURT:  Why would he put himself in it?
 3            MR. NAVARRO:  I don't know, Your Honor.
 4            THE COURT:  I don't understand.
 5            MR. NAVARRO:  I don't know why he would.
 6            THE COURT:  Well, I don't understand the
 7   significance of the hunting trip to begin with.  I just don't
 8   see what it has to do --
 9            MR. NAVARRO:  He will -- Your Honor, if I may.
10            THE COURT:  Mr. Gutierrez indicated that his memory
11   was shaky about what time of year it really was, but then he
12   just finally came up with summer.  But so what?
13            MR. NAVARRO:  Well, Your Honor, the reason why it's
14   significant is because the informant has testified about a
15   number of things that were not recorded.  He testified about
16   being present with my client when my client discussed two
17   pounds of methamphetamine.  He talked about being present with
18   my client who was upset at Mr. Hernandez about the loss of
19   drugs.  No one can corroborate this information unless my
20   client takes the stand, which he doesn't have to.
21        I can't call Mr. Hernandez; he's dead.  I can't call him
22   as a witness.  So during my investigation, Your Honor, I spoke
23   to this individual here.  His name is Oscar Rodriguez, and he
24   identified himself, identified my client.  And then in this
25   photograph he identified himself and Nestor Hernandez on the
```

```
 1    hunting trip, and this photograph he identified --

 2              THE COURT:  Do you want to have the photograph

 3    marked for identification?

 4              MR. NAVARRO:  Well, Your Honor, I have them all

 5    marked as 1001, 1002 and 1003 and also 1004.

 6        The Government provided us in discovery this photograph,

 7    which is from my client's Facebook account, and Mr. Rodriguez

 8    will identify that as being Mr. Rodriguez's rifle.

 9              MS. JAIMEZ:  Your Honor, the Government would object

10    to this evidence.

11              THE COURT:  Just a minute.  Let him finish.

12              MR. NAVARRO:  He would identify this rifle, I think

13    it's Colt 223, that belonged to Mr. Rodriguez.  Again, it's one

14    point, Your Honor, but I believe it's an important point

15    because the jury has heard information from the informant about

16    what he may have done and things he -- and from our

17    perspective, Your Honor, when he testified about this hunting

18    trip, it was a situation that we believe he was not being

19    honest about.

20        And Mr. Rodriguez will come in and testify he went on

21    these hunting trips.  I think they went four times.  I think he

22    went three times with my client -- three times with my client

23    and with Nestor Hernandez, and one time with my client alone,

24    but the point is is that he contradicts a hundred percent what

25    this individual is saying.
```

1          THE COURT:  About the hunting trip?

2          MR. NAVARRO:  Not just about the hunting trip, but

3   what my client said.  He testified -- well, I asked him during

4   the hunting trip, my client was arguing with Nestor about

5   drugs.  My client wanted to come back to Los Angeles.

6   Remember, we had a motions hearing about this.

7      I was trying to keep all of this out before I found out

8   about this, and you said they could bring it in so I had to get

9   ready for it.  I investigated it, and I was able to find this

10   individual.  I can't find every single witness.

11          THE COURT:  No, I understand.  All right.  All

12   right.  You have given us your proffer.

13      Ms. Jaimez?

14          MS. JAIMEZ:  Your Honor, the Government would object

15   to the admission of this so-called rebuttal evidence.  It's

16   improper impeachment under Federal Rules 608(b), Your Honor.

17   The federal rules clearly prohibit extrinsic evidence used to

18   prove specific incidents of conduct to attack witness

19   credibility.

20      Impeachment by past conduct simply isn't permitted under

21   the Federal Rules of Evidence.  There are certain exceptions.

22   For example, impeachment by contradiction is occasionally

23   permitted, but in order to impeach by contradiction with

24   witness testimony, as the defense is proposing here, there are

25   certain requirements that have to be made under the case law.

1    And a lot of this case law was actually briefed by the former

2    AUSA on this case, Angela Scott, at Docket No. 95, the

3    opposition to the defendant's application for disclosure of

4    CS-2.

5         And what's noted in that briefing is the fact for

6    impeachment by contradiction, you need, first of all, for the

7    fact to be material to the case, something that's material to

8    the charges, not simply something that could possibly weigh in

9    to credibility.  Here, whether or not these allegations with

10   respect to the Lancaster trip don't tend to make the charges

11   more or less credible or more or less believable, Your Honor.

12        But what's more important, Your Honor, another requirement

13   to be able to use impeachment by contradiction, the case law

14   says that you must be contradicting direct testimony or

15   specific testimony.  And what the cases point to is direct exam

16   testimony, Your Honor.

17        And they note that when testimony is extracted on

18   cross-examination, it's often influenced by the manner that the

19   examiner has asked the question.  And so typically parties are

20   not allowed to bring in witnesses to do this impeachment by

21   contradiction to impeach answers brought out on

22   cross-examination.  It's typically only allowed to impeach

23   direct exam testimony.

24        During Yader Gutierrez's direct exam, he did not mention

25   the Lancaster trip at all.  And, therefore, in order to bring

1    in this other witness simply to talk about the Lancaster trip,

2    it goes beyond the purpose of the impeachment by contradiction

3    exception to 608(b).

4         And then finally, in order to be able to bring in this

5    impeachment by contradiction evidence, there has to be a

6    weighing, Your Honor, a 403 weighing.  In this case, it's going

7    to confuse the jury.  The probative value is essentially

8    nothing.  It doesn't go to the charges, but it will confuse the

9    jury, and it will create a side show that is irrelevant to this

10   particular case and especially in light of the fact,

11   Your Honor, most of these trips this witness will discuss, by

12   defendant's counsel's own representation, the CI wasn't even at

13   these trips, so the probative value is very, very minimal.

14              THE COURT:  All right.  I tend to agree.

15              MR. NAVARRO:  Your Honor, if I may respond.

16              THE COURT:  Yes.  Why don't you come to the lectern.

17              MR. NAVARRO:  Your Honor, I agree with the

18   Government in the sense that when it comes to impeachment of

19   witnesses, we have to be very careful.  At the same time,

20   Your Honor, and Your Honor knows, I'm not telling you something

21   you don't know.  When it comes to informants, the rules are a

22   little bit different.  When it comes to an informant like

23   Mr. Yader Gutierrez, I believe the Court has much more and

24   wider discretion.  That's my concern, that --

25              THE COURT:  That's why I have allowed you to go

```
 1   beyond the direct in certain -- with certain witnesses and all,
 2   but I'm troubled by the fact you say this is the only witness
 3   you have and your client's not going to be taking the stand,
 4   which he has the right to do.
 5           MR. NAVARRO:  Well, Your Honor, I will tell you --
 6           THE COURT:  I am reluctantly going to allow it.
 7           MR. NAVARRO:  Your Honor, I just want to let you
 8   know something else.
 9           THE COURT:  Yeah.
10           MR. NAVARRO:  As you know, as CJA counsel, we don't
11   have endless resources.  I have limited resources.  I have an
12   investigator.  I investigate cases.
13           THE COURT:  I understand.
14           MR. NAVARRO:  I went to a prison up north, and I
15   interviewed one of the guys that was in the car with
16   Mr. Gutierrez, a guy named Lonie Vick, and this person told me
17   that the day of the murder that we have been talking about all
18   this time --
19           THE COURT:  Yeah.
20           MR. NAVARRO:  -- that the informant wanted him to go
21   to the house to look for drugs.  Obviously this individual
22   Lonie did not want to come to court and testify, and I'm not
23   going to force him to.
24       I went to another prison in Texas, talked to another one
25   of these people that knows the informant, gave me some more bad
```

1    information on the informant, but he didn't want to be

2    involved.  My point is this, Your Honor, with limited

3    resources, I have been able to find that information that

4    troubles me about this informant.  And, you know, I'm not --

5    I'm just trying to -- I'm trying to seek the truth.  I'm trying

6    to --

7                 THE COURT:  I understand.

8                 MR. NAVARRO:  -- help the client --

9                 THE COURT:  I understand.

10                MR. NAVARRO:  -- with limited resources.

11                THE COURT:  I said I am reluctantly going to let you

12   bring in this one witness tomorrow.

13                MR. NAVARRO:  And that will be my only witness

14   tomorrow, Your Honor, and that will be at 9:00 A.M.  I don't

15   have his date of birth.  I can get it right now, so if the

16   Government wants to run it, they can run it.

17                THE COURT:  Make sure you provide everything that

18   you do have.

19                MR. NAVARRO:  Yes, Your Honor.  Thank you.

20                THE COURT:  All right.  I don't think there's

21   anything else we can do today because of that.

22        So, Ms. Skipper, will you advise the jury to come back at

23   9:00 tomorrow.  Remind them again not to discuss the matter

24   among themselves with anyone.  We will see them at 9:00 A.M.

25        All right.  Perhaps we can clear up most of the matters

UNITED STATES DISTRICT COURT

1  involving the exhibits.  I don't think there is much question

2  about them, at least get them out of the way.  All right.  We

3  will see you at 9:00 tomorrow.

4          MR. NAVARRO:  Thank you, Your Honor.

5          MS. JAIMEZ:  Thank you.

6          THE COURT:  Oh, and I should thank the Government

7  for providing the redacted trial indictment.  Thank you.

8      We are in recess.

9            (Proceedings concluded at 4:02 P.M.)

10                   ---oOo---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6            I, CAROL JEAN ZURBORG, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  November 17, 2015

17

18

19                        /s/ CAROL JEAN ZURBORG
                      _____
20                    CAROL JEAN ZURBORG, CSR NO. 7921, CCRR
                         Federal Official Court Reporter
21

22

23

24

25

**UNITED STATES DISTRICT COURT**