1       UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE TERRY J. HATTER, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,        )
                                     )
6               Plaintiff,           )
                                     )
7        vs.                         )   Case No. CR-14-0209-TJH
                                     )        Volume III
8   ISMAEL GUTIERREZ VILAVAZO,       )    (Pages 410 - 539)
                                     )
9               Defendant.           )
                                     )
10

11

12       REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                     TRIAL DAY 3
13            THURSDAY, MAY 21, 2015
                     9:12 A.M.
14            LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22

23       CAROL JEAN ZURBORG, CSR NO. 7921, CCRR
            FEDERAL OFFICIAL COURT REPORTER
24        312 NORTH SPRING STREET, ROOM 414
           LOS ANGELES, CALIFORNIA  90012
25                  (213) 894-3539

UNITED STATES DISTRICT COURT

1                    **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4          EILEEN DECKER
           United States Attorney
5          BY:  KIMBERLY D. JAIMEZ
                MICHAEL AZAT
6                STEPHANIE CHRISTENSEN
                Assistant United States Attorneys
7          United States Courthouse
           312 North Spring Street
8          Los Angeles, California  90012

9     **FOR THE DEFENDANT:**

10         ANGEL J. NAVARRO
           Attorney at Law
11         714 West Olympic Boulevard, Suite 450
           Los Angeles, California  90015

12    **ALSO PRESENT:**

13         MICHAEL ALKER, Federal Bureau of Investigation

14    **SPANISH-LANGUAGE INTERPRETER:**

15         MONICA DESIDERIO

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1              **INDEX OF WITNESSES**

2

3    DEFENSE WITNESSES                                    PAGE

4    RODRIGUEZ, Oscar

5        Direct Examination by Mr. Navarro              416

6        Cross-Examination by Ms. Jaimez                423

7        Redirect Examination by Mr. Navarro            427

8        Recross-Examination by Ms. Jaimez              427

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|------------------|
| 1001 | - Photograph | | 418 |
| 1002 | - Photograph | | 418 |
| 1003 | - Photograph | | 418 |
| 1004 | - Photograph | | 418 |

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, MAY 21, 2015

 2                            9:12 A.M.

 3                             --oOo--

 4              (Out of the presence of the jury.)

 5              THE COURTROOM DEPUTY:  Please remain seated and come

 6    to order.  This court is now in session.

 7              THE COURT:  Good morning.  We are outside the

 8    presence of the jury.

 9         Any matters any counsel wish to take up?

10              MS. JAIMEZ:  Yes, Your Honor.  The Government would

11    ask that we have the jury instructions conference before

12    closing arguments, if that's possible.

13              THE COURT:  We will.

14              MS. JAIMEZ:  Okay.  Good.  Thank you.

15              THE COURT:  We always do.

16         All right.  Let's bring the jury in, please.

17              MR. NAVARRO:  Your Honor, should I bring the witness

18    in?

19              THE COURT:  Yes.  If you have your witness, bring

20    them in.

21         (Pause in proceedings.)

22              THE COURTROOM DEPUTY:  Please rise.

23         (In the presence of the jury.)

24              THE COURT:  Please be seated, and good morning,

25    ladies and gentlemen.
```

```
 1              MULTIPLE JURORS:  Good morning.
 2              THE COURT:  Let me ask you, and I must, has anything
 3    about this matter come to your attention in any way since you
 4    were here yesterday?  If so, just please raise your hand.
 5         I see no hands having been raised.
 6         Ladies and gentlemen, the Government has rested its case
 7    in chief.  As I told you initially and throughout, the defense
 8    doesn't have to put on a case, and it has the right to do so.
 9    In that regard, Mr. Navarro has a witness.
10         Is that right?
11              MR. NAVARRO:  Yes, Your Honor.
12              THE COURT:  Would you call that witness, please.
13              MR. NAVARRO:  Your Honor, the defense calls Oscar
14    Rodriguez to the stand.
15              THE COURT:  Sir, would you come forward.  Come right
16    up on the witness stand to be sworn, please.
17              THE WITNESS:  Sure.
18              THE COURT:  Right up here, sir.
19              THE COURTROOM DEPUTY:  Please raise your right hand.
20         **OSCAR RODRIGUEZ, DEFENSE WITNESS, WAS SWORN**
21              THE WITNESS:  I do.
22              THE COURTROOM DEPUTY:  Please have a seat.
23              THE WITNESS:  Sure.
24              THE COURTROOM DEPUTY:  State and spell your name for
25    the record.
```

**UNITED STATES DISTRICT COURT**

```
 1              THE WITNESS:  First name is Oscar, O-s-c-a-r, last
 2     name Rodriguez, R-o-d-r-i-g-u-e-z.
 3              THE COURT:  Do you have a middle name,
 4     Mr. Rodriguez?
 5              THE WITNESS:  Cardenas, C-a-r-d-e-n-a-s.
 6              THE COURT:  Go ahead, Mr. Navarro.
 7              MR. NAVARRO:  Thank you, Your Honor.
 8                        DIRECT EXAMINATION
 9     BY MR. NAVARRO:
10     Q     What do you do for a living?
11     A     I am a contractor.
12     Q     Are you also a hunter?
13     A     Yes, I am.
14              THE COURT:  Where do you live, sir, in what city?
15              THE WITNESS:  I live in Arleta, California.
16              THE COURT:  All right.
17              MR. NAVARRO:  Thank you, Your Honor.
18     Q     Now, the clerk has placed in front of you, there is a
19     brown envelope there.  Do you see that envelope?
20     A     Yeah, I seen it.
21     Q     Can you remove the contents and review the documents
22     inside of it.
23     A     These, right?
24     Q     Yes.
25     A     Okay.  I got them.
```

```
 1   Q     Have you seen those items before?
 2   A     Yes, I have.
 3   Q     What are those items?
 4   A     Pictures of deer season.
 5   Q     And are you in the photographs?
 6   A     Yes, I am.
 7   Q     Now, do the photographs accurately depict the events which
 8   are reflected in the photographs?
 9   A     Yeah, everything's in there.  That's where I was.
10              MR. NAVARRO:  And, Your Honor, I would ask for those
11   photographs to be admitted at this time, Exhibits 1001 --
12              THE COURT:  I think we need some better foundation
13   than that.
14              MR. NAVARRO:  I will do so, Your Honor.
15   Q     When were these photographs taken?
16   A     These were taken in October of deer season, like 2012 or
17   around there.
18   Q     And who was with you on the hunting trip?
19   A     Ismael, myself and Nestor, three people.
20   Q     When you say Ismael, that's Ismael Gutierrez?
21   A     Yes.
22   Q     Do you see Ismael Gutierrez in the courtroom today?
23   A     Yes, I do.
24   Q     Can you please point him out?
25   A     He's sitting down right there.
```

```
 1    Q    What clothes is he wearing?

 2    A    Black long-sleeve and --

 3              THE COURT:  Indicating, for the record, the

 4    defendant in this matter.

 5              MR. NAVARRO:  Your Honor, may those items now be

 6    admitted?

 7              THE COURT:  And what was the location of this hunt

 8    that the photographs evidently depict?

 9              THE WITNESS:  This was in Frazier Park.

10              THE COURT:  Where is that, sir?

11              THE WITNESS:  That's in Los Padres National Forest.

12              THE COURT:  All right.

13              MR. NAVARRO:  If I may --

14              THE COURT:  Has the Government had an opportunity to

15    see these?

16              MS. JAIMEZ:  Yes, Your Honor.

17              THE COURT:  Is there any objection?

18              MS. JAIMEZ:  No objection, Your Honor.

19              THE COURT:  All right.  They will come in.

20              MR. NAVARRO:  Thank you.

21         May I publish them, Your Honor.

22              THE COURT:  Yes, certainly.

23         (Exhibits 1001, 1002, 1003 and 1004 received.)

24    BY MR. NAVARRO:

25    Q    Now, this is Exhibit Number 1001, which was previously
```

```
 1   admitted.
 2   A     Yeah, I see it.
 3   Q     Who is in that photograph?
 4   A     It's myself and Ismael.
 5   Q     And there's a deer?
 6   A     Yeah.
 7   Q     And Mr. Gutierrez is holding a rifle?
 8   A     Uh-huh.
 9              THE COURT:  Well, just a minute.  This is your
10   witness.
11              MR. NAVARRO:  I'm sorry, Your Honor.
12              THE COURT:  You can't lead him.
13              MR. NAVARRO:  I'm sorry.
14   Q     Is Mr. Gutierrez holding anything?
15   A     A rifle.
16   Q     And whose rifle is that?
17   A     That's mine.
18   Q     Can you tell what type of rifle it is?
19   A     It's a 270 Winchester bolt-action rifle.
20   Q     And what is the purpose of that type of rifle?
21   A     Hunting, kill deer, bear.
22   Q     Now I am going to place before you previously admitted
23   Exhibit 1002.
24         Do you see that photograph there?
25   A     Yes, I do.
```

```
1    Q    Who is in that photograph?

2    A    Myself and Nestor.

3    Q    Is Nestor holding anything?

4    A    A rifle.

5    Q    Is that the same rifle?

6    A    Same rifle.

7    Q    And these photographs were taken on the same day?

8    A    Same day.

9    Q    I am going to show you another photograph.  This is 1003.

10        What is depicted in this photograph?

11   A    That's me and Ismael.

12   Q    When you say "that's me," who is the person holding the

13   rifle?

14   A    Me.

15   Q    Now, is this the first time you had gone hunting with

16   Mr. Gutierrez?

17   A    No.  I have been hunting with him a couple times.

18   Q    What about Nestor, have you hunted with Nestor before?

19   A    A couple times as well.

20   Q    And in terms of your hunting experience, how often do you

21   hunt?

22   A    I have been doing this for 20 years.  My father's been

23   doing this for 45 years.

24   Q    And when you hunt, can you hunt anytime of the year?

25   A    No.  You can hunt only seasonal.  Archery starts in July,
```

**UNITED STATES DISTRICT COURT**

1    and October it starts for rifle season.

2    Q    During the month of July there's archery hunting?

3    A    Yeah.

4    Q    And where does that take place?

5    A    That takes place like towards Santa Barbara, up there,

6    those mountains towards Santa Barbara.

7    Q    And the deer season starts in October?

8    A    That's for archery.  For rifle it starts in October.

9    Q    And how long does it run?

10   A    A month.

11   Q    This is every year?

12   A    Every year.

13   Q    And this is in Frazier Park?

14   A    Frazier Park.

15   Q    Now, do you know if there's a hunting -- if there's

16   hunting allowed in the area near Lancaster, California?

17   A    Anywhere from Freeway 5 to the 14 Freeway, it's called

18   Tehachapi Mountains, you can't hunt there.

19   Q    How do you know this?

20   A    Well, when you -- you buy a booklet every year.  There's a

21   booklet you've got to buy, and it tells you because sometimes

22   they change.  So that's like a military -- some sort of

23   training thing there, and it's all gated off, closed off.  And

24   there's surveillance cameras all over the place there so nobody

25   goes in there, none soever.

```
1    Q    Do you know a person by the name of Bicho?

2    A    Yes, I do.

3    Q    Now, this individual Beacho ever go on any of the hunting

4    trips --

5    A    No.

6    Q    -- any of the trips that you went with Mr. Gutierrez?

7    A    No, not there.

8    Q    Any of the hunting trips you went with Nestor?

9    A    Yes, with Ismael and Nestor, yes.

10   Q    Did Beacho go on these trips?

11   A    No.

12   Q    Now, when you go hunting now, what type of vehicle do you

13   take?

14   A    Take a four-by-four, four-wheel drive.  A two-wheel won't

15   go up there.

16   Q    Would you take a regular sedan up there?

17   A    No.

18   Q    Why not?

19   A    You'd get stuck.  You will get stuck in sand or ditch or

20   something.

21   Q    When you are hunting up there, is there certain kinds of

22   weapons that you take with you?

23   A    Yeah.  You've got to take certain kinds of rifles.

24   Q    Would you take a revolver?

25   A    No, you can't go in there with a revolver.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    What about an AR-15 rifle, can you take an AR-15 rifle?

 2   A    You can take it, but you are not allowed to shoot an

 3   animal with it because it's not a high-powered rifle.  You are

 4   going to injure an animal, and it's going to take off from you,

 5   and it's just going to go to waste.

 6   Q    And when you are hunting deer, is there a certain kind of

 7   deer you can hunt only?

 8   A    Yeah, the buck, the male buck.

 9   Q    Does it have to be a certain age?

10   A    It's got to be a four-key, which we call it the little

11   spiked deer, and it's got to be an inch on both tines.  Now you

12   kill it, but if it's only one, you cannot kill it.

13   Q    Can you hunt female deer?

14   A    No.

15           MR. NAVARRO:  I have no additional questions,

16   Your Honor.

17           THE COURT:  All right.  Cross-examination,

18   Ms. Jaimez?

19           MS. JAIMEZ:  Yes, Your Honor.

20                        CROSS-EXAMINATION

21   BY MS. JAIMEZ:

22   Q    Good morning.

23   A    Good morning.

24   Q    Now, you have testified you have gone hunting with the

25   defendant in the past, correct?
```

```
 1   A     Correct.
 2   Q     And the individual, Yader Gutierrez, who you know as
 3   Beacho, was never on any of those hunting trips, correct?
 4   A     No, correct.
 5   Q     And you've never socialized with Beacho or Mr. Gutierrez?
 6   A     I seen Beacho around, but nothing that -- just like --
 7   Q     But you never socialized with him, correct?
 8   A     No, correct.
 9   Q     And you have no personal knowledge of when Mr. Gutierrez
10   went on hunting trips himself, correct?
11   A     No, not by himself because he wouldn't know.  I was the
12   one that brought him into hunting with me, because I will tell
13   him, "You want to go hunting with me?"  That's when he would
14   know.
15   Q     I'm sorry?
16   A     Ismael.
17   Q     I referred to Beacho, Mr. Gutierrez, Yader Gutierrez.
18   A     No.
19   Q     So you would have no personal knowledge of when Yader
20   Gutierrez went on hunting trips, correct?
21   A     Correct.
22   Q     Now, you've testified that you only went hunting with the
23   defendant a couple of times; is that correct?
24   A     Correct.
25   Q     Isn't it possible that the defendant has gone hunting
```

**UNITED STATES DISTRICT COURT**

```
 1    without you?

 2    A     Well --

 3    Q     Yes or no, is it possible?

 4    A     Yeah, it's possible.

 5          THE COURT:  Just a minute.  You don't instruct the

 6    witness on how to answer, and also, anything is possible.  So

 7    you can rephrase your question.

 8    BY MS. JAIMEZ:

 9    Q     Are you the only person with whom the defendant has ever

10    gone hunting?

11    A     Yes.

12          THE COURT:  Now, how do you know that?

13          THE WITNESS:  Well, because they wouldn't even know

14    where to start, where to go.  And to go there, you've got to go

15    through security door, and there's a forest range.  He is right

16    there as soon as you walk in, drive in, they take your license

17    plate picture.  And if you get out Smokey Bear Road, that's

18    where it starts.  They wouldn't let any cars go up there

19    because of the fires because a lot of zones were closed at the

20    time.

21          THE COURT:  Having gone up there with you, couldn't

22    he go up there with someone else?

23          THE WITNESS:  Well, that's why every year when you

24    buy -- purchase your deer tag, they give you a forest ranger

25    pass that you've got to have on your car, knowing that --
```

```
 1   you're showing that you're a hunter.  And if you don't have it,
 2   they're going to wait for you by the time you get to the
 3   freeway.  It's a one-way-in street, and they are going to wait
 4   for you there, and they are going to find out what you're doing
 5   up there.
 6   BY MS. JAIMEZ:
 7   Q    Do you conduct surveillance of all of the areas where one
 8   can go hunting?
 9   A    No, I don't conduct, but there is people watching up
10   there.
11   Q    But you have never personally reviewed surveillance
12   footage to say when someone could have gone hunting or not have
13   gone hunting?
14   A    No.
15   Q    So you have no personal knowledge of when the defendant
16   went hunting at every point in his life since knowing you?
17   A    No.
18   Q    Correct?
19   A    I don't have that knowledge.
20              MS. JAIMEZ:  All right.  One moment, Your Honor.
21              THE COURT:  Surely.
22              MS. JAIMEZ:  No further questions.
23              THE COURT:  All right.  Anything further of this
24   witness?
25              MR. NAVARRO:  Just briefly, Your Honor.
```

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Redirect.
 2                      REDIRECT EXAMINATION
 3   BY MR. NAVARRO:
 4   Q    Mr. Rodriguez --
 5   A    Sure.
 6   Q    -- to go -- when you're hunting during this time of the
 7   year, you're driving the 5 Freeway?
 8   A    5 Freeway, and then you can hunt from there, on.  Frazier
 9   Park, Tejon Hunting Club as well, and there's a lot of private
10   ranches.
11   Q    And when you go up there, rangers are there?
12   A    Rangers, they are there waiting for people, and there is a
13   big line.  And they have everybody pull to the side before you
14   go into the mountains.
15   Q    And what do rangers look for?
16   A    Make sure you have the right rifle, what you're doing up
17   there, who you're going with.  And the latest thing is that now
18   you have to have the right, proper bullet.  You have to use
19   nonlead bullets.  You cannot use a lead bullet.
20              MR. NAVARRO:  No further questions, Your Honor.
21              THE COURT:  Anything further of this witness?
22          Yes.  Recross.
23                      RECROSS-EXAMINATION
24   BY MS. JAIMEZ:
25   Q    Not everyone is aware of the hunting regulations, correct?
```

UNITED STATES DISTRICT COURT

```
 1   A     Correct.
 2   Q     And not everyone follows the hunting regulations as
 3   carefully as you might, correct?
 4   A     Correct.
 5            MS. JAIMEZ:  No further questions.
 6            THE COURT:  Anything further of this witness?
 7            MR. NAVARRO:  No, Your Honor.  Thank you.
 8            THE COURT:  Thank you, sir.  You're excused.
 9            THE WITNESS:  Thank you very much.  I put this back?
10            THE COURT:  Yes, just leave those.  Thank you.
11        Do you have any further witnesses, Mr. Navarro?
12            MR. NAVARRO:  No, Your Honor.  The defense will
13   rest.
14            THE COURT:  Very well.
15        Ladies and gentlemen, both sides have rested now, so I am
16   going to ask you to go back into the jury room while we take
17   care of some matters of law, and we will call you back as soon
18   as we can.
19        Everyone, please rise for the jury.
20        (Out of the presence of the jury.)
21            THE COURT:  Please be seated.  We are outside the
22   presence of the jury.
23        Mr. Navarro, do you have any motions of any kind at this
24   time?
25            MR. NAVARRO:  I would simply submit under Rule 29
```

**UNITED STATES DISTRICT COURT**

1    motion.

2              THE COURT:  All right.  Rule 29 motion, having been

3    submitted, it is denied.

4         Does the Government plan on any rebuttal?

5              MS. JAIMEZ:  No, Your Honor.

6              THE COURT:  Thank you.

7         We will take a brief recess, and then we will go over the

8    instructions.

9              THE COURTROOM DEPUTY:  This court is in recess.

10        (Recess taken from 9:29 A.M. to 10:04 A.M.)

11        (Out of the presence of the jury.)

12             THE COURTROOM DEPUTY:  Please remain seated and come

13   to order.  This court is once again in session.

14             THE COURT:  We are again outside the presence of the

15   jury, and this is the time for going over the instructions.  I

16   am going to indicate to you the instructions I intend to give,

17   and receive comments and objections from you.  Where I cite to

18   a number, such as 1201 or 1202, it's with regard to O'Malley.

19   If we are using the Ninth Circuit model or something else, I

20   will so inform you.  And we will take them in the order that

21   the Government has requested them.

22        And, again, Mr. Navarro, you did not submit any proposed

23   instruction, did you?

24             MR. NAVARRO:  No, Your Honor.  I looked at the

25   instructions the Government filed, and they were fine,

1   Your Honor.  I did ask for one additional instruction dealing

2   with informant testimony, which I believe is submitted to

3   Your Honor.

4           THE COURT:  We will see where that is, then.

5       Number 1, 12:01, Province of the court and jury, I intend

6   to give that.  12:02, Judging the evidence, I will also give.

7   12:03, I will give that, and I think also with judicial

8   notice -- I took some judicial notice of some such ridiculous

9   things, like Albuquerque in New Mexico.  There is probably an

10  Albuquerque in Iowa, too, all right, but I will give it.

11      12:04 I will also give.  That's direct and circumstantial

12  evidence, of course.  12:05, Inference from the evidence, will

13  be given.  12:07, Jury's recollection controls.  12:08, that's

14  covered actually by 12:03, so that will not be given, The

15  question is not evidence.

16      12:09, Consider only the charged offense, that will be

17  given.  12:10, burden of proof/reasonable doubt, will be given

18  as requested.  12:11, verdict as to accused only, that will be

19  given.  12:12, Consider each count separately, will be given.

20  13:04, The indictment is not evidence, that's an O'Malley

21  13:05.  It's listed as 13:04 in the request, but it will be

22  given.

23      And then 13:05 as requested by the Government, it's listed

24  as 13:06 of O'Malley.  14:01, opinion evidence of the expert

25  witness, that will be given.  14:02, Charts and summaries

1    admitted into evidence, inserted by the prosecution, will be

2    given.  15:01, discrepancies in testimony and credibility of

3    witness, will be given as requested.  15:06 also will be given

4    as requested.  It's impeachment, inconsistent statements or

5    conduct.  18 -- 15:08 will not be given.  That's The

6    defendant's conviction of a felony.

7         15:12, defendant as a witness, that will not be given.

8    15:14, effect of defendant's failure to testify, that will be

9    given as requested in standard form.  31:01 will be given but

10   with the AKAs deleted.  That's The Nature of the Offense

11   Charged - Conspiracy to Distribute Methamphetamine.

12        Number 22, 11:14, Dismissal of some defendants, that will

13   not be given.  The jury just has one defendant before them, and

14   with the redacted indictment, they don't know of any other.

15   31:02, The statute defining the offense charged, will be given

16   as requested.  31:03, The essential elements of the offense

17   charged, will be given as requested.  31:05, Membership in an

18   agreement, modified for 18 United States Code Section 846, will

19   be given as requested.

20        31:06, Acts and declarations of co-conspirators, will be

21   given as requested.  31:01, The Nature of the Offense Charged -

22   Distribution of Methamphetamine, again, with the deleted AKAs,

23   will be given in modified form.  64:02, The statute defining

24   the offense charged - Distribution of a Controlled Substance,

25   will be given as requested.  64:03, The essential elements of

432

1    the offense charged - Distribution of Methamphetamine, will be

2    given as requested.

3        64:04 "to distribute" - defined, it's listed as O'Malley

4    64:03, however, and that will be given as requested.  Ninth

5    Circuit 8.25, Liability for Substantive Offense Charged by

6    Co-Conspirator, will be given as requested.  18:01 will be

7    given as requested.  31:01, with the deleted AKAs again, will

8    be given in modified form, the nature of the offense charge,

9    use of a telephone to facilitate a felony drug offense.

10        17:04, "Knowing" - Defined, will be given as requested.

11   17:08, Proof of knowledge or intent - Rule 404(b) Evidence,

12   will not be given.  36, a special opinion testimony from law

13   enforcement officer citing to *United States versus Martinez,*

14   Ninth Circuit 2011 case, will be given as requested.  20:01,

15   communication between court and jury during deliberations, that

16   will be given as requested.

17        38 20:03, verdict and multiple defendants, that's covered

18   by 12:11 and 12:12, so will not be given.  15:02, credibility

19   of witnesses and informant, will be given as requested.  17:08,

20   proof of knowledge and intent, that is a duplicate of number

21   35.  That's not going to be given, and will not be given.

22   101.50, official translation, will be given again.  And 42,

23   Ninth Circuit 410, Government's use of undercover agents and

24   informants, that's covered by 15:02 so will not be given.

25        Now, there were two supplementals, Ninth Circuit 928,

 1    transcript of recording in foreign language, that will be given

 2    as requested, and 929, foreign language testimony, that will be

 3    given as requested.  And then there's several that the Court

 4    uses as standards:  That's 11:03, objections and rulings;

 5    11:04, court's comments to counsel; 11:05, court's questions to

 6    witnesses; 17:05, "Willfully" act, that will be given; 17:06,

 7    motive explained, that will be given; 17:07, proof of knowledge

 8    or intent, will also be given.

 9         Now, any comments or objections?  The Government first.

10              MR. AZAT:  Can we have just one moment, Your Honor?

11              THE COURT:  Certainly.  Take your time.

12         (Counsel conferred off the record.)

13              MR. AZAT:  Your Honor, may I please have a moment to

14    confer with defense counsel?

15              THE COURT:  Yes, please.  Go right ahead.

16              MR. AZAT:  Thank you.

17         (Counsel conferred off the record.)

18              THE COURT:  Mr. Azat?

19              MR. AZAT:  Thank you, Your Honor.

20              THE COURT:  Yes.

21              MR. AZAT:  The United States would request that

22    instruction 1705 from O'Malley not be given to the jury because

23    "willfully" is not a mens rea of any of the counts charged in

24    this indictment, Your Honor.  Rather, "knowing and

25    intentionally" are the mens rea requirements.

```
 1              THE COURT:  Which number was that?

 2              MR. AZAT:  That was 1705, Your Honor.

 3              THE COURT:  1705.

 4              MR. AZAT:  O'Malley, which is "willfully."  I

 5   believe it was one of the court's supplemental instructions.

 6              THE COURT:  All right.  And I take it that you're in

 7   agreement with that, Mr. Navarro?

 8              MR. NAVARRO:  That's fine, Your Honor.

 9              THE COURT:  All right.  We will strike that, then.

10              MR. AZAT:  I just, if I may, Your Honor, one more

11   item.

12              THE COURT:  Yes.

13              MR. AZAT:  The United States does request that the

14   Court instruct the jury on the proposed jury instruction number

15   42 the Government has submitted, which relates to the

16   Government use of undercover agents and informants.  The Court

17   indicated that it would not give the instruction because

18   O'Malley's instruction 1501.

19              THE COURT:  1502.

20              MR. AZAT:  I'm sorry, Your Honor?

21              THE COURT:  1502.

22              MR. AZAT:  1502, excuse me, Your Honor.  1502 covers

23   the information in that instruction.  However, 1502 does not

24   specifically instruct the jury that the Government is allowed

25   to use stealth and deception in its investigations, and also
```

1    that confidential informants are allowed to assume the roles of

2    members of criminal organizations.

3        In this trial, Your Honor, the confidential informant

4    specifically testified that he represented to the defendant and

5    to the defendant's co-conspirator that he was, in fact, a drug

6    dealer or he was, in fact, associated with drug dealers

7    himself.  Therefore, we think this instruction is relevant.

8            THE COURT:  All right.  I will take a look at that.

9        Mr. Navarro, you wish to be heard with regard to that?

10           MR. NAVARRO:  Your Honor, I would defer to

11   Your Honor on that.  I think the instruction you proposed is

12   fine.  They want the additional one; it's fine with me.  We get

13   it all the time in the other cases, so it's routinely given,

14   Your Honor.

15           THE COURT:  Well, I don't necessarily want to follow

16   routine if we need it.  I will take another look at both 1502

17   and the Ninth Circuit 410.

18           MR. NAVARRO:  And, Your Honor, just so you know, I

19   am not going to be arguing anything the informant did was --

20   that he was a drug dealer or anything.  That's not what I'm

21   arguing.

22           THE COURT:  All right.  I will take a look at that.

23           MR. AZAT:  Thank you, Your Honor.  Nothing further.

24           THE COURT:  It would be the proper O'Malley for a

25   single defendant verdict form, and that will be added on.  I

```
 1    don't think there is anything else.
 2        How much time is the Government requesting for its final
 3    argument, including both the opening and the rebuttal?
 4            MR. AZAT:  Your Honor, the United States is
 5    anticipating no more than 45 minutes for its closing and five
 6    minutes rebuttal.
 7            THE COURT:  You may have a total of 45 minutes.
 8            MR. AZAT:  Thank you, Your Honor.
 9            THE COURT:  Mr. Navarro?
10            MR. NAVARRO:  I expect about 35 minutes, Your Honor.
11            THE COURT:  All right.  You may have that.  All
12    right.
13        Are you prepared to proceed in the next five minutes or
14    so?
15            MR. AZAT:  I am, Your Honor.  Thank you.  Just one
16    more item.
17            THE COURT:  Yeah.
18            MR. AZAT:  I requested to let the Court know, if I
19    may, my co-counsel will be seated in the second row of the
20    bleachers while I give my closing, if that's okay with you.
21            THE COURT:  That's okay with me.
22            MR. AZAT:  Thank you, Your Honor.
23            THE COURT:  It sounds like some of the bank robbery
24    cases that we used to do.  You all are too young.  We don't do
25    bank robberies anymore, I guess, but the tellers would always
```

```
 1    come in and be asked to identify the alleged robber, and of
 2    course they look over to the defense table.  So I would always
 3    have the defendants dressed properly and sitting out there
 4    where you are going to have your co-counsel sitting.  They
 5    point over there and can't pick out a person and look around
 6    the courtroom, and it's bad news.  But you select your seats.
 7         All right.  You're just lucky you are not trying to get
 8    Lakers tickets now since they got the number two draft choice.
 9         All right.  Let's take five minutes and bring the jury
10    back.
11              THE COURTROOM DEPUTY:  This court is in recess.
12         (Recess taken from 10:22 A.M. to 10:33 A.M.)
13         (Out of the presence of the jury.)
14              THE COURTROOM DEPUTY:  Please remain seated and come
15    to order.  This court is once again in session.
16              THE COURT:  We are once more outside the presence of
17    the jury.  I took a look at -- oh, I thought they all
18    disappeared on me.
19              MR. AZAT:  I warned you, Your Honor.
20              THE COURT:  They don't need to come up.  I just want
21    to let you know that I took a look at both 1502, which you
22    requested, and we said we are going to give.  And is it that
23    you want that plus the special?
24              MR. AZAT:  If we could, Your Honor.  We prefer just
25    the Ninth Circuit, but I assume Your Honor --
```

438

```
 1            THE COURT:  You would prefer the Ninth Circuit.
 2  That doesn't ask that they view the witness with caution or any
 3  of those things.
 4            MR. AZAT:  I thought that the Ninth Circuit includes
 5  that, Your Honor, but if --
 6            THE COURT:  Well, not what you've given us.  It just
 7  reads:  You have heard testimony from an informant who was
 8  involved in the Government's investigation in this case.  Law
 9  enforcement officials may engage in stuff in deception, such as
10  the use of informants and undercover agents in order to
11  investigate criminal activities.  Undercover agents and
12  informants may use false names and appearances and assume the
13  roles of members in criminal organizations.
14            MR. AZAT:  I misspoke, Your Honor.  We would like
15  both of them.
16            THE COURT:  All right.  I take it there is no
17  objection, Mr. Navarro?
18            MR. NAVARRO:  No, Your Honor.
19            THE COURT:  All right.  They will both be given
20  then.  All right.  If there's nothing further from either side,
21  we will bring the members of the jury in.
22       And by the way, I don't expect either the Government or
23  the defense to attempt to instruct the jury.  You can, of
24  course, indicate in your arguments what you think the Court
25  will do, but the Court will be doing the instructing.  So you
```

```
 1   don't have to quote from the instructions, necessarily.
 2              MR. NAVARRO:  So you don't want us -- I can't
 3   paraphrase an instruction.
 4              THE COURT:  Well, you can say that -- talk about
 5   reasonable doubt and other kinds of things and what you expect
 6   that the Court will do.
 7              MR. NAVARRO:  Right, but I am not going to read the
 8   instructions, Your Honor.
 9              THE COURT:  But don't attempt to just instruct.
10              MR. NAVARRO:  No.
11              THE COURTROOM DEPUTY:  Please rise.
12         (In the presence of the jury.)
13              THE COURT:  Please be seated, ladies and gentlemen.
14   I think I detected a bit of retrogression there.  You have been
15   in the right order previously, and all of a sudden --
16              JUROR NO. 10:  He opened the door too fast.
17              THE COURT:  Okay.  Ladies and gentlemen, you
18   remember at the beginning I told you that the Government would
19   have two bites at the apple, as it were, doing the final
20   arguments, and that's simply because they bear the burden of
21   proof.  And the Government will open the final arguments, then
22   you will hear from Mr. Navarro on behalf of the defendant, and
23   then there will be final or closing argument by the Government.
24         Mr. Azat, you may proceed.
25              MR. AZAT:  Thank you, Your Honor.  May it please the
```

1    Court.

2           THE COURT:  Yeah.

3           MR. AZAT:  Ladies and gentlemen, good morning.

4           MULTIPLE JURORS:  Good morning.

5           MR. AZAT:  The events set in motion nearly two years

6    ago are drawing to a close, and those events were told to you

7    through evidence that the United States presented over the

8    course of this short trial.  That evidence told a simple story

9    that this man, the defendant, Ismael Gutierrez Vilavazo, the

10   man sitting in this very courtroom was also known as "Mike" or

11   "Mikey," or as Yader Gutierrez put him in his cell phone, as

12   M-a-k-e-y, probably trying to spell "Mikey," according to the

13   sale of 48.6 grams of pure methamphetamine to Yader Gutierrez,

14   the confidential informant you heard testify during that trial.

15   That sale took place on September 26, 2013.

16       Defendant coordinated the sale with this man, Jorge

17   Huerta.  Jorge Huerta delivered the drugs to the confidential

18   source.  Jorge Huerta is also referred to by the defendant as

19   his "nephew," which he is, or "my people," whereas Jorge Huerta

20   liked to be referred to as "Moreno."

21       Now, as his Honor told you, I have some time this morning,

22   and I want to use that time to summarize the evidence that you

23   heard over the course of this trial, the evidence that told you

24   that simple story.  I will review the charges against the

25   defendant briefly.  His Honor will instruct you on the law at a

1    later time.  And I am going to talk about what the evidence

2    must show beyond a reasonable doubt before you can return a

3    verdict of guilty against the defendant for the eight charges

4    brought against him in this case.

5        I will take this time to discuss some of the evidence and

6    suggest to you that that evidence tells only one story that's

7    reasonable, and that evidence presents a story that leads to

8    that one reasonable conclusion, that is, Defendant is guilty

9    beyond a reasonable doubt of the charges brought.

10       For his conduct in this case the defendant is charged with

11   eight counts.  I want to talk about those counts briefly.  The

12   first is the conspiracy to distribute methamphetamine.  The

13   second is the distribution of that methamphetamine and also the

14   aiding and abetting of the distribution of that

15   methamphetamine.  I am going to talk about the two ways you can

16   find the defendant guilty of this count.

17       There are six additional counts also that are commonly

18   referred to as phone counts.  Those are Counts 3 through 8,

19   which charge Defendant with having used a telephone to

20   facilitate a felony drug offense, in this case the sale of that

21   methamphetamine.

22       So I want to talk to you about that first count, the

23   conspiracy to distribute methamphetamine.  So what do you have

24   to find that the evidence prove beyond a reasonable doubt for

25   Defendant to be guilty of Count 1?  First, there was an

agreement between two or more people to commit the crime, which
in this case was the sale of methamphetamine.  And second, the
defendant joined that conspiracy knowing the purpose of the
agreement and intending to help accomplish it, which again, is
to sell that methamphetamine.  If you find that both evidence
are proved beyond a reasonable doubt by the evidence you heard,
then you must return a verdict of guilty for Count 1.

Second count is the distribution of meth.  In Count 2
Defendant is charged with the distribution of methamphetamine.
And here are the elements for the distribution of
methamphetamine:  First, defendant knowingly and intentionally
distributed 48.6 grams of pure methamphetamine.

Ladies and gentlemen, it's undisputed that 48.6 grams of
pure methamphetamine was sold on September 26 to the man you
heard testify in this trial, Yader Gutierrez.  That's an
undisputed fact.  It's been stipulated to by the parties.  The
second is Defendant knew the substance distributed was
methamphetamine.

Now, as I mentioned, there's that fact that's undisputed,
that that meth, 48.6 grams of it, was sold on September 26.
The second fact that's undisputed is that someone other than
Defendant was there that delivered the methamphetamine that
day, but you can still find defendant guilty of Count 2, and
there's two ways to do that:  You can find defendant guilty of
Count 2 under what's known in the law, conspiracy liability.

 1   And the second way you can find him guilty of Count 2, if you

 2   found the defendant aided and abetted in that distribution.  In

 3   either case, Defendant is guilty of Count 2 if you find that

 4   either of those theories are met.

 5        Here's that conspiracy liability I just said to you.  You

 6   can find Defendant guilty of Count 2 if you find the

 7   defendant -- that someone delivered the meth, which, again, is

 8   undisputed.  Somebody delivered that meth.  The second, the

 9   person who delivered that meth was a member of the conspiracy.

10   In other words, they are a member of an agreement to deliver

11   that meth.  The third, the person delivered the meth in

12   furtherance of the conspiracy.  Fourth, the defendant was also

13   a member of the conspiracy at the time that meth was delivered.

14   And fifth, the meth was delivered as part of the conspiracy and

15   was a foreseeable consequence of the conspiracy.

16        If you find these facts to have been proven beyond a

17   reasonable doubt, you can find the defendant guilty under Count

18   2 under what's called the conspiracy liability.  Now, the next

19   way you can find the defendant guilty of Count 2 is in the

20   aiding and abetting of the distribution of meth.

21        Here are the elements of aiding and abetting in the

22   distribution of meth:  First, the defendant knew that the crime

23   was being committed, which in this case was the sale of that

24   methamphetamine; second, the defendant did some act to help

25   commit the crime.  That could be a number of things:  The

1    defendant could have aided, the defendant could have commanded

2    another, the defendant could have merely encouraged another.

3    And third, the defendant acted intentionally to cause the crime

4    to be committed, again, the crime was the sale of the meth.

5        On Counts 3 through 8, charge the defendant with the use

6    of a telephone to facilitate a drug offense.  These are what I

7    referred to a moment ago as the phone counts.  Each time

8    defendant used his phone to help facilitate that meth deal,

9    he's been charged with a phone count.  There's six of them, six

10    different times he used that phone, whether it be a text

11    message, whether it be a telephone call, each time he is

12    charged with a phone count.

13        If you find that he knowingly and intentionally used that

14    telephone to commit the felony drug offense or to help to

15    commit the felony drug offense, sale of the methamphetamine,

16    you should find the defendant guilty of each of those phone

17    counts.  Again, there are six of them.

18        So let's start with conspiracy.  Did the evidence prove

19    beyond a reasonable doubt the defendant is guilty of Count 1?

20    Ladies and gentlemen, I would submit to you that you find two

21    things were proved by the evidence beyond a reasonable doubt,

22    that Defendant was guilty of Count 1:  First, that defendant

23    was the person on the phone calls; and second, that defendant

24    was coordinating the sale of the methamphetamine on those phone

25    calls.

1        There they are.  -3398 is the defendant's phone.

2   Defendant coordinated the sale of meth.  If you find the

3   evidence proved these two facts beyond a reasonable doubt, then

4   you must find defendant guilty of Count 1.  So let's go through

5   the evidence what you saw.

6        How do we know that -3398 was the defendant's phone?

7   Well, first of all, we know the defendant -- you didn't see the

8   subscriber information for -3398.  There was no subscriber

9   information for -3398 that the Government presented.  So

10   Defendant, I would submit to you, tried to conceal who actually

11   was the person on that phone.  He was careful.  He was

12   cautious.  But what evidence did you see that shows defendant

13   was actually the person on -3398?  There it is.  He said so

14   himself.

15        When the defendant was arrested by that young man you saw

16   testify the first day of this trial, Officer McGraw, the

17   defendant told Officer McGraw when he was booked that "(818)

18   263-3398 is my phone number."  And he also told him that "I

19   live at 11461 Oxnard Street."  So defendant said so.  Defendant

20   admitted that's his phone.

21        You also saw some testimony about some maps.  On September

22   25th, in Exhibit 103-A, which is a transcript of a call, the

23   defendant said, "I'm far away."  He told that to Yader

24   Gutierrez.  You heard from Detective Hansen that after

25   reviewing the phone records and conducting his historical cell

1   site analysis, that yeah, the defendant was far away.  He was

2   in Alabama that day.

3        On October 4th, you heard Special Agent Alker testify the

4   defendant was seen at his house driving an Audi.  Well, you

5   also heard Detective Hansen testify that "Yeah, on October 4th

6   I reviewed the cell phone records from October 4th, and there

7   was a call made in the approximate vicinity of where

8   Special Agent Alker saw the defendant that day," again placing

9   the defendant with that phone, corroborating what

10  Special Agent Alker said.

11       October 7 Defendant tells Yader Gutierrez he is in

12  Oklahoma.  He's specific, "I'm in Oklahoma."  Guess where the

13  phone was?  It is in Oklahoma with its owner.  October 25th

14  Defendant is seen by Special Agent Jeremy Stebbins during

15  surveillance in the vicinity of Truesdale, when he followed him

16  from his house over to Truesdale.  Guess where his phone was?

17  In the vicinity of Truesdale, Exhibit 509.

18       January 13th, Officer McGraw also told you the defendant

19  was arrested in Tennessee.  That's when he admitted the phone

20  was his.  Guess where the phone was on January 13th?  It was in

21  Tennessee because it's Defendant's phone, because he was the

22  one on the calls coordinating this meth sale.

23       Defendant called his wife 245 times in three months.

24  That's Exhibit 414.  Defendant called his mom 45 times in three

25  months from that phone.  Who else would call those numbers?

1    Defendant, on his phone.  How do we know?  Because Defendant

2    said so.  The Bureau of Prisons records the defendant

3    identified the number he called 245 times as belonging to his

4    wife, Suzy Alvarez, and the number he called 45 times as

5    belonging to his mother, Maria Vilavazo.

6        And lastly, we heard -- or excuse me, you see in the

7    transcripts that Defendant, when he was talking to Yader

8    Gutierrez, was being referred to as "Mike" or "Mikey" in those

9    calls.  Defendant responded in kind.  How do we know that -3398

10   is Defendant's phone?  Because the evidence is overwhelming,

11   ladies and gentlemen.  -3398 is defendant's phone, and the

12   evidence has shown that beyond a reasonable doubt.

13       So I will submit to you, ladies and gentlemen, the first

14   item that we discussed earlier to prove conspiracy beyond a

15   reasonable doubt is proved by the evidence you've heard.  So

16   next, the only remaining question of fact for you to find

17   defendant guilty beyond a reasonable doubt on Count 1 is what

18   defendant was talking about on those calls and in those text

19   messages.

20       Were they setting up a drug deal, or were they talking

21   about gardening or automotive mechanic work or roofing?  I

22   would submit to you, ladies and gentlemen, that those calls and

23   those texts that you have in evidence that you saw during this

24   trial show the defendant was coordinating the sale of 48.6

25   grams of methamphetamine.  It's the only reasonable conclusion.

1      It's an undisputed fact, because there was a stipulation

2  entered between the defense and the United States that the

3  transcripts are accurate transcriptions of the texts and phone

4  calls that took place at the times and dates that were

5  transcribed.  So again, the only reasonable conclusion as to

6  what was discussed between those texts and calls is the

7  question.  What was discussed on those texts and calls was a

8  drug deal.  Defendant used the phone to coordinate the sale of

9  48.6 grams of methamphetamine because he was brokering that

10 deal.  He was brokering that deal.  He was making the deal

11 happen.

12     So how do we know?  What did the evidence show us?  Well,

13 the evidence showed us that defendant put Yader Gutierrez in

14 touch with Jorge Huerta.  You heard Special Agent Alker testify

15 that he reviewed the records, the phone records of Yader

16 Gutierrez, and did not see any telephonic contact, no phone

17 calls or text messages between Jorge Huerta and Yader Gutierrez

18 until after Yader Gutierrez testified that Defendant said he

19 was going to put him in touch with Jorge Huerta.  Then we

20 started seeing them talk to each other in those toll records.

21     You saw during a conversation between the defendant and

22 Yader Gutierrez, the defendant was negotiating the price of

23 that deal.  The meth was delivered by the deliveryman, Jorge

24 Huerta, who is from the same company, finger of the same hand,

25 who is the same as Mike.

1    The defendant referred to, in calls with Yader Gutierrez,

2  to try to assure him to build that relationship of trust that

3  Special Agent Sader talked about from the DEA that's necessary

4  for a drug deal to happen.  Defendant said, "They're my

5  people."  Afterwards, after the deal was consummated, Defendant

6  tells Yader Gutierrez that he can get him more methamphetamine

7  with a warranty.

8    So let's talk about those texts, and let's talk about what

9  was said during those conversations.  On September 19th Yader

10  Gutierrez sent a text to Mike, "What's up Mikey?  I need some

11  of what I told you about last time."

12    "I'll call you later.  I'm just waking up."

13    Now, what defendant says in these calls and texts is

14  important because it tells that story.  What he doesn't say is

15  also important and something I submit to you, ladies and

16  gentlemen, you should consider.  In all those calls, in all

17  those texts, Defendant never says, "Don't call me asking to

18  purchase drugs.  I am not a drug dealer.  Stop asking me about

19  this stuff.  I am not interested."

20    After they text each other, Defendant met with

21  Mr. Gutierrez at a friend's house, which Defendant asked Yader

22  Gutierrez to come and meet with him under the pretext of doing

23  automotive work.  And you heard Yader Gutierrez say that's when

24  they discussed the selling of methamphetamine.  And you heard

25  Yader Gutierrez say he told him that the defendant would sell

1    him two ounces of methamphetamine for $450 each.  That was

2    September 19th.  Defendant says, "I am going to put you in

3    touch with my guy, my contact.  He is going to deliver the

4    meth."

5         September 25th there was a call, "What's up, Mikey?  They

6    haven't called me.  The guy you are in contact with hasn't

7    called me."

8         "I am going to call the guy so you can go with him."

9         "He wants you to pay him everything."

10        Special Agent Sader testified about drug deals where

11   people don't know each other.  He said in his training and

12   experience, individuals will either sell drugs on consignment

13   or they won't, but trust is an important aspect of a drug deal.

14   I submit to you, ladies and gentlemen, when two people don't

15   know each other in a drug deal, where you can't exactly go run

16   to the cops if they stick you for money, you might want

17   everything up front.

18        And in this deal Jorge Huerta had never met Yader

19   Gutierrez until they actually passed the drugs on, until the

20   actual drug deal.

21        This conversation was about a drug deal, Exhibit 102-A.

22   You can read it.  You will have the exhibits back with you in

23   the jury room.

24        "Who am I going to make the deal with, with you or with

25   him?"  Trust.  Trust.

1        "I don't know him."

2        "It's okay.  They're my people," reassuring.

3        "I am going to tell you to call him.  They're my people.

4    You can trust him.  He's not going to rip you off."

5        Ladies and gentlemen, I would submit to you, a drug deal

6    is a dangerous game.  Defendant put Yader Gutierrez in touch

7    with his people to sell him meth.  He was brokering the deal.

8    Defendant was reassuring Yader Gutierrez because trust is

9    important.  And again, you heard Special Agent Sader talk to

10   you about why.  Trust is important in a drug deal.  First time

11   meeting, asking everything up front, reassurance,

12   characteristics of a drug deal.

13       Another call on September 25th, "What's up, Mike?"

14       "Look, he's barely going to get off right now, 5:00 or

15   4:00."

16       "But are you going to be there?  Because I don't know

17   him."

18       "It's the same thing.  He's my nephew."

19       Now, whether you're going to believe that the defendant's

20   related to Jorge Huerta by blood or by law, I would submit to

21   you he's his nephew because Jorge Huerta is married to the

22   defendant's niece, and the evidence showed that.  Defendant is

23   coordinating the deal.  Defendant is reassuring Yader Gutierrez

24   that he can trust the person, his nephew, who is delivering the

25   meth.  Defendant is making this deal happen.  It's his deal.

1    He's the broker.  It's his deal.

2        And what happened after Defendant said he gets off around

3    4:00 or 5:00?  Exactly what the defendant said would happen.

4    4:58 P.M., 1658 in military time, 4:58 in regular-people time,

5    Jorge Huerta called the defendant when he got off work.  That

6    phone call lasted two minutes.  Two minutes later, at 5:00,

7    Jorge Huerta, in the green call you see, called Yader

8    Gutierrez.  Got off work, called the defendant, talked about

9    drugs.

10       Defendant told Jorge Huerta to call Yader Gutierrez.

11   Jorge Huerta hung up the phone and called him because Defendant

12   was brokering the sale of meth, and they did get in contact.

13   Huerta got in contact with Yader Gutierrez so he could deliver

14   the meth.  And what did they talk about?  What did the

15   deliveryman say about the people he works with, about the kind

16   of work he does?

17       Exhibit 104-A, they talked about quantity.  "Hey, if you

18   want, I will call.  I have to go to Los Angeles with my friend.

19   I am bringing the money.  I am going to want an ounce and a

20   half."  They talked about time.  They talked about price.  They

21   talked about all the characteristics of the drug deal.

22       The deal didn't happen on September 25th.  It happened on

23   September 26th.  And on September 26th, you heard how Yader

24   Gutierrez tried to get ahold -- how to contact the man who is

25   setting up the deal, the defendant, the man who is brokering

1    the deal.  He tries to get ahold of the defendant.

2         You heard Yader Gutierrez and Agent Alker testify that the

3    defendant was not answering his phone, so Yader Gutierrez sent

4    him a text.  "Hey, Mikey, I already spoke to your nephew.

5    Please call me.  I want to tell you something."

6         September 26, Exhibit 105-A, Yader Gutierrez is also

7    trying to get ahold of Jorge Huerta, because you heard how

8    Jorge Huerta's phone was disconnected.  So Yader Gutierrez also

9    tries texting Jorge Huerta.  "When can we meet?  I already have

10   the money.  What's going on."  September 26th.  Exhibit 106-A.

11        Huerta does not respond because his phone is disconnected.

12   You heard Special Agent Sader tell you that drug dealers, in

13   his experience, oftentimes switch phones, disconnect phones,

14   change phones to avoid detection from law enforcement.

15        Eventually the defendant returns Yader Gutierrez's call

16   later that evening.  What were they talking about, ladies and

17   gentlemen?  What were they talking about?  "You needed a small

18   one?"

19        "The truth is that we have for two ounces.  That's the

20   truth."

21        "All right."

22        "I'll tell him right now to call you."

23        How do we know all that happened?  The toll records.  The

24   toll records corroborate Yader Gutierrez's testimony.  I know

25   that was a long slough through those toll records, but the toll

1   records indicate who was talking to who and when, and this toll
2   record showed that here are the first two calls that Yader
3   Gutierrez makes to Mikey when he is trying to get ahold of him.
4       Finally, Defendant calls Gutierrez back at 6:08 P.M.,
5   civilian time, and he tells him that he can't get ahold of
6   Jorge Huerta because his phone is disconnected.  So the
7   defendant hangs up.  And at 6:10 P.M. he calls Jorge Huerta for
8   himself to find out if that phone is disconnected, and it was.
9   So who does defendant call seven times immediately thereafter,
10  right after he finds out Jorge Huerta's phone is disconnected?
11  He calls this number, (818) 915-7044, a number that the
12  evidence showed is tied to two people, Jorge Huerta's
13  mother-in-law and the defendant's mother, because the defendant
14  needed to get ahold of Jorge Huerta's new number so that he can
15  give it to Yader Gutierrez and get this deal done.
16      -7044 is subscribed to Rosalva Gutierrez, Exhibit 803.
17  Rosalva Gutierrez is Jorge Huerta's mother-in-law.  There's the
18  groom, Jorge Huerta, that we saw on Exhibit 912.  There's the
19  bride, Jenny Ruiz.  And there is the mother of the bride,
20  defendant's sister, Rosalva Gutierrez.
21      And the second person that number is associated with is
22  Defendant's mother.  We know that from the evidence because
23  Defendant gave this number as a contact for his mom in his
24  Bureau of Prisons records, -7044, Maria Vilavazo, defendant's
25  mother.

1          Ladies and gentlemen, whether this is defendant's sister's

2     phone, who is Jorge Huerta's mother-in-law, or Defendant's

3     mother's phone that Defendant's sister pays for, the evidence

4     shows that the defendant hung up with Gutierrez, tried calling

5     Jorge Huerta, find out that his number is disconnected, and

6     then immediately calls seven times to the number he knows would

7     be able to get him that new number.  Defendant needed to get

8     Jorge Huerta in touch with Yader Gutierrez to get that deal

9     done, to make sure that his deal happened.

10          The defendant and Yader Gutierrez talk again that day

11     about a deal.  They negotiate the price.  Look at the answers,

12     "Tell him to bring it down a bit because he is giving it to me

13     for 600 and we had agreed it would be less, you know."

14          Like the defendant and Yader Gutierrez had agreed, it

15     would be $450 an ounce on September 19th.  And Jorge Huerta,

16     who had never met Yader Gutierrez, was trying to price gouge

17     him by charging him $600 an ounce.  So Yader Gutierrez calls

18     the broker, says, "Whoa, your people are charging me too much,

19     man.  Bring it down a bit because that's what we agreed."

20          You heard Special Agent Sader tell you that in his

21     experience somebody who's never met somebody before during a

22     first-time drill certainly would try to charge as much as they

23     can try to make as much profit from that person.  They don't

24     know that person.  Why wouldn't they?  The toll records

25     corroborate these calls.  The toll records showed that these

1  calls happened at the time that the witness, Yader Gutierrez,

2  said they happened.  These tolls were taken from Yader

3  Gutierrez's cell phone.

4      Ladies and gentlemen, Defendant was making the deal

5  happen.  He was coordinating the deal and needed to make sure

6  that Huerta got in touch with Yader Gutierrez to make the deal

7  happen.  Not only was he making sure the deal happened, he was

8  negotiating the deal, which is part of making it happen.

9      Who called Yader Gutierrez that evening?  Jorge Huerta

10  from a phone paid for by Jorge Huerta's wife, Jenny Ruiz,

11  Exhibit 811.  Who did Officer Doug Johnson say when he

12  testified he saw at the meth delivery that evening?  Jorge

13  Huerta.

14      After Defendant did his part of putting Jorge Huerta in

15  touch with Yader Gutierrez and negotiating the price, the deal

16  was brokered.  So it was time for Jorge Huerta to do his part,

17  and that's exactly what he did.  He delivered the

18  methamphetamine to Yader Gutierrez.

19      Now, ladies and gentlemen, it is undisputed that the

20  methamphetamine was delivered to Yader Gutierrez, 48.6 grams of

21  pure meth, Exhibit 201-A, a photograph of that.  And Jorge

22  Huerta received $950 for two ounces, or $475 per ounce.  That

23  is less than the $600 per ounce price that was initially quoted

24  by Jorge Huerta.  The price was lower because Defendant told

25  Jorge Huerta to lower the price after he negotiated with Jorge

1    Huerta.

2         So that begs the question, ladies and gentlemen, it begs

3    the question of fact to the jury, was Jorge Huerta acting

4    alone?  Was this just him on his own and Defendant had nothing

5    to do with this?  No, he was not.  Read Exhibit 111-A, which is

6    the transcript of the actual deal, and you will see from the

7    transcript what the deliveryman says.  He says that he works

8    with the defendant, that they are from the same company.

9         Ladies and gentlemen, that evidence shows beyond a

10   reasonable doubt the defendant and Jorge Huerta were working

11   together in the drug trade.  The defendant sells larger

12   quantities, like a wholesaler, as Special Agent Sader

13   testified, and Jorge Huerta sells smaller quantities, like a

14   retailer.  So what was said during the actual delivery of the

15   methamphetamine, Exhibit 111-A, Yader Gutierrez asks, "Are you

16   working with Mike?"

17        "This one, this one is from the same company," on page 3.

18        "Mike doesn't sell small ones," consistent with a

19   wholesaler.

20        "I'm the one in charge of selling it like this,"

21   consistent with a retailer.

22        "All of us are one.  We are all one hand.  One finger of

23   the hand, fingers of the same hand.  The one that works with

24   me, the one that works with me, all of us are one."

25        "It's just that Mike doesn't like to be moving."

1          "Yeah, I know, Mike doesn't always -- Mike moves pounds

2     and all that."

3          "Mike and I are the same."

4          And after the deal was said and done, the defendant and

5     Yader Gutierrez had another conversation.  And during that

6     conversation, the defendant told Yader Gutierrez that he will

7     give him more methamphetamine, a pound quantity with warranty

8     and everything.

9          October 7th, "What's up, Mike?  The thing your nephew gave

10    me was good, man.  I really want half a half a pound."

11         "I will get there tomorrow.  I'm just -- I'm in Oklahoma

12    right now."  We know that's true from the evidence.

13         "But I want it to be good like the one you gave me.  I

14    want it to be good like the one -- the one you gave me."

15         "I am going to give you warranty and everything."

16         Exhibit 112-A, ladies and gentlemen, I would submit to you

17    that the evidence proves beyond a reasonable doubt that -3398

18    is the defendant's phone, and that defendant used his phone to

19    coordinate the sale of 48.6 grams of methamphetamine, and that

20    defendant is guilty beyond a reasonable doubt on Count 1 of the

21    indictment because the evidence is overwhelming.  The evidence

22    is overwhelming.

23         Aiding and abetting, Count 2, it's undisputed, again, that

24    48.6 grams of methamphetamine was sold.  And as we just went

25    through, there's overwhelming evidence that Defendant

1   intentionally coordinated that sale by putting Yader Gutierrez

2   in touch with Jorge Huerta, "my people," "my nephew,"

3   negotiating the price, and after the deal agreeing to give him

4   more with a warranty.

5          You can also find Defendant guilty under aiding and

6   abetting of Count 2.  Either way you get to the same place,

7   Defendant's guilty beyond a reasonable doubt on Count 2.

8   Defendant knew the crime was being committed, Defendant did

9   some act to help commit the crime, and Defendant acted

10  intentionally to cause the crime to be committed.

11         And lastly, the phone counts, those six different counts

12  for each time defendant used that phone, knowingly and

13  intentionally used the telephone to commit and causing to

14  commit a felony drug offense, in this case the sale of the

15  methamphetamine.  Those calls and texts are outlined in the

16  indictment, and Defendant is guilty beyond a reasonable doubt

17  of each one.

18         Ladies and gentlemen, I told you when I started that the

19  evidence in this case you saw told a simple story.  Now, you

20  have heard the evidence and you know that story for yourselves.

21  The evidence presented in this case suggests only one

22  reasonable conclusion, that the defendant is guilty beyond a

23  reasonable doubt of each crime as charged.

24         Thank you for your patience and attention.

25              THE COURT:  Thank you, Mr. Azat.

1           Now, ladies and gentlemen, on behalf of the defendant, we

2    will hear from Mr. Navarro.

3               MR. NAVARRO:  Thank you, Your Honor.  If I could

4    just have a second to set up the computer here.

5               THE COURT:  Of course.  Take your time.

6           (Pause in proceedings.)

7               MR. NAVARRO:  Sorry, Your Honor.

8               THE COURT:  It's all right.

9               MR. NAVARRO:  Hopefully this will work, Your Honor.

10              THE COURT:  That's fine.

11              MR. NAVARRO:  Its 11:13.

12          Good morning, ladies and gentlemen.

13              MULTIPLE JURORS:  Good morning.

14              MR. NAVARRO:  My name is Angel Navarro, and I

15   represent Ismael Gutierrez Vilavazo, who is seated there, and I

16   want to talk to you about this case.  The charges in this case

17   against my client are as follows:  Count 1 is the conspiracy to

18   distribute methamphetamine; Count 2 is aiding and abetting

19   Jorge Huerta to distribute the same drugs; and Count 3 is use

20   of a telephone to help accomplish 1 or 2.

21          Now, Judge Hatter is going to talk to you about the law,

22   and we call these jury instructions.  He talks to you about

23   those instructions.  These are the instructions that have been

24   developed over many years, over many cases heard in this

25   country.  And one of the basic concepts here is you are

1    permitted to draw your experience as people.  You are permitted

2    to use your commonsense.  It doesn't leave the door when you

3    walk in.  You bring that with you.  And it's one of the

4    instructions that he is going to read to you, and it's a very

5    important instruction.  Don't ignore your commonsense.  Don't

6    ignore your instinct.

7         There's -- one of the instructions talks about presumption

8    of innocence.  Every defendant is presumed to be innocent.  And

9    that's kind of a rare concept, and I tell you why.  When I was

10   a little boy, if something happened at school and I didn't do

11   it, I would speak up.  We are always told, "Tell me what

12   happened."  Something happens at home with my kids, "Tell me

13   what happened.  Who did what?"

14        We always expect people to defend themselves, but in a

15   court of law in this country quite the opposite happens.  The

16   defendant in the criminal case is protected.  He has the right

17   to be presumed innocent.  The burden is on the other side, on

18   the Government, to prove those charges, and that never changes.

19        Again, the concept of this burden of proof, it seems

20   elementary, it seems basic, but again, I think we as human

21   beings are -- we are wired differently.  I know I am.  I

22   expect -- I see something that happened yesterday across the

23   street, a woman, probably assume, "I wonder what she did."  I

24   know nothing about the lady that was arrested yesterday.  I

25   have no idea, but we make assumptions.  We bring in our

1    experiences.

2         But when you are in a court of law, we can't do that.  The

3    burden of proof is on the Government.  The presumption of

4    innocence stays with my client.  Now, we almost, again, like I

5    said to you, we expect the accused to take the stand.  They

6    must be hiding something if they don't testify.  And again, the

7    burden of proof is never on the defendant.  It is always on the

8    Government.

9         It would be a violation of your oath if you walked in

10   yesterday and you looked over, maybe you thought I was the

11   defendant.  It happens all the time.  Maybe you thought my

12   client was the defendant.  Maybe you thought, "Well, I wonder

13   what he did."  It's human nature to think that, but that's not

14   how the law works.  And I want to just tell you this just one

15   time.  Every defendant has the right to remain silent, a

16   straightforward concept, and that's been the law in this

17   country, and it will be the law even after this trial.

18        Now, when you analyze the evidence in this case, if you

19   find that the evidence can reasonably permit two conclusions,

20   one for guilt and one for innocence, you have to find

21   innocence.  That's the law.  Judge Hatter will explain this

22   very basic concept to you.  So if you come to a fork and you

23   say, "Well, you know, we think he's guilty, but we also think

24   he's innocent," then you have to find him innocent.  That's

25   what the law requires.

1       The evidence in this case consists of text messages; the

2   recorded phone calls, you have all that; the recorded

3   undercover buy from Mr. Huerta; the trial testimony of all the

4   witnesses; and any and all stipulations and any and all

5   exhibits that were admitted.  You are going to have that.

6   That's the evidence you are going to have to make a decision

7   from.

8       Now, what does the evidence tell us?  As Mr. Azat said,

9   the evidence tells a story.  The evidence should be able to

10  explain what took place.  But I submit to you that I want you

11  to pay attention to what was said not only on the stand, but

12  what the text messages say, who sent the text messages, the

13  context, the translations of the recordings.  Read them, look

14  at them to get a clear understanding of everything that went on

15  in this case.

16      In order for my client to be guilty of conspiracy, he must

17  have known of the conspiracy and then deliberately entered into

18  it knowing in some way or intending in some way to help

19  accomplish it.  Merely knowing that something is going on

20  doesn't make you guilty.  Knowing a drug dealer doesn't make

21  you a drug dealer.  Knowing a drug user doesn't make you a drug

22  user.  It's simple stuff.  Knowing Huerta and the informant are

23  engaged in the drug deal does not make my client guilty.

24      With respect to aiding and abetting, the Government must

25  prove beyond a reasonable doubt that my client, again,

1  knowingly and deliberately associated himself with this crime

2  as a participant, someone who wanted the crime to be committed.

3  He can't just be aware of it.  He has to want to have this

4  happen.  He needs to -- the Government needs to prove to you

5  that somehow my client wanted this to take place, not just be a

6  mere spectator.  That's an instruction.  I am only paraphrasing

7  a portion of the instruction.

8       This case began, from what you've heard, September 19th

9  when the informant began sending texts to my client.  The

10  informant wanted to see if he, the informant, can do something.

11  And that's the text, and we talked about this ad nauseam, and

12  he says, "What's up, Mikey?  Are you busy?  I call you, you

13  don't answer."  And then he says, "I don't have work, and I

14  want to see if I can do something."  If he can do something,

15  not if my client can do something, if he can do something.

16  That's what he wrote.  Those are the informant's own words.

17       And then they discuss more, "I'm waking up," et cetera, et

18  cetera, and nothing happens.  Now, what do these texts all

19  mean?  These texts mean to me that the informant is trying to

20  make a deal happen.  He is trying to make this drug deal take

21  place.  He is looking for to see if there's something he can

22  do.  He wants to involve Mr. Gutierrez.

23       Now, from the texts it appears that Mr. Gutierrez is not

24  interested.  He is barely waking up.  He's somewhere not in

25  California.  Apparently, he is somewhere else.  We all saw from

**UNITED STATES DISTRICT COURT**

```
 1    the charts it appears that the informant is trying to lure
 2    Mr. Gutierrez into a drug deal.  The informant also says, "I
 3    need some of what I told you about last time."  What's he
 4    talking about there?
 5         He testified -- the informant took the stand and testified
 6    that there was a meeting the night before at my client's
 7    cousin's home.  He doesn't know the guy's name, but he was at
 8    this home, and he talked about a two-pound deal, and he talked
 9    about a price of $450.  That's very convenient.  They have this
10    private meeting.  It's not recorded, never called Agent Alker,
11    never called anybody from the FBI, no one from the L.A.P.D.,
12    nobody.  He called nobody.
13         But during that private meeting in which they are present,
14    and only them two are present, he testified that my client said
15    they talked about two pounds and a price of 450 an ounce.  That
16    will become important later on.  Now, the next time they have
17    any contact is about six days later, September 25th.  There's
18    two calls.  The first call the informant calls Mr. Gutierrez at
19    about 3:22 P.M.
20         And what does Mr. Gutierrez say?  "I am going to call the
21    guy so you can go with him."  He also says, "I have forgotten.
22    You're going to deal with him."  So what does that mean?  Well,
23    "I have forgotten" means I have forgotten.  I guess it wasn't
24    that big of a deal.  I guess he didn't want to make this
25    happen.
```

1    "I'm going to give the guy a call so you can deal with

2    him."  Well, the informant is calling my client, so my client

3    is like a telephone operator.  "I'm going to put you in contact

4    with that guy.  You guys do what you've got to do.  I'm out of

5    this equation."  It makes sense.  He's not even locally here.

6    He's somewhere else, and he is being bothered by this

7    informant.  And he goes, "Look, I will put you in contact with

8    this guy.  You guys do what you're going to do."

9        What else does he say?  "I am not doing that.  That's why.

10   I am just passing it on to him."  So what does that mean when

11   you say "I'm not doing that"?  It kind of means "I'm not doing

12   that.  I'm not dealing drugs.  Go talk to him."  That's what

13   the text said.  I am not making stuff up here when I am telling

14   you this.  That's what the text says.

15       "I'm just passing it on to him."  What does that mean?

16   That can be interpreted by the Government, "Well, I am going to

17   broker the deal.  I am going to pass it to him."  No, it just

18   means, "Go talk to him.  Leave me alone."  And again, the

19   informant is trying to get my client involved in this drug

20   deal.

21       Now, we know that this informant is not really a

22   professional informant.  I think it is his first rodeo as far

23   as informants are concerned, because he has no prior experience

24   of what we know of being an informant.

25       There is a second call.  The informant again calls my

 1    client about half an hour later, and he wants to know where my

 2    client's at.  The informant wants to involve him.  The

 3    informant says that his people need the stuff, that the client

 4    will leave, trying to put some urgency into it, yet again

 5    trying to order Mr. Gutierrez to do this drug deal.  He tells

 6    him he wants to do the deal with him.  He tells -- and then my

 7    client tells the informant, "You know what, this guy's my

 8    nephew."

 9        Now, we know that's not his nephew.  We know that he's

10    related to the family.  Now, does that mean that by telling

11    him, "He's my nephew," "I'm brokering this drug deal"?  It just

12    means, "No, call him.  He's my nephew."  That's what that

13    means.  That's what I interpret from it.

14        Now, these are not random calls by the informant.  The

15    informant, as we know, is working with the FBI.  They were

16    right there coaching him and helping him what to say.  There's

17    at least one officer who spoke Spanish so that he can

18    communicate with him.  The informant is not talking to my

19    client.  He's talking to the recorder.  He's trying to get

20    incriminating information, as he said, not only on one drug

21    deal, but multiple drug deals.  That's what he wants to do.  He

22    is getting paid to do that.  He is trying to put together, as

23    he testified, a case for the agents.

24        He doesn't stop there.  On that same day he then begins to

25    text Huerta beginning at 5:16 P.M., but by this time he is even

1    giving Huerta, I think, a contact.  He calls him "The contact."
2    And then when they get together, when Huerta and the informant
3    get together, things change.  Huerta says, "I sell them for
4    about 600, but we will talk about that when I see you."  That's
5    very different than the contacts via text and via telephone
6    with my client, extremely different, 180 degrees different.
7         The informant says he's going to want an ounce and a half,
8    and Huerta says -- he doesn't say, "I'm just waking up.  I will
9    call you later."  He said, "Okay.  Around what time?"  There is
10   no hesitation on his part.  This is a drug deal between Huerta
11   and the informant.  Huerta never tells him, "Oh, no, Mike and I
12   sell it for 600," or "Let me call Mike before I can decide."
13   He never says he will have to give Mike a cut, a percentage or
14   referral fee or something.  No, they are dealing directly with
15   each other.
16        But here are the texts, "I will be there in ten minutes."
17        "I want an ounce and a half."
18        "Okay.  No problem.  I sell them for 600.  I sell them for
19   600."  He doesn't say the hand sells them for 600, whatever
20   they call it, the organization, whatever you want to call it.
21   It's him.  They're talking very openly, as people often do,
22   when they text.
23        Now, the next important date is September 26, which is the
24   following day.  That's the date -- that's a big day for the
25   informant.  That's the day he is going to get his drug deal

1    done.  He texts Mr. Gutierrez at about 4:54 and then at 5:54,

2    and Mr. Gutierrez doesn't respond.  You read the texts, "Hey

3    Maky, I already spoke to your nephew.  Please call me.  I want

4    to tell you something."  "Hey, Maky, you never called me."  If,

5    in fact, my client wants to get this drug deal done, he would

6    have called him right away.  He doesn't do that.  He doesn't

7    respond.  To me, this is consistent with the informant trying

8    to get -- trying to lure in Mr. Gutierrez, but he is not going

9    for the bait, whatever that means.

10        Now, it's clear to me that Mr. Gutierrez is not part of

11   this drug deal.  The informant sends separate texts trying to

12   lure him, and again, my client doesn't respond.  Now, what does

13   the informant do next?  He then calls Mr. Gutierrez to get him

14   involved.  He calls him on the phone now, and then he speaks

15   directly with Huerta to work on the drug deal.

16        Now, he called Mr. Gutierrez, my client, but they didn't

17   involve him.  After that he went directly with Mr. Huerta.

18   That's significant.  This is a text he sent to Huerta, "Hey,

19   when can we meet?  I already have the money."  September 26,

20   5:10 P.M., that's a text that he sends to Huerta.

21        After that, my client calls back the informant.  He calls

22   him back at 6:10.  The informant is looking for his buddy,

23   nephew, but he calls him "buddy."  The informants says he's got

24   the money, but Huerta has cut off the phone.  So what does

25   Gutierrez say?  What he told him the day before, I think, he

1    works until 4:00 or 5:00.  There's no urgency on my client's

2    end.  The urgency is on the informant.  The informant says he

3    has money for two ounces.

4        My client says, "Look, I'll call Huerta so he can call

5    you."  He keeps bugging him and bugging him, so "I am going to

6    put you in contact with him."  The defendant then calls

7    Mr. Gutierrez again at 6:43 trying to get him involved in

8    lowering the price.  And what does my client say?  He says

9    nothing about that.

10       At 7:02 the informant calls Huerta.  This call was also

11   recorded.  He says that he and Mr. Gutierrez have agreed on a

12   price.  Again, there is no text that says anything about that.

13   In the previous call you heard there is no them agreeing on a

14   price.  This comes from his mouth and his mouth only about an

15   alleged meeting that took place sometime before.  That wasn't

16   recorded; there was nobody there.  It's consistent with the

17   story he's telling.  It has to be consistent that way.

18       Now, we heard from Special Agent Acre -- Alker, I'm sorry,

19   he gave the defendant $1100.  He didn't give him $900.  If, in

20   fact, they had somehow agreed, why did he give him $1100?  Last

21   time I checked, 450 times 2 is 900.  If, in fact, they had a

22   deal for 900, give him the 900, and he will show up with $900.

23   Pretty simple math to me.

24       The informant calls Huerta again at 7:27 P.M.  They

25   discuss when and where they are going to be meeting.  Obviously

1   my client is not involved in any of this.  They are talking

2   about meeting up at a parking lot at a McDonald's.  Now, the

3   drug deal takes place on September 26.  7:30 P.M., the

4   informant met with Huerta to complete the deal.  He was wiring

5   a wire.  He calls Huerta just before they set up a meeting.

6   Five minute later he calls Huerta again.  They are going to be

7   meeting at the McDonald's parking lot.

8        Huerta says, "I'm in the white Chrysler."  The informant

9   wants to find out if Mr. Gutierrez is involved.  Huerta tells

10  him, "I'm the one in charge of selling it like this."  Huerta

11  also tells him, "If you want big one, I can go for more."

12       The informant says, "I called Mike and he doesn't answer."

13  Sorry, I misspoke.  The informant says, "I call Mike.  He

14  doesn't answer."

15       Huerta also says, "You can send me a message, or you can

16  call me."  Huerta also tells the informant, "Yeah you're going

17  to make arrangements with me.  With respect to the price, I'm

18  going to give them to you both for 950, for both of them,

19  because I sell them for 6-."  Those are his own words.

20       Now, during the drug deal, the informant and Huerta even

21  discuss adding Huerta as a contact to the informant -- I

22  believe there was reference in the transcript, "What should I

23  put you down as?"

24       And Huerta tells him, "Put me down as 'Moreno.'" That's an

25  AKA for him.  That's not his real name.  I don't think he ever

1    gave him his real name.  As a drug dealer he gave him an AKA.

2    That's what he gave him.

3         The informant and Huerta then have a discussion about my

4    client.  Huerta, "It's just that Mike doesn't like to be moving

5    either."

6         The informant says, "I know that Mike always moves pounds

7    and all that."

8         Where is the evidence of that?  It's just his word.  I

9    guess he's a drug dealer or something, I don't know.

10        Huerta says, "I'm in charge.  I'm the one in charge of

11   here."

12        The informant asks, "Of the small one?  I mean one ounce,

13   half an ounce?"

14        "No, no, I also move the big stuff."  That's what Huerta

15   tells him.  Huerta then says, "For me, it's better to sell like

16   this because I have it ready to go, and I also help people make

17   money."  He talks about how they sell drugs at Jack-in-the-Box,

18   and he breaks it down.  He was very open about his drug dealing

19   because this is a drug dealer.

20        They talk about future deals for cocaine and meth as well.

21   They talk about how to communicate with each other.  They talk

22   about one peso, two pesos, whatever it may be.  This is their

23   drug deal.  This is not my client's drug deal.

24        Finally, after the deal is completed --

25        My computer turned off here.  Hopefully it comes back on,

1    Your Honor.  Oh, something happened, Your Honor.

2              THE COURT:  I didn't do it.

3              MR. NAVARRO:  See if I can get it back.

4         Sorry.  No, that's the wrong screen.

5         I'm sorry, can this time not count against me, Your Honor?

6    I apologize.

7              THE COURT:  It's all right.

8              MR. NAVARRO:  I have to find out where I was at.

9         Finally, after the drug deal is complete, what does the

10   informant say?  And it's recorded.  He says, "Yes, it's

11   complete.  I have good information now."  That's what he said.

12   That's very important, because as far as he's concerned, he's

13   got some good information.  I don't think it's good information

14   on my client.  It's good information on the drug dealer he has

15   been dealing with.  He has a phone number.  They're talking

16   about future drug deals.  They are talking about all kinds of

17   things.  That's between them two.

18        Now, what do we know about the informant?  Oh, he

19   testified he's been paid over $9,000 by the FBI.  He got help

20   from the FBI with a speeding ticket in Oklahoma.  He got help

21   from the FBI with immigration to give him a temporary visa.

22   The FBI called his finance company a couple times when he

23   wasn't making car payments so his car wouldn't be taken.

24        And I asked him if he ever paid taxes on the money that he

25   earned, the $9,000, and he never paid a cent of taxes.  In this

1    country if you are illegal, undocumented, the IRS wants money.

2    They get it from all of us.  If you are undocumented, you still

3    pay taxes.  You can still pay taxes.  It's pretty common

4    knowledge.  People who are here illegally will do that.  He

5    didn't do that.  Of course not.  Why would he do that?

6         I also asked him a bunch of questions about the incident

7    where he was involved.  He was one of four people in a car

8    where they were intimidating a guy, trying to extort him from a

9    vehicle for a vehicle.  He got a free pass on that as well.

10        Now, we know that he used drugs as well.  We know that

11   he's used cocaine in the past.  Doesn't matter, still their

12   informant.  Got a free pass on that as well.

13        Now, it's very difficult to disprove what he's saying

14   about the conversations, they had about two pounds, and he also

15   testified there was another incident where my client ordered a

16   friend of theirs named Nestor to give drugs to a third party.

17   We can't disprove that.  I have no way of proving it.  I have

18   no way of proving that it didn't happen because it's his word.

19   He came in and he testified under oath that's what he said.

20   How do I -- I can't.  It's nearly impossible to do that if

21   there was a video camera that my client was wearing or that

22   Nestor was wearing or something, perhaps, but that's not how

23   people live.

24        Now, I did ask him some questions that seemed really

25   unimportant at the time.  I asked him about a hunting trip he

1  took.  And he says, "Yeah, there was a hunting trip.  We went

2  up to the mountains near Lancaster, and we were in a

3  convertible.  And it was myself, Nestor and Ismael Gutierrez.

4  We were hunting.  We killed one deer."  His car.  It was the

5  middle of summer.  And during the trip, Mr. Gutierrez wanted to

6  get back to Los Angeles because he was very upset.  So what?

7  Who cares?  You might think, "So what?  Who cares?"

8       That, we were able to establish, and you heard from

9  Mr. Oscar Rodriguez today, we heard from him, he came in and

10  testified he's been on hunting trips with Mr. Gutierrez, Ismael

11  Gutierrez, and with Nestor.  He has been a hunter for over 20

12  years; I think his father 45 years.  He told you very

13  specifically what you do as a hunter.

14       I am not a hunter myself, but he is, and he tells you you

15  only hunt certain times of the year depending where you live

16  and where you're going.  Deer season is about a month open.

17  They were up in Los Padres National Forest off the 5 as you go

18  up over the Grapevine, Frazier Park.  We showed him the

19  photographs.  There's snow on the ground.  There's pictures of

20  the witness, of my client and of someone he identified as

21  Nestor.  I asked him was Beacho, the informant, there.

22       "No, he never went with us."  That's important.  The

23  informant never expected that we would find a witness who would

24  basically show beyond any doubt that he was not being honest.

25  And that's the significance of Mr. Rodriguez's testimony.

1        He's got no incentive to come in here and lie.

2    Mr. Rodriguez is testifying about events that took place.  They

3    went hunting, told you exactly what happened, what kind of car

4    you've got to go in.  You can't go in a convertible.  You can't

5    use a .38.  You can't use an AR-15 rifle.  It's nonsense.

6    That's the importance and significance of what Mr. Rodriguez

7    testified to.  It may seem like a little lie, but it's a big

8    lie.  He came in here and he lied, the informant did.

9        And I believe that based on that lie, based on the things

10   we know that he's been doing, how can he be believed with

11   regard to the secret meeting he had with my client when there's

12   nobody but himself?  He's got to make it up, and he's got to

13   make it up in order to make sure that my client, you know, goes

14   down for this case.

15       Now, we knew the drugs were fingerprinted.  My client's

16   fingerprints were not on the drugs.  I guess if they are all

17   working, they are part of the same hand, they are all working

18   together.  They have to break it up.  I am assuming that's what

19   drug dealers do.  I am not a drug dealer, but if I bring a

20   pizza home, my kids, we all split the pizza.  The same concept

21   applies when you are a meth dealer.  You get the meth, cut it

22   up.  There would be some fingerprints, I assume, and there's no

23   fingerprints.  That's important as well.

24       Now, my client is supposed to be this dealer of pounds of

25   drugs.  Where are his customers at?  Where's the pole camera

1    that expert testified about that they use all the time?  Where

2    are the telephone pings?  Expert testified about those kind of

3    things they do.  Where's the drug lab?  Where's the wiretaps?

4    He testified, "We use wiretaps all the time."  Where are the

5    wire taps of my client?  Where are the cars with traps, you

6    know, the cars that have the traps that you put the drugs in?

7    Where are the undercover agents that were used against my

8    client?  And finally, where are the drugs?  He is a multi-pound

9    dealer, and he is involved, where's the stuff?  It's not there

10   because it's not true.

11       We heard from Agent Michael Sader.  He's an expert, drug

12   expert.  He's been in DEA for 22 years.  He told us drug

13   dealers change their phones on a regular basis to avoid

14   detection by law enforcement.  Prosecution told you that.  Did

15   my client ever change his telephone number?  No, same phone

16   number that he's used throughout the investigation.  It was the

17   same phone number, never changed it.

18       Huerta did.  There was testimony that Huerta was dropping

19   his phones every month.  He told the informant, "Yeah, I change

20   it every month."  That's what drug dealers do.  That's not what

21   my client did.  Agent also testified about drug dealers using

22   aliases.  You don't want to let people know who you really are.

23   Mr. Gutierrez never used an alias.  He said Ismael Gutierrez.

24   Jorge Huerta used an alias.  He wanted to be known as Moreno.

25   The informant never knew his name.  That's what a drug dealer

1   does.  That's not what my client did.

2       Agent Sader also testified that drug dealers like to hide

3   who they are from law enforcement.  My client, where did he

4   live?  He lived with his mother and his sister at a residence

5   on Oxnard Street in North Hollywood.  That's consistent with a

6   person who lives at home with his family, not a person who's a

7   multi-pound meth dealer as the informant would want you to

8   believe.

9       Now, ladies and gentlemen, when you came in yesterday, I

10  just -- I spoke briefly to you, keep an open mind.  Use your

11  commonsense.  You don't leave that at home.  You take that

12  everywhere you go.  Look at the texts.  Look who's making the

13  calls.  I think almost every call, may be -- well, every single

14  contact there was originated by the informant.  When my client

15  called him back, it was because he kept calling him and bugging

16  him and texting him.

17      My client wasn't looking to broker a drug deal.  The

18  informant wanted to get a drug deal going.  He was going to get

19  paid $9,000 tax free.  Pretty good money if you can make it,

20  and he wanted to get as many people as he could.  He got

21  Huerta.  That's the drug dealer.  That's between him and

22  Huerta.

23      But he did everything he could to lure my client into this

24  drug deal.  He tried texting him and calling him and talking

25  about all kinds of nonsense.  And then even when he wasn't

```
 1   present, he was using his name as if he was some kind of major

 2   drug dealer.

 3        And it comes down to this:  If, in fact, my client is a

 4   narcotics trafficker, if, in fact, he is a drug dealer, he

 5   could still be innocent to these charges.  You could be a drug

 6   dealer and simply not be involved in this drug deal, but that's

 7   not what the informant wants you to believe.  He wants you to

 8   believe, oh, he's a drug dealer, and he was involved in this

 9   drug deal, and he brokered it.  We heard from government

10   counsel talking about this was my client's drug deal.  "It's

11   his deal."  That's what Mr. Azat said.  "The defendant is

12   making this deal happen."  That's not true.

13        The evidence points in a different direction.  The

14   evidence points to the direction that it was the informant who

15   was trying to make this drug deal happen at the direction of

16   the FBI and the L.A.P.D.  It was the informant who was trying

17   to get my client involved in a drug deal.  It was the informant

18   who ultimately got his drug deal done, but it was with

19   Mr. Huerta, the guy known as Moreno, not Ismael Gutierrez.

20        I submit this to you, ladies and gentlemen, my client is

21   innocent of these charges.  Thank you.

22            THE COURT:  Thank you, Mr. Navarro.

23        Now, ladies and gentlemen, on behalf of the government, we

24   will hear the final or closing argument.

25        Mr. Azat, You have ten minutes.
```

1              MR. AZAT:  Thank you, Your Honor.

2         Ladies and gentlemen, as defense counsel correctly pointed

3    out, knowing a drug dealer or hanging around drug dealers

4    doesn't make you guilty, but brokering a drug deal does, and

5    that's what defendant did in this case.  He brokered a drug

6    deal.  The confidential informant in this case was a customer.

7    He was a customer that came to the defendant and asked him to

8    purchase methamphetamine.  And the defendant put him in touch

9    with Jorge Huerta so that Jorge Huerta could deliver to the

10   confidential informant 48.6 grams of pure methamphetamine,

11   which is exactly what Jorge Huerta did.  It's exactly what

12   Jorge Huerta did at the direction of the defendant.

13        Now, defense counsel also asked you not to leave your

14   commonsense at the door.  And I trust, ladies and gentlemen,

15   that we all should carry our commonsense with us all the time

16   because all you need in this case is commonsense when you

17   examine the evidence.  Read the transcripts.  Read the

18   transcripts.  You'll see what defendant was talking about when

19   defendant said, "They're my people.  You can trust them.  He's

20   my nephew."

21        Defense counsel said this deal started on September 19th.

22   It didn't start on September 19th.  Yader Gutierrez testified

23   he knew the defendant for longer than that.

24        He knew Defendant, and he came to him and asked if he

25   could purchase drugs.  And the defendant brokered that drug

deal, and that makes him guilty of the counts that are brought

against him in this action.  Simple fact is, ladies and

gentlemen, that the drug deal would not have happened without

the defendant's actions.  That's the simple fact of this case,

and that makes him guilty.  The fact that he knowingly and

intentionally conspired with Jorge Huerta to distribute

methamphetamine to Yader Gutierrez, the fact that he was not

there when the meth changed hands does not make him innocent.

That's the simple fact of this case.

          Defendant reassured Yader Gutierrez that he could trust

his deliveryman.  Yader Gutierrez was worried about meeting

somebody for the first time.  Defendant told him, "They're my

people.  They're my nephew."  Defendant put him in contact with

him.  Defendant negotiated the price.  Those are the facts the

evidence showed in this case.

          Defense counsel also said that "Where are the traps?

Where are the video?  Where's the helicopters?" whatever.  I'm

sorry if I misstate what defense counsel said, but the point is

defense counsel would have you believe that without every

single thing that he went down that list existing, defendant

must be innocent.  That doesn't change what the evidence is,

and the evidence showed his involvement.  It showed his role in

that transaction, and it showed the transaction happening.

That makes him guilty.

          And when defense counsel said that he didn't even use an

1    alias, he wanted everybody to know who he is because he's not

2    doing anything wrong, the defendant's name is Ismael Gutierrez

3    Vilavazo, and he had everybody call him Mike.  That's an alias.

4        Now, defendant also put on a side show for you.  He had

5    someone come up here and testify about hunting.  And

6    Mr. Rodriguez, very well may have been telling you the truth,

7    that he and the defendant have gone hunting, that he has met

8    the confidential informant before.  But what does that mean?

9    Does that in any way mean that the defendant could not have

10   gone on another trip with the confidential informant some other

11   time without that witness?

12       And whether that trip was a hunting trip that was done

13   under the rules and procedures that that witness taught the

14   defendant how to follow when he went hunting or whether the

15   defendant told some 19-year-old kid, "Me, you and one of my

16   other buddies are going to get in the car and drive out to the

17   mountains and shoot some guns," that witness does not foreclose

18   the fact that that hunting trip might very well have happened.

19   Maybe it wasn't even a hunting trip.

20       It's a red herring, ladies and gentlemen.  It's a red

21   herring designed to distract you from the facts of this case

22   which are simple, straightforward and supported by the evidence

23   that you heard.  If you exercise your commonsense, it will lead

24   you to only one reasonable conclusion.

25       And lastly, I want to talk just briefly about the burden.

**UNITED STATES DISTRICT COURT**

1    The Government embraces its burden, which is to prove that the

2    evidence shows beyond a reasonable doubt defendant is guilty of

3    the charges.  That burden is not all possible doubt.  It's not

4    all possible doubt.  It's reasonable doubt.  Use your

5    commonsense.  Use your commonsense when you go back in that

6    room and evaluate the evidence.  The evidence shows that it

7    supports only one story that is reasonable, the defendant is

8    guilty beyond a reasonable doubt of the charges against him.

9         Thank you.

10            THE COURT:  Thank you, Mr. Azat.

11        Ladies and gentlemen, you've heard all of the evidence as

12   well as the arguments now, but you have yet to be fully

13   instructed about the law that you must apply to the facts which

14   only you will have found after your complete deliberations.  I

15   think it's best that you go to lunch now, and when you come

16   back at 1:15, we'll instruct you, and then you will commence

17   your deliberations.

18        It's very important that you not discuss this matter among

19   yourselves.  Just put it aside.  Enjoy your luncheon.  See why

20   Ms. Skipper likes the federal cafeteria so much.

21        Everyone please rise for the jury.

22        (Out of the presence of the jury.)

23            THE COURT:  Please be seated.  We are outside the

24   presence of the jury.

25        Would you take a look at the verdict forms, see if you

```
 1    have any comments, objections.
 2         (Pause in proceedings.)
 3              THE COURT:  Does anyone wish to be heard?
 4              MR. AZAT:  Briefly, Your Honor, if I may.
 5              THE COURT:  Certainly.
 6              MR. AZAT:  The United States would request one small
 7    change on page 2 of the verdict form, Your Honor.  We request
 8    that the first full paragraph beginning "Having found the
 9    defendant..."
10              THE COURT:  Yes.
11              MR. AZAT:  Would read "Having found the defendant
12    guilty of Count 2, we unanimously find the methamphetamine
13    distributed was the following amount of pure or actual
14    methamphetamine."
15              THE COURT:  An amount of actual -- I'm sorry, I
16    missed that.
17              MR. AZAT:  No, Your Honor, it would be just on line
18    5.
19              THE COURT:  Yes.
20              MR. AZAT:  The United States would request that
21    "defendant" be replaced with "methamphetamine."
22              THE COURT:  Oh.
23              MR. AZAT:  And after "distributed," the word "was"
24    was included.
25              THE COURT:  "Was distributed," all right.
```

```
 1            MR. AZAT:  "So we unanimously find."

 2            THE COURT:  And "the following amount"?

 3            MR. AZAT:  Yes.  The reason, Your Honor, we think

 4    that as written it may be a little confusing giving the

 5    Pinkerton instruction and also the aiding and abetting

 6    liability that was charged.

 7            THE COURT:  All right.  So it reads:  "Having found

 8    the defendant guilty of Count 2, we unanimously find the

 9    methamphetamine was distributed in the following amount of pure

10    or actual," et cetera.

11            MR. AZAT:  That would be fine, Your Honor.

12            THE COURT:  Mr. Navarro, any problem with that?

13            MR. NAVARRO:  That's fine, Your Honor.

14            THE COURT:  All right.  Make that change, then.

15        If you have no other matters, have lunch, and we will see

16    you at 1:15.

17            THE COURTROOM DEPUTY:  This court is in recess.

18        (Recess taken from 11:57 A.M. to 1:21 P.M.)

19        (Out of the presence of the jury.)

20            THE COURTROOM DEPUTY:  Please remain seated and come

21    to order.  This court is once again in session.

22            THE COURT:  We are outside the presence of the jury.

23    The jury is back from lunch, and I just wanted to indicate to

24    you we made the change that you requested in the verdict form.

25    And I do intend to give the social media instruction again, and
```

**UNITED STATES DISTRICT COURT**

```
 1    take it that there's no objection to that.
 2               MR. NAVARRO:  No, Your Honor.
 3               THE COURT:  All right.  We will bring the jury in.
 4          (Pause in proceedings.)
 5               THE COURTROOM DEPUTY:  Please rise.
 6          (In the presence of the jury.)
 7               THE COURT:  Please be seated.  And good afternoon,
 8    ladies and gentlemen.
 9               MULTIPLE JURORS:  Good afternoon.
10               THE COURT:  Ladies and gentlemen and members of the
11    jury -- oh, boy, I am starting out with a bad throat.  Excuse
12    me.  Excuse me just a minute.
13          Ladies and gentlemen and members of the jury, now that
14    you've heard all of the evidence that is to be received in this
15    trial and each of the arguments of counsel, it becomes my duty
16    to give you these final instructions of the court as to the law
17    that is applicable to this case, and you should use these
18    instructions to guide you throughout your decision-making
19    process.
20          Now, all of the instructions of law given to you by the
21    Court, those which I gave to you at the beginning of the trial,
22    those given to you during the trial and these final
23    instructions, all of them must guide and govern your
24    deliberations.  It's your duty as jurors to follow the law
25    stated in all of the instructions of the court and to apply
```

these rules of law to the facts as you find them to be from the evidence which has been received during this trial.  And remember, you have taken an oath to do that.

The lawyers have quite properly referred to some of the applicable rules of law in their closing arguments to you.  If, however, any difference appears to you between the law stated by counsel and that as stated by the Court in these instructions, you, of course, are to be governed by the instructions given to you by the Court.  You are not to single out any one instruction alone as stating the law, but you must consider all of the instructions as a whole in reaching your decisions.

Neither are you to be concerned with the wisdom of any rule of law stated by the Court.  And regardless of any opinion you may have as to what the law ought to be, remember, it would be a violation of your sworn duty to base any part of your verdict upon any other view or opinion of the law than that which is given to you in these instructions of the Court.  In the same way it would be a violation of your sworn duty as the judges of the facts to base your verdict upon anything but the evidence which has been received in this case.

Now, you were chosen as jurors for this trial in order to evaluate all of the evidence received and to decide each of the factual questions presented by the allegations brought by the Government in the indictment and the plea of not guilty by the

defendant.  In resolving the issues presented to you for decision in this trial, you must not be persuaded by bias, prejudice or sympathy for or against any of the parties to this case or by any public opinion.

Remember that justice through trial by jury depends upon the willingness of each of you individual jurors to seek the truth from the same evidence presented to all of you as jurors here in the courtroom and to arrive at a verdict by applying the same rules of law as now being given to each of you in these instructions of the Court.

And you don't have to take notes.  I am going to give you a copy of the instructions so they will be there with you.

I instruct you you must presume the defendant to be innocent of the crime charged.  I have told you that throughout.  Thus, the defendant, although accused of crimes in the indictment, begins the trial with a clean slate, quote/unquote, with no evidence against him.

The indictment, as you already know, is not evidence of any kind.  The defendant is, of course, not on trial for any act or crime not contained in the indictment.  And the law permits nothing but legal evidence presented before you, the jury, in court to be considered in support of any charge against the defendant.  The presumption of innocence alone, therefore, is sufficient to acquit the defendant.

The burden is always upon the prosecution to prove guilt

beyond a reasonable doubt, and this burden never shifts to a defendant, and that's because the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or, indeed, producing any evidence.

The defendant is not even obligated to produce any evidence by cross-examining the witnesses for the Government. It is not required that the Government prove guilt beyond all possible doubt, however.  The test is simply one of reasonable doubt, and a reasonable doubt is a doubt which is based upon reason and commonsense.  It's the kind of doubt that would make a reasonable person hesitate to act.

Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act on it in the most important of his or her own affairs.  And unless the Government proves beyond a reasonable doubt that the defendant has committed each and every element of the offenses charged in the indictment, you must find the defendant not guilty of the offenses.  If you, as a jury, view the evidence in the case as reasonably permitting either of two conclusions, that is one of innocence and the other of guilt, then as a jury you must adopt the conclusion of innocence.

Remember, you are here to determine whether the Government has proven the guilt of the defendant for the charges in the indictment beyond a reasonable doubt.  You are not called upon

1    to return a verdict as to the guilt or innocence of any other

2    person or persons.  So if the evidence in the case convinces

3    you beyond a reasonable doubt the guilt of the defendant for

4    the crimes which are charged in the indictment, you should so

5    find even though you may believe that one or more other

6    unindicted persons are also guilty.  But if any reasonable

7    doubt remains in your minds after impartial consideration of

8    all of the evidence in the case, remember, it's your duty to

9    find the defendant not guilty.

10        Now, the case has been disposed of as to Jorge Beristain

11   Huerta.  He is not of concern to you, and you should not

12   speculate as to the reason for this occurrence.  This

13   disposition should not control or influence your verdict with

14   reference to the defendant, and you must base your verdict

15   solely on the evidence which has been received.

16        Now, it's a sworn duty of the attorney on each side of a

17   case to object when the other side offers testimony or an

18   exhibit which that attorney believes is not properly

19   admissible.  Only by raising an objection can a lawyer request

20   and obtain a ruling from the Court on the admissibility of the

21   evidence being offered by the other side.

22        You should not be influenced against an attorney or his or

23   her client because the attorney has made objections.  And

24   please do not attempt, moreover, to interpret my rulings on

25   objections as to somehow indicate to you how I think you should

1    decide this case.  I'm simply making a ruling on a legal

2    question.

3         It's the duty of the court to admonish a lawyer who, out

4    of zeal for his or her cause, does something which I feel is

5    not in keeping with the rules or evidence or procedure.  You

6    are to, again, to draw absolutely no inference against the side

7    to whom an admonition of the Court may have been addressed

8    during the trial of this case.  And I don't believe there were

9    any admonitions.

10        Now, during the course of a trial I occasionally ask

11   questions, and I did so in this trial as well.  Again, do not

12   assume that I hold any opinion on the matters to which my

13   questions may have related.  I, as a Court, ask a question

14   simply to clarify a matter, not to help one side of the case or

15   hurt another side.

16        The evidence in this case consists of the sworn testimony

17   of the witnesses, and that is regardless of who may have called

18   them; all exhibits received in evidence, again, regardless of

19   who may have produced them; and all facts which may have been

20   agreed to or stipulated and all facts and events which may have

21   been judicially noticed.

22        When the attorneys on both sides stipulate or agree as to

23   the existence of a fact, you may accept the stipulation as

24   evidence and regard that fact as having been proved.  You're

25   not required to do so, however, since you are the sole judges

1   of the facts.  The Court has taken judicial notice of -- and I

2   think it had something to do with Albuquerque being in New

3   Mexico and nothing beyond that, but when the Court declares it

4   has taken judicial notice of some fact or event, you may accept

5   the Court's declaration as evidence and regard as having been

6   proved the fact or event which has been judicially noticed.

7   Again, you are not required to do so, however, since you are

8   the sole judge of the facts.

9       Now, any proposed testimony or proposed exhibit to which

10  an objection was sustained by the Court and any testimony or

11  exhibit ordered stricken by the Court must be entirely

12  disregarded by you.  Anything you may have seen or heard

13  outside the courtroom is not evidence and, of course, may be

14  entirely disregarded.

15      Anything you may have seen or heard -- excuse me.

16  Questions, objections, statements and arguments of counsel are

17  not evidence in the case unless made as an admission or

18  stipulation of fact.  And you are to base your verdict only on

19  the evidence which has been received in the case.  In your

20  consideration of the evidence received, however, you're not

21  limited to the bald statements of the witnesses or to the bald

22  assertions in the exhibits.  In other words, you are not

23  limited solely to what you have seen or heard as to what

24  witnesses testified or the exhibits that have been admitted.

25      You are permitted to draw from the facts which you find to

1  be proved such reasonable inferences which you feel are

2  justified in light of your experience and, again, commonsense.

3      Now, the evidence in this case consists of the sworn

4  testimony of the witnesses, regardless of who may have called

5  them; all exhibits received into evidence, regardless of who

6  may have produced them; and all facts which may have been

7  agreed to or stipulated and all facts and events which may -- I

8  think I have given you that instruction.  I have.  That's a

9  repeat.

10     Inferences are simply deductions or conclusions which

11  reason and commonsense lead you, as a jury, to draw from the

12  evidence which has been received in the case.  Importantly,

13  there are two types of evidence which are generally presented

14  during a trial, and that's true in this trial as well:  Direct

15  evidence and circumstantial evidence.

16     Direct evidence is simply the testimony of a person who

17  asserts or claims to have actual knowledge of a fact, such as

18  an eyewitness.  Circumstantial evidence, on the other hand, is

19  proof of a chain of facts and circumstances indicating the

20  existence of a fact.  The law makes absolutely no distinction

21  between the weight or value to be given to either direct or

22  circumstantial evidence, nor is a greater degree of certainty

23  required of circumstantial evidence than of direct evidence.

24  You should weigh all of the evidence in the case.

25     Now, if any reference by the Court or by counsel to

matters of testimony or exhibits does not coincide with your

own recollection of that evidence, remember, it's your

recollection which should control throughout your deliberations

and not the statements of the Court or of counsel.  Again,

you're the sole judges of the evidence which has been received

in this case.

Now, ladies and gentlemen, there's nothing particularly

different in the way that a juror should consider the evidence

in a trial from that in which any reasonable and careful person

would deal with any very important question that must be

resolved by examining facts, opinions and evidence.  You're

expected to use your good sense in considering and evaluating

the evidence in this case.

Use the evidence only for those purposes for which it has

been received, and give the evidence a reasonable and fair

construction in the light of your common knowledge of the

natural tendencies and inclinations of human beings.  If the

defendant be proved guilty beyond a reasonable doubt, say so;

if not proved guilty beyond a reasonable doubt, again, say so.

And keep constantly in mind it would be a violation of

your sworn duty to base a verdict upon anything other than the

evidence which has been received in the case and the

instructions of the court.  Remember as well that the law never

imposes upon a defendant in a criminal case the burden or duty

of calling any witnesses or producing any evidence, and that's

1    simply because the burden of proving guilt beyond a reasonable

2    doubt always remains with the Government.

3        Now, the questions asked by a lawyer for either party to

4    this case are not evidence, and I have told you that a number

5    of times.  If a lawyer asks a question of a witness which

6    contains an assertion of fact, therefore, you may not consider

7    the assertion by the lawyer as any evidence of that fact.  Only

8    the answers are evidence.

9        Now, charts and summaries have been prepared by the

10   prosecution and have been admitted into evidence and have been

11   shown to you during the trial, and that is for the purpose of

12   examining facts that are allegedly contained in books, records

13   or other documents, which are also in evidence in the case.

14   You may consider the charts and summaries as you would any

15   other evidence which has been admitted during the trial, and

16   give them such weight or importance, if any, you feel they

17   deserve.

18       You heard a recording -- recordings in the Spanish

19   language.  A transcript of the recordings has been admitted

20   into evidence.  The transcript is an official English-language

21   transcription of the recording.  Although some of you may know

22   Spanish, it's important that all jurors consider the same

23   evidence.  Therefore, you must accept the English translation

24   contained in the transcript even if you would translate it

25   differently.

1          You heard testimony of a witness who testified in the

2     Spanish language.  This witness testified through the official

3     court interpreter.  Although some of you may know Spanish, it

4     is important that all of you, as jurors, consider the same

5     evidence.  Therefore, you must accept the official English

6     translation of the witness' testimony even if you would

7     translate it differently.  And this way, all of you, as jurors,

8     are considering the same evidence.

9          Now, the testimony of a witness may be discredited, or as

10    we sometimes say, impeached, by showing he or she previously

11    made statements that are different than or inconsistent with

12    his or her testimony here in court.  The earlier inconsistent

13    or contradictory statements are admissible only to discredit or

14    impeach the credibility of the witness and not to establish the

15    truth of these earlier statements made somewhere other than

16    here during the trial.  It is your province as a jury to

17    determine the credibility of a witness who has made prior

18    inconsistent or contradictory statements.

19         Remember that the defendant in a criminal case has an

20    absolute right under our Constitution not to testify.  The fact

21    that the defendant did not testify must not be discussed or

22    considered in any way when deliberating and also in arriving at

23    your verdict.  No inference of any kind may be drawn from the

24    fact that the defendant decided to exercise his privilege under

25    the Constitution and did not testify.  As stated before, the

1    law never imposes upon a defendant in a criminal case the

2    burden or duty of calling any witnesses or producing any

3    evidence.

4        Now, the evidence that an act was done or that an offense

5    was committed by the defendant at some other time is not, of

6    course, any evidence or proof whatever that at another time the

7    defendant performed a similar act or committed a similar

8    offense, including offenses charged in Counts 1 through 8 of

9    this indictment.  Evidence of a similar act or offense may not

10   be considered by you, the jury, in determining whether the

11   defendant actually performed the physical acts charged in this

12   indictment, nor may such evidence be considered for any other

13   purpose whatever unless you, as a jury, first find beyond a

14   reasonable doubt from other evidence in the case standing alone

15   that the defendant physically did the acts charged in Counts 1

16   through 8 of this indictment.

17       If you, as a jury, should find beyond a reasonable doubt

18   from other evidence in the case that the defendant did the act

19   or acts alleged in the particular count under consideration,

20   then you, as a jury, may then consider evidence as to an

21   alleged earlier act of a like nature in determining the state

22   of mind or intent with which the defendant actually did the act

23   or acts charged in the particular count.

24       The defendant is not on trial for any acts or crimes that

25   are not alleged in the indictment, nor may the defendant be

convicted of the crimes charge, even if you were to find that he committed other crimes, even crimes similar to the ones charged in this indictment.  I don't believe there is any evidence of such in this trial.

Now, you have heard testimony from an informant who was involved in the Government's investigation in this case.  Law enforcement officials may engage in stealth and deception, such as the use of informants and undercover agents, and that is in order to investigate criminal activities.  Undercover agents and informants may use false names and appearances and assume the roles of members in criminal organizations.

The testimony of an informant, someone who provides evidence against someone else for money or to escape punishment for his own misdeeds or crimes or for other personal reasons or advantage, must be examined and weighed by you, the jury, with greater care than a witness who is not so motivated.

Yader Gutierrez may be considered an informant in this case.  You, as a jury, must determine whether the informer's testimony has been affected by self-interest or by the agreement he has with the Government or his own interest in the outcome of this case or by prejudice against the defendant.

Now, the rules of evidence ordinarily do not permit witnesses to testify as to their own opinions or their own conclusions about important questions in a trial.  An exception to this rule exists as to those persons who are described as

"expert witnesses."  An "expert witness" is someone who by education or by experience may have become knowledgeable in some technical, scientific or very specialized area.

If such knowledge or experience may be of assistance to you in understanding some of the evidence or in determining a fact, an "expert witness" in that area may state an opinion as to a matter in which he or she claims to be an expert.  You should consider each expert opinion received in evidence in this case and give it such weight, if any, as you may think it deserves.

You should consider the testimony of expert witnesses just as you consider other evidence in the case.  If you should decide that the opinion of an expert witness is not based upon sufficient education or experience, or if you should conclude that the reasons given in support of the opinion are not sound, or if you should conclude that the opinion is outweighed by other evidence, you may disregard the opinion in part or in its entirety.  As I told you several times, you, the jury, are the sole judges of all the facts in this case.

Now, you've heard from Agent David Miner.  Agent Miner offered percipient testimony, that is, testimony based on personal knowledge that he gained from participating in this investigation.  You have also heard testimony from Agent Miner who, because of his education or experience, was permitted to state an opinion and the reasons for that opinion.

1    Agent Miner's testimony should be judged like any other

2    testimony.  You may accept it or reject it and give it as much

3    weight as you think necessary.

4              MR. AZAT:  Your Honor, I apologize to interrupt the

5    Court, but I don't believe the jury heard from

6    Special Agent Miner in this trial.

7              THE COURT:  Who was the agent, then?

8              MR. AZAT:  There was a Special Agent Sader.

9              THE COURT:  Sader.  I must have just gotten the

10   wrong --

11        What is his first name?

12             MR. AZAT:  Michael Sader, Your Honor.

13             THE COURT:  All right.  So you heard from

14   Agent Michael Sader.

15        Can you have them make that change, please.

16        So let me start over with that.  You've heard from

17   Agent Michael Sader, and Agent Sader offered percipient

18   testimony, that is testimony based on personal knowledge that

19   he gained from participating in this investigation.  You've

20   also heard testimony from Agent Sader who, because of his

21   education or experience, was permitted to state an opinion and

22   the reasons for that opinion.  Agent Sader's testimony should

23   be judged like any other testimony, and you may accept it or

24   reject it and give it as much weight as you may think

25   necessary.

1        Now, remember, ladies and gentlemen, that an indictment is

2   only a formal method used by the Government to accuse a

3   defendant of a crime.  It's not evidence of any kind against

4   the defendant, and the defendant is presumed to be innocent of

5   the crimes charged.  Even though this indictment has been

6   returned against the defendant, the defendant begins his trial

7   with absolutely no evidence against him.  The defendant has

8   pled not guilty to this indictment, and, therefore, denies that

9   he is guilty of the charges.  And remember, too, that the

10  defendant is not on trial for any act or any conduct which is

11  not specifically charged in the indictment.

12       And let me read the indictment to you again.  The grand

13  jury charges in Count 1, 21 United States Code Section 846:

14       "A. Object of a Conspiracy.

15       "Beginning on a date unknown and continuing to on or about

16  October the 7th, 2013, in Los Angeles County, within the

17  Central District of California, and elsewhere defendants Ismael

18  Gutierrez Vilavazo, also known as 'Ismael Gutierrez,' also

19  known as 'Mike Gutierrez,' also known as 'Mikey,' and Jorge

20  Beristain Huerta, AKA 'Moreno,' and others known and unknown to

21  the Grand Jury, conspired and agreed with each other to

22  knowingly and intentionally distribute at least five grams of

23  methamphetamine, a Schedule II controlled substance, in

24  violation of Title 21, United States Code, Sections 841(a)(1)

25  and 841(b)(1)(B)(viii).

1        "B. Means By Which the Object of the Conspiracy Was to Be

2    Accomplished.

3        "The object of the conspiracy was to be accomplished in

4    substance as follows:

5        "1. Defendant Vilavazo would obtain methamphetamine for

6    distribution to customers in the Los Angeles area and

7    elsewhere.

8        "2. Co-Conspirator Huerta, on behalf of Defendant

9    Vilavazo, would store methamphetamine for later distribution to

10   customers.

11       "3. Defendant Vilavazo would arrange the basic terms of

12   the sale of methamphetamine to customers.

13       "4. As arranged by Defendant Vilavazo,

14   Co-Conspirator Huerta would deliver methamphetamine to, and

15   pick up payment for the methamphetamine from, the customers.

16       "C.  Overt Acts.

17       "In furtherance of the conspiracy, and to accomplish the

18   objects of the conspiracy, on or about the following dates,

19   Defendants Vilavazo and Co-Conspirator Huerta, and others known

20   and unknown to the Grand Jury, committed various overt acts

21   within the Central District of California, including but not

22   limited to the following:

23       "The object of the conspiracy was to be accomplished" --

24   let's see.  "Overt Acts," I'm sorry.

25       "In furtherance of the conspiracy, and to accomplish the

1   objects of the conspiracy, on or about the following dates,

2   Defendants Vilavazo and Co-Conspirator Huerta, and others known

3   and unknown to the Grand Jury, committed various overt acts

4   within the Central District of California, including but not

5   limited to the following:

6       "1. On September the 19th, 2013, Defendant Vilavazo told

7   an individual whom Defendant Vilavazo believed to be a

8   methamphetamine customer but who was, in fact, a confidential

9   source working for law enforcement (hereinafter, 'the CS') to

10  call Defendant Vilavazo the following day and

11  Defendant Vilavazo would introduce the CS to a person who was

12  holding methamphetamine on behalf of Defendant Vilavazo.

13      "2. On September the 25th, 2013, using coded language in a

14  telephone call, Defendant Vilavazo explained to the CS that

15  methamphetamine would be distributed to the CS by individuals

16  whom Defendant Vilavazo referred to as 'my people.'

17      "3. On September the 25th, 2013, using coded language in a

18  telephone call, Defendant Vilavazo explained to the CS that the

19  individual who would distribute the methamphetamine to the CS

20  was his nephew.

21      "4. On September the 25th, 2013, Defendant Vilavazo spoke

22  with Co-Conspirator Huerta about the methamphetamine

23  transaction that Defendant Vilavazo had negotiated with the CS.

24      "5. On September the 25th, 2013, at the direction of

25  Defendant Vilavazo, Co-Conspirator Huerta contacted the CS to

discuss when they would be able to meet to complete the

methamphetamine transaction.

    "6. On September the 26th, 2013, using coded language in a

telephone call, Defendant Vilavazo agreed with the CS that he

would tell Co-Conspirator Huerta to lower the price of the

methamphetamine Defendant Vilavazo had arranged to sell to the

CS.

    "7. On September the 26, 2013, using coded language in a

telephone call, Co-Conspirator Huerta told the CS that the

methamphetamine the CS wanted to purchase would be sold to the

CS at a lower price.

    "8. On September the 26, 2013, in the parking lot of a

North Hollywood restaurant, Co-Conspirator Huerta distributed

approximately 48.6 grams of methamphetamine to the CS.

    "9. On September the 26, 2013, Co-Conspirator Huerta

received $960 from the CS, $950 of which was payment for the

methamphetamine that Co-Conspirator Huerta sold to the CS that

day and $10 of which Co-Conspirator Huerta held as credit for a

future narcotics transaction with the CS.

    "10. On October the 7th, 2013, using coded language in a

telephone call, Defendant Vilavazo told the CS that he was out

of town and was not immediately available to meet the CS, but

that Co-Conspirator Huerta had a small quantity of

methamphetamine left that the CS could purchase in

Defendant Vilavazo's absence."

1     And there is a final overt act charged here or alleged:

2     "October the 7th, 2013, using coded language in a

3 telephone call, Defendant Vilavazo agreed to distribute one

4 half pound of methamphetamine to the CS."

5     "Count Two, 21 United States Code Sections 841(a)(1),

6 (b)(1)(B)(viii) and 18 United States Code Section 2(a):

7     "On or about September the 26th, 2013, in Los Angeles

8 County, within the Central District of California,

9 Co-Conspirator Jorge Beristain Huerta, also known as 'Moreno,'

10 aided and abetted by Defendant Ismael Gutierrez Vilavazo, also

11 known as 'Ismael Gutierrez,' also known as 'Mike Gutierrez,'

12 also known as 'Mikey,' knowingly and intentionally distributed

13 at least five grams, that is, approximately 48.6 grams, of

14 methamphetamine, a Schedule II controlled substance.

15     "Counts Three Through Eight, 21 United States Code section

16 843(b):

17     "On or about the dates and times set forth below, in Los

18 Angeles County, within the Central District of California, and

19 elsewhere, Defendant Ismael Gutierrez Vilavazo, also known as

20 'Ismael Gutierrez,' also known as 'Mike Gutierrez,' also known

21 as 'Mikey,' knowingly and intentionally used a communication

22 facility, namely, a telephone, in committing and in causing and

23 facilitating the commission of an act constituting a felony

24 under Title 21, United States Code, Section 846, namely,

25 conspiracy to distribute methamphetamine, as charged in Count

**UNITED STATES DISTRICT COURT**

1    One, and under Title 21, United States Code, Section 841(a)(1),

2    namely, distribution of methamphetamine, as charged in Count

3    Two."

4        Count Three has a date of 9/25/13 and a time of 3:22 P.M.

5    Count Four has a date of 9/25/13 and a time of 3:53 P.M.  Count

6    Five has the date of 9/25/13 and a time of 4:58 P.M.  Count Six

7    has a date of 9/26/13 and a time of 6:10 P.M.  Count Seven has

8    a date of 9/26/13 and a time of 6:43 P.M.  Count Eight has a

9    time of 10/7 -- a date of 10/7/13 and a time of 5:24 P.M.

10       Now, the indictment charges that the offenses alleged in

11   Counts One through Eight were committed on or about certain

12   dates.  Although it's necessary for the Government to prove

13   beyond a reasonable doubt that the offenses were committed on a

14   date reasonably near the dates which are alleged in Counts One

15   through Eight of the indictment, it's not necessary for the

16   Government to prove that the offenses were committed precisely

17   on the dates which are charged.

18       When a separate crime is charged in each count of the

19   indictment, each charge and the evidence pertaining to it

20   should be considered separately by you the members of the jury.

21   The fact that you may find the defendant guilty or not guilty

22   as to one of the counts should not control your verdict as to

23   any other count.

24       Now, Count One of the indictment charges that beginning on

25   a date unknown until on or about the 7th day of October 2013,

1    in Los Angeles County, in the Central District of California

2    and elsewhere, Ismael Gutierrez Vilavazo and Jorge Beristain

3    Huerta came to some type of agreement or understanding to

4    commit an offense against the United States or agency thereof,

5    namely, to knowingly and intentionally distribute

6    methamphetamine, a Schedule II controlled substance.

7         Section 371 of Title 18 of United States code provides in

8    part --

9              MR. AZAT:  Your Honor, I apologize again for

10   interrupting the Court.  I noticed a mistake in the

11   Government's proposed jury instructions that I think would be

12   important to correct now.

13             THE COURT:  Okay.

14             MR. AZAT:  The instruction that the Court is about

15   to read, we would ask that that instruction be removed entirely

16   as that is not one of the charges -- the crime charged.  The

17   crime charged was 21 United States Code Section 846, and I

18   believe this proposed instruction references section 371 of

19   Title 18.  And I do apologize to the Court for that.

20             THE COURT:  All right.  So it should be what again?

21             MR. AZAT:  It should be stricken, Your Honor, and

22   removed entirely.

23             THE COURT:  All right.

24             MR. AZAT:  And rather -- that's all, Your Honor.

25             THE COURT:  All right.  Fine.

1          MR. AZAT:  Thank you.

2          THE COURT:  So we will ignore that instruction.

3      But ladies and gentlemen, in order for the Government to

4  sustain its burden of proof for the crime of conspiracy to

5  distribute methamphetamine as alleged in Count One of the

6  indictment, the Government must prove three essential elements

7  beyond a reasonable doubt:  1, the conspiracy, agreement or

8  understanding to distribute methamphetamine as described in the

9  indictment was formed, reached or entered into by two or more

10  persons; secondly, at some time during the existence or life of

11  the conspiracy, agreement or understanding, the defendant knew

12  the purpose or purposes of the agreement; and 3, with knowledge

13  of the purpose or purposes of the conspiracy, agreement or

14  understanding, the defendant then deliberately joined the

15  conspiracy, agreement or understanding.

16      Now, before you, as a jury, may find that the defendant or

17  any other person became a member of the conspiracy which is

18  charged in Count One of the indictment, the evidence in the

19  case must show beyond a reasonable doubt that the defendant

20  knew the purpose or goal of the agreement or understanding and

21  then deliberately entered into the agreement intending in some

22  way to accomplish the goal or purpose by this common plan or

23  joint action.

24      Merely associating with others and discussing common

25  goals, the mere similarity of conduct among or between such

1    conduct merely being present where a crime takes place or is

2    discussed or even knowing about criminal conduct does not in

3    and of itself make someone a member of the conspiracy or a

4    conspirator.

5        Now, evidence has been received in this case that certain

6    persons who are alleged in Count One of the indictment to be

7    co-conspirators of the defendant have done or said things

8    during the existence of the alleged conspiracy in order to

9    further or advance its goals.  Such acts or statements of these

10   individuals may be considered by you in determining whether or

11   not the Government has proven the charges in Count One of the

12   indictment against the defendant.

13       Since these acts may have been performed and these

14   statements may have been made outside the presence of the

15   defendant and either done or said without the defendant's

16   knowledge, these acts or statements should be examined with

17   particular care by you before considering them against the

18   defendant who did not do the particular act or make the

19   particular statement.

20       Now, Count Two of the indictment charges that on or about

21   the 26th day of September 2013, in Los Angeles County, in the

22   Central District of California, Jorge Beristain Huerta aided

23   and abetted by Defendant Ismael Gutierrez Vilavazo -- Vilavazo,

24   rather, knowing and intentionally distributed at least 5 grams,

25   that is approximately 48.6 grams of methamphetamine, a Schedule

1    II controlled substance.

2         Let me go back to Count One for just a minute, ladies and

3    gentlemen, tell you that with regard to the overt acts.  It's

4    only necessary that the jury find unanimously that one of the

5    overt acts did, indeed occur, but you must find it unanimously,

6    any one of those that were read to you.

7         The term "to distribute" as used in these instructions

8    means to deliver or to transfer possession or control of

9    something from one person to another.  The term "to distribute"

10   includes the sale of something by one person to another.

11        The term "knowingly," as used in these instructions to

12   describe the alleged state of mind of the defendant, means that

13   he was conscious and aware of his action, realized what he was

14   doing or what was happening around him and did not act because

15   of ignorance, mistake or accident.

16        Section 841(a)(1) of Title 21 of United States Code

17   provides, in part, that A, it shall be unlawful for any person

18   knowingly and intentionally to distribute a controlled

19   substance.

20        In order for the Government to sustain its burden of proof

21   for the crime of distribution of a controlled substance as

22   charged in Count Two of the indictment, the Government must

23   prove the following two essential elements beyond a reasonable

24   doubt:  1, that the defendant knowingly and intentionally

25   distributed approximately 48.6 grams of methamphetamine, the

1   controlled substance described in Count Two of the indictment;

2   and 2, at the time of such distribution, the defendant knew

3   that the substance distributed was methamphetamine, a

4   controlled substance.

5       Now, a person may violate the law even though he or she

6   does not do each and every act constituting the offense if that

7   person aided and abetted, quote/unquote, the commission of the

8   offense.  Section 2A of Title 18 of the United States code

9   provides "Whoever commits an offense against the United States

10  or aides, abets, counsels, commands, induces or procures its

11  commission is punishable as a principle."

12      Before a defendant may be held responsible for aiding and

13  abetting others in the commission of a crime, it's necessary

14  that the Government prove beyond a reasonable doubt that the

15  defendant knowingly and deliberately associated himself in some

16  way with the crime which is charged and participated in it with

17  the intent to commit the crime.

18      To be found guilty of aiding and abetting the commission

19  of the crime charged in the indictment, the government must

20  prove beyond a reasonable doubt that Defendant:  1, knew that

21  the crime charged was to be committed or was being committed;

22  2, knowingly did some act for the purpose of aiding, commanding

23  or encouraging the commission of that crime; and 3, acted with

24  the intention of causing the crime charged to be committed.

25      Before the defendant may be found guilty as an aider and

abetter to the crime, the Government must also prove beyond a

reasonable doubt that some person or persons committed each of

the essential elements of the offense charged as detailed for

you in these instructions.  Merely being present at the scene

of the crime or merely knowing that a crime is being committed

or is about to be committed is not sufficient conduct for you,

the jury, to find that a defendant aided and abetted the

commission of that crime.  The Government must prove that the

defendant knowingly and deliberately associated himself with

the crime in some way as a participant, someone who wanted the

crime to go committed, not as a mere spectator.

Now, each member of the conspiracy is responsible for the

actions of the other conspirators performed during the course

of and in furtherance of the conspiracy, the actions of the

other conspirators performed.  If one member of the conspiracy

commits a crime in furtherance of the conspiracy, the other

members have also, under the law, committed that crime.

Therefore, you may find the defendant guilty of

distribution of methamphetamine as charged in Count Two of the

indictment if the Government has proved each of the following

elements beyond a reasonable doubt:  First, the person named in

Count One of the indictment committed the crime of distribution

of methamphetamine as alleged in that count; second, the person

was a member of the conspiracy charged in Count One of the

indictment; third, the person committed the crime of

1    distribution of methamphetamine in furtherance of that

2    conspiracy; fourth, the defendant was a member of the same

3    conspiracy at the time the offense charged in Count One was

4    committed; and fifth, the offense fell within the scope of the

5    unlawful agreement and could reasonably have been foreseen to

6    have been unnecessary or a natural consequence of the unlawful

7    agreement.

8               MR. AZAT:  Yes, Your Honor.

9               THE COURT:  Yes.

10              MR. AZAT:  Just one more item.  I believe Your Honor

11   instructed the jury as to Count One, the jury must agree

12   unanimously as to an overt act.  That law applies to conspiracy

13   under Title 18, Section 371.

14              THE COURT:  All right.

15              MR. AZAT:  The Government need not prove any overt

16   acts under Title 21, Section 846, conspiracy.  So I would

17   respectfully request that the Court reinstruct regarding that.

18              THE COURT:  All right.  Ladies and gentlemen, you

19   don't have to find any one of the overt acts.  And why they're

20   here, I don't know, but you don't have to find any one of them

21   to have been properly alleged beyond a reasonable doubt.

22       Now, Counts Three through Eight of the indictment charge

23   that on or about 1, the 25th day of September 2013 at 3:22

24   P.M., 3:53 P.M. and 4:58 P.M.; 2, the 26th day of September

25   2013 at 6:10 P.M. and 6:43 P.M.; and 3, the 7th day of October

1   2013 at 5:24 P.M., in Los Angeles County, in the Central

2   District of California, the defendant knowingly and

3   intentionally used a communication facility, namely a

4   telephone, in committing and then causing and facilitating the

5   commission of an act constituting a felony under Title 21,

6   United States Code, Section 846, namely conspiracy to

7   distribute methamphetamine as charged in Count One, and aiding

8   and abetting an act to be done in violation of Title 21, United

9   States Code, Section 841(a)(1), namely distribution of

10  methamphetamine as charged in Count Two.

11       Now, the intent of a person or the knowledge that a person

12  possesses at any given time may not ordinarily be proved

13  directly, and that's simply because there is no way of directly

14  scrutinizing the workings of the human mind.  In determining

15  the issue of what a person knew or what a person intended at a

16  particular time, you're free to consider any statements made or

17  acts done or omitted by that person, and all other facts and

18  circumstances which have been received in evidence which may

19  aid in your determination of that person's knowledge or intent.

20       And now intent and motive are simply different concepts

21  and should never be confused.  Motive is what prompts a person

22  to act or fail to act.  Intent, on the other hand, only refers

23  to the state of mind with which the act is done or omitted.

24  Personal advancement and financial gain, for example, are two

25  very well recognized motives for much of human conduct.  These

1    otherwise praiseworthy motives may prompt one person to

2    voluntary acts of good, while on the other hand, prompting

3    another person to voluntary acts of crime.

4         So good motive alone is never a defense where the act done

5    or omitted is a crime.  The motive of the defendant is,

6    therefore, immaterial, except insofar as evidence of that

7    motive may aid you in the determination of the state of mind or

8    the intent of the defendant.

9         Now, you, as jurors, are the sole and exclusive judges of

10   the credibility of each of the witnesses who have been called

11   to testify in this case, and only you may determine the

12   importance or the weight, if any, that their testimony

13   deserves.  After making your assessment concerning the

14   credibility of a witness, you may decide to believe all of that

15   witness' testimony, only a portion of it, or, indeed, none of

16   it.

17        In making your assessment of that witness, you should

18   carefully scrutinize all of the testimony given by that

19   witness, the circumstances under which each witness has

20   testified, and all of the other evidence which tends to show

21   whether a witness, in your opinion, is worthy of belief or not.

22        Consider each witness' intelligence, motive to falsify his

23   or her state of mind and appearances and manner while on the

24   witness stand.  Consider the witness' ability to observe the

25   matters which he or she has testified, and consider whether he

1    or she impresses you as having an accurate memory or

2    recollection of these matters.  Consider also any relation a

3    witness may bear to either side of the case, the manner in

4    which each witness might be affected by your verdict, and the

5    extent, if at all, each witness is either supported or

6    contradicted by other evidence in the case.

7         Inconsistencies or discrepancies in the testimony of a

8    witness or between the testimony of different witnesses may or

9    may not cause you to disbelieve or discredit such testimony.

10   Two or more persons witnessing an incident or a transaction may

11   simply see or hear it differently.

12        Misrecollection, much like the failure of recollection, is

13   not an uncommon human experience.  So in weighing the effect of

14   a discrepancy, always consider whether it pertains to a matter

15   of importance or whether it is an insignificant detail, and

16   consider where the discrepancy results from an innocent error

17   or from intentional falsehood.

18        After making your own judgement or assessment concerning

19   the believability of a witness, you can then attach such

20   importance or weight to that testimony, if any, as you feel it

21   deserves.  You will then be in a position to decide whether the

22   Government has proven the charges beyond a reasonable doubt.

23        In doing your deliberations you must not communicate or

24   provide any information to anyone by any means about this case.

25   I told you this at this beginning of the trial.  You may not

 1   use any electronic device or media, such as a telephone, cell

 2   phone, tablet, a computer, the Internet, any Internet service,

 3   any texts or instant messaging service, any Internet chat room,

 4   blog or website, such as Facebook, Myface -- Myspace, Google

 5   Plus, Snapchat, Instagram.  I don't know what any of these

 6   things mean, but you must not use them if you know what they

 7   mean.

 8        You can't use YouTube.  I guess you tweet on Twitter.  You

 9   can't do that either, or any other social media.  You can't use

10   any social media to communicate with anyone any information

11   about this case or to conduct any research about this case

12   until after I've accepted your verdict, then you're free to do

13   whatever.

14        In other words, you can't talk to anyone on the phone,

15   correspond with anyone or electronically communicate with

16   anyone about this case.  You can only discuss the case in the

17   jury room with your fellow jurors during the deliberations.

18   And I expect you will inform me as soon as you become aware of

19   another juror's violation of these instructions.  You may not

20   use these electronic means or any other means to investigate or

21   communicate about the case because it is important that you

22   decide this case based solely on the evidence which has been

23   presented to you here in this courtroom.

24        Information in print on the Internet or available through

25   social media might be wrong, incomplete or, indeed, inaccurate.

1   You're only permitted to discuss the case with your fellow

2   jurors during deliberations, and that's because they have seen

3   and heard the same evidence that you have.  In our judicial

4   system it's important that you are not influenced by anything

5   or anyone outside of the courtroom.  Otherwise your decision

6   may be based on information known only by you and not your

7   fellow jurors or other parties in the case.  This would

8   unfairly and adversely affect the judicial process.

9       Now, the punishment provided by law for the offenses

10  charged in the indictment is a matter exclusively within the

11  province of this court and should never be considered by you,

12  the members of the jury, in arriving at an impartial verdict as

13  to the offenses which have been charged here.

14      Now, a form of verdict has been prepared for your

15  convenience, and it reads as follows.  With the proper caption,

16  the Court, it reads:  We, the jury, unanimously find the

17  defendant, Ismael Gutierrez Vilavazo, number 1, not guilty or

18  guilty of Count One of the indictment," place for you to fill

19  in one or the other.  "If your answer is not guilty, proceed to

20  the next page."

21      "Having found" -- but if it is guilty, "Having found the

22  guilty" -- "the defendant guilty of Count One, we unanimously

23  find the defendant conspired to distribute the following amount

24  of 'pure' or 'actual' methamphetamine," and a place for you to

25  check either "At least 5 grams but less than 50 grams" and/or

1    "Less than 5 grams."

2        2, not guilty or guilty of Count Two of the indictment, if

3    your answer is not guilty, proceed to number 3, but if it's

4    guilty, "Having found the defendant guilty of Count Two, we

5    unanimously find the methamphetamine was distributed in the

6    following amount of 'pure' or 'actual' methamphetamine," and a

7    place for you to check off "At least 5 grams but less than 50

8    grams" or check off "Less than 5 grams."

9        3 -- well, Three through Eight, there are places for you

10   to check off either guilty or not guilty as charged in Count

11   Three, Count Four, Count Five, Count Six, Count Seven, Count

12   Eight.

13       Now, you will take this form to the jury room with you,

14   and when you have reached a unanimous agreement as to your

15   verdict, you will have your foreperson write your verdict on

16   the forms, date it, date and sign the forms, and then return

17   with your verdicts to the courtroom.

18       If it becomes necessary during your deliberations to

19   communicate with the Court, you can send a note signed by your

20   foreperson or by one or more members of the jury through the

21   bailiff.  No members of the jury should ever attempt to

22   communicate with the Court, that is me, by any means -- or any

23   of the court staff, by any means other than a signed writing.

24   And I will never communicate with you or any member of the jury

25   concerning the evidence, your opinions or the deliberations

 1   other than in writing or orally here in open court.

 2        On the other hand, if you need more paper or pens or

 3   anything, some exhibit that hasn't been given to you and it's

 4   been admitted into evidence and you need it, you can -- you

 5   should put that in writing.  But if it's simply some more

 6   materials to aid you, just knock on the door, let the bailiff

 7   know that, that you need more pens, pencils, paper, et cetera.

 8        And you will note from the oath which is about to be taken

 9   by the bailiffs that they, too, as well as all other persons,

10   are forbidden to communicate in any way or manner with any

11   member of the jury concerning the evidence, your opinions or

12   the deliberations.

13        We have the bailiffs here?

14             THE COURTROOM DEPUTY:  Yes.

15             THE COURT:  They should be coming in.

16        Would you come forward, sir.

17             THE BAILIFF:  Yes, sir.

18             THE COURT:  Bailiff can you come on this -- just

19   come around, if you will, to where the others are.

20             THE COURTROOM DEPUTY:  Please raise your right hand.

21                   **THE BAILIFFS WERE SWORN**.

22        (The bailiffs responded "Yes.")

23             THE COURTROOM DEPUTY:  Please state and spell your

24   name for the record.

25             BAILIFF TAYLER:  Dwayne Tayler; D-w-a-y-n-e, Tayler,

**UNITED STATES DISTRICT COURT**

1    T-a-y-l-e-r.

2            BAILIFF REICHMAN:  Kenneth Reichman; R-e-i-c-h, man.

3            BAILIFF SMITH:  Richard Smith, S-m-i-t-h.

4            THE COURT:  Thank you.

5        Now, ladies and gentlemen please bear in mind also that

6    you are never to reveal any person, not even to me, how you

7    stand as a jury numerically or otherwise on the question of

8    whether or not the Government has sustained its burden of proof

9    until after you have reached a unanimous verdict.

10        Now, upon retiring to the jury room to begin your

11   deliberations, you should select one of your members to act as

12   your foreperson, and that foreperson will preside over your

13   deliberations and will be your spokesperson here in open court.

14   And remember, your verdict must represent the collective

15   judgment of the entire jury.

16        In order to return a verdict, it's necessary that each

17   juror agree to it.  In other words, your verdict must be

18   unanimous.  And remember, it's your duty, as jurors, to consult

19   with one another and deliberate with one another with a view

20   towards reaching an agreement, that is, if you can do so

21   without violation to individual judgment.  Each of you must

22   decide the case for himself and herself, but do so only after

23   an impartial consideration of all of the evidence in the case

24   with your fellow jurors.

25        And during the course of your deliberations, don't

1    hesitate to re-examine your own views and to change your

2    opinion if convinced it is erroneous.  But at the same time,

3    you should not surrender your honest conviction, however,

4    solely because of the opinion of your fellow jurors or for the

5    mere purpose of thereby being able to return a unanimous

6    verdict.

7         And remember at all times that you're not partisans here.

8    You're judges.  You are the judges of the facts of this case.

9    And your sole interest is to seek the truth from the evidence

10   that's been received during this trial.  Remember that your

11   verdict must be based solely upon the evidence which has been

12   received in this case and nothing else.  Nothing you've seen or

13   read outside of court may be considered.  Nothing that I've

14   said or done during the course of this trial is intended in any

15   way to somehow suggest to you what I think your verdict should

16   be.

17        Nothing said in these instructions and nothing in any form

18   of verdict is to suggest or convey to you in any way or manner

19   any intimation as to what verdict I think you should return.

20   What the verdict shall be, indeed, is the exclusive duty and

21   responsibility of you, the members of the juror.  And this I

22   have told you so many times.  You are the sole judges of the

23   facts in this case.

24        Just excuse us one minute, ladies and gentlemen, and just

25   be at ease and let counsel come to the sidebar.

```
 1          (Discussion held at sidebar.)

 2              THE COURT:  Any other comments with regard to the

 3   instructions or objections?

 4              MS. JAIMEZ:  With regard to the instructions, I

 5   don't think so.  There was going to be one final housekeeping

 6   matter as to the transcript binders we discussed pretrial.  We

 7   have those available for individual jurors.  So we have

 8   individual transcript binders for each juror in individual

 9   transcripts.

10              THE COURT:  You have those ready?

11              MS. JAIMEZ:  Yes.  They are on the trial cart.

12              THE COURT:  Very well.  They will have those.

13              MS. JAIMEZ:  Okay.

14              THE COURT:  It's my practice to keep the alternate

15   down separate from the first 12 that will be deliberating.  If

16   we have to excuse one of the first 12, we will ask Mr. Rhoads

17   to come back downstairs.  He will be instructed not to talk

18   about the case.  And if he has to replace someone, then they

19   will start the deliberations from the top.

20         Is there any objection to that?

21              MR. AZAT:  No, Your Honor.

22              MR. NAVARRO:  No, Your Honor.

23              MS. JAIMEZ:  No, Your Honor.

24              THE COURT:  All right.  Thank you.

25              MS. JAIMEZ:  Thank you.
```

1           THE COURT:  All right.

2       (In open court.)

3           THE COURT:  All right.  We are back on the record.

4       Mr. Rhoads, you've sat through all of the testimony, the

5   arguments and other things, but we are going to ask you to go

6   up to the jury assembly room.  And please don't discuss the

7   matter with anybody, because if one of your colleagues here has

8   to be excused, then you will replace that person, and you will

9   have to start the deliberations from the very beginning.  And

10  we will make sure if there are any matters that have to be

11  taken care of in open court, you will be brought back down,

12  too, with your fellow jurors.

13      If you have some items that you need to pick up in the

14  jury assembly room -- I mean the jury room here and you don't

15  have it, you can go up to the jury assembly room at this time

16  and we will call you as soon as we can.

17          ALTERNATE JUROR:  Thank you.

18          THE COURT:  Thank you.

19      And, ladies and gentlemen, your first order of business

20  should be the selection of a foreperson, and then you will have

21  with you, as I previously said, a copy of the instructions that

22  I have read to you.  You will also have individually a

23  transcript of --

24      Of what?

25          MS. JAIMEZ:  The recorded calls that we played in

```
 1    trial.

 2            THE COURT:  The recorded calls.  All right.  Each of

 3    you will have that.  You will also have a copy of the

 4    indictment as well as the jury verdict form.  If you need

 5    anything else and you proceed in a manner in which I've said,

 6    if it deals with the merits of the case, you should put it in

 7    writing.  If it's merely you need more coffee or tea or

 8    something, just knock on the door and let the bailiff know.

 9        Everyone, please rise for the jury.

10        (Out of the presence of the jury.)

11            THE COURT:  You may be seated.  We are outside the

12    presence of the jury.

13        It's my practice to bring the lawyers in if there's a note

14    dealing with the merits from the jury and before responding to

15    the jury.  So it's important that you be within five minutes of

16    a call from the clerk if that, indeed, becomes the case.  If

17    they're going to go beyond 5:00 or until whatever time, we will

18    let you know so that you can plan properly.

19        Do we have any other housekeeping matters that need to be

20    taken up at this time?  We can take them as soon as Ms. Skipper

21    gets back here.

22            MR. AZAT:  No, Your Honor, just that the United

23    States would be briefly allowed to take a look -- to review the

24    changes to the jury instructions before they head back, just to

25    ensure that 371 was removed, the Michael Sader --
```

```
 1          THE COURT:  Oh, yes, I think I got it back.  I don't
 2   know how that got in there.  I should have caught that.
 3          MR. AZAT:  And the third was the no overt act having
 4   to be proved beyond a reasonable doubt.
 5          THE COURT:  Well, I really don't have a -- I can
 6   give a written one, too, that they don't find have to find any
 7   of the overt acts by a unanimous -- you want that?
 8          MR. AZAT:  I'm sorry, Your Honor?
 9          THE COURT:  That we have something in writing that I
10   already instructed them?
11          MR. AZAT:  No, we don't believe that anything
12   further needs to be added, just that 371 be removed, the
13   Michael Sader has been corrected.
14          THE COURT:  Yes, that has been removed.  There are a
15   couple nits that we will take up and show you.  Let's see what
16   Ms. Skipper has, and we will show you.
17          MR. AZAT:  Is there any way also, Your Honor, that
18   they have page numbers so we can reference them when we look at
19   them?
20          THE COURT:  No, there are no numbers.
21          MR. AZAT:  Thank you, Your Honor.
22       (Pause in proceedings.)
23          THE COURT:  We will recess until we hear from the
24   jury.
25          THE COURTROOM DEPUTY:  We are in recess.
```

**UNITED STATES DISTRICT COURT**

```
1          (Recess taken from 2:27 P.M. to 3:16 P.M.)

2          (Out of the presence of the jury.)

3          THE COURTROOM DEPUTY:  Please remain seated and come

4    to order.  This Court is once again in session.

5          THE COURT:  We are outside the presence of the jury,

6    and I am trying to get some clarification here.  Unfortunately,

7    and I guess I didn't look carefully enough at it, the

8    Government's proposed 36, which I said I would give, has

9    Miner's name in there, and then, of course, Agent Michael Sader

10   is not both percipient and expert.

11       So the change that is going into the jury, "You have heard

12   testimony from Agent Michael Sader, 1B, who because of his

13   education or experience was permitted to state an opinion and

14   the reasons for that opinion.  Agent Sader's testimony should

15   be judged like any other testimony.  You may accept it or

16   reject it, give it as much weight as you think is necessary."

17         MR. AZAT:  Your Honor, the instruction 36 -- and I

18   apologize again for this -- should not have been read at all,

19   and the reason being is because Special Agent David Miner never

20   testified at all.

21         THE COURT:  Yes, I see.

22         MR. AZAT:  Right.  And he was the only individual

23   who this instruction would have applied to.

24         THE COURT:  That's right.

25         MR. AZAT:  Because our other testifying experts
```

**UNITED STATES DISTRICT COURT**

```
 1    were, in fact, experts and would have been covered by 1.  So by
 2    proposed jury instruction 14, which the Court did, in fact,
 3    read, which is O'Malley 1401, which is the expert instruction.
 4    So given that, the United States respectfully requests that the
 5    Court reread the instruction as was given from the court
 6    reporter's record, instruct the jury they should now disregard
 7    that instruction and instruct the jury that Michael Sader was
 8    not a percipient witness, but, rather, was an expert witness.
 9    And to the extent the jury relied on Your Honor's prior
10    instruction, please start deliberation anew.
11              THE COURT:  Mr. Navarro?
12              MR. NAVARRO:  Your Honor, I think that's fine.  I
13    have no objection to that.
14              THE COURT:  All right.  We are going to have to get
15    the alternate down here.
16              MR. AZAT:  Thank you, Your Honor.
17              THE COURT:  Thank you.
18         So I take it you just want to withdraw 36 altogether?
19              MR. AZAT:  Yes, Your Honor, please.  And we do
20    believe it is important to include those other instructions
21    that I did just mention, Your Honor, being that, again, reread
22    the instruction as given; instruct the jury to disregard;
23    instruct the jury that the witness, Michael Sader, who was
24    mentioned in the initial instruction, was an expert witness;
25    and that to the extent the jury did rely on that instruction,
```

1    they should deliberate anew.

2           THE COURT:  I intend to tell the jury that it is an

3    error to give an instruction of the person who did not testify,

4    and that they should be guided by the instruction dealing with

5    expert witness testimony.

6           MR. AZAT:  Thank you, Your Honor.

7         (Pause in proceedings.)

8           THE COURTROOM DEPUTY:  Please rise.

9         (In the presence of the jury.)

10          THE COURT:  Please be seated, ladies and gentlemen.

11        Ladies and gentlemen, I called you back here to correct an

12   error in the instructions.  I don't know if you recall, but I

13   gave you an instruction involving a witness who was on the

14   witness list, but evidently -- well, he was not called.  It was

15   Agent David Miner.

16        We then changed the instruction to the Government's last

17   witness, Michael Sader, and actually it doesn't apply to him

18   either, because he was not testifying as a percipient as well

19   as expert witness, but only as an expert witness.  And if

20   you've already started talking about him, I want you to put

21   that aside and start over again regarding anything dealing with

22   him.

23        And let me just read to you the instruction again with

24   regard to expert witnesses.  The rules of evidence

25   ordinarily -- excuse me, ordinarily do not permit witnesses to

1    testify as to their own opinions or their own conclusions about

2    important questions in a trial.  An exception to this rule

3    exists as to those persons who are described as "expert

4    witnesses."

5         An expert witness is someone who by education or by

6    experience may have become knowledgeable in some technical,

7    scientific or very specialized area.  If such knowledge or

8    experience may be of assistance to you in understanding some of

9    the evidence or in determining a fact, then an expert witness

10   in that area may state an opinion as to a matter in which he or

11   she claims to be an expert.

12        You should consider each expert opinion received in

13   evidence in this case and give it such weight, if any, as you

14   may think it deserves.  You should consider the testimony of

15   expert witnesses just as you consider other evidence in this

16   case.  If you should decide that the opinion of an expert

17   witness is not based upon sufficient education or experience,

18   or if you should conclude that the reasons given in support of

19   the opinion are not sound, or if you should conclude that the

20   opinion is outweighed by other evidence, you may disregard your

21   opinion in part or in its entirety.

22        Now, there were several witnesses who were called as

23   expert witnesses, and you recall I said that they could

24   proceed, but that you, as the judges of the facts, would

25   finally determine if, indeed, you considered them to be expert.

1    With that in mind, you should apply this particular -- there

2    are several witnesses and you will have to use your

3    recollection as to which ones of them are referred to as expert

4    witnesses, but you would apply this particular instruction to

5    any of those that you consider to be expert.

6         And even though I've read this instruction to you several

7    times, I think it's important to also let you know that, as I

8    told you in one of the other instructions, that you must

9    consider all of the instructions as a whole.

10        Any questions from any of the jurors at this time?  If so,

11   just raise a hand.

12        I see no hands having been raised.

13        And let me ask you, Ms. Paulson, you're Juror No. 2,

14   you're the foreperson?

15             JUROR NO. 2:  Uh-huh.

16             THE COURT:  Yes?

17             JUROR NO. 2:  Yes.

18             THE COURT:  And you intend to stay until about 4:30

19   today.  Is that what you said?

20             JUROR NO. 2:  Yes.

21             THE COURT:  And if you can't complete your work, you

22   will be here at 9:00 tomorrow morning?

23             JUROR NO. 2:  Yes.

24             THE COURT:  And you understand you shouldn't start

25   your deliberations again until the first 12 of you are in

```
 1    place?  You understand that?

 2                JUROR NO. 2:  Yes.

 3                THE COURT:  All right.  Thank you.  Then we will let

 4    you go back to your deliberations, and Mr. Rhoads go back

 5    upstairs.

 6         Everyone please rise for the jury.

 7         (Out of the presence of the jury.)

 8                THE COURT:  Please be seated.  We are outside the

 9    presence of the jury.

10         Are there any other matters that counsel wish to take up

11    at this time?

12                MR. NAVARRO:  No, Your Honor.

13                MR. AZAT:  No, Your Honor.  Thank you.

14                THE COURT:  Fine.  We will let you know when we next

15    hear from the jury.  If it's 4:30 and you haven't heard, that

16    takes care of it for today, and be back tomorrow morning.

17    Thank you.

18                MR. NAVARRO:  Your Honor, tomorrow, if we get that

19    far, I have a 9:00 bail hearing with Judge Ward.

20                THE COURT:  It should not be a problem.

21                MR. NAVARRO:  Just letting you know.

22                THE COURT:  Thank you.

23         (Recess taken from 3:31 P.M. to 4:24 P.M.)

24         (Out of the presence of the jury.)

25                THE COURTROOM DEPUTY:  Please remain seated and come
```

1    to order.  This Court is once again in session.

2          THE COURT:  We are here again outside the presence

3    of the jury.  And at 4:02 we received the fourth note from the

4    jury, signed by Stephanie Paulson, who is Juror No. 2, she is

5    the foreperson, and indicates that a verdict, a unanimous

6    verdict, has been reached.

7       Anything from any counsel before we bring in the jury?

8          MR. NAVARRO:  No, Your Honor.

9          MR. AZAT:  No, Your Honor.  Thank you.

10         THE COURT:  Okay.  Let's bring the jury in.

11         THE COURTROOM DEPUTY:  Please rise.

12     (In the presence of the jury.)

13         THE COURT:  Please be seated, ladies and gentlemen.

14     Ladies and gentlemen, I have received Note No. 4 at 4:02,

15    signed by Juror No. 2, Ms. Paulson, who is the foreperson.

16     Ms. Paulson, you indicate that the jury has reached a

17    unanimous verdict; is that right?

18         JUROR NO. 2:  Yes, Your Honor.

19         THE COURT:  Would you please hand it to the clerk.

20     And even before I receive it, I want to thank all 13 of

21    you for the fine work that you've done.  I really mean it.  If

22    we didn't have citizens such as yourselves who are willing to

23    give up of your time and efforts, we could not have the finest

24    jury system in the world, and we do.  You are the reason why.

25     Mr. Navarro:  Would you rise with your client, please.

1           MR. NAVARRO:  Your Honor.

2           THE COURT:  Ms. Skipper.

3           THE COURTROOM DEPUTY:  United States District Court,

4    Central District of California, Eastern Division; United States

5    of America versus Ismael Gutierrez Vilavazo, criminal case

6    10- -- I'm sorry, criminal case 14-209, Verdict.

7       "We, the jury, unanimously find Defendant Ismael Gutierrez

8    Vilavazo:  Number 1, guilty of Count One of the indictment."

9       "Having found the defendant guilty of Count One, we

10   unanimously find the defendant conspired to distribute the

11   following amount of pure or actual methamphetamine:  At least 5

12   grams but less than 50 grams."

13      Number 2, "Guilty of Count Two of the indictment."

14      "Having found that the defendant" -- "Having found the

15   defendant guilty of Count 2, we unanimously find the

16   methamphetamine was distributed in the following amount of pure

17   or actual methamphetamine:  At least 5 grams but less than 50

18   grams."

19      Number 3, "Guilty as charged in Count Three of the

20   indictment."

21      Number 4, "Guilty as charged in Count Four of the

22   indictment."

23      Number 5, "Guilty as charged in Count Five of the

24   indictment."

25      Number 6, "Guilty as charged in Count Six of the

```
 1   indictment."
 2        Number 7, "Not guilty as charged in Count Seven of the
 3   indictment.
 4        Number 8, "Guilty as charged in Count Eight of the
 5   indictment."
 6        Dated May 21st, 2015, and signed by the foreperson.
 7             THE COURT:  You may be seated.
 8        Ladies and gentlemen of the jury, is that your verdict as
 9   just read by the clerk of the court?
10        (The jury responded "Yes.")
11             THE COURT:  Mr. Navarro, would you care to have the
12   jury polled?
13             MR. NAVARRO:  Yes, Your Honor.  Thank you.
14             THE COURT:  Juror No. 1, is that your verdict, sir?
15             JUROR NO. 1:  Yes, Your Honor.
16             THE COURT:  Juror No. 2?
17             JUROR NO. 2:  Yes, sir, Your Honor.
18             THE COURT:  Juror No. 3?
19             JUROR NO. 3:  Yes, Your Honor.
20             THE COURT:  Juror No. 4?
21             JUROR NO. 4:  Yes, Your Honor.
22             THE COURT:  Juror No. 5?
23             JUROR NO. 5:  Yes, Your Honor.
24             THE COURT:  Juror No. 6?
25             JUROR NO. 6:  Yes, Your Honor.
```

```
 1                    THE COURT:  Juror No. 7?

 2                    JUROR NO. 7:  Yes, Your Honor.

 3                    THE COURT:  Juror No. 8?

 4                    JUROR NO. 8:  Yes, Your Honor.

 5                    THE COURT:  Juror No. 9?

 6                    JUROR NO. 9:  Yes, Your Honor.

 7                    THE COURT:  Juror No. 10?

 8                    JUROR NO. 10:  Yes, Your Honor.

 9                    THE COURT:  Juror No. 11?

10                    JUROR NO. 11:  Yes, Your Honor.

11                    THE COURT:  Juror No. 12?

12                    JUROR NO. 12:  Yes, Your Honor.

13                    THE COURT:  Ladies and gentlemen, you gave up one of

14    the most valuable Constitutional rights that we have, and that

15    is the right of free speech during this trial, but now I am

16    going to excuse you and you get those rights back.  You are

17    free to talk about this case if you choose to or not to.  And I

18    am going to ask that you wait for me for just a minute or two.

19    I want to thank you.  And sometimes the lawyers like to talk to

20    the jurors afterwards if they're willing to talk with them.  I

21    know I always did that when I was practicing in San Francisco

22    and Sacramento and other places.

23        If, indeed, you're willing to speak to any of the lawyers

24    who wish to speak to you, they will be outside the courtroom

25    here.  Those of you who don't wish to talk with anyone, we will
```

```
 1   show you another way out, but if you will just wait for me, I
 2   will be with you in about five minutes.
 3        Everyone please rise for the jury.
 4        (Out of the presence of the jury.)
 5             THE COURT:  Please be seated.  We are outside the
 6   presence of the jury once more.
 7        Are there any motions of any kind at this time?
 8             MR. NAVARRO:  Your Honor, I would again renew my
 9   Rule 29 motion.
10             THE COURT:  Very well.  It's renewed, and it is
11   denied.
12        We need to set a date for the sentencing in this matter,
13   about six, eight weeks out.
14             THE COURTROOM DEPUTY:  I have July 13, 10:00 A.M.
15             THE COURT:  Would you check your calendars.
16             MR. NAVARRO:  Your Honor, typically probation wants
17   about no less than ten weeks, Your Honor.  That's my
18   understanding.  That's what the federal rules require.
19             THE COURT:  Well, let's find something ten weeks
20   out, then.
21             THE COURTROOM DEPUTY:  July 27th or August 3rd.
22             MR. NAVARRO:  The first date is fine, Your Honor.
23             THE COURT:  July 27th.
24        Is that a good date for the Government as well?
25             MR. AZAT:  July 27th is fine, Your Honor.  Thank
```

1   you.

2          THE COURT:  All right.  That will be at 10:00 A.M.

3      And, Mr. Navarro, you should arrange with probation to be

4   present with your client when they interview him.

5          MR. NAVARRO:  Of course, Your Honor.

6          THE COURT:  All right.  Thank you.

7      I want to thank all counsel.  I'm very fond of saying that

8   the most civil lawyers that I see are those who practice

9   criminal law, and that's probably because you see each other

10  more frequently and you're nicer to each other as a result

11  thereof.

12      And I particularly want to thank Ms. Jaimez and Mr. Azat.

13  It's such a pleasure to hear you begin either your opening

14  statements or your closing arguments with "May it please the

15  Court."  You don't hear that very much anymore, and the office

16  upstairs should know that some of us really like to hear that.

17  Thank you.

18      And thank you, Mr. Navarro.

19      All right.  For those of you who do wish to speak to any

20  of the jurors who are willing to speak to you, they will be

21  with you in about 15 to 20 minutes outside.  Thank you all.

22          THE COURTROOM DEPUTY:  Court is adjourned.

23              (Proceedings concluded at 4:34 P.M.)

24                      ---oOo---

25

1              **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6              I, CAROL JEAN ZURBORG, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  November 17, 2015

17

18

19                   /s/ CAROL JEAN ZURBORG

20            _____
                 CAROL JEAN ZURBORG, CSR NO. 7921, CCRR
21                  Federal Official Court Reporter

22

23

24

25

                    **UNITED STATES DISTRICT COURT**